# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Philadelphia Newspapers, LLC, | ) | Case No. 09-_____ (___) |
| | ) | |
| Debtor. | ) | Joint Administration Requested |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Broad Street Video, LLC, | ) | Case No. 09-_____ (___) |
| | ) | |
| Debtor. | ) | Joint Administration Requested |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Philadelphia Media, LLC, | ) | Case No. 09-_____ (___) |
| | ) | |
| Debtor. | ) | Joint Administration Requested |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| PMH Acquistion, LLC, | ) | Case No. 09-_____ (___) |
| | ) | |
| Debtor. | ) | Joint Administration Requested |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Philadelphia Direct, LLC, | ) | Case No. 09-_____ (___) |
| | ) | |
| Debtor. | ) | Joint Administration Requested |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Broad Street Publishing, LLC, | ) | Case No. 09-_____ (___) |
| | ) | |
| Debtor. | ) | Joint Administration Requested |
| | ) | |

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Philly Online, LLC, | ) | Case No. 09-_____ (___) |
| | ) | |
| Debtor. | ) | Joint Administration Requested |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| PMH Holdings, LLC, | ) | Case No. 09-_____ (___) |
| | ) | |
| Debtor. | ) | Joint Administration Requested |
| | ) | |

**MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS: (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (B) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (C) AUTHORIZING USE OF CASH COLLATERAL, (D) GRANTING ADEQUATE PROTECTION TO PREPETITION SENIOR LENDERS AND (E) SCHEDULING A FINAL HEARING**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully represent:

**Bankruptcy Rule 4001 and Local Rule 1002-4 Concise Statement**

1.      By this motion (this "Motion"), the Debtors request entry of interim and final

orders (together, the "DIP Orders") authorizing the Debtors to, among other things:  (i) obtain

postpetition financing pursuant to sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d),

and 507 of the Bankruptcy Code on an interim basis in an amount up to $10 million and, on a

final basis, in the aggregate committed amount of up to $25 million (the "DIP Facility"); (ii) use

cash collateral pursuant to section 363 of the Bankruptcy Code; and (iii) grant adequate

protection pursuant to sections 361, 362, 363, 364, and 507 of the Bankruptcy Code to Citizens

Bank of Pennsylvania ("Citizens"), as agent for the Prepetition Lenders (the "Prepetition

Agent"), and such Prepetition Lenders (defined below).  Pending a final hearing on this Motion

2

(the "Final Hearing"), the Debtors intend to seek authority to use cash collateral on an emergency basis from and after the Petition Date until the date of the interim hearing on this Motion, and then to implement the financing described herein on an interim basis pursuant to the Debtor-in-Possession Loan and Security Agreement (the "DIP Financing Agreement"), by and among Callowhill Partners, LLC (the "Proposed DIP Agent"), as administrative agent for the lenders identified on the signature pages thereto (together with the Proposed DIP Agent, the "DIP Lenders"), and the Debtors, as borrowers (the "Borrowers"). A copy of the DIP Financing Agreement is attached hereto as **Exhibit A**. A copy of the proposed interim order (the "Interim DIP Order") regarding the DIP Financing Agreement is attached hereto as **Exhibit B**.

2.    Material provisions of the DIP Financing Agreement are set forth in the following sections of the DIP Financing Agreement and/or the Interim DIP Order.

a.    *Borrower*: Philadelphia Newspapers, LLC. [DIP Financing Agreement, Parties (page 1); Interim DIP Order recital.]

b.    *Guarantors*: PMH Acquisition, LLC, Broad Street Video, LLC, Philadelphia Direct, LLC, Philly Online, LLC, PMH Holdings, LLC, Broad Street Publishing, LLC and Philadelphia Media, LLC. [DIP Financing Agreement, Parties (page 1); Interim DIP Order recital.]

c.    *Security*: First and priming liens on all assets of the Debtors, senior in priority to the liens of the Prepetition Agent and Prepetition Lenders, but junior in priority with respect to any specified assets on which valid prepetition liens other than those of the Prepetition Lenders exist. [DIP Financing Agreement §§4.5, 6.2 and 11.1; Interim DIP Order ¶'s 13, 14.]

d.    *DIP Facility commitment*: $25,000,000, subject to the Budget (hereinafter defined), and including a letter of credit subfacility of up to $10,000,000. [DIP Financing Agreement §§1.1 ("Commitment" and "Interim Commitment"), 2.1; Interim DIP Order ¶2.]

e.    *Conversion rights*: Upon the effective date of a plan of reorganization, the DIP loans shall convert into a first lien exit term loan. [DIP Financing Agreement § 2.2(a).]

3

f.   *Interest*:  Base rate plus 550 basis points or LIBOR plus 750 basis points.  [DIP Financing Agreement § 2.3(a); Interim DIP Order ¶ 11.]

g.   *Fees*:  $25,000 administrative fee, 200 basis point commitment fee.   [DIP Financing Agreement §§ 2.4(a) and (b).]

h.   *Maturity*:  Outside maturity date of 9 months from the Petition Date.  [DIP Financing Agreement §§1.1 ("Termination Date"); 2.5(b); Interim DIP Order ¶ 24.]

3.   The provisions described in Bankruptcy Rule 4001(b)(l)(B)(i)-(iv) are set forth

at the following sections the Interim DIP Order:

a.   *Name of Each Entity with Interest in Cash Collateral*.  [Interim DIP Order ¶ E.]

b.   *Purposes of Use of Cash Collateral*.  [Interim DIP Order ¶ F, 4.]

c.   *Duration of Use of Cash Collateral*.  [Interim DIP Order ¶ 24.]

d.   *Liens, Cash Payments or Other Adequate Protection to Be Provided to Each Entity with Interest in Cash Collateral*.  [Interim DIP Order ¶ 18.]

4.   In addition, the provisions described in Bankruptcy Rule 4001(c)(1)(B)(i)(xi)

are set forth at the following sections of the DIP Financing Agreement and/or the Interim

DIP Order:

a.   *Grant of Priority or a Lien on Property of the Estate*.  [DIP Financing Agreement §§ 4.5, 6.2 and 11.1; Interim DIP Order ¶ 13, 14.]

b.   *Adequate Protection for a Claim that Arose Before the Commencement of the Case*.  [Interim DIP Order ¶ 18.]

c.   *Determination of the Validity, Enforceability, Priority or Amount of a Claim that Arose Before the Commencement of the Case, Subject to the Rights of a Creditors' Committee or Other Parties in Interest*.  Not applicable.

d.   *Waiver or Modification of the Automatic Stay*.  [Interim DIP Order ¶ 26.]

e.   *Release, Waiver or Limitation on any Claim or Cause of Action Belonging to the Estate*.  Not Applicable.

f.   *Indemnification of Any Entity*.  [DIP Financing Agreement § 9.3.]

4

g.      *Release, Waiver or Limitation on Rights under Section 506(c) Under Final Order.*
[Interim DIP Order ¶ 10.]

## Jurisdiction

5.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 1334.
This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

6.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The bases for the relief requested herein are sections 105, 361, 362, 363 and 364
of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (the "Bankruptcy Code"), Rules
2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")
and Rules 1002-4, 2002-1, and 9014-3 of the Local Rules of Bankruptcy Practice and
Procedure of the United States Bankruptcy Court for the Eastern District of Pennsylvania
(the "Local Rules").

## Background

8.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary
petition for relief with the Court under chapter 11 of title 11 of the Bankruptcy Code.  The
Debtors are operating their business and managing their property as debtors in possession
pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment
of a trustee or examiner has been made in these chapter 11 cases (the "Chapter 11 Cases") and,
as of the date of the filing of this Motion, no official committees have been appointed or
designated.  Concurrently with the filing of this Motion, the Debtors have sought procedural
consolidation and joint administration of these Chapter 11 Cases.

9.      The factual background relating to the Debtors' commencement of these Chapter
11 cases is set forth in detail in the *Declaration of Richard R. Thayer, the Executive Vice*

CURRENT 13654091v1

795873_2

*President, Finance of the Debtors In Support of First Day Motions* filed on February 22, 2009

[Docket No. __] and incorporated herein by reference.

10.    These chapter 11 cases principally are balance sheet restructuring cases. The

Debtors' assets and going concern value are worth less today than they were worth in 2006, like

virtually every other asset and business in America, be it houses, retail, automotive, newspapers

or stocks. The Debtors filed these cases principally to restructure an overleveraged balance

sheet. The Debtors generate positive EBITDA. In 2008, the Debtors generated approximately

$36 million in earnings before interest, taxes, depreciation and amortization, prior to adjustment

for one time items ("Adjusted EBITDA"). The Debtors project positive Adjusted EBITDA for

2009 in excess of $25 million. The Debtors intend to use cash collateral and DIP financing to

operate their business while they explore various restructuring alternatives.

### Relief Requested

11.    The Debtors request that the Court authorize them to obtain senior secured,

superpriority postpetition financing in the aggregate not to exceed $25 million pursuant to

the terms of this Motion, the DIP Financing Agreement and the DIP Orders.

12.    The proposed financing will be provided by the Proposed DIP Agent (the

Debtors' prepetition lender) and the DIP Lenders. It will be senior to all obligations under

the Prepetition Credit Agreement (defined below). As such, the liens created under the DIP

Financing Agreement are priming liens with respect to liens currently held by the Prepetition

Senior Lenders (defined below).

13.    Pending the entry of an interim order authorizing the DIP Financing Agreement,

the Debtors' have requested, in their Motion for Authority to use Cash Collateral and related

relief filed concurrently herewith (the "Cash Collateral Motion"), that the Court authorize the

6

Debtors, on an emergency basis, (i) to use cash collateral as provided in the Cash Collateral Motion; (ii) to provide adequate protection to the Prepetition Lenders as described herein and in the Cash Collateral Motion; (iii) approve the proposed notice of the interim hearing on this Motion (the "Interim Hearing"); and (iv) schedule the Interim Hearing.

14.    Pending entry of the final order authorizing the DIP Financing Agreement (the "Final DIP Order"), the Debtors request that the Court authorize the Debtors, on an interim basis, to: (i) borrow up to $10 million pursuant to the terms of the DIP Financing Agreement; (ii) use cash collateral as provided in the Interim DIP Order; (iii) grant to the DIP Secured Parties the liens and superpriority claims described herein; (iv) provide adequate protection to the Prepetition Lenders, as described herein and in the Interim DIP Order; (v) approve the proposed notice of the Final Hearing; and (vi) schedule the Final Hearing.

### Funding of the Debtors' Operations

15.    The Debtors are parties to a Credit and Guaranty Agreement dated June 29, 2006 (as amended, the "Prepetition Credit Agreement") with Citizens Bank of Pennsylvania, as administrative and collateral agent (the "Prepetition Agent"), and certain other lender parties (collectively, the "Prepetition Senior Lenders"), pursuant to which the Prepetition Senior Lenders extended a term loan in the original principal amount of $295,000,000 (the "Prepetition Term Loan") and a senior secured revolving credit facility (the "Prepetition Revolver") in the original committed amount of $50,000,000 (where applicable, the Prepetition Term Loan and Prepetition Revolver are hereinafter collectively referred to as the "Prepetition Credit Facility").

16.    Debtor Philadelphia Newspapers, LLC ("Philly News") is the borrower under the Prepetition Credit Agreement. Debtors PMH Acquisition, LLC, Philadelphia Direct, LLC, Philly Online, LLC, PMH Holdings, Broad Street Publishing, LLC, Philadelphia Media, LLC and

7

Broad Street Video, LLC guarantied the obligations incurred by the borrowers under the terms of the Prepetition Credit Agreement.

17.     The Prepetition Agent and Prepetition Senior Lenders assert that the Prepetition Credit Facility is secured by first priority liens on and security interests in substantially all of the Debtors' real and personal property (collectively, the "Prepetition Collateral"), including, without limitation, a first priority mortgage on the Debtors' corporate headquarters at 400 North Broad Street in Philadelphia.

18.     Also as of the Petition Date, Debtor Philly News, as borrower, is party to that certain Purchase Agreement, dated as of June 29, 2006 (the "Purchase Agreement") with various holders and each purchaser party thereto (the "Prepetition Mezzanine Lenders"). The Purchase Agreement provides for the borrowers' issuance to the Prepetition Mezzanine Lenders of $85 million in principal amount of 16% senior subordinated notes dues 2014 (the "Senior Subordinated Notes"). Debtors PMH Acquisition, LLC, Philadelphia Direct, LLC, Philly Online, LLC, PMH Holdings, Broad Street Publishing, Philadelphia Media, LLC and Broad Street Video, LLC guarantied the obligations incurred by the borrowers under the terms of the Senior Subordinated Notes. The Senior Subordinated Notes are unsecured.

19.     The relative rights and priorities with respect to the Prepetition Credit Facility and the Subordinated Notes are governed by a Subordination and Intercreditor Agreement dated as of June 29, 2006 by and among the Debtors, the Prepetition Agent, and The Royal Bank of Scotland PLC on behalf of the holders of the Subordinated Notes.

20.     As of January 31, 2009, the Debtors were obligated under the Prepetition Credit Facility in the approximate aggregate amount of $296,600,000, of which approximately $290,500,000 is outstanding principal and interest on account of the Prepetition Term Loan and

8

approximately $6,100,000 is outstanding principal and interest on account of the Prepetition Revolver.

21.    As of January 31, 2009, the Debtors were obligated under the Subordinated Notes in the approximate aggregate amount of $98,463,000.

### Prepetition Negotiations

22.    The Debtors have determined that restructuring their balance sheet is in the best interests of their businesses and constituents, including union and non-union employees, advertisers, creditors, customers and the Philadelphia community that the Debtors service. For months leading up to the Petition Date, the Debtors attempted to reach agreement on a consensual out-of-court restructuring with the Senior Lenders, but despite their exhaustive, good faith efforts, were not able to do so.

23.    The Debtors have had several meetings with the Prepetition Agent and a steering group of the Prepetition Lenders (the "Steering Group"). During these meetings, the Debtors have made proposals whereby investors would have invested tens of millions of dollars of new equity in exchange for an equity interest in the restructured enterprise. These new money investment proposals were rejected.

24.    After a mid-November 2008 meeting, during which a $20 million new equity proposal was rejected, it was determined that the Prepetition Agent and Steering Group would make their own restructuring proposal that would include a $20 million new money loan. On January 29, 2009, the Prepetition Agent and Steering Group finally delivered their proposal containing a proposed commitment for debtor-in-possession financing (the "DIP Commitment"), a term sheet for the to-be-arranged debtor-in-possession financing, a term sheet for a restructured term note, and a management incentive plan ("MIP") term sheet. The proposal contemplated a

9

"pre-arranged" chapter 11 filing.  The DIP Commitment made reference to a fee letter ("Fee

Letter"), which Fee Letter was not attached (and was first delivered to the Debtors on February

5).  Notwithstanding the foregoing, the DIP Commitment required acceptance by the Debtors

less than 48 hours after its delivery.  Most significantly, the materials delivered did not contain a

commitment for exit financing and, in fact, the Prepetition Agent and Steering Group informed

the Debtors that the Lenders were not willing nor able to provide exit financing nor had they find

a third party willing to do so.  Therefore, the Prepetition Agent and the Steering Group's

proposal was not capable of closing, and could not support a feasible, pre-arranged plan of

reorganization.

25.    After these deliveries, there were further discussions between the parties.  Then,

on February 6, 2008, the Prepetition Agent delivered to the Debtors a DIP Commitment with a

seven hour deadline to sign that letter.  On February 9, 2009, the Debtors informed the

Prepetition Agent that they had located DIP financing that would convert into an exit facility.

On February 10, 2009, the Debtors delivered to the Prepetition Agent a commitment letter and

term sheet for the alternative, convertible DIP financing offered by Callowhill Partners, LLC (the

"Proposed DIP Agent").

26.    On February 11, 2008, the Prepetition Agent delivered a revised DIP financing

commitment and term sheet, again imposed a short (48 hour) cut-off time, and again did not

deliver an exit financing commitment.

27.    On February 13, 2009, the Debtors, wary of the Prepetition Agent's ability to

exercise rights and remedies with respect to the Debtors' cash and other operating assets,

executed a DIP financing commitment letter with the Prepetition Agent that incorporated the

terms of the February 11 term sheet.  Although the Debtors signed this letter, the Debtors

10

informed the Prepetition Agent prior to signing that (a) they objected to certain provisions of the letter (including a provision calling for the retention of a new, unidentified officer that would have corporate governance responsibilities equivalent to a Board of Directors) and (b) such provisions that could not be implemented.    The Debtors requested that such provisions be modified.    The letter accommodated the Debtors' right to seek alternative financing arrangements as required by the Bankruptcy Code and the Debtors' fiduciary duties.

28.    The following chart compares the DIP financing facilities offered by the Prepetition Agent and Proposed DIP Agent, respectively:

| Prepetition Agent Terms | Proposed DIP Agent Terms |
|---|---|
| $20,000,000 aggregate facility | $25,000,000 aggregate facility |
| Secured by first priority priming liens on all assets of the Debtors' estates, senior to liens under the Prepetition Credit Agreement, junior to other liens on specific assets | Same |
| Interest at Base Rate plus 800 basis points or LIBOR plus 1000 basis points | Interest at Base Rate plus 550 basis points or LIBOR plus 750 basis points |
| Fees:  (i) $100,000 annual administrative fee, (ii) $350,000 participation fee, and (iii) $450,000 delayed draw commitment fee (aggregate of $900,000) | Fees:  (i) one time $25,000 administrative fee, and (ii) upfront fee of $500,000 (aggregate of $525,000) |
| Professional fees of Prepetition Agent and Prepetition Lenders (who are not fully secured) are to be paid during the case from DIP loan advances | No payments to professionals of Prepetition Agent or Prepetition Lenders |
| Conditioned upon retention of a chief restructuring officer, acceptable rating by Moody's (at a minimum), and delivery of current appraisals on all assets | No such conditions apply |
| Filing venue must be Delaware or other | Filing venue may be wherever appropriate |

11

| Prepetition Agent Terms | Proposed DIP Agent Terms |
|---|---|
| jurisdiction acceptable to the Prepetition Agent | |
| Must be paid off at maturity, no exit financing commitment | DIP Lenders will convert the DIP Facility to an exit facility pursuant to an agreeable plan |
| Maturity: 6 months | Maturity: 9 months |

29.     The Debtors reasonably determined that the DIP Facility offered by the Proposed DIP Agent provided greater liquidity at a significantly lower cost, plus the prospect of exit liquidity that was not available from the Prepetition Agent and Lenders, under provisions otherwise similar to those offered by the Prepetition Agent and Lenders.  As with the commitment offered by the Prepetition Agent, the Proposed DIP Agent required liens on all assets superior to those of the Prepetition Agent and Prepetition Lenders.  Given that the value of the Debtors' business and assets are almost certainly far less than the amount of the outstanding debt under the Prepetition Credit Agreement, the Debtors were unable to find alternate post-petition financing not secured by such priming liens.  Based on the foregoing, in the sound exercise of their business judgment and fiduciary duties, the Debtors have determined to proceed under the DIP Facility offered by the Proposed DIP Agent.  Prior to interim or final approval of this DIP Facility, the Debtors intend to seek authority to use the Prepetition Lenders' cash collateral on an emergency basis.

### Use of Cash Collateral and Proposed Adequate Protection

30.     In order to address their working capital needs and fund their reorganization efforts, the Debtors also require the use of cash collateral of the Prepetition Senior Lenders (the "Cash Collateral").  The use of Cash Collateral will

12

provide the Debtors with the additional necessary capital with which to operate their business, pay their employees, maximize value and pursue reorganization under chapter 11. Absent the ability to use Cash Collateral in conjunction with the DIP Facility, the Debtors will not be able to pay insurance, wages, rent, utility charges, and other critical operating expenses. Consequently, without access to Cash Collateral, the Debtors will not be able to maintain their business operations and continue their restructuring efforts, and would likely be forced to cease operations and liquidate. Accordingly, the Debtors' estates would be immediately and irreparably harmed.

### **The Interests of the Prepetition Senior Lenders Are Adequately Protected.**

31.    Pursuant to sections 364(d) of the Bankruptcy Code, the Court may authorize post-petition financing or incurring of debt secured by a senior lien on property of the estate that is already subject to a lien only if the debtor-in-possession is unable to obtain credit otherwise, and there is adequate protection of the interests of such other lienholder.   *See* 11 U.S.C. § 364(d).

32.    Pursuant to sections 363(c)(2) of the Bankruptcy Code, a debtor in possession may only use "cash collateral" with either the consent of the secured party with an interest therein or court approval. *See* 11 U.S.C. § 363(c)(2). Section 363(e) of the Bankruptcy Code provides that, upon request of an entity that has an interest in cash collateral sought to be used by a debtor, the court shall prohibit or condition such use of cash collateral as is necessary to provide adequate protection of such entity's interest. *See* 11 U.S.C. § 363(e).

33.    Appropriate adequate protection is decided on a case-by-case basis. *See, e.g., In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Beker Indus. Corp.*, 58 B.R. 725 (Bankr. S.D.N.Y. 1986); *see also In re*

13

*JKJ Chevrolet, Inc.*, 190 B.R. 542, 545 (Bankr. E.D. Va. 1995) (adequate protection is a flexible concept that is determined by considering the facts of each case) (citing *In re O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. 1987).   Although adequate protection is not defined in the Bankruptcy Code, section 361 of the Bankruptcy Code provides the following three (3) nonexclusive examples of what may constitute adequate protection:

> (1)    requiring the [debtor] to make a cash payment or periodic cash payments to such entity, to the extent that the . . . use . . . under section 363 . . . results in a decrease in the value of such entity's interest in such property;
>
> (2)    providing to such entity an additional or replacement lien to the extent that such . . . use . . . results in a decrease in the value of such entity's interest in such property; or
>
> (3)    granting such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.   Essentially, with the provision of adequate protection, the Bankruptcy Code seeks to shield a secured creditor from diminution in the value of its interest in the particular collateral during the period of use (either as cash collateral or as collateral for post-petition financing). *See In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. at 736; *see also In re Nice*, 355 B.R. 554, 563 (Bankr. N.D. Va. 2006) ("adequate protection is solely a function of preserving the value of the creditor's secured claim as of the petition date due to a debtor's continued use of collateral").   The Debtors assert that the Prepetition Senior Lenders are adequately protected by the granting of replacement liens (only to the extent their prepetition security interests are perfected and enforceable), superpriority claims, and the continuation of the Debtors' business.

14

## *Replacement Liens*

34.    As adequate protection for any diminution in value of the Prepetition Senior Lenders' interests, the Debtors request that the Court grant the Prepetition Senior Lenders security interests ("Replacement Liens") equivalent to a lien granted under section 364(c)(2) and (3) of the Bankruptcy Code, as applicable, in and upon the Debtors' real and personal property and the Cash Collateral, whether such property was acquired before or after the Petition Date, to the extent:  (i) that the Prepetition Senior Lenders' prepetition security interests in the Collateral are valid and properly perfected, and (ii) of the amount of any diminution in value of the Prepetition Senior Lenders' Collateral resulting from the relief granted herein.  If granted, the Replacement Liens will adequately protect the Prepetition Senior Lenders' interests from any potential depreciation and deterioration.

## *Superpriority Claims*

35.    In addition to the Replacement Liens, the Debtors propose to grant the Prepetition Senior Lenders an allowed superpriority administrative claim (the "Prepetition Superpriority Claim"), which shall have priority (except with respect to the claims and liens granted pursuant to the DIP Facility, the Carve-Out and the Permitted Prior Liens) under sections 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code, and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726(b), 1113, 1114 and, if approved in the Final Order, section 506(c) of the Bankruptcy Code.

15

36.     The foregoing claims are to be granted to the Prepetition Senior Lenders because, among other things, the Prepetition Credit Facility will be primed and the Debtors will continue to use the Cash Collateral and other collateral under the Prepetition Credit Agreement in the Debtors' ongoing operations.

*Continued Operation of the Debtors' Business*

37.     In addition to the proposed Replacement Liens and the Prepetition Superpriority Claim, the Prepetition Senior Lenders are also adequately protected as a result of the continuation of the Debtors' business operations.  Without the proposed DIP Facility and use of the Cash Collateral, the Debtors would forego business opportunities and their operations would be irreparably harmed.  Indeed, absent the proposed DIP Facility and use of the Cash Collateral, the Debtors likely will be unable to pay their ordinary business expenses, including employee wages.  In that event, all operations will cease -- employees will be terminated, the Philadelphia Inquirer no longer will be published, and all assets on which the Prepetition Senior Lenders assert a lien will be liquidated.  Those pledged assets (including advertising and subscription accounts receivable, newsprint and ink inventory, machinery, equipment and vehicles, and the Philadelphia Inquirer building) are worth less in a liquidation than they are worth as a going concern. Since the Debtors have generated positive EBITDA in the past and project positive EBITDA for the future, the proposed DIP Facility and use of Cash Collateral to operate the business and maintain going concern value provides adequate protection to the Prepetition Senior Lenders. As going concern value exceeds liquidation value, adequate protection is being provided.

38.     The continuation of the Debtors' operations likely presents the best opportunity for the Prepetition Senior Lenders to receive the greatest recovery on account of their claims.

16

Accordingly, the Debtors submit that the proposed DIP Facility and use of the Cash Collateral will allow the Debtors to continue their operations and, thereby, protect the Prepetition Senior Lenders' interests. Courts have recognized that the preservation of the going concern value of secured lender's collateral constitutes adequate protection of such creditor's interest in the collateral. *See, e.g., In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 716 (Bankr. D. Del. 1996) (holding that if there is no actual diminution of value of collateral and the debtor can operate profitably post-petition, then the secured creditor is adequately protected); *In re 499 W. Warren Street Assocs., Ltd. P'ship*, 142 B.R. 53, 56 (Bankr. N.D.N.Y. 1992) (where the court found a secured creditor's interest in collateral adequately protected when cash collateral was applied to normal operating and maintenance expenditures on the collateral property); *In re Willowood E. Apartments of Indianapolis II, Ltd.*, 114 B.R. 138, 143 (Bankr. S.D. Ohio 1990) (same); *In re Stein*, 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982) (creditor's secured position would be enhanced by the continued operation of the debtor's business); *In re Aqua Assocs.*, 124 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("The important question, in determining whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized.") (citation omitted).

39.     In summary, the Debtors submit that Prepetition Senior Lenders are adequately protected by the proposed Replacement Liens in the Collateral, by the Prepetition Superpriority Claim, and by maintaining the business of the Debtors as a going concern and thereby preventing any diminution in the value of the Prepetition Collateral.

### The DIP Facility Should Be Authorized

40.     Approval of the DIP Facility, in conjunction with the use of Cash Collateral, will provide the Debtors with immediate and ongoing access to borrowing availability to pay their

17

current and ongoing operating expenses, including postpetition wages and salaries and utility and vendor costs. Unless these expenses are paid, the Debtors will be forced to cease operations, which would likely: (i) result in irreparable harm to their business; (ii) deplete going concern value; and (iii) jeopardize the Debtors' ability to reorganize and maximize value. The credit provided under the DIP Financing Agreement and the use of Cash Collateral will enable the Debtors to continue to satisfy their vendors, service their customers, pay their employees and operate their business in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of their estates for the benefit of all stakeholders. The availability of credit under the DIP Financing Agreement will provide confidence to the Debtors' creditors that will enable and encourage them to continue their relationships with the Debtors. Finally, the implementation of the DIP Financing Agreement will be viewed favorably by the Debtors' vendors, employees and customers, thereby promoting a successful reorganization. Accordingly, the timely approval of the relief requested herein is imperative.

41.    Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt: (a) with priority over any and all administrative expenses, as specified in section 503(b) or 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364. The Debtors propose to obtain the financing set forth in the DIP Financing Agreement by providing, *inter alia,* superpriority claims, security interests and liens pursuant to section 364(c)(1), (2), (3) and section 364(d) of the Bankruptcy Code.

18

42.    The Debtors' liquidity needs can be satisfied only if the Debtors are authorized to borrow under the DIP Facility and to use such proceeds to fund their operations.  The Debtors have been unable to procure sufficient financing in the form of unsecured credit allowable under section 503(b)(1), as an administrative expense under section 364(a) or (b) or in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1).

43.    The Debtors have not been able to obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.  The post-petition financing facility offered by the Prepetition Senior Lenders was more costly and provides less borrowing availability than the proposed DIP Facility.  It also provided no exit facility, and therefore no means of confirming a feasible plan.  It was, however, to be secured by section 364(d) priming liens, just like the proposed DIP Facility.  Since the Prepetition Senior Agent was prepared to have the liens of the Prepetition Senior Lenders primed by a credit facility (to be provided by only three of the more than fifty Prepetition Senior Lenders) that was significantly more burdensome to the estate than the proposed DIP Facility, the Prepetition Senior Agent has essentially admitted that the interests of the Prepetition Senior Lenders are adequately protected in the context of the proposed DIP Facility and use of Cash Collateral.[1]

44.    Bankruptcy courts grant a debtor considerable deference in acting in accordance with its business judgment.  *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't*

---

[1]    Neither the Prepetition Senior Agent's DIP commitment nor the Proposed DIP Agent's commitment contained any provisions regarding adequate protection payments to the Prepetition Senior Lenders.

19

*Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *see also In re Funding Sys. Asset Mgmt. Corp.*, 72 B.R. 87 (Bankr. W.D. Pa. 1987); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); *In re Simasko Prod. Co.*, 47 B.R. 444,449 (D. Colo. 1985).

45.    Furthermore, section 364(d) does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien. *Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most lend money only in return for a senior secured position"); *In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (debtor adequately established that some degree of priming of loan was necessary if debtor were to obtain funding).

46.    Substantially all of the Debtors' assets are encumbered and the Debtors have been unable to procure the required funding absent granting the proposed superpriority claims and liens. The Debtors submit that the circumstances of this case require the Debtors to obtain financing pursuant to section 364(c) and section 364(d) of the Bankruptcy Code and,

CURRENT 13654091v1

795873_2

accordingly, the DIP Financing Agreement reflects the exercise of their sound business judgment.

47.     The terms and conditions of the DIP Financing Agreement are fair and reasonable and were negotiated extensively by well-represented parties in good faith and at arms' length. Accordingly, the DIP Lenders and all obligations incurred under the DIP Financing Agreement should be accorded the benefits of section 364(e) of the Bankruptcy Code.

### The Use of Cash Collateral Should Be Approved

48.     Under section 363(c)(2) of the Bankruptcy Code, a debtor in possession may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use ... in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).  The Debtors require the use of Cash Collateral to fund their day-to-day operations.  Indeed, absent such relief, the Debtors' business will be brought to an immediate halt, with damaging consequences for the Debtors and their estates and creditors. The interests of the Prepetition Senior Lenders in the Cash Collateral will be protected by the adequate protection set forth above.  Accordingly, the Debtors' request to use Cash Collateral in the operation of their business and administration of these Chapter 11 Cases should be approved.

### The Proposed Adequate Protection Should Be Authorized

49.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used ... or proposed to be used ... by [a debtor in possession], the court, with or without a hearing, shall prohibit or condition such use ... as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Section 364(d) of the Bankruptcy Code provides that "the court ... may authorize the obtaining of creditor the incurring of debt secured by a senior or equal lien on property of

the estate that is subject to a lien only if … there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d).

50.    Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief. 11 U.S.C. § 361.  What constitutes adequate protection must be decided on a case-by-case basis.  *See In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985); *In re Shaw Indus., Inc.*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003).  The focus of the requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use.  *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citation omitted).

51.    The Debtors submit that the adequate protection proposed herein to protect the Prepetition Senior Lenders' interest in the prepetition collateral is fair and reasonable and sufficient to satisfy the requirements of sections 363(c)(2) and (e) and 364(d) of the Bankruptcy Code.

### The Automatic Stay Should Be Modified on a Limited Basis

52.    The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors to:  (i) grant the security interests, liens and superpriority claims described above with respect to the DIP Secured Parties and the Prepetition Senior Lenders, as the case may be, and to perform such acts as may be

CURRENT 13654091v1

795873_2

requested to assure the perfection and priority of such security interests and liens; and (ii) implement the terms of the proposed DIP Orders.

53.    Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.

### Interim Approval Should Be Granted

54.    Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fifteen (15) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

55.    Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtors request that the Court conduct an expedited preliminary hearing on this Motion and (a) authorize the Debtors to use Cash Collateral and borrow under the DIP Facility on an interim basis, pending entry of a final order, in order to (i) maintain and finance the ongoing operations of the Debtors and (ii) avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest, and (b) schedule a hearing to consider entry of a final order.

56.    The Debtors have an urgent and immediate need for cash to continue to operate. Currently, the Debtors do not have sufficient funds with which to operate their business on an ongoing basis.  Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending a final hearing on the Motion, the Debtors will be immediately and irreparably harmed. The availability of interim loans under the DIP Facility will provide

23

necessary assurance to the Debtors' vendors, employees and customers of their ability to meet their near-term obligations. Failure to meet these obligations and to provide these assurances likely would have a long-term negative impact on the value of the Debtors' business, to the detriment of all parties in interest. Furthermore, the lack of an interim facility would result in accelerated cash demands on the Debtors. Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtors and facilitating their reorganization efforts.

57.     To successfully implement the foregoing, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay under Bankruptcy Rule 6004(h).

### Notice

58.     The Debtors have provided notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the Prepetition Agent; (d) counsel to the Prepetition Lenders; (e) counsel to the holders of the Subordinated Notes; (f) the Internal Revenue Service; and (g) the banks that process disbursements in the Debtors' cash management system. In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

24

CURRENT 13654091v1

795873_2

WHEREFORE, for the reasons set forth herein and in the Declaration of Richard Thayer filed concurrently herewith, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as **Exhibit A**; and grant such other and further relief as is just and proper.

Dated:  February 23, 2009
       Wilmington, Delaware

                             /s/

**DILWORTH PAXSON LLP**
Lawrence G. McMichael
Anne M. Aaronson
1500 Market St., Suite 3500E
Philadelphia, PA 19102
Telephone:  (215) 575-7000
Facsimile:  (215) 575-7200
*Proposed Section 327(e) and Local Counsel
for the Debtors and Debtors in Possession*


**PROSKAUER ROSE LLP**
Mark K. Thomas (*pro hac vice* pending)
Paul V. Possinger (*pro hac vice* pending)
Three First National Plaza
70 West Madison, Suite 3800
Chicago, Illinois  60602-4342
Telephone:  (312) 962-3550
Facsimile:  (312) 962-3551

-and-

**PROSKAUER ROSE LLP**
Richard Corbi (*pro hac vice* pending)
1585 Broadway
New York, New York  10036
Telephone:  (212) 969-3000
Facsimile:  (212) 969-2900
*Proposed Section 327(a) Counsel for the
Debtors and Debtors in Possession*

CURRENT 13654091v1

795873_2