**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

In re:                                       :    **Chapter 11**

PHILADELPHIA NEWSPAPERS, LLC,                :
 ET AL.,

                                             :    **Case No. 09-11204 (JKF)**
                        Debtors.                  **Jointly Administered**
_____ :

# MEMORANDUM OPINION
## SUPPORTING APRIL 20, 2009 RULING,
## WHICH DENIED DEBTORS' APPLICATION TO EMPLOY
## ELLIOTT GREENLEAF & SIEDZIKOWSKI, P.C
## WITHOUT PREJUDICE

BY:   JEAN K. FITZSIMON
      United States Bankruptcy Judge

The Debtors seek to employ Elliott Greenleaf & Siedzikowski, P.C. ("Elliott

Greenleaf" or the "Firm") as special counsel to investigate certain pre-petition

activity and potential causes of action therefrom.  Objections were filed to the

Application to Employ (the "Application") by the Official Committee of Unsecured

Creditors (the "Committee") and jointly by the Steering Group of Prepetition

Secured Lenders[1] and Citizens Bank of Pennsylvania, as Agent for the

Prepetition Secured Lenders (collectively, the "Secured Lenders").  A hearing was

held on this matter on April 20, 2009 (the "April Hearing").  At the conclusion of

---

[1] The Steering Group members are: Angelo Gordon & Co., L.P.; CIT Syndicated Loan Group; Eaton Vance Management; GECC; McDonnell Investment management; and Wells Fargo.  See Joint Objection of the Steering Group of Prepetition Secured Lenders and Citizens Bank of Pennsylvania, as agent for the Prepetition Secured Lenders, to Application (Docket entry no. 378) at 2 n.1.

the April Hearing, the Court, for reasons stated on the record, denied the Application without prejudice. The Debtors appealed that ruling on April 30, 2009. This Memorandum Opinion and Order memorializes the April 20th ruling and further expounds on the Court's rationale for denying the Debtors' Application without prejudice.[2] The discussion below represents the Court's findings of fact and conclusions of law.[3]

# I. BACKGROUND

*The Bankruptcy and Application to Employ*

The Debtors, who own and operate various print and on-line sources of media, including the Philadelphia Inquirer and the Philadelphia Daily News, filed for Chapter 11 bankruptcy protection on February 22, 2009 ("Petition Date").[4]  On March 2, 2009, the Committee was appointed by the United States Trustee. Docket entry no. 88.[5]  On March 16, 2009, the Court approved the Debtors' applications to employ Dilworth Paxson LLP and Proskauer Rose LLP as co-counsel for the Debtors. See Docket entries nos. 204 and 206.

---

[2] Local Rule 8001-1 (b) provides: *Opinion in Support of Order*. The bankruptcy judge whose order is the subject of an appeal may, within 15 days of the filing of the notice of appeal, file a written opinion in support of the order or a written supplemental opinion that amplifies any earlier written opinion or recorded oral bench ruling or opinion.  L.B.R. 8001-1(b)(2005).

[3] While it is, of course, a matter for the district court to determine, the Court notes that determination of a request to appoint special counsel generally is not considered a final, appealable order. See e.g. In re Devlieg, Inc., 56 F.3d 32 (7th Cir. 1995); In re Westwood Shake & Shingle, Inc., 971 F.2d 387 (9th Cir. 1992); In re Nucor, Inc., 118 B.R. 786,788 (D. Col. 1990) (collecting cases).

[4] Eight cases are being jointly administered under case number 09-11204.

[5] Eckert Seamans Cherin & Mellott, LLC and O'Melveny & Myers LLP are co-counsel for the Committee.  Docket entries nos. 328 and 329.

Debtor Philadelphia Newspapers, LLC, is the borrower under the Prepetition
Credit Agreement with the Prepetition Agent and the Prepetition Senior Lenders.  See
Docket entry no. 353 at 2.  Approximately $295 million is owed under the Prepetition
Credit Agreement.  Id.  Debtors Philadelphia Direct, LLC; Philly Online, LLC; PMH
Holdings; Broad Street Publishing, LLC; Philadelphia Media, LLC; and Broad Street
Video, LLC, guaranteed the obligations under the Prepetition Credit Agreement.  Id.

On April 8, 2009, the Debtors filed the Application[6] seeking "an order pursuant to
section 327(e) of the Bankruptcy Code authorizing [the Debtors] to employ and retain
Elliott Greenleaf as their special counsel as of the Petition Date to perform specific non-
bankruptcy related legal services that they will require during the course of the Chapter
11 cases."[7]  Application (Docket entry no. 323) at ¶ 6.  The Application proposes that
the Firm render the following specific, limited services:

> 1. Investigation of certain incident(s) involving the
> unauthorized recording of confidential pre-petition
> meeting(s) between the Debtors and their senior secured
> lenders;
>
> 2. Advice regarding potential causes of action to be pursued
> in connection with such unauthorized recording; and
>
> 3. Pursuit of any non-bankruptcy litigation or other legal
> action in connection with such unauthorized recording(s) and
> in connection with the possible improper use and disclosure
> of such unauthorized recording(s) to others.

---

[6] The Debtors previously filed an Application to Employ the Firm on February 27, 2007 (see
docket entry no. 86), but withdrew that Application on March 5, 2009.  See docket entry no. 108.

[7] The Court notes that the Application requests *nunc pro tunc* approval to the Petition Date, but
fails to demonstrate any cause therefor.  As the Application was denied, this issue was not addressed in
the April Ruling.  No evidence to support such a request was presented at the April Hearing.

Id. ¶ 9.  Exhibit A to the Application is a Declaration by Mark J. Schwemler, a shareholder at Elliott Greenleaf, attesting to, among other things, the proposition that the Firm has no interest adverse to the Debtors.  Docket entry no. 323-1.

***Responses to the Application***

Three responses were filed to the Application.  The Committee objects to the Application, suggesting that "granting the Application is likely to further inflame passions and incur substantial costs," and therefore that a "dispassionate third party" such as the Committee is in the best position to perform the investigation. Committee Brief, Docket entry no. 374 at 2.  The Committee argues that the statute of limitations is not about to run on the potential action of the Debtors and that pursuing the matter at this time will detract the Debtors attention from the central purpose of their Chapter 11 case.  Id. at 5.  Further, the Committee asserts that because it is already investigating the validity of the Secured Lenders' liens pursuant to the current cash collateral stipulation, and because investigating the alleged unauthorized recordings falls squarely within the Committee's duties pursuant to section 1103(c) of the Code, money should not be wasted on employing an additional law firm.  The United States Trustee also responded to the Application, stating that while she has no comment on the need for an investigation, she would request some additional information and a budget if the Elliott Greenleaf firm were to be retained.  Docket entry no. 376.

Lastly, the Secured Lenders submitted a joint objection to the Application. This objection argues that the Debtors have failed to satisfy the legal standard set forth by § 327(e), which requires that the Debtors make a showing that employment of special counsel is in the best interests of the estate.  The Secured Lenders further argue: (1) that the investigation is a "fishing expedition" by the Debtors; and (2) that the potential damages will not exceed $10,000 under the Pennsylvania statute and applicable caselaw.  Docket entry no. 378 at 10, 15-17.

### The Debtors' Reply

On April 17, 2009, the Debtors submitted an Omnibus Reply Brief in support of their Application.  The Reply Brief argues, among other things, that negotiations between the Debtors and the Secured Lenders broke down after the recording incident that is the proposed subject of the Firm's investigation.  Docket entry no. 383 at 4.  The Reply further asserts that the retention of Elliott Greenleaf is for a special purpose and that the Debtors "seek . . . to obtain and discover further facts which may have a significant impact on the outcome of these bankruptcy cases, whether resulting in monetary recovery or equitable subordination."  Docket entry no. 383 at 8-9.

In support of the Application, the Debtors submit (attached to the Reply Brief) a proposed draft complaint  (the "Draft Complaint") against CIT Syndicated Loan Group, Vincent DeVito and "John Does" ("other members of the Steering Group").  Docket entry no. 383-1 at 4.  The Draft Complaint contains the following

5

causes of action: (1) Count I: (v. Defendants CIT and DeVito) violation of

Pennsylvania's Wiretapping and Electronic Surveillance Control Act (18 Pa.C.S.

§§ 5701 *et seq.*) (seeking statutory, actual, and punitive damages in an

unspecified amount); (2) Count II: (v. Defendants CIT and DeVito) Violation of the

Federal Electronic Communications Privacy Act (18 U.S.C.  §§ 2510, *et seq.*)

(seeking statutory, actual, and punitive damages in an unspecified amount);

(3) Count III: (v. all Defendants) Tortious Interference with Prospective

Contractual Relations (seeking "all damages, including for Plaintiffs' inability to

restructure their debt in a more orderly, efficient and cost-effective manner" and

punitive damages); (4) Count IV: (does not specify which Defendants) Conspiracy

(seeking "damages caused" in an unspecified amount, plus punitive damages);

and (5) Count V: (does not specify which Defendants) Request for Equitable

Relief (seeks subordination of all of Defendants' claims).  Docket entry no. 383-1.

### *The April 20th Hearing*

At the April Hearing, Brian Tierney, the Chief Executive Officer of

Philadelphia Newspapers, LLC, testified in support of the Debtors' Application.

Mr. Tierney first described his own background, the acquisition of the

Philadelphia Newspapers, and the financial troubles of the company.  <u>See</u>

Transcript of the April 20, 2009 Hearing (Docket entry no. 419) (hereinafter "Tr.")

at 6-15.  Mr. Tierney then discussed briefly the fact that in 2008 the Debtors, due

mostly to a precipitous decline in advertizing revenue, defaulted on their bank

debt.  Tr. at 15-16.  As a consequence of the default, the Debtors and the lenders

had a series of discussions last fall (in late 2008) regarding the possibility of the

lenders "putt[ing] in the liquidity that the business needs." Tr. at 17.   According to

Mr. Tierney, these meetings were confidential in nature.  Tr. at 19.

At one such meeting, on November 17, 2008 between the Debtors and

their counsel and the senior lenders and their counsel,[8] the following incident (the

"Taping Incident," as described by Mr. Tierney) took place.  Approximately two

hours and 15 minutes into the meeting, upon getting up and returning to the

meeting table, Mr. Tierney noticed that Mr. DeVito, a representative of CIT

Financial (one of the lenders from the Steering Group of senior lenders), had

what appeared to be a digital recording device with a red light on at the edge of

his open computer.  Tr. at 20.  Mr. Tierney told Mr. DeVito that what he was doing

is illegal in Pennsylvania.  Tr. at 21.  Mr. Kassner (counsel for Citizens Bank),

who was sitting next to Mr. DeVito, told Mr. DeVito to turn the device off.  Id.

Mr. DeVito did so.  Id.

Shortly following this incident, Mr. David Neier, then one of Mr. Tierney's

lawyers, expressed concerns regarding the incident to Mr. Fred Hodara (counsel

---

[8] Mr. Tierney testified that those in attendance at the November 17, 2008 meeting included
Mr. Huffard from the Blackstone Group, Bruce Shearer from Citizens Bank, Mr. Kassner (who represents
Citizens Bank), "Angelo, Gordon represented by Bradley, Patelli, CIT represented by Vincent DeVito . . . a
fellow from . . . Eaton Vance, a fellow . . . from McDonnell . . . I believe Wells Fargo Foothill was by
phone . . . our representative from Jeffries," and himself, Richard Thayer, Scott Baker, and Mark Thomas
on behalf of the Debtors.  Tr. at 18-19.

for the Steering Group of lenders).  Tr. at 22-23; Exhibit D-1.[9]   As a result of their

conversation, an (undated) letter was soon emailed to Mr. Tierney from the Chief

Counsel of CIT.  See Exhibit D-2.  This letter from the CIT Group states that the

tape made on November 17, 2008, by Mr. DeVito "has been erased without

having made any copies or other duplications thereof."  Id.  The letter further

"confirms that the CIT . . . Group has not made any other recordings of meetings,

calls or other communications . . . [and] will not record any other meetings calls or

other communications of any kind. . . ."  Id.

Also submitted as relevant to the question of whether Mr. DeVito ever

taped meetings before or will ever tape them again is a deposition of Bruce

Shearer[10] of Citizens Bank that was taken in connection to the Debtor-in-

Possession ("DIP") financing issue which the Senior Lenders and Debtors are

negotiating.[11]   The relevance and meaning of Mr. Shearer's testimony was

debated at the April Hearing.  In relevant portions, Mr. Shearer said the following

regarding Mr. DeVito's statements and actions at the November 17 meeting and

whether Mr. DeVito regularly records meetings:

Q: Tell me what happened after Mr. Tierney pointed out
there was a tape recorder on the Table.

---

[9] Exhibits D1-D3 were admitted into evidence without objection at the conclusion of the hearing.

[10] Mr. Shearer's deposition was admitted into evidence as Exhibit D-3.

[11] The next hearing on the DIP loan is scheduled for June 25, 2009.

A: It was turned off.

\* \* \*

Q: What did DeVito say?

A: He said he usually taped -- or he liked to participate in the discussion in meetings as opposed to writing notes, so he could refer back to the tape, and he apologized and turned the tape recorder off.

Q: Did you say he usually taped meetings?

A: He made it appear that it was a practice of his.

Q: Did he say whether he taped any other meetings with the debtor?

A: No, sir.

\* \* \*

Q: In other meetings that you've attended, have you observed Mr. DeVito recording the meetings?

A: No, sir.

Q: Have you ever listened to a tape that Mr. DeVito made of one of the meetings or a recording?

A: No, sir.

\* \* \*

Q: Have you ever heard Mr. DeVito discuss with the bank things that he has had recorded in the past?

A: No, sir.

Q: Did you know before the meeting that Mr. DeVito was going to record the meeting?

A: No, sir.

Q: After the meeting was there any discussion among the
banks about the consequences of recording the meeting?

A: No, sir.

\* \* \*

Q: It just happened, and then you just moved on and
forgot about it?

\* \* \*

A: Correct.

Exhibit D-3, pgs. 17-20.  The Debtors rely on the above to establish that further

investigation regarding other recording incidents is called for.  The Secured

Lenders argue that Mr. Shearer's interpretation of Mr. DeVito's conversation with

him indicates only that he thought this was a practice of Mr. DeVito's and not that

Mr. DeVito said that it was.  More importantly, Mr. Shearer's statement reflects

his memory of Mr. DeVito's statements at the November 17 meeting, yet

Mr. Tierney did not testify that Mr. DeVito said anything; he testified only that

Mr. DeVito turned the recorder off.  Tr. at 21.

Mr. Tierney also testified regarding what he considers to be Elliott

Greenleaf's particular advantages, including its expertise in this area of the law

and reasonable billing rates.  Tr. at 39-40.  However, when the Committee's

counsel cross-examined Mr. Tierney and asked whether he knew of "any reason

the Committee or its professionals would be unable or incompetent to conduct"

the investigation into the taping incident, Mr. Tierney answered "I don't."  Tr. at

57.  Mr. Tierney went on to explain that while he is sure that Eckert Seamans –

one of the law firms representing the Committee - is competent ("a wonderful

firm"), that he fears "the issue of conflict, potential conflict" with regard to the

Committee's counsel and otherwise prefers to go with Elliott Greenleaf, as he

knows and trusts that firm.  Tr. 57-60.

## II. STANDARD ON APPOINTMENT OF SPECIAL COUNSEL PURSUANT TO 11 U.S.C § 327(e)

Section 327 of the Code outlines a debtor's rights with regard to

employment of professionals.  Under section 327(a), a debtor may retain general

counsel who is "disinterested."  Section 327(e) of the Code – under which the

Debtors here seek to employ Elliott Greenleaf – creates a limited exception to the

"disinterested" test under § 327(a).  Pursuant to § 327(e):

> [a debtor] with the court's approval, may employ, for a
> specified special purpose, other than to represent the
> trustee in conducting the case, an attorney that has
> represented the debtor, if in the best interest of the
> estate, and if such attorney does not represent or hold
> any interest adverse to the debtor or to the estate with
> respect to the matter on which such attorney is to be
> employed.

11 U.S.C.§ 327(e).  This section "will most likely be used when the debtor is

involved in complex litigation, and changing attorneys in the middle of the case

after the bankruptcy case has commenced would be detrimental to the progress

11

of that other litigation."  3 <u>Collier on Bankruptcy</u> (15 Ed. Rev. 2006) ¶ 327.04[9][d];

<u>see</u> <u>also</u> <u>In re J.S. II, L.L.C.</u>, 371 B.R. 311,318 (Bankr. N.D. Ill. 2007).  In

examining whether to appoint special counsel, a court "may look at the totality of

the circumstances, including the role of counsel prior to the filing and the actual

services performed . . ."  <u>Id.</u>; <u>see</u> <u>also</u> <u>In re Engel</u>, 124 F.3d 567, 575 (3rd Cir.

1997) (determination of special counsel application is "well within the discretion of

the court").

Under section 327(e), an attorney or law firm is properly employed as

special counsel once it is demonstrated that each of the following criteria is met:

(1) employment may only be authorized for a "specified, special purpose" other

than "conducting the case."  The special purpose must be unrelated to the

debtor's reorganization and must be "explicitly defined or described in the

application seeking approval of the attorney's employment;" (2) the firm holds no

adverse interest to the debtor; and (3) the employment of the firm is in the best

interest of the estate.  <u>In re Running Horse, L.L.C.</u>, 371 B.R. 446, 451 (Bankr.

E.D. Ca. 2007); <u>see</u> <u>also</u> <u>In re Duque</u>, 48 B.R. 965, 971 (D.C. Fla. 1984)

(outlining a similar four-part test that includes the factor that an attorney or firm

must have previously represented the debtor).  It is the debtor's burden to show

that the proposed employment of special counsel is proper.  <u>In re Running Horse,</u>

<u>L.L.C.</u>, 371 B.R. 446, 451 (Bankr. E.D. Ca. 2007) (<u>citing</u> <u>In re Big Mac Marine,</u>

12

Inc., 326 B.R. 150, 154 (8th Cir. BAP)).  While the Application fails to satisfy the

first element, the Debtors sufficiently clarified the purpose at the April Hearing.

They also established that the Firm does not hold an adverse interest to the

Debtors.

    With regard to element three above – what exactly constitutes the "best

interest of the estate," the Third Circuit has stated: "[t]he attorney's employment

must be in the best interest of the estate, which means property of estate is

threatened and the need for services is real.  Employment cannot be based on

some 'hypothetical or speculative benefit.'"  In re Engel, 124 F.3d 567, 575 (3rd

Cir. 1997) (citing In re Duque, 48 B.R. 965 (D.C. Fla. 1984)) (additional citations

omitted).  See also In re J.S. II, L.L.C., 371 B.R. 311, 320 (Bankr. N.D. Ill. 2007).

It should be noted that Engel is not directly a case concerning the appointment of

special counsel.  Rather, the issue on appeal in Engel was whether appointment

of special counsel under § 327 of the Code necessarily means that the counsel

has a right to be paid from estate funds under § 330.  The Third Circuit held that it

does not.  124 F.3d at 571.  However, in analyzing this question, the Court had

the opportunity to discuss whether special counsel had benefitted the estate by

performing services to the debtor.  124 F.3d 575.  While it is true that an analysis

after the appointment of special counsel (and when considering whether to award

13

fees), as in <u>Engel</u>, is not precisely the same question as the analysis prior to the

appointment of counsel (the question posed here), there is no indication that the

*definition* of "best interest of the estate" put forth by the Third Circuit in the <u>Engel</u>

decision should not apply in both circumstances.[12]

The Debtors cite the case of <u>In re Covenant Financial Group of America,</u>

<u>Inc.</u>, 243 B.R. 450 (Bankr. N.D. Ala. 1999), in alleged distinction to <u>Engel</u>.  The

Debtors assert that <u>Covenant Financial</u> is an example of a case in which a court

"permitted retention of special counsel even when the ultimate financial recovery

or benefit to the estate was unknown, but the prospect of such a benefit

warranted approving retention."  Debtors' Brief, docket no. 383, at 11.  In

<u>Covenant Financial</u>, a legal malpractice lawyer was permitted to be retained as

special counsel where there was "no reasonable expectation that the trustee

[would] be able to find another attorney to prosecute the lawsuit, and certainly

. . . not . . . one willing to work on a contingency fee basis."  <u>Id</u>. at 454.  And while

it may be true, as the Debtors point out, that the ultimate financial benefit to the

estate of the lawsuit was unknown, the <u>Covenant</u> court points out, in analyzing

the best interest of the estate, that "the lawsuit . . . is the only asset of the

---

[12] The  Debtors' attempt to distinguish <u>Engel</u> as a case simply addressing the question of whether "bankruptcy estate moneys may be used to pay for criminal counsel for the debtor" is unavailing.  Debtors' Brief at 11.  While <u>Engel</u> does primarily deal with the question of whether a criminal special counsel was entitled to payment from the bankruptcy estate, the Debtors present no reason to distinguish the law set forth and relied on in <u>Engel</u> merely because the facts are distinguishable from the case at bar.

bankruptcy estate from which a dividend to unsecured creditors may be realized."

Id. at 457 n.9.  Therefore, in Covenant Financial a determination was made that

the need for special counsel was not hypothetical or speculative.  Rather, under

the circumstances, appointment of special counsel was in the best interest of the

estate.

## III. APPLICATION OF THE STANDARD
## TO THE FACTS OF THIS CASE

The Debtors have not met their burden of showing that retaining the

services of the Firm currently is in the best interest of the estate.  11 U.S.C.

§ 327(e).  The Third Circuit tells us that "best interest of the estate" means that

there is a true, current need for the counsel and a benefit to be derived from the

retention at the time sought.  The Debtors simply have not demonstrated that this

is the case here.  While the Court certainly is troubled by the fact that one of the

members of the Steering Group apparently recorded a meeting with the Debtors

without permission (and, as discussed below, agrees with the Debtors that the

incident warrants further investigation in connection with the claim asserted by

that party in this case), it must be remembered that, for all the paper filed and in-

court testimony taken, all that has been produced is evidence that the single

Taping Incident occurred.[13]  This does not rise to a showing that there is a current

---

[13] The Court has carefully reviewed the Shearer Deposition, on which the Debtors heavily rely to

(continued...)

15

need for counsel to investigate non-bankruptcy claims arising from this incident or

even suggest any likely benefit from their pursuit in light of CIT's unequivocal

denial of any other recordings.

Though the Taping Incident merits investigation from the standpoint of a

potential impact on the bankruptcy claim of CIT, so far the Debtors' mere

assertion of potential general and broad non-bankruptcy claims (such as the

tortious interference with contract count named in the Draft Complaint) do not

establish even a potential benefit to the estate in pursuing those causes of action

at this time.  The Debtors specifically propose to employ Elliott Greenleaf to

handle the "[p]ursuit of . . . non-bankruptcy litigation" in connection with the

Taping Incident.  Application at 4.  In other words, investigation of the Taping

Incident for purposes of pursuing non-bankruptcy claims does not now warrant

full-time, separate special counsel.  The Debtors have not proven that a

significant and meaningful threat exists to the estate from the Taping Incident or

that it is in the best interest of the estate to deploy time, money, and attention in

this way.  There is no evidence presented that these claims are time-sensitive.  In

the absence of consent from the Secured Lenders or an order from the court

---

[13](...continued)

argue that Mr. DeVito has a practice of recording meetings.  However, the deposition, is clear  that
Mr. Shearer has no knowledge of Mr. DeVito recording other meetings with the Debtors, of possessing
any additional recordings, or of using the recording made.  Also, as noted above, Mr. Tierney did not
testify that Mr. DeVito said "he usually taped" meetings at the November 17 meeting or, indeed, that
Mr. DeVito said anything after he inquired about the recorder.  Exhibit D-3.

authorizing such use of the Secured Lenders' cash collateral or some other source of funds, moreover, the Debtors have no resources to fund such an investigation; the Committee, on the other hand, is authorized to use the Secured Lenders' Cash Collateral to conduct its duties.

An additional reason that the Court believes the Committee's handling the investigation at this time is more appropriate is so the Secured Lenders and the Debtors can focus on the more important business of the DIP financing and use of cash collateral.  Currently, those issues, much more central to the success of this Chapter 11 bankruptcy case than the retention of special counsel, are unresolved.  The Debtors and Secured Lenders must focus on moving this case forward and providing liquidity to these cash-strapped Debtors.  This is in the best interest of the estate.  Indeed, in the absence of financing, there will be no Debtors to pursue these claims.

At this point, the Court finds that the Debtors have not met their burden with respect to § 327(e).  Therefore, the Application is denied.  However, because the Court is not convinced that an investigation into the Taping Incident by special counsel will never be called for, the Application is denied without prejudice.  If, at a later point, and probably based on facts established by the Committee, as it has agreed to share the results of its investigation with the Debtors, the Debtors are

able to make a showing sufficient to satisfy the requirements in the Third Circuit

for retaining special counsel, the Debtors may present the Application again.

## IV. AUTHORITY OF THE COMMITTEE
## OF UNSECURED CREDITORS TO INVESTIGATE

It is possible (though the Court makes no prejudgment) that the Taping

Incident could lead to bankruptcy causes of action against CIT.  Because of this

possibility, at the April Hearing the Court asked the Committee to investigate the

Taping Incident.  Tr. at 96.  Pursuant to 11 U.S.C. § 1103(c)(2), included in the

duties of Creditors Committee is the duty to "investigate the acts, conduct, assets,

liabilities, and financial condition of the debtor . . . and any other matter relevant

to the case or to the formulation of a plan."  The investigation of the Taping

Incident falls squarely within the parameters of that provision.  Further, the

Committee's counsel has been given the right to challenge the validity, priority,

and extent of the Secured Lenders' liens (and a sum of money has been carved

out for this investigation), a right the Debtors have waived.  See Sixth Interim

Cash Collateral Order, docket entry no. 443 at 3.  Determining whether and to

what extent a creditor's claim should be subordinated and what may be setoff

against such claim is work that the Committee can readily do at the same time.

Four factors remain relevant to the Court's decision to ask the Committee

to pursue the investigation.  First, the Committee offered to take up this task.  See

Committee's Objection, docket entry no. 374.  Second, the Debtor does not *per se* have an objection to the Committee investigating the Taping Incident; "the Debtors have no objection to the Committee evaluating and investigating any aspect of the Recording Incident," and have vowed to cooperate with the Committee.  Debtors' Reply Brief, docket entry no. 383 at 12; Tr. at 95.  Third, the Court does not doubt that the Committee's counsel is competent to conduct a thorough and fair investigation into this matter, an investigation which will ultimately shed light on the question of whether further claims – perhaps the non-bankruptcy claims the Debtors seek to pursue – potentially have merit.  Fourth, no evidence has been presented that the statute of limitations is in danger of running with regard to the causes of actions the Debtors seek to pursue.  See e.g. Bristow v. Clevenger, 80 F.Supp. 2d 421, 428 (M.D. Pa. 2000) (citing two year statute of limitations for 19 Pa. § 5725).

Although the Debtors, as mentioned, do not object to the Committee conducting an investigation of its own, they do object to the Committee conducting an investigation *instead* of Elliott Greenleaf.  The Debtors appear to have two objections to the appointment of the Committee to conduct this investigation, neither of which has merit.  First, while mention of this issue was not made in their brief or by the Debtors' counsel at the April Hearing, Mr. Tierney indicated at the April Hearing that he objects to the Committee's counsel's

19

investigation into the Taping Incident due to a potential conflict of interest.[14]  Tr. at

57-59.  The Court raises this issue only to put it to rest; no conflict of interest

exists among the Committee, Committee counsel, and the Debtors on this

issue.[15]

In fact, the interests of these two parties are actually in line here, namely

fully and completely to investigate this incident, to determine whether further

action is called for, and, in the end, to recover as much money for the estate as

possible.  The Committee and the Debtors each would benefit by subordinating or

reducing the debt of a secured creditor.  When, as here, an "identity of interests"

exists there is no conflict and retention – or appointment to conduct an

investigation in this case – is proper.  In re AroChem Corp., 176 F.3d 610, 627

(2nd Cir. 1999).  See also In re Buffalo Coal Co., 2008 WL 1925152 (Bankr. W.

Va. Apr. 30, 2008) (appointing former counsel for the Committee of Unsecured

Creditors as special counsel to pursue causes of action against one of the former

creditors on the Committee in case converted from Chapter 11 to Chapter 7 and

holding that no conflict or appearance of impropriety existed); see also 11 U.S.C.

---

[14] The Debtors indicate that this is an issue on appeal.  See docket entry no. 444.

[15] Upon careful review of Mr. Tierney's testimony on this point, it is apparent that Mr. Tierney is concerned about a conflict of interest due to the fact that he mistakenly believes that counsel for the Committee will somehow be representing the Debtors in the investigation of the Taping Incident.  Tr. 57-60.  It is the Committee, however, on whose behalf counsel will conduct the investigation.  The Committee has agreed to share the results of its investigation with the Debtors, which can draw their own legal conclusions therefrom.

§ 327(c) ("a person is not disqualified for employment . . . solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an *actual conflict of interest*") (emphasis added).  Here, no objection by a *creditor* and no actual conflict have been presented.

The Debtors' second objection to the Court's allowing the Committee to investigate the Taping Incident is that "because any claims arising from the Recording Incident belong to the Debtors, the Debtors' assessment and consideration of any such claims must be protected by privileged communications with counsel."  Debtors' Reply Brief, Docket entry no. 383 at 12.  The Debtors, however, do not even explain, much less demonstrate, nor can the Court fathom, precisely how the Committee's investigation of the Taping Incident will jeopardize the Debtors' privileged communications with their counsel.  The Committee has not been asked to pursue the legal ramifications of the Taping Incident.  Nor will such an investigation into facts threaten in any way the Debtors' ownership of any legal claims arising from the investigation.  When the Committee shares the results of its investigation with the Debtors, Debtors and their counsel will be free to confer confidentially and draw their own legal conclusions.  Thus, this objection by the Debtors is without merit.

21

# V. CONCLUSION

In exercising its discretion in reviewing employment applications, the court should ultimately consider "the protection of the interests of the bankruptcy estate and its creditors, and the efficient, expeditious, and economical resolution of the bankruptcy proceeding." In re Computer Learning Centers, Inc., 272 B.R. 897, 903 (Bankr. E.D. Va. 2001). See also In re AroChem Corp., 176 F.3d 610, 621 (2nd Cir. 1999). Here, such consideration points to a denial, without prejudice, of the Application to Employ Elliott Greenleaf & Siedzikowski, P.C. At this time, the Debtors have failed to show that employment of Elliott Greenleaf is in the best interest of the estate. It is possible that investigation of the underlying Taping Incident by the Committee of Unsecured Creditors will yield additional information that may warrant a different result upon the renewal of the Debtors' Application. However, at this time, the protection of the interests of this bankruptcy estate call for the assets, attention, and time of the Debtors and Secured Lenders to be spent on financing and plan formulation.

Dated: May 15, 2009.                    _____
                                        JEAN K. FITZSIMON
                                        United States Bankruptcy Judge

22