## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Philadelphia Newspapers, LLC, *et al.*[1], | ) | Case No. 09-11204 (SR) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

### DEBTORS' MOTION FOR AN ORDER: (A) APPROVING PROCEDURES FOR THE SALE OF CERTAIN OF THE DEBTORS' ASSETS; (B) SCHEDULING AN AUCTION; (C) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES; (D) APPROVING FORM OF NOTICE; AND (E) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (the "Debtors" or "Seller"), hereby move the Court, pursuant to sections 105(a), 1123 and 1129 of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq*., the "Bankruptcy Code") and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of orders: (A) approving procedures for the sale of certain of the Debtors' assets, (B) scheduling an auction, (C) approving assumption and assignment procedures, (D) approving form of notice, and (E) granting related relief (the "Motion"). In support of this Motion, the Debtors represent as follows:

### Jurisdiction and Venue

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: PMH Acquisition, LLC (1299), Broad Street Video, LLC (4665), Philadelphia Newspapers, LLC (3870), Philadelphia Direct, LLC (4439), Philly Online, LLC (5185), PMH Holdings, LLC (1768), Broad Street Publishing, LLC (4574), Philadelphia Media, LLC (0657) and Philadelphia Media Holdings, LLC (4680).

3.      The statutory bases for the relief requested herein are sections 105, 1123 and 1129 of the Bankruptcy Code and Bankruptcy Rules  2002, 6004 and 6006 and Rules 2002-1 6004-1 and 9014-3 of the Local Rules for the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Local Rules").

## Background

4.      On February 22, 2009 (the "Petition Date"), the Debtors, other than Debtor Philadelphia Media Holdings LLC ("PMH"), commenced these voluntary cases (the "Chapter 11 Cases") by the filing of petitions for relief under chapter 11 of the Bankruptcy Code.  PMH filed its petition for relief under chapter 11 of the Bankruptcy Code on June 10, 2009 and its chapter 11 case has been procedurally consolidated with the Chapter 11 Cases.  The Debtors continue in possession of their properties and continue to operate their respective businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On March 2, 2009, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") in the Chapter 11 Cases.

5.      The factual background relating to the Debtors' commencement of these Chapter 11 Cases is set forth in detail in the *Declaration of Richard R. Thayer, the Debtors' Executive Vice President, Finance, in Support of First Day Motions* [*Docket No. 23*] (the "First Day Declaration") filed on February 23, 2009 and incorporated herein by reference.

6.      On August 20, 2009, the Debtors executed that certain Asset Purchase Agreement (the "Stalking Horse Agreement," a copy of which is attached hereto[2] as **Exhibit B**) with Philly Papers, LLC, as purchaser (the "Stalking Horse")[3], for the sale (the "Plan Sale") of substantially all of the Debtors' assets, pursuant to Debtors' Joint Chapter 11 Plan (the "Plan").  The Plan, the

---

[2] The copy of the Stalking Horse Agreement attached hereto does not include its exhibits or schedules.
[3] The equity investors in the Stalking Horse currently include two investors who are current investors in PMH.

Stalking Horse Agreement and a related Disclosure Statement were filed with the Court on August 20, 2009 [Docket Nos. 946 and 947].  Under the Stalking Horse Agreement and the Plan, the Stalking Horse will pay to the Debtors' estates a cash purchase price of $30,000,000, plus an additional cash payment in an amount equal to the Debtors' existing deposits with their insurance carriers and credit card processors, less the amount of accrued and unpaid administrative and priority claims against the Debtors' estates as of the closing of the Plan Sale, and less the sum of $750,000, which $750,000 will be used to fund a liquidating trust for the benefit of the Debtors' general unsecured trade creditors.  The Debtors anticipate that the Stalking Horse Agreement will yield gross proceeds to the estates in the amount of over $43,000,000, after payment of approximately $4,000,000 in administrative and priority claims.  The Debtors further anticipate that they will have approximately $8,000,000 of cash on hand as of the closing.  The sale proceeds plus cash on hand will be used to pay off any outstanding debtor-in-possession financing facility advances (estimated to be $14,500,000 as of closing) and to make a cash distribution to the Debtors' senior secured lenders of approximately $36,000,000.  Additionally, the Stalking Horse Agreement and the Plan do not include the sale of the Debtors' real property located at 400 North Broad Street, Philadelphia, Pennsylvania and certain adjacent parcels, which real property will be transferred pursuant to the Plan to Citizens Bank, as agent for certain senior secured lenders, (or its designee) for the benefit of the senior secured lenders.  Finally, the Stalking Horse Agreement and the Plan will provide for distribution of 3% of the equity interests in the Stalking Horse to holders of unsecured prepetition claims other than general unsecured trade creditors.

7.     The Debtors believe that the value they will realize from the Stalking Horse Agreement constitutes fair market value for their assets and will support a confirmable Plan that

CURRENT 14211897v11

822556_1

will maximize value to their various creditor constituencies and bring a successful conclusion to

these Chapter 11 Cases.  However, the Debtors' businesses and assets will be subject to a

marketing effort and the Stalking Horse bid will be subject to higher or better offers.

Accordingly, the Debtors are prepared to proceed with the sale of their business and assets under

the terms of the Stalking Horse Agreement, subject to higher and better bids in accordance with

the procedures proposed in this Motion.  The sale process will result in the Plan being

implemented.

### Relief Requested

8.    The Debtors are requesting, pursuant to sections 105, 1123 and 1129 of the

Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006, entry of an order (the "Bid

Procedures Order") substantially in the form attached hereto as **Exhibit B**: (A) approving

Bid Procedures (as defined below) for the Plan Sale; (B) scheduling an auction (the "Auction");

(C) approving assumption and assignment procedures (the "Assumption and Assignment

Procedures"); (D) approving the form of notice (the "Notice"); and (E) granting related relief.

9.    The Plan Sale to the qualified bidder(s) with the highest or otherwise best bid(s) at

the Auction (collectively, the "Successful Bidder") as contemplated herein will maximize the

value of the Debtors' estates for the benefit of all of the Debtors' stakeholders, will fund and

implement the Plan under section 1129 of the Bankruptcy Code, and, accordingly, is in the best

interests of the Debtors, their creditors, and their estates.  The relief requested in this Motion

therefore should be granted.

CURRENT 14211897v11

822556_1

<u>**Description of the Proposed Bid Procedures**</u>

**A.    The Proposed Bid Procedures**

10.    The Debtors believe that the best interests of their estates are served by conducting a public Auction to identify the highest or otherwise best offer for their assets to be sold pursuant to the Plan.  Accordingly, the Debtors seek the Court's approval of the following Bid Procedures (the "<u>Bid Procedures</u>"), which also are attached as **<u>Addendum 1</u>** to the proposed Bid Procedures Order.[4]

<u>**Bid Procedures**</u>

11.    Set forth below is the general process to be employed by the Debtors with respect to the proposed Plan Sale of the assets identified in the Stalking Horse Agreement (the "<u>Purchased Assets</u>").

>    a.    **<u>Assets to Be Sold.</u>**  The Debtors are offering the Purchased Assets for sale pursuant to the Plan.  The Debtors shall retain all rights and title to assets that are not subject to a bid accepted by the Debtors and approved by the Bankruptcy Court at the Confirmation Hearing (defined below).  A Qualified Bidder may also submit a bid that includes assets of the Debtors that are not defined as Purchased Assets in the Stalking Horse Agreement (the "<u>Other Assets</u>" and, together with the Purchased Assets, the "<u>Assets</u>").

>    b.    **<u>The Bidding Process.</u>**  The Debtors, in conjunction with their advisors, shall:  (i) determine whether any person is a Potential Bidder (hereinafter defined); (ii) coordinate the efforts of Potential Bidders in conducting their respective due diligence investigations regarding the Debtors' businesses; (iii) receive offers from Qualified Bidders (hereinafter defined); and (iv) negotiate any offer made to purchase the Assets, together or separately (collectively, the "<u>Bidding Process</u>").  Neither the Debtors nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Assets to any person who is not a Potential Bidder.

---

[4]  To the extent the description of the Bid Procedures set forth herein differs from those set forth in <u>Addendum 1</u> to the Bid Procedures Order, the terms of <u>Addendum 1</u> to the Bid Procedures Order shall control.

CURRENT 14211897v11

822556_1

c.      **Participation Requirements.**  Unless otherwise ordered by the Bankruptcy Court, for cause shown, or as otherwise determined by the Debtors, in order to participate in the Bidding Process each person (a "Qualified Bidder") must submit a bid that adheres to the following requirements (a "Qualified Bid"):

i.      All Qualified Bids must be submitted to Marshall Sonenshine and David Haase of Sonenshine Partners, 400 Park Avenue, 17th Floor, New York, New York 10022, with copies to Mark K. Thomas and Paul V. Possinger, Proskauer Rose LLP, 70 West Madison Street, Chicago, Illinois 60602, not later than 5:00 p.m. (prevailing Eastern Time) on October 20, 2009 (the "Bid Deadline").  The Debtors shall immediately distribute by facsimile transmission, electronic mail, personal delivery or reliable overnight courier service a copy of each Bid received to counsel for the Committee.

ii.     All Qualified Bids shall be in the form of an offer letter from a person or persons that the Debtors deem financially able to consummate the purchase of the Assets, which letter states:

(A)     that such Qualified Bidder offers to purchase some or all of the Assets upon the terms and conditions set forth in an executed asset purchase agreement (hard copy and an electronic version in Word format and blacklined against the Stalking Horse Agreement), together with its exhibits and schedules, including terms relating to price and the time of closing (the "Proposed Agreement");

(B)     that such Qualified Bidder is prepared to consummate the transaction on or before December 31, 2009, following entry of an order of this Court confirming the Plan and approving the Sale to the Successful Bidder (the "Confirmation Order");

(C)     that such Qualified Bidder's offer is irrevocable until the earlier to occur of December 31, 2009 or two (2) business days after the closing of the Plan Sale of the Purchased Assets;

(D)     the actual value of such Qualified Bidder's bid to the Debtors' estates; and

CURRENT 14211897v11

822556_1

        (E)    which of the Debtors' leases and executory contracts are to be assumed in connection with the consummation of the Qualified Bidder's bid.

iii.    All Qualified Bids shall be accompanied by a deposit into escrow with the Debtors of an amount equal to $3,000,000 (the "Good Faith Deposit").

iv.    All Qualified Bids shall be accompanied by satisfactory evidence, in the opinion of the Debtors and their advisors, of committed financing or other ability to perform all transactions contemplated by the Proposed Agreement.

v.    All Qualified Bids must provide for funding of all payments required under the Plan.

vi.    All Qualified Bids must identify the proposed management team of the Qualified Bidder.

vii.    Qualified Bids cannot contain any financing conditions or contingencies (other than those set forth in the Stalking Horse Agreement).

viii.    All Qualified Bids must provide for adequate workers' compensation insurance coverage and for adequate working capital financing to finance going concern operations to the extent contemplated, and to provide adequate assurance of future performance to counterparties to any executory contracts and unexpired leases to be assumed by the Potential Bidder.

d.    **Due Diligence.**  The Debtors shall afford each Potential Bidder (hereinafter defined) due diligence access to the Purchased Assets. Due diligence access may include management presentations as may be scheduled by the Debtors, access to data rooms, on site inspections and such other matters which a Potential Bidder may request and as to which the Debtors, in their sole discretion, may agree.  Neither the Debtors nor any of their affiliates (nor any of their respective representatives) are obligated to furnish any information relating to the Purchased Assets to any person except to Potential Bidders.  Potential Bidders are advised to exercise their own discretion before relying on any information regarding the Assets provided by anyone other than the Debtors or their representatives.  To be a "Potential Bidder," each bidder must have delivered the following:

i.    an executed confidentiality agreement in form and substance satisfactory to the Debtors; and

ii.     current audited and unaudited financial statements or other financial information of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Purchased Assets, current audited and unaudited financial statements or other financial information of the Potential Bidder's equity holder or other financial backer, or such other form of financial disclosure and evidence acceptable to the Debtors and their advisors in their sole discretion, demonstrating such Potential Bidder's ability to close the proposed transaction, to fund the Plan, to finance going concern operations to the extent contemplated, and to provide adequate assurance of future performance to counterparties to any executory contracts and unexpired leases to be assumed by the Potential Bidder.

e.     **"As Is, Where Is."**   The sale of the Purchased Assets or the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or estates, except to the extent set forth in the Proposed Agreement of the Successful Bidder.   Except as otherwise provided in the Proposed Agreement, all of the Debtors' right, title and interest in and to the Purchased Assets to be acquired shall be sold pursuant to the Plan free and clear of all liens, claims, charges, security interests, restrictions and other encumbrances of any kind or nature thereon and there against (collectively, the "<u>Transferred Liens</u>"), with such Transferred Liens to be satisfied in accordance with the Plan.  Each bidder shall be deemed to acknowledge and represent that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or Purchased Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Purchased Assets, or the completeness of any information provided in connection with the Purchased Assets, the Bidding Process or the Auction, except as expressly stated in these Bidding Procedures or, as to the Successful Bidder, in the applicable Proposed Agreement.

f.     **Stalking Horse.**   The Stalking Horse has submitted a Qualified Bid pursuant to the Stalking Horse Agreement, which Qualified Bid shall serve as a stalking horse bid (the "<u>Stalking Horse Bid</u>").

g.     **Stalking Horse Bid Protections**:  The Debtors hereby seek court authority to:   (i) provide a break-up fee in the amount of $1,000,000 to the Stalking Horse, payable in the event that an alternative transaction closes and the Stalking Horse is not the Successful Bidder; (ii) provide expense reimbursement in an

amount equal to all of the out-of-pocket expenses incurred by the Stalking Horse in connection with the transactions contemplated by the Stalking Horse Agreement up to a maximum of $500,000; and (iii) provide that any competing Qualified Bids must exceed the aggregate consideration to be paid to or for the benefit of the Debtors' estates as set forth in the Stalking Horse Bid by at least $1,750,000.

h.    **Credit Bid**:  The Plan Sale is being conducted under sections 1123(a) and (b) and 1129 of the Bankruptcy Code, and not section 363 of the Bankruptcy Code.  As such, no holder of a lien on any assets of the Debtors shall be permitted to credit bid pursuant to section 363(k) of the Bankruptcy Code.

i.    **Auction.**  If the Debtors receive more than one Qualified Bid prior to the Bid Deadline, the Debtors shall conduct an auction (the "Auction") at the offices of Proskauer Rose LLP, 1585 Broadway, New York, NY 10036, on October 22, 2009, beginning at 11:00 a.m. (prevailing Eastern Time) or such later time or other place as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids.  Only representatives of the Stalking Horse, the Debtors, the United States Trustee, the Senior Agent, the Steering Group, the Committee, and any Qualified Bidders who have timely submitted Qualified Bids shall be entitled to attend the Auction.  The Debtors may announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make subsequent overbids) for conducting the Auction, so long as such rules are not inconsistent with these Bidding Procedures.  Based upon the terms of the Qualified Bids received, the number of Qualified Bidders participating in the Auction, and such other information as the Debtors determine is relevant, the Debtors, in their sole discretion, may conduct the Auction in the manner they determine will achieve the maximum value for the Purchased Assets.  At the Auction, the minimum initial bid against the Stalking Horse bid must exceed the value of the Stalking Horse bid by $1,750,000.  Subsequent bids shall be made in minimum increments of $100,000.

As soon as practicable after the conclusion of the Auction, the Debtors shall: (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Plan Sale and confirming the Plan; and (ii) identify the highest or otherwise best offer or combination of offers for the Assets and any second-highest offer (the "Successful Bid").  The Debtors will present the Successful Bid to the Bankruptcy Court for approval at the Confirmation Hearing.  The Debtors

reserve all rights to not submit any bid which is not acceptable to the Debtors.

j.  **Acceptance of Qualified Bids.**  The Debtors shall sell the Purchased Assets to the Stalking Horse or the Assets to the Successful Bidder, as the case may be, submitting the highest or otherwise best Qualified Bid at the Auction, after confirmation of the Plan and approval of such Qualified Bid by the Bankruptcy Court at the Confirmation Hearing and upon the Plan's effective date.  The Debtors' presentation to the Bankruptcy Court for approval of a particular Qualified Bid does not constitute the Debtors' acceptance of such Qualified Bid.  The Debtors shall have accepted a Qualified Bid only when that Qualified Bid has been approved by the Bankruptcy Court at the Confirmation Hearing.

k.  **The Confirmation Hearing.**  After the conclusion of the Auction, and the solicitation of the Plan, the Bankruptcy Court shall conduct a hearing (the "Confirmation Hearing")[5] to confirm the Plan and approve the Plan Sale.  At the Confirmation Hearing, the Debtors will seek entry of an order (the "Confirmation Order"), among other things:  (i) confirming the Plan; (ii) authorizing and approving the Plan Sale to the Successful Bidder(s), as determined by the Debtors in accordance with the Bidding Procedures, pursuant to the terms and conditions set forth in the Proposed Agreement(s) submitted by the Successful Bidder(s) (as such agreement may be modified prior to, during or after the Auction with the agreement of the Debtors); and (iii) exempting the sale and conveyance of the Purchased Assets from any transfer tax, stamp tax or similar tax pursuant to section 1146(c) of the Bankruptcy Code.  The Confirmation Hearing may be adjourned or rescheduled without notice other than by an announcement of the adjourned date in open court.

Following the entry of the Confirmation Order approving the Plan Sale, if the Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the next highest or otherwise best Qualified Bid(s), as disclosed at the Confirmation Hearing, shall be deemed to be the Successful Bid(s) and the Debtors shall be authorized to effectuate such sale without further order of the Bankruptcy Court.

l.  **Return of Good Faith Deposit.**  The Good Faith Deposits of all Qualified Bidders shall be retained by the Debtors and all

---

[5] The Debtors have requested by separate motion that the Court set the Confirmation Hearing on November 2, 2009 at 10:00 a.m. prevailing Eastern Time.  *See* Docket No. 948.

-10-

Qualified Bids will remain open and irrevocable, notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of a Successful Bid by a Qualified Bidder, until the earlier to occur of December 31, 2009 or two (2) business days after the closing of the Plan Sale of the Purchased Assets.  If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, which shall be retained by the Debtors as liquidated damages.

m. **Modifications.**  The Debtors may: (i) determine, in their business judgment, which Qualified Bid, if any, is the highest or otherwise best offer; (ii) consult with the representatives of the Committee or other significant constituent in connection with the bidding process and Bid Procedures; and (iii) reject at any time before entry of the Confirmation Order approving a Qualified Bid, any bid that, in the Debtors' sole discretion, is:  (x) inadequate or insufficient; (y) not in conformity with the requirements of the Plan, the Bankruptcy Code; the Bidding Procedures, or the terms and conditions of sale; or (z) contrary to the best interests of the Debtors, their estates, their creditors and other parties in interest.   At or before the Confirmation Hearing, the Bankruptcy Court, or, consistent with the purposes of the Bid Procedures to obtain the highest or otherwise best offer(s) for the Assets, the Debtors, may impose such other terms and conditions as it or they may determine to be in the best interests of the Debtors' estates, their creditors and other parties in interest.

n. **Reservation of Rights**:  In addition to their rights set forth in sections (i.) and (m.) above, the Debtors may modify these Bid Procedures or impose, at or prior to the Auction, additional terms and conditions on the proposed Sale of the Purchased Assets if, in their reasonable judgment, such modifications would be in the best interests of the Debtors' estates and promote an open and fair sale process.

**B.     The Proposed Assumption and Assignment Procedures**

12.     To facilitate and effect the Plan Sale of the Debtors' assets to the Successful Bidder(s), the Debtors seek authorization to assume and assign certain contracts and unexpired leases in connection with the Plan Sale.  In order to provide counterparties with adequate notice of such assumption and proposed adequate cure amounts (the "Cure Amounts"), the Debtors

propose the following procedures (the "<u>Assumption & Assignment Procedures</u>"), which also are

attached as **<u>Addendum 2</u>**[6] to the proposed Bid Procedures Order:

    a.    Within five (5) days prior to the Bid Deadline, the Debtors shall file a schedule of cure obligations (the "<u>Contract & Cure Schedule</u>") listing all leases and executory contracts that the Stalking Horse intends to assume (the "<u>Assigned Contracts</u>") and the amount, if any, that the Debtors contend is the amount needed to pay to cure any defaults with respect to such Assigned Contracts (the "<u>Cure Amounts</u>").

    b.    Upon filing, a copy of the Contract & Cure Schedule and these Assumption & Assignment Procedures will be served on each of the counterparties to the Assigned Contracts listed on the Contract & Cure Schedule.

    c.    The Debtors shall amend the Contract & Cure Schedule promptly after the completion of the Auction to update the information contained therein with respect to the Successful Bid(s), and shall serve an amended Contract & Cure Schedule on each of the counterparties to the Assigned Contracts listed thereon.

    d.    Any objections ("<u>Assignment Objections</u>") to the assumption and assignment of any Assigned Contract, including, but not limited to, objections relating to adequate assurance of future performance or to the cure amount set forth in the Contract & Cure Schedule must be filed with the Bankruptcy Court and served upon the Notice Parties on or before 4 p.m. prevailing Eastern Time on the day before the Confirmation Hearing (the "<u>Assignment Objection Deadline</u>").

    e.    Any counterparty failing to file an Assignment Objection by the Assignment Objection Deadline shall be forever barred from: (i) objecting to the Cure Amount set forth on the Contract & Cure Schedule with respect to its Assigned Contract; (ii) seeking additional amounts arising under its Assigned Contract prior to the Closing from the Debtors or the Successful Bidder; and (iii) objecting to the assumption and assignment of its Assigned Contract to the Successful Bidder.

    f.    Any Assignment Objections not consensually resolved prior to the Confirmation Hearing shall be heard at the Confirmation Hearing

---

[6] To the extent the description of the Assumption and Assignment Procedures set forth herein differs from those set forth in <u>Addendum 2</u> to the Bid Procedures Order, the terms of <u>Addendum 2</u> to the Bid Procedures Order shall control.

CURRENT 14211897v11

822556_1

with any related Cure Amounts or adequate assurance of future performance being fixed by the Bankruptcy Court. All other objections to the proposed assumption and assignment of the Assigned Contracts will be heard at the Confirmation Hearing.

g.   Except as may otherwise be agreed to by all parties to an Assigned Contract, on or before the Closing, the cure of any defaults under Assigned Contracts necessary to permit assumption and assignment thereof shall be by:  (i) payment of the undisputed Cure Amount; and/or (ii) establishment of a reserve with respect to any disputed Cure Amount. The party responsible for paying Cure Amounts shall be as set forth in the Proposed Agreement between the Successful Bidder and the Seller.

13.    The Debtors believe that the proposed Assumption & Assignment Procedures will provide the counterparties to the Assumed Contracts a full and fair opportunity to be heard with respect to issues concerning Cure Amounts and the proposed assumption and assignment of the Assumed Contracts.

## Legal Argument

### A.    This Court Has The Authority to Approve the Bid Procedures

14.    Courts have indicated that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets from the estate.  *See*, *e.g.*, *Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 656-57 (S.D.N.Y. 1992) (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same).

15.    Here, the proposed Bid Procedures are reasonable, appropriate, and within the Debtors' sound business judgment under the circumstances, because they will serve to maximize

CURRENT 14211897v11

822556_1

the value that the Debtors will recover on account of the Plan Sale and they will enable the Debtors to fund and confirm the Plan.

**B.     The Bid Procedures Are Appropriate**

16.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See*, *e.g., Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand); *Integrated Resources*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the . . . debtor's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") quoting *Cello Bay Co. v. Champion Int'l Corn. (In re Atlanta Packaging Products, Inc.)*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

17.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. *See*, *e.g.*, *Integrated Resources*, 147 B.R. at 659 (such procedures "encourage bidding and maximize the value of the debtor's assets"); *In re Financial News Network, Inc.*, 126 B.R. 152, 156 (S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estate").

18.     The Debtors believe that the Bid Procedures establish the parameters under which the value of the Debtors' assets may be established and maximized at the Auction, the ensuing Confirmation Hearing and under the Plan.   The proposed Bid Procedures will enhance competitive bidding; therefore, such procedures will increase the likelihood that the Debtors will receive the greatest possible consideration for such assets by ensuring a competitive and fair bidding process.

-14-

C.    <u>Credit Bidding Under Section 363(k) Does Not Apply in Plan Sales</u>

19.    The proposed Bid Procedures provide that holders of secured claims cannot submit credit bids with respect to the Plan Sale.  Such prohibition against credit bids is appropriate and permissible under applicable provisions of the Bankruptcy Code in the context of a sale pursuant to a plan, as opposed to a sale outside the ordinary course of business under section 363(b).  Put simply, the ability to credit bid provided in section 363(k) of the Bankruptcy Code allows credit bidding only in section 363(b) sales, not in plan sales.

20.    Credit bidding should not be authorized because sales to implement a plan are different than sales under section 363 of the Bankruptcy Code.  The Bankruptcy Code expressly provides two separate and distinct methods by which a debtor may sell all or substantially all of its assets:  (a) sales conducted outside the ordinary course of business under section 363(b) of the Bankruptcy Code ("<u>Section 363 Sales</u>"); and (b) sales pursuant to a chapter 11 plan.  *Compare* 11 U.S.C. § 363(b)(1) ("The trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate…") *with* 11 U.S.C. § 1123(b) ("Subject to subsection (a) of this section, a plan may - … (4) provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests…").  *Accord* 11 U.S.C. § 1111(b)(1)(B)(ii) (prohibiting secured creditors from making the section 1111(b)(2) election if "the holder of a claim of such class has recourse against the debtor on account of such claim and such property is sold under section 363 of this title *or is to be sold under the plan*.") (emphasis added).  If Debtors could only sell assets at Section 363 Sales, the highlighted language in section 1111(b)(i)(B)(ii) would be useless surplus language and not included in the Bankruptcy Code.  Sections 363, 1111 and 1123 all recognize that plan sales are different than Section 363 Sales.

21.     Section 363(k) of the Bankruptcy Code allows the holder of a lien that secures an allowed claim the ability to credit bid <u>only</u> at a sale conducted under section 363(b) and only if the Court does not restrict the lien holders' ability to credit bid.  Section 363(k) provides that: "At a sale *under subsection (b) of this section*…the holder of [a secured claim] *may* bid at such sale . . . .") (emphasis added).  By its plain words, section 363(k) does not apply to ordinary course sales under section 363(c) or to sales conducted pursuant to a plan.  *Id.*  Moreover, section 363(k) itself provides that the court may deny a creditor the ability to a credit bid at Section 363 Sales.  11. U.S.C. § 363(k) (. . . *unless the court for cause orders otherwise* the holder of such claim may bid at such sale . . .) (emphasis added).

22.     Case law supports the proposition that the Bankruptcy Code does not require that secured creditors be given an opportunity to credit bid at a sale under a plan.  Courts have held that a debtor may conduct a plan sale without allowing credit bids and still meet the "fair and equitable" requirements as set forth in either section 1129(b)(2)(A)(i) or (iii).  *In re Criimi Mae, Inc.*, 251 B.R. 796, 806-07 (Bankr. D. Md. 2000) (holding that secured creditor only has credit bid rights in a plan sale if cram down under section 1129(b)(2)(A)(ii) is required for confirmation, that section 1129(b)(2)(A)(i), (ii) and (iii) are to be read in the disjunctive, and that a plan may be confirmed by satisfying either section 1129(b)(2)(A)(i) or (iii) without providing the right to credit bid).  Since this is a plan sale, as opposed to a Section 363 Sale, the Court should, for cause, rule that the ability to credit bid pursuant to section 363(k) is not available.  Alternatively, the Court, for cause, should deny the ability to credit bid, because granting the lenders the ability to credit bid at a plan sale would have a chilling effect on competing bidders.

23.     The language of section 363(k) clearly and unambiguously applies only to sales under section 363(b) and not to sales under a plan; therefore, courts must enforce it according to

its terms. *See United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242 (1989) ("The plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of the statute will produce a result demonstrably at odds with the intention of its drafters.") (internal citations omitted). Courts specifically have recognized the inapplicability of section 363(k) to plan sales and have held that secured creditors have no statutory ability to credit bid at plan sales. *Criimi Mae, Inc.*, 251 B.R. at 806-07; *In re ORFA Corporation of Philadelphia*, 1991 WL 225985, *5 (Bankr. E.D. Pa. Oct. 30, 1991) ("there is no [Bankruptcy] Code provision which expressly renders a sale conducted pursuant to a plan of reorganization subject to §§ 363(b), (k).").

24.     Accordingly, because section 363(k) is inapplicable to the proposed Plan Sale, the Court should approve the Bid Procedures and order that secured creditors have no ability to credit bid at any such sale.

### D.    The Initial and Subsequent Overbids are Appropriate

25.     One important component of the Bid Procedures is the "overbid" provision, pursuant to which any initial offer for the Purchased Assets must be in an amount of at least $1,750,000 more than the purchase price offered by the Stalking Horse (the "Overbid"). A minimum initial overbid is necessary, among other things, to ensure that there is an increase in the net proceeds received by the estates, after deducting amounts to be paid to the Stalking Horse in the event of a prevailing overbid. Case law also supports minimum overbids that are up to 10% of the initial purchase price as fair and reasonable. As the court stated in *In re Wintex, Inc.*, 158 B.R. 540 (D. Mass. 1992):

> A debtor may avoid the increased costs and complexity associated with considering additional bids unless the additional bids are high enough to justify their pursuit. The 10% increase requirement is one example of a reasonable litmus test.

-17-

*Id.* at 543. *See, e.g.*, *In re Financial News Network*, 126 B.R. 152, 154 (S.D.N.Y. 1991) (requiring minimum overbids to exceed purchaser's offer of $105 million by at least $10 million (9.5%)); *In re Colony Hill Associates*, 111 F.3d 269 (2d Cir. 1997) (requiring minimum overbids to exceed purchaser's initial offer of $7.5 million by at least $650,000 (8.6%)); *In re Tempo Technology Corp.*, 202 B.R. 363, 369 (D. Del. 1996) (requiring minimum overbids of $1.4 million in cash where original purchase price was $150,000 cash plus $3 million in stock of the purchaser and $500,000 of assumed liabilities).

**E.      The Break-Up Fee and Expense Reimbursement Is Appropriate**

26.      In order to compensate the Stalking Horse for the time, effort, expense, and risk that it incurred in negotiating, documenting, and seeking to consummate the Sale, the Bid Procedures also provide that if the Stalking Horse is not the Successful Bidder, and if an alternative transaction closes, the Stalking Horse will be entitled to a break-up fee in the amount of $1,000,000 (the "Break-Up Fee"), plus expense reimbursement in an amount equal to all of the out-of-pocket expenses incurred by the Stalking Horse in connection with the transactions contemplated by the Stalking Horse Agreement up to a maximum of $500,000 (the "Expense Reimbursement", and collectively with the Overbid and the Break-Up Fee, the "Bid Protections").

27.      Bid Protections are a normal and, in many cases, necessary components of sales conducted under the Bankruptcy Code:

> Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets .... In fact, because the... corporation ha(s) a duty to encourage bidding, break-up fees can be *necessary* to discharge [such] duties to maximize values.

*Integrated Resources,* 147 B.R. at 659-60 (emphasis in original).  Specifically, "breakup fees and other strategies may be legitimately necessary to convince a 'white knight' bidder to enter the

-18-

bidding by providing some form of compensation for the risks it is undertaking." *995 Fifth Ave.,* 96 B.R. at 28 (quotations omitted).  *See also Integrated Resources,* 147 B.R. at 660-61 (break-up fees can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Indus., Inc.,* 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("without such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence").

28.    As a consequence, courts frequently approve bid protections in connection with proposed bankruptcy sales.  Courts considering the propriety of proposed bid protections typically consider "(1) whether the relationship of the parties who negotiated the fee is marked by self-dealing or manipulation; (2) whether the fee hampers, rather than encourages, bidding; and (3) whether the amount of the fee is reasonable in relation to the proposed purchase price." *In re Twenver, Inc.,* 149 B.R. 954, 956 (Bankr. D. Colo. 1992); *accord, In re Bidermann Indus. U.S.A., Inc.,* 203 B.R. 547, 552 (Bankr. S.D.N.Y. 1997); *Integrated Resources,* 147 B.R. at 657.

29.    In *Calpine Corp. v. O'Brien Envtl. Energy. Inc. (In re O'Brien Envtl. Energy. Inc.*), 181 F.3d 527 (3d Cir. 1999), the United States Court of Appeals for the Third Circuit held that although bid protections are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of Bankruptcy Code section 503(b) apply to bid protections in bankruptcy cases.  Accordingly, to be approved, bid protections must provide postpetition benefit to the Debtor's estate. *See id.* at 533.

30.    The *O'Brien* Court identified at least two instances in which bid protections may provide benefit to the estate.  First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have

CURRENT 14211897v11

822556_1

been made and without which bidding would have been limited." *Id*. at 537.  Second, when the availability of bid protections induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id*.

31.     The proposed Bid Protections are appropriate under the "administrative expense" standard of *O'Brien*.  Here, the Stalking Horse bid provides a floor for a confirmable Chapter 11 Plan.  The Bid Protections are fair and reasonable in amount, particularly in view of the efforts that have been and will be expended by the Stalking Horse.  Moreover, the Bid Protections will enable the Debtors to secure an adequate floor for the Auction and, thus, ensure that competing bids are materially higher or otherwise better than the Stalking Horse's initial bid, which provides a clear benefit to the Debtors' estates.

32.     Here, if the Court does not approve the proposed Bid Protections, the Debtors risk losing the Stalking Horse's offer to the detriment of the estates.  Moreover, the Debtors believe that the willingness of the Stalking Horse to commit to a sale of the Purchased Assets, subject to higher and better offers, and thereby provide the funding necessary to confirm the Plan, may encourage third parties to submit higher bids for the Purchased Assets and will encourage customers, employees and vendors to support operations during this case.

33.     In sum, the Debtors' ability to offer the Bid Protections enables them to ensure the sale of the Debtors' assets at a price that they believe to be fair while, at the same time, providing them with the potential of even greater benefit to the estates.  Thus, the Bid Protections should be approved.  Accordingly, the proposed Bid Protections are reasonable and appropriate under the circumstances.

**F.    The Auction, Hearing and Notice Procedures Are Appropriate**

34.    Pursuant to Bankruptcy Rule 2002, the Debtors are required to provide creditors with twenty (20) days' notice of the Sale and twenty-five (25) days' notice of the Confirmation Hearing.  Pursuant to Bankruptcy Rule 2002(c), the Debtors are required to notify their creditors of the proposed sale of the Debtors' assets, including a disclosure of the time and place of the Confirmation Hearing, the terms and conditions of the Plan Sale, and the deadline for filing any objections.

35.    The Debtors propose that within three days following entry of the Bid Procedures Order, the Debtors will distribute a Notice of Sale of Assets in the form of Addendum 3 to the proposed order attached hereto (the "Plan Sale Notice"), and the Bid Procedures Order to: (a) counsel to the Committee; (b) the Office of the United States Trustee; (c) counsel to the Debtors' secured creditors; (d) those parties that request notice of all pleadings in the Debtors' chapter 11 cases pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure; and (e) any known prospective bidders.  In addition, within three (3) days following entry of the Bid Procedures Order,  the Debtors will serve the Sale Notice by first class mail on all known creditors of the Debtors.

36.    Further, if the Bankruptcy Court believes it is appropriate, the Debtors will publish an abbreviated version of the Sale Notice at least once in the national edition of The Wall Street Journal at least twenty days prior to the Auction.  The Debtors contend that such notice of the Auction is good and sufficient notice and that no other or further notice thereof is required.

CURRENT 14211897v11

822556_1

**Notice**

37.    In accordance with the Court's *Order Establishing Certain Notice, Case Management and Administrative Procedures* [*Docket No. 194*] (the "Case Management Order"), this Motion has been served upon: (a) the Core Group; and (b) the 2002 List.

38.    The Debtors submit that good and sufficient notice of this Motion has been provided and no other or further notice need be provided.

**No Prior Request**

39.    No prior request for the relief requested herein has been made to this Court or any other court in connection with these Chapter 11 Cases.

CURRENT 14211897v11

822556_1

WHEREFORE, the Debtors respectfully request (A) entry of the Bid Procedures Order,

substantially in the form attached hereto as **Exhibit A**; and (B) such other and further relief as

the Court deems just and proper.

Dated: August 28, 2009
      Philadelphia, Pennsylvania

/s/  Lawrence G. McMichael
_____

**DILWORTH PAXSON LLP**
Lawrence G. McMichael
Anne M. Aaronson
Catherine G. Pappas
1500 Market St., Suite 3500E
Philadelphia, PA 19102
Telephone:  (215) 575-7000
Facsimile:  (215) 575-7200

-and-

**PROSKAUER ROSE LLP**
Mark K. Thomas (admitted *pro hac vice*)
Paul V. Possinger (admitted *pro hac vice*)
Peter J. Young (admitted *pro hac vice*)
Three First National Plaza
70 West Madison, Suite 3800
Chicago, Illinois  60602-4342
Telephone:  (312) 962-3550
Facsimile:  (312) 962-3551

*Co-Counsel for the Debtors and Debtors in Possession*

CURRENT 14211897v11

822556_1