# EXHIBIT B

# [STALKING HORSE AGREEMENT]

Execution Version

# ASSET PURCHASE AGREEMENT

## DATED AS OF AUGUST 20, 2009

### BY AND AMONG

**PHILADELPHIA MEDIA HOLDINGS, LLC,**

**PMH ACQUISITION, LLC,**

**PHILADELPHIA NEWSPAPERS, LLC,**

**PHILADELPHIA DIRECT, LLC,**

**BROAD STREET VIDEO, LLC,**

**PHILLY ONLINE, LLC,**

**PHILADELPHIA MEDIA, LLC,**

**BROAD STREET PUBLISHING, LLC, AND**

**PMH HOLDINGS, LLC,**

AS SELLERS,

AND

**PHILLY PAPERS, LLC**

AS PURCHASER

2208/59219 Current/15517013v5

08/20/2009 12:35 PM

821303_1

# TABLE OF CONTENTS

SECTION 1      INTERPRETATION ..............................................................................1

    1.1.   Definitions ............................................................................................1

SECTION 2      PURCHASE, SALE AND ASSIGNMENT OF PURCHASED ASSETS............9

    2.1.   Sale of Assets ........................................................................................9

    2.2.   Excluded Assets ..................................................................................11

    2.3.   Assumed Liabilities ............................................................................11

    2.4.   Excluded Liabilities ............................................................................13

    2.5.   Purchase Price. ....................................................................................13

    2.6.   Purchaser Deposit ..............................................................................14

    2.7.   Allocation of Purchase Price..............................................................15

    2.8.   Sale at Closing Date ...........................................................................15

    2.9.   Excluded Assets and Liabilities .........................................................15

SECTION 3      REPRESENTATIONS AND WARRANTIES OF SELLERS ...........................15

    3.1.   Organization and Good Standing........................................................15

    3.2.   Authorization .....................................................................................15

    3.3.   No Conflicts .......................................................................................16

    3.4.   Consents and Approvals .....................................................................16

    3.5.   Compliance with Law. .......................................................................16

    3.6.   Title to Assets ....................................................................................16

    3.7.   Intentionally omitted..........................................................................17

    3.8.   Litigation ...........................................................................................17

    3.9.   Intellectual Property...........................................................................17

3.10.   Material Contracts.................................................................................17

3.11.   Real Property ....................................................................................18

3.12.   No Broker or Finder...............................................................................18

3.13.   Insurance ........................................................................................18

3.14.   Financial Statements ..............................................................................18

3.15.   Absence of Certain Changes ........................................................................19

3.16.   Taxes ............................................................................................20

3.17.   Collective Bargaining Agreements, Employment Agreements, etc. .........................20

3.18.   Employee Benefit Plans.............................................................................21

3.19.   Environmental Warranties ..........................................................................23

3.20.   Restricted Cash ...................................................................................24

3.21.   Accounts Receivable................................................................................24

3.22.   Transactions with Certain Persons ...............................................................24

3.23.   All Material Information...........................................................................24

3.24.   Employees .........................................................................................24

3.25.   Disclaimer of Other Representations and Warranties...............................................24

SECTION 4        REPRESENTATIONS AND WARRANTIES OF PURCHASER....................24

4.1.    Organization and Good Standing.....................................................................24

4.2.    Authorization .....................................................................................24

4.3.    No Conflicts ......................................................................................25

4.4.    Consents and Approvals ............................................................................25

4.5.    Litigation ........................................................................................25

4.6.    No Broker or Finder...............................................................................25

Current/15517013v5                                                08/20/2009 12:35 PM

821303_1

4.7.   Capital Resources .................................................................................25

4.8.   Purchaser not a Plan ...........................................................................25

4.9.   "AS IS" TRANSACTION ...................................................................26

SECTION 5      CERTAIN COVENANTS OF SELLERS ..........................................26

5.1.   Plan and Confirmation Order ..............................................................26

5.2.   Provision of Records ...........................................................................26

5.3.   Receipt of Property Relating to Assets ................................................26

5.4.   Conduct of Business Pending the Closing. ...........................................27

5.5.   Access to Information ..........................................................................28

5.6.   Bid Procedures Order ..........................................................................29

5.7.   Transfer of Permits .............................................................................29

5.8.   Release of Encumbrances ....................................................................29

5.9.   Further Assurances ..............................................................................29

5.10.  Assignment of Rights ..........................................................................29

5.11.  Break-Up Fee .....................................................................................29

5.12.  Cure Amounts ....................................................................................30

SECTION 6      CERTAIN COVENANTS OF PURCHASER. ...................................30

6.1.   Performance with Respect to the Assets and the Assumed Contracts .........................30

6.2.   Cure Amounts ....................................................................................30

6.3.   Workers' Compensation ......................................................................30

6.4.   Financing ............................................................................................30

6.5.   Equity Ownership ...............................................................................30

6.6.   Further Assurances ..............................................................................31

- iii -

SECTION 7     CERTAIN MUTUAL COVENANTS ...............................................................31

    7.1.  Mutual Cooperation. ....................................................................................31

    7.2.  Approvals and Filings .................................................................................32

    7.3.  Public Statements ........................................................................................33

SECTION 8     EMPLOYEE MATTERS .............................................................................33

    8.1.  Employment. ...............................................................................................33

    8.2.  Employee Benefit Matters. .........................................................................34

    8.3.  Seller Assumed Plans ..................................................................................34

    8.4.  Compliance with WARN Act ......................................................................35

SECTION 9     CONDITIONS TO SELLERS' OBLIGATIONS .........................................36

    9.1.  Representations and Warranties ...................................................................36

    9.2.  Compliance with Agreements ......................................................................36

    9.3.  Approvals; No Injunctions ...........................................................................36

    9.4.  Purchaser's Closing Deliveries and Obligations .........................................36

    9.5.  Auction .........................................................................................................36

    9.6.  Entry of the Confirmation Order ..................................................................36

SECTION 10    CONDITIONS TO PURCHASER'S OBLIGATIONS ................................37

    10.1.  Representations and Warranties ...................................................................37

    10.2.  Compliance with Agreements ......................................................................37

    10.3.  Approvals; No Injunctions ...........................................................................37

    10.4.  Sellers' Closing Deliveries and Obligations ...............................................37

    10.5.  Auction .........................................................................................................37

    10.6.  Entry of the Confirmation Order ..................................................................37

Current/15517013v5

08/20/2009 12:35 PM

821303_1

10.7.  Collective Bargaining Agreements .................................................................37

10.8.  Title Insurance Policies and Surveys .............................................................37

10.9.  Material Adverse Effect .................................................................................38

10.10. Certain Liabilities ..........................................................................................38

SECTION 11    CLOSING; TERMINATION .................................................................38

11.1.  The Closing ....................................................................................................38

11.2.  Termination ....................................................................................................40

11.3.  Effects of Termination. ..................................................................................42

SECTION 12    TAXES .................................................................................................42

12.1.  Taxes Related to Purchase of Assets .............................................................42

12.2.  Cooperation ....................................................................................................43

SECTION 13    EXPENSES, EMPLOYEES, ATTORNEYS' FEES AND BROKERS' FEES..43

13.1.  Expenses ........................................................................................................43

13.2.  Attorneys' Fees; Brokers' Fees; Expenses ....................................................43

SECTION 14    MISCELLANEOUS ..............................................................................43

14.1.  Sale of Assets Subject to Bankruptcy Court Approval ..................................43

14.2.  Survival of Representations and Warranties ..................................................43

14.3.  Entirety of Agreement; Amendments and Waivers .......................................44

14.4.  Assignment ....................................................................................................44

14.5.  Successors and Assigns; No Third Party Beneficiaries .................................44

14.6.  Governing Law; Jurisdiction .........................................................................44

14.7.  Gender and Number .......................................................................................45

14.8.  Headings ........................................................................................................45

14.9.   Construction ............................................................................................................45

14.10. Severability ..............................................................................................................45

14.11. Negotiated Agreement .............................................................................................45

14.12. Notices .....................................................................................................................45

14.13. Counterparts; Facsimile Copies ..............................................................................47

- vi -

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "<u>Agreement</u>") is made as of this 20th day of August, 2009, by and among Philly Papers, LLC, a Delaware limited liability company ("<u>Purchaser</u>"), Philadelphia Media Holdings, LLC ("<u>PMH</u>"), PMH Acquisition, LLC, a Delaware limited liability company ("<u>Parent</u>"), and each of Parent's direct and indirect Subsidiaries (as defined below) listed on the signature pages hereto (individually, "<u>Seller</u>" or "<u>Debtor</u>" or "<u>Debtor-in-Possession</u>" and collectively with PMH and Parent, "<u>Sellers</u>" or "<u>Debtors</u>" or "<u>Debtors-in-Possession</u>").

## <u>W I T N E S S E T H</u>:

WHEREAS, on February 23, 2009, each Seller, other than PMH, filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") with the Bankruptcy Court (as defined below), and on February 24, 2009, the Bankruptcy Court entered an order approving Sellers' application seeking administration and consolidation of Sellers' chapter 11 cases for procedural purposes only;

WHEREAS, on June 10, 2009, PMH filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court and, on June 16, 2009, the Bankruptcy Court entered an order approving PMH's application seeking administration and consolidation of its chapter 11 case with the other Sellers' chapter 11 cases for procedural purposes only;

WHEREAS, Sellers are continuing in the possession of their respective assets and in the management of their respective businesses pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, Sellers are presently engaged in the Business (as defined below); and

WHEREAS, Purchaser desires to purchase from Sellers, and Sellers desire to sell, transfer and assign to Purchaser, the Assets (as defined below) in accordance with this Agreement and in accordance with and subject to the Plan and the Confirmation Order (each as defined below), pursuant to sections 105(a), 1123 and 1129 of the Bankruptcy Code;

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants, promises and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## SECTION 1
## <u>INTERPRETATION</u>

1.1.    <u>Definitions</u>.  Whenever used in this Agreement, the following words and phrases shall have the respective meanings ascribed to them as follows.

"Additional Purchase Price" has the meaning set forth in Section 2.5(a).

"Affiliate" means, with respect to any Person, any other Person which directly or indirectly controls, is controlled by or is under common control with such Person. For purposes of this definition "control" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Ancillary Agreements" means, together, the Assignment and Assumption Agreement, the Bill of Sale, the Deeds, the Trademark Assignment and the Deposit Escrow Agreement.

"Assets" means, other than the Excluded Assets, all of Sellers' tangible and intangible assets, properties, rights, claims and contracts owned, leased and/or licensed by any Seller of every kind, character and description, whether accrued, contingent or otherwise, existing as of the Closing (which Assets comprise substantially all of Sellers' assets, properties, rights, claims and contracts), including, without limitation those Assets set forth in Section 2.1.

"Assignment and Assumption Agreement" means that certain assignment and assumption agreement to be executed at Closing with respect to the Assumed Contracts, in form to be agreed upon by Purchaser and Sellers.

"Assumed Contracts" has the meaning set forth in Section 2.3.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Auction" means the auction in connection with the sale of the Assets, as described in the Bid Procedures Order.

"Avoidance Actions" means all causes of action arising under chapter 5 of the Bankruptcy Code.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Pennsylvania.

"Base Purchase Price" has the meaning set forth in Section 2.5(a).

"Benefits Plans" has the meaning set forth in Section 3.18(a).

- 2 -

"<u>Bid Procedures Motion</u>" means the motion to be filed by Sellers in the Cases seeking the entry of the Bid Procedures Order.

"<u>Bid Procedures Order</u>" means the order of the Bankruptcy Court, the form and substance of which shall be subject to the approval of Purchaser and Sellers in their reasonable discretion.

"<u>Bidders</u>" has the meaning set forth in <u>Section 11.1(d)</u>.

"<u>Bids</u>" has the meaning set forth in <u>Section 11.1(d)</u>.

"<u>Bill of Sale</u>" means that certain bill of sale to be executed at Closing with respect to the Assets other than the Assumed Contracts, in form to be agreed upon by Purchaser and Sellers.

"<u>Breakup Fee</u>" has the meaning set forth in <u>Section 5.11</u>.

"<u>Business</u>" means Sellers' business of operating newspapers and publications, including those listed on <u>Schedule 1.1(a)</u> hereto and related websites located at the domain names listed on <u>Schedule 1.1(b)</u> hereto (the "<u>Websites</u>").

"<u>Business Day</u>" means a day other than a Saturday, Sunday or any other day on which the principal national banks located in the City of Philadelphia are not open for business during normal banking hours.

"<u>Cases</u>" means the Chapter 11 cases of Sellers filed in the Bankruptcy Court.

"<u>CBAs</u>" mean, collectively, Sellers' collective bargaining agreements with any union.

"<u>CERCLA</u>" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

"<u>CERCLIS</u>" means the Comprehensive Environmental Response, Compensation and Liability Information System maintained by the United States Environmental Protection Agency.

"<u>Closing</u>" has the meaning set forth in <u>Section 11.1</u>.

"<u>Closing Date</u>" has the meaning set forth in <u>Section 11.1</u>.

"<u>COBRA</u>" has the meaning set forth in <u>Section 8.2(b)</u>.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Confirmation Hearing</u>" means a hearing seeking the confirmation of the Plan pursuant to the Confirmation Order and section 1129 of the Bankruptcy Code.

- 3 -

"Confirmation Order" means a final, nonappealable order of the Bankruptcy Court confirming the Plan, in form and substance reasonably acceptable to Purchaser and Sellers, which order, as of the Closing Date, shall not have been stayed, vacated or otherwise rendered ineffective, and shall authorize, among other things (i) the sale of the Assets to Purchaser free and clear of all Encumbrances, (ii) the assignment of the Assumed Contracts to and the assumption of the Assumed Contracts by Purchaser and (iii) the consummation of the transactions contemplated by the Ancillary Agreements and all other transactions and agreements contemplated hereby.

"Contracts" means all commitments, contracts, leases, licenses, agreements and understandings, written or oral, relating to the Assets or the operation of the Business to which any Seller is a party or by which any Seller or any of Assets are bound.

"Cure Amounts" means all amounts payable in connection with the cure of defaults of any of the Assumed Contracts.

"Debtors" has the meaning set forth in the preamble.

"Debtors-in-Possession" has the meaning set forth in the preamble.

"Deeds" has the meaning set forth in the Section 11.1(a)(iii).

"Deposit Escrow Agent" has the meaning set forth in Section 2.6.

"Deposit Escrow Agreement" has the meaning set forth in Section 2.6.

"Disclosure Statement" means a disclosure statement under section 1125 of the Bankruptcy Code to be filed in connection with the solicitation of the Plan.

"Disputed AP" has the meaning set forth in Section 5.4(c).

"DOJ" has the meaning set forth in Section 7.2(b).

"Employee" means any employee of Sellers as of the Closing Date.

"Encumbrances" means, with respect to any Asset, any mortgage, deed of trust, deed to service debt, pledge, security interest, lien, charge, lease, claim, encumbrance, option, right of first refusal, imperfection of title, covenant, encroachment, easement, servitude, proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement, state of facts or any other restrictions or third party rights.

"Environmental Law" means any federal, state, local or foreign statute, law, ordinance, rule, regulation, code, order, writ, judgment, injunction, decree or legally binding judicial or agency interpretation, policy or guidance relating to pollution or protection of the environment,

- 4 -

natural resources, or health and safety, including those relating to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Materials.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" has the meaning set forth in Section 3.18(a).

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Liabilities" means all of the obligations and liabilities of Sellers other than the Assumed Liabilities.

"Excluded Real Property" means the real property described on Schedule 2.2(b), together with all buildings, fixtures, structures, improvements, and other appurtenances thereto and thereon.

"Expense Reimbursement" has the meaning set forth in Section 5.11.

"Financial Statements" has the meaning set forth in Section 3.14.

"Fiscal Year Financial Statements" has the meaning set forth in Section 3.14.

"FTC" has the meaning set forth in Section 7.2(b).

"GAAP" means accounting principles generally accepted in the United States of America, consistently applied.

"Governmental Authority" means any United States federal, state or local government or any foreign government, or political subdivision thereof, or any multinational organization or authority or any authority, agency or commission entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, any court or tribunal (or any department, bureau or division thereof), or any arbitrator or arbitral body.

"Hazardous Materials" means (a) petroleum or petroleum products, by-products or breakdown products, radioactive materials, asbestos-containing materials, polychlorinated biphenyls and radon gas and (b) any other chemicals, materials or substances designated, classified or regulated as hazardous or toxic or as a pollutant or contaminant under any Environmental Law.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"Intellectual Property" has the meaning set forth in Section 3.9.

- 5 -

"Law" means any federal, state, local or foreign statute, law, code, ordinance, order, rule or regulation or any common law requirement.

"Lease" means the Lease of the premises at 400 N. Broad Street, Philadelphia, Pennsylvania from Philadelphia Newspapers, LLC, as initial landlord, to the Purchaser, having terms as set forth on the Term Sheet attached hereto as Exhibit A, the landlord's interest in which shall be subject to assignment to or for the benefit of the Senior Lenders in accordance with the Plan. In accordance with the Plan, the Senior Lenders shall acquire title to the Excluded Real Property subject to the rights of Purchaser under the Lease.

"Liability" means any debt, liability, duty, responsibility, obligation, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, premium or obligation of any kind, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed, including all costs and expenses relating thereto.

"Liquidation Trustee" means the trustee of the liquidation trust to be established pursuant to the Plan.

"Material Adverse Effect" means, (x) with respect to the Sellers, any material adverse effect on the business, operations, assets, condition (financial or otherwise), liabilities or results of operations of the Sellers taken as a whole, or on the ability of the Sellers to perform their obligations under this Agreement and the Ancillary Agreements and consummate the Transactions, and (y) with respect to the Assets, any material adverse effect on the condition of the Assets taken as a whole; provided, however, that in determining whether there has been a Material Adverse Effect, any effect to the extent attributable to any of the following shall be disregarded: (i) with respect to the Sellers or the Assets, the occurrence of any event materially adversely affecting the industry in which the Business operates or in which the Assets are held and not uniquely relating to the Sellers, the Business or the Assets (as applicable), (ii) with respect to the Sellers or the Assets, any change in the general condition of the regional, national or global economy; (iii) the taking of any action required to be taken by a party under the terms of this Agreement, or (iv) the announcement or existence of this Agreement or the Transactions.

"Material Contract" means any Contract that requires payment by or to Sellers of more than $100,000 in any consecutive twelve (12) month period or is otherwise material to the business of the Sellers taken as a whole.

"Orders" has the meaning set forth in Section 7.1(c).

"Organizational Documents" means, with respect to any Person (other than an individual), (a) the certificate or articles of incorporation or organization and any joint venture,

- 6 -

limited liability company, operating or partnership agreement and other similar documents adopted or filed in connection with the creation, formation or organization of such Person and (b) all by-laws, voting agreements and similar documents, instruments or agreements relating to the organization or governance of such Person, in each case, as amended or supplemented.

"Owned Real Property" has the meaning set forth in Section 3.11.

"PMH" has the meaning set forth in the preamble.

"Parent" has the meaning set forth in the preamble.

"Permits" has the meaning set forth in Section 3.5(b).

"Permitted Encumbrances" means those Encumbrances set forth on Schedule 1.1(c), any other Encumbrances such as utility easements, zoning restrictions, tax liens (for taxes not yet due and payable), other exemptions noted on a current survey, or other customary covenants and restrictions of record that do not adversely affect the ownership or leasing of the Real Property or the conduct of the Business, and Encumbrances related to Assumed Liabilities.

"Person" means any individual or corporation, association, partnership, limited liability company, joint venture, joint stock or other company, business trust, trust, organization, Governmental Authority or other entity of any kind.

"Plan" means the Joint Plan filed or to be filed by the Debtors in the Cases in form and substance reasonably satisfactory to Purchaser and Sellers, as amended from time-to-time.

"Pre-Closing Period" has the meaning set forth in Section 5.4(a).

"Pre-Closing Returns" has the meaning set forth in Section 3.16.

"Providing Party" has the meaning set forth in Section 7.1(b).

"Purchase Price" means the purchase price payable to Sellers for the Assets provided for in Section 2.5.

"Purchaser" has the meaning set forth in the preamble.

"Purchaser Deposit Amount" has the meaning set forth in Section 2.6.

"Qualifying Bid" has the meaning set forth in Section 11.1(e).

"Real Property" means all real property owned, leased or subleased by Sellers and all easements granted to Sellers, each of which is described on Schedule 1.1(d), together with all buildings, improvements and fixtures thereon and all appurtenances and rights thereto.

- 7 -

"Restricted Cash" means all cash held by insurance or credit card companies to secure Sellers' obligations under such policies or plans.

"Restricted Cash Financing" has the meaning set forth in Section 6.2.

"Requesting Party" has the meaning set forth in Section 7.1(b).

"Scheduling Motion" means a motion to be filed with the Bankruptcy Court seeking an order (a) setting a date for the Confirmation Hearing and deadlines for submitting ballots and objections in connection with the Plan; and (b) approving the Disclosure Statement and related solicitation materials.

"Seller Assumed Plans" has the meaning set forth in Section 8.3.

"Sellers" has the meaning set forth in the preamble.

"Senior Agent" means Citizens Bank of Pennsylvania, as agent for the Senior Lenders.

"Senior Lenders" means the lenders party to the Credit and Guaranty Agreement dated as of June 29, 2006, as amended, with Debtor Philadelphia Newspapers, LLC, as borrower, and the other Debtors (other than PMH) as guarantors.

"Stub Period Balance Sheet" has the meaning set forth in Section 3.14.

"Stub Period Date" has the meaning set forth in Section 3.14.

"Stub Period Financial Statements" has the meaning set forth in Section 3.14.

"Subsidiary" means, with respect to any Person, any corporation or other business entity, whether or not incorporated, of which more than fifty percent (50%) of the securities or interests having, by their terms, ordinary voting power to elect members of the board of directors or managers, or other persons performing similar functions with respect to such entity, are held, directly or indirectly, by such Person.

"Superior Bid" has the meaning set forth in Section 11.1(d).

"Tax" or "Taxes" means (i) all federal, state, local and foreign taxes, charges, fees, imposts, levies or other assessments, including income, gross receipts, excise, employment, sales, use, transfer, license, payroll, franchise, severance, stamp, withholding, Social Security, unemployment, disability, real property, personal property, registration, alternative or add-on minimum, estimated or other taxes, charges, fees, imposts, levies or other assessments, including any interest, penalties or additions thereto, whether disputed or not, and (ii) any liability for any items

- 8 -

described in clause (i) payable by reason of contract, transferee liability, operation of law (including Treasury Regulation Section 1.1502-6) or otherwise.

"Tax Authority" means any domestic (whether federal, state, or local) or foreign governmental authority having responsibility for taxation.

"Tax Return" means any report, return, information return, filing, claim for refund or other information, including any schedules or attachments thereto, and any amendments to any of the foregoing required to be supplied to a taxing authority in connection with Taxes.

"Termination Date" has the meaning set forth in Section 11.2(b).

"Trademark Assignment" means that certain trademark assignment to be executed at Closing with respect to the registered trademarks of Sellers, in form to be agreed upon by Purchaser and Sellers.

"Transactions" mean the transactions contemplated by this Agreement, the Ancillary Agreements and all other transactions and agreements contemplated hereby and thereby.

"Transaction Taxes" has the meaning set forth in Section 12.1.

"Transferred Employees" has the meaning set forth in Section 8.1(a).

"Transferred Real Property" means the Owned Real Property other than the Excluded Real Property.

"Union Employees" has the meaning set forth in Section 8.1(a).

"WARN Act" means, collectively, the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any other similar statutes or regulations of any jurisdiction relating to any plant closing or mass layoff.

"Workers' Compensation Claims" means claims asserted by employees of the Sellers generally considered as workers' compensation claims (e.g., claims for compensation for injury or illness incurred while working for Sellers).

## SECTION 2
## PURCHASE, SALE AND ASSIGNMENT OF PURCHASED ASSETS

2.1.    Sale of Assets.  Subject to the terms and conditions of this Agreement, at Closing, Sellers shall sell, assign, convey, transfer and deliver to Purchaser, and Purchaser shall purchase from Sellers, all of Sellers' right, title and interest in the Assets, free and clear of all Encumbrances other than the Permitted Encumbrances, including all of Sellers' right, title and interest in the

- 9 -

following:

  (a)  all tangible personal property owned or used by any Seller including, without limitation, all equipment, furniture, fixtures, newsprint, inventory, supplies, machinery, vehicles, tools and furnishings;

  (b)  all Owned Real Property, together with all buildings, fixtures, structures, improvements and other appurtenances thereto and thereon, other than the Excluded Real Property;

  (c)  all interests of Sellers in the Assumed Contracts;

  (d)  all interests of Sellers in, and all assets relating to, the Seller Assumed Plans;

  (e)  any and all claims and causes of action of Sellers or their chapter 11 estates against third parties, including, without limitation, all Avoidance Actions except as expressly set forth in Section 2.2 herein below;

  (f)  all interests of Sellers in and to all Intellectual Property and all computer software, programs and similar systems (including data and related documentation) owned or licensed by Sellers;

  (g)  all accounts receivable and other receivables of Sellers including, without limitation, all accounts receivable and other receivables from advertisers payable to any Seller with respect to services performed by or on behalf of any Seller on or prior to the Closing Date;

  (h)  all Permits that relate to the Business;

  (i)  all rights of any Seller relating to deposits and prepaid charges and expenses, and claims for refunds relating to the Assets;

  (j)  Sellers' rights in all insurance policies, including workers' compensation policies, to the extent transferable and to the extent the coverage relates to the Assets or the Assumed Liabilities (including, without limitation, the Restricted Cash);

  (k)  all books and records, files, data, reports, computer codes and sourcing data, advertiser and supplier lists, cost and pricing information, business plans, and manuals, blueprints, research and development files, accounting and tax files, personnel records and other records of any Seller or related to the operations of any Seller and/or the Business;

  (l)  all marketing, advertising and promotional materials; and

- 10 -

Current/15517013v5                     08/20/2009 12:35 PM

821303_1

(m)     all goodwill associated with the Business and/or the Assets.

2.2.     <u>Excluded Assets</u>.  Notwithstanding the generality of <u>Section 2.1</u>, the following assets are not a part of the sale and purchase contemplated by this Agreement and are excluded from the Assets (collectively, the "<u>Excluded Assets</u>"):

(a)     all cash and cash equivalents of Sellers (other than the Restricted Cash);

(b)     the Excluded Real Property;

(c)     any Contracts other than the Assumed Contracts;

(d)     those assets of Sellers set forth on <u>Schedule 2.2(d)</u>;

(e)     the Purchase Price;

(f)     all rights, claims and causes of action of Sellers relating to this Agreement;

(g)     all assets relating to Benefit Plans, other than Seller Assumed Plans;

(h)     all corporate minute books, stock transfer books, the corporate seal of Sellers and all other corporate books and records relating to Sellers' organization and existence; and

(i)     any shares of stock or other equity interests in any Parent or Subsidiary of Parent.

2.3.     <u>Assumed Liabilities</u>.  <u>Schedule 2.3</u> lists those Contracts that Purchaser may elect to assume and request Sellers to assign to Purchaser at the Closing. No less than ten (10) days prior to the Confirmation Hearing, Purchaser shall designate which of such Contracts it wishes to have Sellers assign to Purchaser (the "<u>Assumed Contracts</u>"), which (subject to <u>Sections 6.3</u> and <u>10.10</u> below) Assumed Contracts shall expressly include the workers' compensation and other insurance policies identified on <u>Schedule 2.3</u>. Appropriate deletions shall be made to <u>Schedule 2.3</u> at the Closing and a schedule of Assumed Contracts and any Cure Amounts relating thereto, shall be filed by Sellers with the Bankruptcy Court prior to the Confirmation Hearing.  At Closing, Purchaser shall be required to provide adequate assurance of future performance with respect to the Assumed Contracts.  Effective as of the Closing Date, Purchaser shall assume and thereafter in due course pay, fully satisfy, discharge and perform the Liabilities of Sellers arising after the Closing under the Assumed Contracts and the other Liabilities of Sellers referred to in this <u>Section 2.3</u> (collectively, the "<u>Assumed Liabilities</u>"), as follows:

(a)     all trade payables arising after February 23, 2009 and all accrued liabilities (including, without limitation, any accrued salaries, vacation pay or other compensation expense) and all deferred revenues as of the Closing Date that arose in the ordinary course of

- 11 -

Sellers' business;

(b)      all Liabilities relating to the Seller Assumed Plans;

(c)      all Liabilities relating to ownership or use of the Assets or otherwise relating to the Business, in each case arising after the Closing;

(d)      all Cure Amounts with respect to the Assumed Contracts;

(e)      all claims having statutory priority pursuant to sections 503 or 507 of the Bankruptcy Code (other than employee Liabilities assumed by Purchaser pursuant to Section 2.3(a)), to the extent allowed in the Cases;

(f)      all Liabilities for Workers' Compensation Claims pending at the Closing or asserted thereafter;

(g)      all Liabilities to pay for, purchase or acquire assets, supplies or services ordered but not received and consumed by Sellers on or prior to the Closing Date (whether pursuant to purchase orders or otherwise) in the ordinary course of Sellers' business; and

(h)      any Liability of Sellers for indemnification to any officer, director, manager, employee or agent pursuant to any litigation set forth on Schedule 2.3(h) or any other litigation commenced on or after the date hereof and prior to the Closing.

Notwithstanding the foregoing, on or prior to two Business Days prior to the bidding deadline set forth in the Bid Procedures Order, Purchaser shall have the right to reject and not assume some or all of the following Liabilities:  (i) Liabilities for any salary, accrued vacation or other employee compensation obligation under clause (a) above, and/or (ii) Liabilities relating to Sellers' indemnification obligations to any officer, director, manager, employee or agent under clause (h) above.  Sellers shall promptly provide all information and materials reasonably requested by Purchaser relating to these Liabilities and shall otherwise cooperate and assist Purchaser, at Purchaser's request, in evaluating these Liabilities, including, without limitation, providing Purchaser with a detailed accounting of the cash value of such Liabilities.  Purchaser shall deliver Sellers written notice on or prior to two Business Days prior to the bidding deadline set forth in the Bid Procedures Order of any Liability with respect to which it elects to exercise its rights under the preceding sentence to reject and not assume (in which case, any such Liability shall be an Excluded Liability).

In addition, and notwithstanding anything to the contrary contained herein, the dollar amount of the liabilities to be assumed by Purchaser under Section 2.3(e) above for claims that have statutory priority pursuant to sections 503 and 507 of the Bankruptcy Code shall in no event exceed (x) the amount of the Restricted Cash released to Purchaser in connection with the Restricted Cash Financing less (y) the amount payable by Purchaser pursuant to Section 2.5(b) below.

- 12 -

2.4.   Excluded Liabilities.  Under no circumstance shall Purchaser assume or be obligated to pay, and none of the Assets shall be or become liable for or subject to, any of the Excluded Liabilities, including, but not limited to, the following liabilities, which shall be and remain Liabilities of Sellers:

(a)   Liabilities which are not Assumed Liabilities;

(b)   Liabilities associated with any Excluded Assets;

(c)   Liabilities associated with any and all indebtedness of any Seller for borrowed money not included in the Assumed Liabilities;

(d)   Liabilities arising out of or in connection with claims, litigation and proceedings (whether instituted prior to or after Closing) for acts or omissions that occurred, or arise from events that occurred, prior to the Closing Date (other than as set forth in Section 2.3(h) hereof);

(e)   Liabilities arising out of any CBAs;

(f)   Liabilities arising out of any Benefit Plans, other than the Seller Assumed Plans and any other Benefit Plan that Purchaser expressly agrees to assume in its sole discretion pursuant to a written amendment to Section 2.3 above;

(g)   penalties, fines, settlements, interest, costs and expenses arising out of or incurred as a result of any actual or alleged violation by any Seller of any Law prior to the Closing Date;

(h)   Liabilities arising out of or resulting from layoffs or termination of employees by any Seller prior to Closing and/or the consummation of the Transactions sufficient in the aggregate to require notice under the WARN Act; and

(i)   all Liabilities for expenses (i) relating to the negotiation and preparation of this Agreement and (ii) relating to the Transactions, in each case to the extent incurred by Sellers and including those related to legal counsel, accounting, brokerage and investment advisors fees and disbursements.

2.5.   Purchase Price.

(a)   The aggregate purchase price for the Assets shall equal $30,000,000.00 (the "Base Purchase Price"), exclusive of and in addition to the assumption of the Assumed Liabilities, (i) plus the amount (the "Additional Purchase Price") by which the Restricted Cash exceeds the sum of (x) the Assumed Liabilities described in Section 2.3(e) above with respect to statutory priority pursuant to sections 503 or 507 of the Bankruptcy Code, to the

- 13 -

extent allowed in the Cases, and (y) the payment to be made pursuant to <u>Section 2.5(b)</u> below (it being acknowledged and agreed that the Restricted Cash shall be used to satisfy the obligations in clauses (x) and (y) hereof), and (ii) <u>less</u> the amount of any Disputed AP as of the Closing Date.  The Base Purchase Price shall be payable in immediately available funds on behalf of Sellers to the Senior Agent for the benefit of the Senior Lenders and the Additional Purchase Price shall be payable in immediately available funds to Sellers, each in accordance with the wire instructions to be delivered by Sellers to Purchaser prior to the Closing; and

(b)     In addition, Purchaser shall pay from the Restricted Cash the amount of the Unsecured Creditor Fund (as defined in the Plan), which amount shall not exceed the amount of the Restricted Cash released to Purchaser in connection with the Restricted Cash Financing less the amount of Assumed Liabilities under Section 2.3(e), in immediately available funds to the Liquidation Trustee on behalf of Sellers in accordance with the wire instructions to be provided by the Liquidation Trustee to Purchaser at or before Closing.

2.6.     <u>Purchaser Deposit</u>.  Simultaneously with the execution of this Agreement, pursuant to the terms of an escrow agreement substantially in the form attached hereto as <u>Exhibit B</u> (the "<u>Deposit Escrow Agreement</u>"), Purchaser is depositing with the escrow agent under the Deposit Escrow Agreement (the "<u>Deposit Escrow Agent</u>") the sum of $3,000,000 by certified check or wire transfer of immediately available funds (the "<u>Purchaser Deposit Amount</u>"), to be released by the Escrow Agent and delivered to either Purchaser or Sellers in accordance with the provisions of the Deposit Escrow Agreement and the terms of this Agreement as follows:

(a)     If the Closing shall occur, the Purchaser Deposit Amount, together with all accrued interest and investment income thereon, shall be applied in accordance with <u>Section 11.1(b)</u> below towards the Purchase Price payable by Purchaser under <u>Section 2.5(a)</u> hereof;

(b)     If this Agreement is terminated by Sellers pursuant to <u>Section 11.2(e)</u>, the Purchaser Deposit Amount, together with all accrued interest and investment income thereon, shall be delivered to Sellers.  Sellers' right to the Purchaser Deposit Amount shall be in lieu of any and all other rights and remedies that Seller may otherwise have against Purchaser on account of, and in full satisfaction of, any breach, violation or default by Purchaser under this Agreement; and

(c)     If this Agreement is terminated for any reason other than by Sellers pursuant to <u>Section 11.2(e)</u>, the Purchaser Deposit Amount, together with all accrued interest and investment income thereon, shall be returned to Purchaser and, if payable pursuant to the terms hereof, Purchaser shall be paid the Breakup Fee and Expense Reimbursement, in lieu of any and all other remedies that Purchaser may otherwise have against Sellers on account of, and in full satisfaction of, any breach, violation or default by Sellers under this

- 14 -

Agreement.

2.7.    <u>Allocation of Purchase Price</u>.  To the extent required by Law, promptly following the Closing Date, Purchaser and Sellers shall prepare and file those statements or forms (including Form 8594) required by Section 1060 of the Code and the Treasury regulations thereunder and shall file such statements or forms with their respective applicable federal income Tax Returns due after the Closing Date.  The parties shall prepare such statements or forms consistently with the allocation of all or a portion of the Purchase Price plus the Assumed Liabilities among the Assets as proposed by Purchaser and consented to by Sellers (which such consent shall not be unreasonably withheld, conditioned or delayed) prior to the Closing.  Each party shall provide the other party with a copy of such statements or forms as filed.  Each party agrees that it shall take no position with respect to the allocation of the Purchase Price that is adverse to any other party.

2.8.    <u>Sale at Closing Date</u>.  The sale, transfer, assignment, conveyance and delivery by Sellers of the Assets to Purchaser and the assumption by Purchaser of the Assumed Liabilities, as provided herein and in the Ancillary Agreements, shall be effected on the Closing Date by (i) the execution and delivery by Sellers and Purchaser of the Assignment and Assumption Agreement with respect to the Assumed Contracts and the Assumed Liabilities, (ii) the execution and delivery by Sellers to Purchaser of Deeds with respect to the Transferred Real Property, (iii) the execution and delivery by Sellers of the Trademark Assignment with respect to Sellers' registered trademarks, and (iv) the execution and delivery by Sellers to Purchaser of the Bill of Sale with respect to all of the Assets other than the Assumed Contracts and the Transferred Real Property.

2.9.    <u>Excluded Assets and Liabilities</u>.  Notwithstanding anything to the contrary contained herein, Purchaser shall not purchase any of the Excluded Assets nor assume any liability for any of the Excluded Liabilities.

### SECTION 3
### <u>REPRESENTATIONS AND WARRANTIES OF SELLERS</u>

Sellers hereby jointly and severally represent and warrant to Purchaser as follows:

3.1.    <u>Organization and Good Standing</u>.  <u>Schedule 3.1</u> sets forth for each Seller its name and jurisdiction of organization.  Each Seller is (a) validly existing and in good standing under the laws of the jurisdiction of its organization and (b) duly qualified to do business and in good standing in each jurisdiction in which the ownership, use or leasing of its assets and properties, or the conduct or nature of its business, makes such qualification, licensing or admission necessary, except for such failures to be so qualified, licensed or admitted and in good standing which, individually or in the aggregate, would have a Material Adverse Effect.

3.2.    <u>Authorization</u>.  Subject to entry of the Confirmation Order, each Seller has all requisite power and authority to execute and deliver, and carry out its obligations under, this

- 15 -

Agreement and the Ancillary Agreements and consummate the Transactions, and is not under any prohibition or restriction, contractual, statutory or otherwise, against doing so.  Each of this Agreement and the Ancillary Agreements has been or will be duly executed and delivered by each Seller and, assuming due authorization, execution and delivery by Purchaser, constitutes or will constitute the legal, valid and binding obligation of such Seller, enforceable against it in accordance with its terms, subject to entry of the Confirmation Order.

3.3.    No Conflicts.  Subject to entry of the Confirmation Order and approval, if required, under the HSR Act and other than as set forth on Schedule 3.3 hereto, the execution, delivery and performance by each Seller of this Agreement and each of the Ancillary Agreements and the consummation by each Seller of the Transactions shall not, with or without the giving of notice or lapse of time, (i) violate any provision of the Organizational Documents of such Seller, (ii) violate any Law to which such Seller is subject, (iii) conflict with, result in any violation of any term or condition of, result in a breach or termination of, or constitute a default under any Contract to which such Seller is a party or result in the creation of any Encumbrance upon any of the Assets (including any Assumed Contract), or (iv) conflict with, or result in a breach or default under, any term or condition of any other agreement or other instrument to which such Seller is a party or by which such Seller is bound, except as would not have a Material Adverse Effect.

3.4.    Consents and Approvals.  Subject to entry of the Confirmation Order and approval, if required, under the HSR Act and other than as set forth on Schedule 3.4 hereto, the execution, delivery and performance by each Seller of this Agreement and the Ancillary Agreements and the consummation of the Transactions do not require the consent or approval of, or filing with, any Governmental Authority.

3.5.    Compliance with Law.

(a)    Sellers are in compliance with Sellers' Organizational Documents and with all Laws relating to the Assets, except as would not have a Material Adverse Effect on the Sellers or the Assets.

(b)    Schedule 3.5(b) sets forth a true and complete list of all material approvals, permits, certificates, qualifications, authorizations, licenses, franchises, consents, orders and registrations, together with all modifications, amendments, supplements and extensions thereof, of all United States federal, state and local Governmental Authorities and any other Person that are necessary for Sellers to own the Assets (collectively, the "Permits").  To Sellers' knowledge, the Permits are valid and in full force and effect and are fully and freely transferable by Sellers to Purchaser except as would not have a Material Adverse Effect.  Except as set forth on Schedule 3.5(b), none of the Permits shall be terminated or become terminable as a result of the Transactions.

3.6.    Title to Assets.  Except as set forth in Schedule 3.6 hereto, Sellers are the owners of

- 16 -

the Assets as of the date hereof. Subject to entry of the Confirmation Order, Sellers have, and at the Closing Purchaser shall receive, good, valid and marketable title to the Assets, free and clear of any and all Encumbrances except for the Permitted Encumbrances. The Assets consisting of personal property are in good operating condition and repair (reasonable wear and tear excepted), are suitable for the purposes for which they are presently used and presently proposed to be used and are located at the Real Property. At Closing, this Agreement and the Ancillary Agreements will effectively vest in Purchaser all of Sellers' right, title and interest in the Assets and Purchaser will require no material assets other than the Assets in order to conduct the Business as conducted by Seller immediately prior to Closing. No Seller has taken any action, or failed to take any action, which action or failure would preclude or prevent Purchaser as a legal matter from conducting the Business in the manner now conducted (subject to the Excluded Real Property). No Asset is subject to any agreement, written or oral, for its sale or use by any Person other than Sellers.

3.7. <u>Intentionally omitted</u>.

3.8. <u>Litigation</u>. No lawsuit, governmental investigation or legal, administrative or arbitration action or proceeding is pending or, to the best of Sellers' knowledge, has been threatened against any Seller, or any director or officer of any Seller in his or her capacity as such, which questions the validity of this Agreement or seeks to prohibit, enjoin or otherwise challenge the consummation of the Transactions, or which relates to, or could have a Material Adverse Effect on, the Assets.

3.9. <u>Intellectual Property</u>. Except as would not have a Material Adverse Effect, one or more Sellers own, or is licensed or otherwise possesses legally enforceable rights to use, all material trademarks, trade names, service marks, service names, mark registrations, logos, assumed names, registered and unregistered copyrights, patents or applications and registrations used in the Business as currently conducted (collectively, the "<u>Intellectual Property</u>"). Except as would not have a Material Adverse Effect, (a) as of the date hereof, there are no pending or, to the best of Sellers' knowledge, threatened claims by any Person alleging infringement of any material Intellectual Property rights of any Person by Sellers as a result of their use of the Intellectual Property used in the Business, (b) to the best of Sellers' knowledge, the conduct of the Business does not infringe any material intellectual property rights of any Person, (c) no Seller has made any claim of a violation or infringement by others of its rights to or in connection with the Intellectual Property included in the Assets, and (d) to the best of Sellers' knowledge, no person is infringing any Intellectual Property included in the Assets.

3.10. <u>Material Contracts</u>. True and complete copies (including all modifications, amendments and supplements) of each of the Material Contracts have been made available by Sellers to Purchaser. Except as has not had or would not have a Material Adverse Effect, or as would be cured pursuant to this Agreement and the Plan, no Seller and, to the best of Sellers' knowledge, no other party to any Material Contract is in default, violation or failure to perform under any Material Contract. To the best of Sellers' knowledge, no Seller has assigned, delegated or

- 17 -

otherwise transferred to any third party any of its rights or obligations with respect to any Material Contract. To the best of Sellers' knowledge, no party to any of the Material Contracts has threatened or is intending to cancel, terminate, materially alter, or not renew any of the Material Contracts.

3.11.  Real Property.  Schedule 3.11 sets forth a list of real property currently owned ("Owned Real Property") or leased by Sellers and used in the operation of the Business. Except as would not have a Material Adverse Effect, one or more Sellers own and has valid title to all of the Owned Real Property and has valid leasehold interests in all of the leased properties used in the operation of the Business, free and clear of any and all Encumbrances (except for Permitted Encumbrances). Except as would not have a Material Adverse Effect, to Sellers' knowledge, each material lease agreement to which any Seller is a party is valid and enforceable and no Seller is in default under any such agreement other than as would be cured pursuant to this Agreement and the Plan, and no circumstances exist which, with notice, the passage of time or both, would reasonably be expected to constitute a default by any Seller under any such lease agreement.

3.12.  No Broker or Finder.  Except for Sonenshine Partners, no broker, finder or financial advisor has been engaged by any Seller in connection with the Transactions.

3.13.  Insurance.  All insurance policies maintained by Sellers are with reputable insurance carriers, and provide coverage appropriate in character and amount for the Assets. Each such insurance policy is in full force and effect, and all premiums due and payable in respect thereof have been paid.

3.14.  Financial Statements.  Sellers have delivered to Purchaser the consolidated balance sheet of Sellers as of, and consolidated statements of earnings and retained earnings and cash flows for the fiscal years ended, December 28, 2008 and December 30, 2007 (collectively, the "Fiscal Year Financial Statements"). The Fiscal Year Financial Statements have been prepared in accordance with GAAP consistently applied in accordance with Sellers' past practice throughout the periods indicated. Sellers have also delivered to Purchaser an unaudited balance sheet for Sellers as of June 28, 2009 (the "Stub Period Balance Sheet") and the related income statement for the six (6)-month period then ending (collectively, the "Stub Period Financial Statements"). The Stub Period Financial Statements have been prepared in accordance with GAAP consistently applied in accordance with Sellers' past practice except for the absence of footnotes and customary year-end adjustments. The Fiscal Year Financial Statements and the Stub Period Financial Statements (together the "Financial Statements") (a) are true, correct and complete in all material respects, (b) are in accordance in all material respects with the books and records of Sellers, and (b) fairly present in all material respects the financial position of Sellers at the dates specified and the results of their operations for the period covered. The copies of the Financial Statements delivered to Purchaser are true, correct and complete copies. Except as set forth on Schedule 3.14, at June 28, 2009 (the "Stub Period Date"), Sellers did not have any material liabilities or obligations of any kind or nature which are not fully reflected in accordance with GAAP on the Stub Period Balance Sheet. Except as set

- 18 -

forth on <u>Schedule 3.14</u>, Sellers have not guaranteed any obligation of any other Person.

3.15.  <u>Absence of Certain Changes</u>.  Except as set forth on <u>Schedule 3.15</u>, from February 22, 2009 to the date hereof, taking into account Sellers' bankruptcy filing and the supervision of Sellers by the Bankruptcy Court, the Business has been conducted by Sellers in the ordinary and usual course and specifically but without limitation, there has not been any:

(a)  damage, destruction or other casualty loss to any of their assets (whether or not covered by insurance);

(b)  material increase in the compensation payable or to become payable by any Seller to any employee or material increase in any bonus, insurance, pension or other employee benefit plan (including material increases in benefits or employer costs associated with any such pension or other employee benefit plans), payment or arrangement made by any Seller for or with respect to any employee, except for compensation increases in the ordinary course of business consistent with past practice of Sellers or as required by law;

(c)  labor dispute, or any activity or proceeding by a labor union or representative thereof to organize any employees, or lockouts, strikes, slowdowns, work stoppages or threats thereof by or with respect to any such employees;

(d)  obligation or liability incurred by any Seller, or creation or assumption by any Seller of any Encumbrance on any Asset, or making of any loan, advance or capital contribution to or investment in any Person, except in the ordinary course of business consistent with past practice of Sellers;

(e)  declaration, setting aside or payment of any dividend or other distribution in respect of capital stock or any other security of any Seller, or direct or indirect redemption, purchase or other acquisition of capital stock or any other security of Sellers;

(f)  payment, discharge or satisfaction of any obligation or liability of any Seller, other than in the ordinary course of business consistent with past practice of Sellers;

(g)  sale, transfer, or other disposition of any tangible or intangible asset of any Seller, other than in the ordinary course of business consistent with past practice of Sellers;

(h)  change in the accounting methods or practices followed by Sellers;

(i)  cancellation of any indebtedness or claims, or termination or waiver of any rights of any Seller, other than in the ordinary course of business consistent with past practice of Sellers;

(j)  disposal or lapse of any material Intellectual Property owned by Sellers;

- 19 -

(k)     assignment, lapse, cancellation, sale or other disposition of any rights or interests of any Seller under any Material Contract; or

(l)     agreement entered into by any Seller (other than any arrangement provided for in this Agreement) to take any of the actions specified in the foregoing subsections (a) through (k).

3.16.   <u>Taxes</u>.  Each Seller has filed all Tax Returns required to be filed by it on or before the Closing Date with any Taxing Authority (collectively, the "<u>Pre-Closing Returns</u>").  The Pre-Closing Returns have been filed in accordance with all applicable Laws and, as of the time of filing, were correct and complete in all material respects regarding the income, costs, business, assets, operations, activities and status of Sellers and any other items of information shown therein.  Each Seller has timely paid, withheld or reserved all Taxes shown as due and payable in the Pre-Closing Returns except for such Taxes that are being contested in good faith by appropriate proceedings and which are listed on <u>Schedule 3.16</u>.  No Seller is delinquent in the payment of any Tax due and payable as shown on any Pre-Closing Return, nor, except as set forth on <u>Schedule 3.16</u>, has any Seller requested an extension of time within which to file or send any Pre-Closing Return which has not since been filed or sent.  Except as set forth on <u>Schedule 3.16</u>, no Seller has granted any extension or waiver of the limitation period applicable to any Pre-Closing Returns to any Taxing Authority.  There is no claim, audit, action, suit, proceeding, or investigation pending or, to the knowledge of Sellers, threatened, against or with respect to any Seller in respect of any Tax except as set forth on <u>Schedule 3.16</u>.  No Seller has a pending request for a ruling with any Taxing Authority.  Except as set forth on <u>Schedule 3.16</u>, there are no liens for Taxes upon the assets of Sellers except liens for current Taxes not yet due or as set forth on <u>Schedule 3.16</u>.  Since its organization, no Seller has been a member of an affiliated group filing any return with any Taxing Authority (except with respect to any other Sellers), or filed or been included in a combined, consolidated or unitary return.  No Seller is under any contractual obligation to indemnify any other Person (other than another Seller) with respect to Taxes nor, except as set forth on <u>Schedule 3.16</u> is any Seller a party to any material agreement providing for payments with respect to Taxes.

3.17.   <u>Collective Bargaining Agreements, Employment Agreements, etc</u>.

(a)     <u>Schedule 3.17</u> lists all employee benefit plans, all union, collective bargaining or other employee association agreements, and all other written agreements (in each case, other than the Benefit Plans set forth on <u>Schedule 3.18(a)</u>) providing for any material salary, bonus, benefits, perquisites, severance, management fees or other compensation relating to service to be paid to any director, officer, employee or independent contractor (other than for professional services) of Sellers.

(b)     No Seller (i) has breached or otherwise failed to comply in any material respect with any provision of any plan or agreement set forth on <u>Schedule 3.17</u>, (ii) has employees organized as a bargaining unit or the like by any labor organization except as

- 20 -

disclosed on Schedule 3.17, (iii) is and has been within the last two (2) years, subject to any unfair labor practice complaints before the National Labor Relations Board or is subject to any current union representation questions involving any employees, (iv) is or has been within the last two (2) years subject to any activities or proceedings of any labor union (or representatives thereof) to organize any unorganized employees, and (v) is or has been within the last two (2) years subject to any strikes, organized slowdowns, work stoppages or lockouts.

(c)     No Seller is in violation in any material respect, and no Seller has received within the last two (2) years written notice of any claim with respect to a material violation or alleged material violation, of any federal or state civil rights law, the Fair Labor Standards Act, as amended, the Age Discrimination in Employment Act, as amended, the National Labor Relations Act, as amended, the Occupational Safety and Health Act, as amended, the Americans with Disabilities Act, as amended, ERISA (with respect to the Seller Assumed Plans), or the Vocational Rehabilitation Act of 1973, as amended.

3.18.   Employee Benefit Plans.

(a)     Schedule 3.18(a) lists all: (i) employee pension or welfare benefit plans (as defined in Section 3(2) and 3(1) of ERISA), respectively, (A) which were maintained or administered by any Seller, or any entity that along with any Seller is treated as a "single employer" under Section 414 of the Code ("ERISA Affiliates") within the last two (2) years; (B) to which any Seller or any ERISA Affiliate contributed, or was legally obligated to contribute, within the last two (2) years; or (C) under which any Seller or any ERISA Affiliate had any liability within the last two (2) years, with respect to its current or former employees, and (ii) all other material plans or arrangements maintained by Sellers for the benefit of current or former employees, their beneficiaries or dependents (collectively, the "Benefit Plans").

(b)     Except as set forth on Schedule 3.18(b), no Seller has contributed and does now contribute to any "multiemployer plan" within the meaning of Section 4201 of ERISA nor incurred any withdrawal liability within the meaning of Section 4201 of ERISA with respect to any multiemployer plan.

(c)     With respect to each Seller Assumed Plan, Sellers have delivered to Purchaser a true and correct copy of (i) the annual reports (Form 5500), if any, filed with the IRS or the United States Department of Labor for the most recent plan year, (ii) the plan document(s) and, all amendments thereto, if any, and all summary plan descriptions, summaries of material modifications, sample enrollment forms and copies or samples of all other administrative documents for such Seller Assumed Plan, and (iii) each trust agreement, group annuity contract and insurance policy, if any, relating to such Seller Assumed Plan. Except as set forth on Schedule 3.18(c), each Seller Assumed Plan (A) has been

- 21 -

administered in all material respects in accordance with its terms and (B) complies in all material respects in form with, and has been operated and administered in all material respects in accordance with, any and all applicable laws, including ERISA and the Code. Each Seller Assumed Plan and each trust (in each case including any amendments to such plans) that is intended to qualify under Section 401(a) and 501(a) of the Code is covered by a favorable determination or opinion letter from the IRS that remains in effect on the date hereof, and remains current with respect to any actual or legally required plan amendment for which the applicable remedial amendment period under IRS Revenue Procedure 2007-44 has expired.

(d)     Except as set forth on Schedule 3.18(d), all contributions and premiums required by law under any Seller Assumed Plan or by the terms of any Seller Assumed Plan or any agreement relating thereto have been timely made.

(e)     Except as set forth on Schedule 3.18(e), with respect to the Seller Assumed Plans, individually and in the aggregate, to the knowledge of Sellers, no event has occurred that could subject any Seller or any of its ERISA Affiliates to any material liability under ERISA, the Code or any other applicable Law, including any "prohibited transaction" (as defined in Section 406 of ERISA and Section 4975(c) of the Code).

(f)     There are now, and during the two (2) years preceding the date of this Agreement there were, no material pending legal proceedings against any Seller Assumed Plan, the assets of any such plan or against Sellers, the plan administrator, or fiduciary of any Seller Assumed Plan with respect to the operation of any such plan (other than routine benefit claims), and, to the knowledge of Sellers, there are no facts or circumstances which could form the basis for any such legal proceedings.  To the knowledge of Sellers, neither Sellers nor any fiduciary of any Seller Assumed Plan has engaged in any material nonexempt prohibited transaction described in Section 406 of ERISA or Section 4975 of the Code, or is in default with respect to any order, writ, judgment or decree of any court or governmental department, bureau, agency or instrumentality, with respect to any Seller Assumed Plan insofar as it relates to any current or former employee.

(g)     Except as set forth on Schedule 3.18(g), Sellers have at all times complied with the requirements of COBRA and Schedule 3.18(g) lists all of the individuals covered under any health care plan of Sellers pursuant to COBRA, the date for each such individual when COBRA coverage began.

(h)     Except as set forth on Schedule 3.18(h), Sellers have no obligations under any of the Seller Assumed Plans to provide health or life insurance benefits to former employees (or their beneficiaries or dependents) for periods after termination of employment, except as specifically required by COBRA or any other applicable state or Federal law.

- 22 -

3.19.  <u>Environmental Warranties</u>.  Except as set forth on <u>Schedule 3.19</u>, since June 26, 2006:

(a)  All facilities and property (including underlying ground water) owned, leased, or used by Sellers in connection with the Business have been, and continue to be, owned, leased and used by Sellers in compliance in all material respects with all Environmental Laws.

(b)  There have been no past, pending or, to the knowledge of Sellers, threatened, (i) claims, complaints, notices or requests for information received by Sellers with respect to any alleged violation of any Environmental Law by any Seller, or (ii) complaints, notices or inquiries to any Seller regarding potential liability under any Environmental Law in respect of premises occupied by any Seller or any Seller's operations.

(c)  There have been no releases of Hazardous Materials at, on or under any property now or previously owned or leased or otherwise used, by any Seller while owned, leased, or used by a Seller which would violate in any material respect any Environmental Laws.

(d)  Sellers have been issued, and have been in material compliance with, all material permits, certificates, approvals, licenses and other authorizations relating to environmental matters that are necessary for the conduct of the Business.

(e)  No property now or previously owned, leased or otherwise used by any Seller has been listed or, to the knowledge of Sellers, proposed for listing (with respect to owned property only) on the National Priorities List pursuant to CERCLA, on the Comprehensive Environmental Response Compensation Liability Information System List ("<u>CERCLIS</u>") or on any similar state list of sites requiring investigation or clean-up.

(f)  To the knowledge of Sellers, there have been no underground storage tanks, active or abandoned, including petroleum storage tanks, on or under any property now or previously owned, leased or otherwise used by any Seller.

(g)  To the knowledge of Sellers, Sellers have not directly transported or directly arranged for the transportation of any Hazardous Material to any location which is listed or proposed for listing on the National Priorities List pursuant to CERCLA, on the CERCLIS or on any similar state list, or which is the subject of federal, state or local, enforcement actions or other investigations which may lead to any material claims against any Seller for any remedial work, damage to natural resources or personal injury, including claims under CERCLA.

(h)  To the knowledge of Sellers, there have been no polychlorinated biphenyls or friable asbestos present at any property now or previously owned, leased or otherwise used,

- 23 -

by any Seller.

3.20.   Restricted Cash.   Schedule 3.20 attached hereto sets forth the amount of Restricted Cash and the name and address of the party holding such Restricted Cash.

3.21.   Accounts Receivable.   Each accounts receivable that constitutes an Asset is a true and correct statement of the account for goods delivered to or services actually performed for and accepted by, such account debtor.

3.22.   Transactions with Certain Persons.   Except as set forth on Schedule 3.22, no Affiliate of any Seller is currently a party to any Contract with any Seller.

3.23.   All Material Information.   No representation or warranty made herein by Sellers and no statement contained in any schedule or certificate furnished or to be furnished to Purchaser by Sellers in connection with the transactions contemplated by this Agreement contains or shall contain an untrue statement of a material fact or omits to state any material fact necessary in order to make any representation, warranty, or other statement of Sellers not misleading.

3.24.   Employees.   Schedule 3.24 is a complete and correct list of the names and annualized compensation, bonus, commission, other consideration, and material perquisite arrangements, written or unwritten, for each current employee of each Seller whose aggregate annual compensation equals or exceeds $200,000.

3.25.   Disclaimer of Other Representations and Warranties.   Except as expressly set forth in this Section 3, Sellers make no representation or warranty, statutory, express or implied, at law or in equity, in respect of Sellers or any of their assets, liabilities or operations, and any such other representations or warranties are hereby expressly disclaimed, and there are no other warranties, statutory, express or implied that extend beyond the warranties contained in this Agreement. Purchaser hereby acknowledges and agrees that, except to the extent specifically set forth in this Section 3, Purchaser is purchasing the Assets on an "as-is, where-is" basis and "with all faults."

## SECTION 4
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Sellers as follows:

4.1.   Organization and Good Standing.   Purchaser is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware and has full corporate power and authority to enter into and carry out its obligations under this Agreement.

4.2.   Authorization.   Purchaser has all requisite power and authority to execute and deliver and carry out its obligations under this Agreement and the Ancillary Agreements, and consummate the Transactions, and is not under any prohibition or restriction, contractual, statutory or otherwise,

- 24 -

against doing so.  Each of this Agreement and the Ancillary Agreements has been or will be duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery by each Seller, constitutes or will constitute the legal, valid and binding obligation of Purchaser, enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other Laws affecting the rights of creditors generally and by general principles of equity (regardless of whether enforcement is considered in a proceeding at law or in equity).

4.3.  <u>No Conflicts</u>.  Subject to approval, if required, under the HSR Act, the execution, delivery and performance by Purchaser of this Agreement and the consummation by Purchaser of the Transactions shall not, with or without the giving of notice or lapse of time, (i) violate any provision of the Organizational Documents of Purchaser, (ii) violate any Law to which Purchaser is subject, or (iii) conflict with, or result in a breach or default under, any term or condition of any other agreement or other instrument to which Purchaser is a party or by which Purchaser is bound.

4.4.  <u>Consents and Approvals</u>.  Subject to entry of the Confirmation Order and approval, if required, under the HSR Act, the execution, delivery and performance by Purchaser of this Agreement and the Ancillary Agreements and the consummation of the Transaction do not require the consent or approval of, or filing with, any Governmental Authority.

4.5.  <u>Litigation</u>.  No lawsuit, governmental investigation or legal, administrative or arbitration action or proceeding is pending or, to the best of Purchaser's knowledge, has been threatened against Purchaser, or any director or officer of Purchaser in his or her capacity as such, which questions the validity of this Agreement or seeks to prohibit, enjoin or otherwise challenge the consummation of the Transactions or would otherwise have a material adverse effect on Purchaser's ability to finance or otherwise consummate the Transactions.

4.6.  <u>No Broker or Finder</u>.  No broker, finder or financial advisor has been engaged by Purchaser in connection with the Transactions.

4.7.  <u>Capital Resources</u>.  True, accurate and complete copies of executed equity commitment letters in the form of <u>Exhibit C</u> hereto to provide equity financing to Purchaser to provide funding for the Purchase Price have been delivered to Sellers prior to the date hereof.  As of the date hereof, each of the foregoing commitment letters, in the form so delivered, is a legal, valid and binding obligation of the parties thereto.  As of the date hereof, each of the foregoing commitment letters is in full force and effect and has not been withdrawn or terminated (and no party thereto has indicated an intent to so withdraw or terminate) or otherwise amended or modified in any respect and Purchaser is not in breach of any of the terms or conditions set forth therein.

4.8.  <u>Purchaser not a Plan</u>.  Purchaser is not an "employee benefit plan" as defined in ERISA, whether or not subject to ERISA, or a "plan" as defined in Section 4975 of the Code and none of Purchaser's assets constitutes (or is deemed to constitute for purposes of ERISA or Section

- 25 -

4975 of the Code, or any substantially similar federal, state or municipal law) "plan assets" for purposes of 29 CFR Section 2510.3-101, as amended by Section 3(42) of ERISA or otherwise for purposes of ERISA or Section 4975 of the Code.

4.9.    **"AS IS" TRANSACTION.**  PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE ASSETS.  WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILTY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE ASSETS.   PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ASSETS AS PERMITTED IN THE SHORTENED TIME-FRAME OF THIS ASSET PURCHASE PROCESS AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS.  ACCORDINGLY, PURCHASER WILL ACCEPT THE ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

## SECTION 5
## CERTAIN COVENANTS OF SELLERS

5.1.    Plan and Confirmation Order.  Within 10 days after the execution of this Agreement, Sellers shall file with the Bankruptcy Court the Plan, the Disclosure Statement, the Bid Procedures Motion and the Scheduling Motion and shall commence the prosecution of the confirmation of the Plan pursuant to the Confirmation Order.

5.2.    Provision of Records.  Sellers shall arrange at Purchaser's cost as soon as practicable following the Closing Date for transportation to Purchaser of the documents in the possession of any Seller relating to the Assets, to the extent not previously delivered in connection with the Transactions, including all agreements and filings with Governmental Authorities, but excluding documents relating to the Excluded Assets or the Excluded Liabilities.

5.3.    Receipt of Property Relating to Assets.  If any of the Sellers or any of their respective Affiliates, or any other Person acting for or in concert with any of the foregoing Persons, shall receive any money, check, note, draft, instrument, payment or other property as proceeds of the Assets or the Assumed Liabilities or any part thereof, each such Person shall receive all such items in trust for, and as the sole and exclusive property of, Purchaser and, immediately upon receipt thereof, shall notify Purchaser in writing of such receipt and shall remit the same (or cause the same to be remitted) to Purchaser in the manner specified by Purchaser.

- 26 -

5.4.    <u>Conduct of Business Pending the Closing</u>.

(a)    From the date hereof through the Closing Date or the earlier termination of this Agreement (the "<u>Pre-Closing Period</u>"), except as may be expressly permitted or contemplated by this Agreement or as otherwise agreed to in writing by Purchaser, each Seller shall continue to operate its business in the ordinary course (it being understood that such ordinary course may take into account the fact that the Business is being operated while in bankruptcy) and as a Debtor and Debtor-in-Possession in the Cases.  Without limiting the generality of the foregoing, during the Pre-Closing Period, except as may be expressly permitted or contemplated by this Agreement or as otherwise agreed to in writing by Purchaser, no Seller shall:

(i)    sell (including by sale-leaseback), lease, transfer, license (whether on an exclusive or non-exclusive basis), mortgage or otherwise dispose of, encumber or subject to any Encumbrance, any Assets or interests therein;

(ii)    fail to maintain in full force and effect any policy of insurance covering the Assets;

(iii)    incur or permit the incurrence of any Liability that would constitute an Assumed Liability, except in the ordinary course of business;

(iv)    enter into any contract, license or other agreement that contains any provision that, as a result of the consummation of the Transactions, would (assuming that the other party's consent or approval is not obtained, to the extent required) result in any penalty, additional payments or forfeiture that would be payable or sufferable by Purchaser on or after the Closing Date;

(v)    except as previously disclosed to or known by Purchaser, materially modify, amend, supplement or terminate any Assumed Contract;

(vi)    except as would not adversely affect Purchaser, change any method of Tax accounting, make any material Tax election, file any Tax Return other than in a manner consistent with past practice, or settle any material Tax claim;

(vii)    (A) perform any act which would cause (1) any representation, warranty, covenant, condition or agreement of Sellers in this Agreement that is qualified by materiality or Material Adverse Effect to be or become untrue in any respect or (2) any representation, warranty, covenant, condition or agreement of Sellers in this Agreement that is not qualified by materiality or Material Adverse Effect to be or become untrue in any material respect, or (B) intentionally omit to take any action necessary to prevent (1) any such representation, warranty, covenant, condition or agreement that is qualified by materiality or  Material Adverse Effect

- 27 -

from being or becoming untrue in any respect or (2) any such representation, warranty, covenant, condition or agreement that is not qualified by materiality or Material Adverse Effect from being or becoming untrue in any respect;

(viii)    fail to comply in any material respect with any Law applicable to the Assets or Permits, except in connection with the filing of the Cases or as permitted by the Bankruptcy Court;

(ix)    waive or compromise any material claim or right with respect to any of the Assets or fail to renew any Permit;

(x)    collect or discount any accounts receivable other than in the ordinary course of business; or

(xi)    authorize any of, or commit or agree to take any of, the foregoing actions.

(b)    Sellers shall promptly notify Purchaser in writing of (i) any event known to any Seller which would render any representation or warranty of any Seller contained in this Agreement, if made on or prior to the Closing Date, untrue or inaccurate in any material respect, (ii) any change, condition or event known to any Seller that has or could reasonably be expected to have a Material Adverse Effect on the Assets or (iii) any failure of a Seller to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied hereunder.

(c)    In addition, during the Pre-Closing Period, Sellers shall (i) collect their accounts receivable consistent with their past practices and in the ordinary course of business and (ii) promptly and timely pay their accounts payable consistent with their past practices and in the ordinary course of business, but no later than on "net 30 day" terms, other than such accounts payable or the applicable portion thereof that Sellers are contesting in good faith by appropriate proceedings (such accounts payable, the "Disputed AP"). Sellers shall provide Purchaser with a detailed accounting of all Disputed AP at Purchaser's request.

5.5.    Access to Information.  Upon reasonable notice by Purchaser, Purchaser and its representatives shall have reasonable access during normal business hours throughout the period from the date hereof through the Closing Date, or the earlier termination of this Agreement in accordance with its terms, to the Assets and documents relating thereto, and during such period Sellers shall furnish promptly to Purchaser, at Purchaser's expense, all information concerning the Assets as Purchaser may reasonably request.  Sellers shall provide or cause to be provided to Purchaser, at Purchaser's expense, such copies or extracts of documents relating to the Assets as Purchaser may reasonably request.  Any inspections, examinations and audits shall be conducted during normal business hours by Purchaser's employees or agents upon reasonable advance notice.

5.6. <u>Bid Procedures Order</u>. Each Seller shall use its commercially reasonable efforts to obtain entry of the Bid Procedures Order by the Bankruptcy Court.

5.7. <u>Transfer of Permits</u>. Except for those Permits that are not transferable by Law, Sellers shall use commercially reasonable efforts to cause the issuance or transfer at Purchaser's expense of all Permits relating to the Assets to Purchaser on or before the Closing Date. Sellers shall give and make all notices and reports Sellers are required to make to the appropriate Governmental Authorities and other Persons, each at Purchaser's expense, with respect to the Permits that may be necessary for the sale of the Assets to Purchaser at the Closing.

5.8. <u>Release of Encumbrances</u>. Sellers' obligation to deliver the Assets free and clear of any Encumbrances (other than Permitted Encumbrances) shall be limited to Sellers' efforts to obtain the Confirmation Order that provides for the delivery of the Assets free and clear of any Encumbrances (other than Permitted Encumbrances). If Purchaser desires to have any Encumbrances released and discharged other than by means of the Confirmation Order, Purchaser, at its sole cost and expense, shall obtain such releases or discharges.

5.9. <u>Further Assurances</u>. Upon the request of Purchaser, each Seller shall, at Purchaser's expense, forthwith execute and deliver such documents as Purchaser or its counsel may reasonably request to effectuate the purposes of this Agreement.

5.10. <u>Assignment of Rights</u>. If, in connection with the Auction or sale referred to in the Bid Procedures Order, Sellers or any of their Affiliates enter into confidentiality or similar agreements with any Person, Sellers shall assign all rights under those agreements to the extent relating to the Business to Purchaser at the Closing and to the extent such rights are assignable.

5.11. <u>Break-Up Fee</u>. Sellers hereby agrees, in the event that a Bankruptcy Court enters an order that becomes final approving a Transaction with a party other than Purchaser and such Transaction is consummated, Sellers shall owe to Purchaser (a) a break-up fee (the "<u>Breakup Fee</u>") in the amount of $1,000,000, which such amount shall be earned and shall be paid upon consummation of such sale, and (b) an amount equal to all of the out-of-pocket expenses incurred by Purchaser or its Affiliates in connection with the transactions contemplated by this Agreement up to a maximum of $500,000 (the "<u>Expense Reimbursement</u>"), which amounts shall be paid only upon consummation of such Transaction, without further order of the Bankruptcy Court. The Breakup Fee and Expense Reimbursement are intended to compensate Purchaser and its Affiliates for the time and expense dedicated to this transaction and the value added by Purchaser and its Affiliates in (i) establishing a bid standard or minimum for other bidders, (ii) placing Sellers' estate property in a sales configuration mode attracting other bidders to the auction and (iii) for serving, by its name and its expressed interest, as a catalyst for other potential or actual bidders. The Breakup Fee and Expense Reimbursement shall constitute allowed super priority administrative claims against Sellers' estate under Sections 503(b) and 507(a)(1) of the Bankruptcy Code and in connection with the entry of the order approving any other sale transaction, Purchaser shall be granted a lien on the deposit

- 29 -

made by the alternate purchaser in order to secure the payment of the Breakup Fee and Expense Reimbursement.

5.12.  <u>Cure Amounts</u>.  Within ten (10) business days of the date hereof, Sellers shall provide Purchaser with a schedule of the true and correct monetary Cure Amounts with respect to each of the Contracts consistent with their books and records.

## SECTION 6
## CERTAIN COVENANTS OF PURCHASER.

6.1.  <u>Performance with Respect to the Assets and the Assumed Contracts</u>.  Purchaser agrees that from and after the Closing Date, that it shall (i) assume all Assumed Liabilities, and (ii) take all actions necessary to satisfy its obligations and liabilities with respect to the Assumed Liabilities (including, without limitation, under the terms and conditions of each Assumed Contract).

6.2.  <u>Cure Amounts</u>.  Purchaser shall pay all Cure Amounts with respect to the Assumed Contracts within five Business Days from the Closing Date.

6.3.  <u>Workers' Compensation</u>.  On or before the Closing Date, Purchaser shall either (i) assume Sellers' workers' compensation policies or (ii) arrange for workers' compensation insurance coverage for all of Sellers' employees on terms similar to Sellers' current workers' compensation insurance policies for the period from and after the Closing Date.  At the Closing, (1) Purchaser shall post a letter of credit or make other arrangements so that the Restricted Cash held by the providers of workers' compensation insurance to Sellers and by certain credit card companies is released (provided, however, in no event shall Purchaser be required to post a letter of credit or obtain loans or additional equity in an aggregate amount in excess of $17,400,000)(the "<u>Restricted Cash Financing</u>"), (2) Purchaser shall apply that Restricted Cash to pay the priority claims assumed by Purchaser pursuant to <u>Section 2.3(e)</u> and to make the payment pursuant to <u>Section 2.5(b)</u>, and (3) Purchaser shall pay over the excess to Sellers as additional Purchase Price as provided in <u>Section 2.5(a)</u>.

6.4.  <u>Financing</u>.  On or prior to two Business Days prior to the bidding deadline set forth in the Bid Procedures Order, Purchaser shall deliver to Sellers (i) an executed debt commitment letter in form reasonably acceptable to Sellers pursuant to which, and subject to the terms and conditions thereof, certain lenders have committed to provide on behalf of Purchaser the Restricted Cash Financing, and (ii) an executed debt commitment letter in form reasonably acceptable to Sellers pursuant to which, and subject to the terms and conditions thereof, certain lenders have committed to provide Purchaser with loans in an amount of at least $10,000,000, the proceeds of which may be used to provide working capital to support Purchaser's operations after Closing.

6.5.  <u>Equity Ownership</u>.  Purchaser shall structure and regulate its ownership for U.S. federal income tax purposes on the Closing Date and thereafter so that the losses incurred by Sellers

- 30 -

from the sale of the Assets to Purchaser are not subject to Section 707(b) of the Code, and Purchaser shall at the Closing provide to Sellers evidence of such ownership.  Purchaser's liability for breach of this section 6.5, either before or after the Closing, shall be limited to $3,000,000.

6.6.    <u>Further Assurances</u>.  Upon the request of Sellers, Purchaser shall, at Sellers' expense, forthwith execute and deliver such documents as Sellers or their counsel may reasonably request to effectuate the purposes of this Agreement.

## SECTION 7
## CERTAIN MUTUAL COVENANTS

7.1.    <u>Mutual Cooperation</u>.

(a)    Sellers, on one hand, and Purchaser, on the other hand, shall promptly give notice to the other upon becoming aware that any action is pending or threatened by or before any Governmental Authority with respect to the Transactions.  Sellers, on the one hand, and Purchaser, on the other hand, (i) shall cooperate with each other in connection with the prosecution, investigation or defense of any such action, (ii) shall supply promptly all information requested by the other, by any such Governmental Authority or by any party to any such action that is legally required to be produced, and (iii) shall each use commercially reasonable efforts to cause any such action to be determined as promptly as practicable and in a manner which does not impact adversely on, and is consistent with, the Transactions.

(b)    After the Closing Date, each of Sellers and Purchaser shall use commercially reasonable efforts to provide to any other party to this Agreement (the "<u>Requesting Party</u>") such records and information and to make available to the Requesting Party such employees or other personnel, in each case as may be reasonably requested in writing by the Requesting Party, for the purpose of assisting the Requesting Party in responding to governmental inquiries, making required governmental filings or defending or prosecuting any action or other proceeding involving any Person other than the party providing such information or records or making available such employees or other personnel (the "<u>Providing Party</u>") and in resolving all claims, preparing all tax returns, and handling all matters necessary to administer and close the Cases; <u>provided</u>, <u>however</u>, that no Providing Party shall be required to (i) incur any out-of-pocket expenses, (ii) provide information, records or employees or other personnel under circumstances which the Providing Party believes in its sole reasonable determination may expose it to liability to any Person or may prejudice any commercial, legal or other interest of the Providing Party, or (iii) take any action that in the Providing Party's reasonable determination unreasonably interferes with its business.

(c)    Each of Sellers and Purchaser shall use its reasonable best efforts to cooperate, assist and consult with each other to procure the entry of the Bid Procedure Order

- 31 -

and the Confirmation Order (together with the Bid Procedures Order, the "Orders") as promptly thereafter as practicable. Without limiting the generality of the foregoing, Sellers shall (i) comply with all requirements under the Bankruptcy Code and Federal Bankruptcy Rules in connection with obtaining the Orders, (ii) agree to proceed with the Cases pursuant to and in accordance with the terms and provisions contemplated by the Orders, in each case after the order has been entered by the Bankruptcy Court and (iii) comply or cause the compliance with the notice requirements of the Orders, in each case after the order has been entered by the Bankruptcy Court, and any other applicable order of the Bankruptcy Court as they relate to the Cases, the Federal Bankruptcy Rules (including, without limitation, Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure) and any applicable rules of the Bankruptcy Court with respect to the Transactions contemplated by this Agreement. In the event that the Orders or any other orders of the Bankruptcy Court relating to this Agreement shall be appealed by any party (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any such order), Sellers and Purchaser will cooperate in taking such steps diligently to defend against such appeal, petition or motion and Sellers and Purchasers shall use their reasonable best efforts to obtain an expedited resolution of any such appeal, petition or motion. Neither Purchaser nor Sellers shall make any filing in the Bankruptcy Court with respect to the Orders (or otherwise take any position in the Bankruptcy Court proceedings with respect thereto) without the express written consent of the other party, which may not be unreasonably withheld, conditioned or delayed, or otherwise that would be reasonably likely to result in the failure of the transactions contemplated hereby. Notwithstanding anything to the contrary herein, however, nothing shall be deemed to prohibit or otherwise restrain Sellers from accepting a Superior Bid in accordance with the terms of the Bid Procedures Order or Purchaser from making any filing in the Bankruptcy Court to challenge or object to the entry of an order by the Bankruptcy Court approving the entry by Sellers into a Superior Bid.

(d)     Subject to the terms and conditions of this Agreement, Sellers and Purchaser shall take all reasonable steps to close the sale of the Assets pursuant to this Agreement on or prior to the Termination Date.

7.2.    Approvals and Filings. (a) Subject to the terms and conditions of this Agreement, including the possible closing of a Superior Bid, each of the parties hereto shall use all commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws and regulations to consummate and make effective the Transactions, including using commercially reasonable efforts to obtain all necessary or appropriate waivers, consents and approvals, and effecting all necessary registrations and filings. Purchaser shall make or cause to be made all filings and submissions under Laws applicable to Purchaser, if any, as may be required for the consummation of the Transactions. Sellers shall make or cause to be made all such other filings and submissions under Laws applicable to any Seller, if any, as may be required for the

- 32 -

consummation of the Transactions. Purchaser, on the one hand, and Sellers, on the other hand, shall coordinate and cooperate in exchanging such information and reasonable assistance as may be requested by either of them in connection with the filings and submissions contemplated by this Section 7.2. Purchaser, on the one hand, and Sellers, on the other hand, shall each promptly provide the other or their respective counsel with copies of all filings made by such party with any Governmental Authority in connection with this Agreement and the Ancillary Agreements and the Transactions.

(b)     HSR. Each of Purchaser and Sellers shall file with the United States Federal Trade Commission (the "FTC") and the United States Department of Justice (the "DOJ") the notification and report form, if any, required for the consummation of the Transactions and any supplemental information requested in connection therewith pursuant to the HSR Act. Any such notification and report form and supplemental information shall be in substantial compliance with the requirements of the HSR Act. Each of Purchaser and Sellers shall furnish to the other such necessary information and reasonable assistance as the other may reasonably request in connection with its preparation of any filing or submission which is necessary under the HSR Act. Sellers and Purchaser shall keep each other apprised of the status of any communications with, and any inquiries or requests for additional information from, the FTC and the DOJ. If such a filing is made, each of Purchaser and Sellers shall seek early termination of the waiting period under the HSR Act and use its best efforts to obtain as promptly as possible any clearance required under the HSR Act for the consummation of the Transactions.

7.3.     Public Statements. The parties shall consult with each other prior to issuing any press release or making any public announcement with respect to this Agreement, the Ancillary Agreements, or the Transactions (including the financial terms hereunder and thereunder), and shall not issue any such press release or public announcement prior to such consultation or to which the other party shall reasonably object, except as may be required by Law or judicial process. No party to this Agreement shall make any statement to, or otherwise communicate (whether orally or in writing) with, any employee or advertiser of, or supplier to, any Seller, regarding this Agreement, the Ancillary Agreements or the Transactions except for any statement or communication with respect to which the other parties hereto shall have previously consented in writing.

## SECTION 8
## EMPLOYEE MATTERS

8.1.     Employment.

(a)     Purchaser will offer to employ, commencing upon Closing, each Employee of Sellers who is, as of immediately prior to the Closing, (i) actively at work in connection with the Business, (ii) on short-term disability or workers' compensation in connection with the Business, or (iii) on a leave of absence approved by Sellers in connection with the Business,

- 33 -

but not including any person on long-term disability, layoff with or without recall rights or on a leave of absence with no prior agreement or understanding to return to employment with Sellers at the end of such disability, layoff or leave.  Employees who accept such offer of employment will be referred to in this Agreement as "Transferred Employees."  With respect to each Employee of Seller who is, as of immediately prior to Closing, subject to any of the CBAs ("Union Employees"), the terms and conditions of employment upon Closing shall be established by the collective bargaining agreements entered into between Purchaser and Debtor's Unions, as set forth in Section 10.7 below.  Schedule 8.1(a) sets forth all Employees who are on long-term disability or on a leave of absence with a prior agreement or understanding to return to employment with Sellers at the end of such disability, layoff or leave.  Notwithstanding the foregoing, nothing in this Agreement will, after the Closing Date, impose on the Purchaser any obligation to retain any Transferred Employee in its employment.

(b)     Except as described in the remaining sentences of this Section 8.1(b), the employment of each such Transferred Employee with Purchaser will commence immediately upon the Closing.  In the case of any individual who is absent from active employment and receiving short-term disability or workers' compensation benefits, the employment of such individual with Purchaser will commence upon his or her return to active work, and such individual will become an Transferred Employee as of such date.

8.2.     Employee Benefit Matters.

(a)     As of the Closing, all of the Transferred Employees will cease participation in any of Benefit Plans that are not Seller Assumed Plans that such Transferred Employees participated in immediately prior to the Closing.

(b)     In accordance with Treasury Regulation Section 54.4980B-9 Q&A-7, as of the Closing Date, Purchaser will assume all liability for providing and administering all required notices and benefits under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") to all current and former employees of Sellers (including, without limitation, Transferred Employees).  Prior to the Closing Date, Seller shall provide to Purchaser detailed information (including without limitation all pertinent information concerning individuals who have elected or continue to have a right to elect COBRA continuation coverage and/or any COBRA subsidy pursuant to the American Recovery and Reinvestment Act of 2009) sufficient to enable Purchaser to carry out its obligations under this Section 8.2(b).  Sellers will have no COBRA liability or obligations to such current and former employees after the Closing Date, except with respect to any violations of law that occurred prior to the Closing Date.

8.3.     Seller Assumed Plans.  Purchaser shall adopt and assume, as of the Closing Date, each and every Benefit Plan of Sellers (other than plans that cover exclusively Union Employees and

- 34 -

multiemployer plans) and all contracts and liabilities thereunder, all of which are identified on Schedule 8.3 attached hereto ("Seller Assumed Plans", provided, however, on or prior to two Business Days prior to the bidding deadline set forth in the Bid Procedures Order Purchaser may elect to exclude any Seller Plan from being a "Seller Assumed Plan") with respect to all persons entitled to benefits under the provisions of such Seller Assumed Plan.  With respect to each Seller Assumed Plan, Purchaser or any entity designated by Purchaser, will be substituted for the applicable Seller as the plan sponsor under each such Seller Assumed Plan and Purchaser shall have all rights of such Seller thereunder, including, without limitation, full authority to maintain, amend or terminate any such Seller Plan at any time, in Purchaser's sole discretion.  Sellers agree to cooperate with Purchaser in adopting and effectuating any plan amendments to the Seller Assumed Plans reasonably desired by Purchaser, so long as such amendments are effective as of, or after, the Closing Date and are consistent with applicable law and applicable collective bargaining agreements and other agreements under which Sellers are obligated.  The parties agree to cooperate in all respects and take any actions necessary to implement the assumption by Purchaser of the Seller Assumed Plans.   Before, or as soon as administratively practicable after, the Closing, Sellers will supply Purchaser with (i) all records concerning participation, vesting, accrual of benefits, payment of benefits, and election forms of benefits under each Seller Assumed Plan, and (ii) any other information reasonably requested by Purchaser as necessary or appropriate for the administration of each Seller Assumed Plan.  Purchaser will make all required filings or reports with or to the IRS, or any other governmental agency, and the participants and their beneficiaries with respect to each Seller Assumed Plan (the "Required Filings") on a timely basis for all plan years ending before, on or after the Closing Date or as may be required with respect to such Seller Plan.  All parties recognize that a reasonable transition period may be necessary after the Closing Date and prior to Purchaser's implementation of its assumption of the Seller Assumed Plans before full compliance with this Section 8.3 is achieved, during which some or all of the Transferred Employees and other participants and beneficiaries of the Seller Assumed Plans may not be able to (i) make (and Purchaser may not be able to process) elective deferral contributions, loan repayments, investment changes, distribution requests, benefit payment requests or reimbursement requests or (ii) exercise or enjoy other rights or features of the Seller Assumed Plans, and that during such transition period Purchaser shall not be considered to be in violation of this Section 8.3.  Notwithstanding the foregoing, other than as may be expressly agreed to by Purchaser in it sole discretion in a written amendment to Section 2.3 above, Purchaser shall not assume or succeed to any of Seller's past, current or future liabilities or obligations (including without limitation any withdrawal liability, termination liability or mass withdrawal liability) with respect to any multiemployer plan (collectively, "Multiemployer Plans") to which any Seller contributes or has ever contributed.

8.4.    Compliance with WARN Act.  With respect to the Employees, Purchaser will have full responsibility under the WARN Act caused by any action of the Purchaser on or after the Closing Date.  For these purposes, a plant closing or a mass layoff will be deemed to have been caused by Purchaser on or after the Closing Date if such plant closing or mass layoff would not have occurred but for Purchaser's failure to make offers of employment to Employees in accordance with this Article VIII, Purchaser's failure to employ the Transferred Employees on the Closing Date in

- 35 -

accordance with the terms of this Agreement and/or Purchaser's failure to continue to employ the Transferred Employees thereafter.  Sellers shall be responsible for all other WARN Act liabilities relating to the periods prior to the Closing Date.

## SECTION 9
## CONDITIONS TO SELLERS' OBLIGATIONS

The obligations of Sellers to consummate the Transactions are subject to the satisfaction (unless waived in writing by Sellers) of each of the following conditions on or prior to the Closing Date:

9.1.    <u>Representations and Warranties</u>.  The representations and warranties of Purchaser contained in this Agreement that are not qualified by materiality or a material adverse effect shall be true and correct in all material respects on and as of the Closing Date, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and the representations and warranties of Purchaser contained in this Agreement that are qualified by materiality or a material adverse effect shall be true and correct in all respects on and as of the Closing Date, except to the extent expressly made as of an earlier date, in which case they shall be true and correct as of such earlier date.

9.2.    <u>Compliance with Agreements</u>.  Purchaser shall have performed and complied in all material respects with all covenants and conditions under this Agreement and the Ancillary Agreements to be performed or complied with by it on or prior to the Closing Date.

9.3.    <u>Approvals; No Injunctions</u>.   Any material Permit or approval required by a Governmental Authority to close the Transactions shall have been obtained or provided by an order of the Bankruptcy Court including the expiration or termination of any waiting period (and each extension thereof, if any) applicable to the sale of the Assets under the HSR Act.  Such Permits or approvals shall be in full force and effect on the Closing Date.  No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation or non-appealable judgment, decree, injunction or other order that is in effect on the Closing Date and prohibits the consummation of the Closing.

9.4.    <u>Purchaser's Closing Deliveries and Obligations</u>.  Purchaser shall have delivered all items and satisfied all obligations pursuant to <u>Sections 11.1(b)</u> and <u>11.1(c)</u>.

9.5.    <u>Auction</u>.  Purchaser shall be the successful bidder at the Auction in accordance with the Bid Procedures Order.

9.6.    <u>Entry of the Confirmation Order</u>.  The Bankruptcy Court shall have entered the Confirmation Order, and such order shall be in full force and effect.

- 36 -

Case 09-11204-sr   Doc 940   Filed 08/20/09   Entered 08/20/09 16:01:40   Desc Main
Document   Page 101 of 172

## SECTION 10
## CONDITIONS TO PURCHASER'S OBLIGATIONS

The obligation of Purchaser to consummate the Transactions is subject to the satisfaction (unless waived in writing by Purchaser) of each of the following conditions on or prior to the Closing Date:

10.1.   <u>Representations and Warranties</u>.  The representations and warranties of the Sellers contained in this Agreement that are not qualified by materiality or a Material Adverse Effect shall be true and correct in all material respects on and as of the Closing Date, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and the representations and warranties of the Sellers contained in this Agreement that are qualified by materiality or a Material Adverse Effect shall be true and correct in all respects on and as of the Closing Date, except to the extent expressly made as of an earlier date, in which case they shall be true and correct as of such earlier date.

10.2.   <u>Compliance with Agreements</u>.  Each Seller shall have performed and complied in all material respects with all covenants and conditions under this Agreement and the Ancillary Agreements to be performed or complied with by it on or prior to the Closing Date.

10.3.   <u>Approvals; No Injunctions</u>.  Any material Permit or approval required by a Governmental Authority to close the Transactions shall have been obtained or provided by an order of the Bankruptcy Court including the expiration or termination of any waiting period (and each extension thereof, if any) applicable to the sale of the Assets under the HSR Act.  Such Permits or approvals shall be in full force and effect on the Closing Date.  No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation or non-appealable judgment, decree, injunction or other order that is in effect on the Closing Date and prohibits the consummation of the Closing.

10.4.   <u>Sellers' Closing Deliveries and Obligations</u>.  Each Seller shall have delivered all items and satisfied all obligations pursuant to <u>Sections 5.9</u> and <u>11.1(a)</u>.

10.5.   <u>Auction</u>.  Purchaser shall be the successful bidder at the Auction in accordance with the Bid Procedures Order.

10.6.   <u>Entry of the Confirmation Order</u>.  The Bankruptcy Court shall have entered the Confirmation Order, and such order shall be in full force and effect.

10.7.   <u>Collective Bargaining Agreements</u>.  Purchaser shall have completed negotiation and execution of collective bargaining agreements with the Debtors' Unions acceptable to Purchaser in its reasonable discretion.

10.8.   <u>Title Insurance Policies and Surveys</u>.  Purchaser shall have received from a reputable

- 37 -

title insurance company a commitment to issue as of the Closing Date an owners title insurance policy for the real property in amounts, in a form and with such endorsements and surveys of the Transferred Real Property and improvements thereon, all as are generally customary for properties similar to the Real Property, and certified to Purchaser, the title insurance company and such other persons as Purchaser may designate.

10.9. <u>Material Adverse Effect</u>.  No Material Adverse Effect shall have occurred since the date of the Agreement.

10.10. <u>Certain Liabilities</u>.   Purchaser shall have determined in its sole and absolute discretion that its potential Liability for (i) Workers' Compensation Claims in <u>Section 2.3(f)</u> (taking into account the insurance policies to be transferred to Purchaser) and (ii) the Cure Amounts with respect to any Assumed Contracts under <u>Section 2.3(d)</u>, is acceptable to Purchaser; provided, however, that this condition shall be deemed to be satisfied at the Closing unless Purchaser provides written notice that it is not so satisfied by two Business Days prior to the bidding deadline set forth in the Bid Procedures Order.

## SECTION 11
## CLOSING; TERMINATION

11.1. <u>The Closing</u>.  The Closing of the purchase by Purchaser from Sellers and sale by Sellers to Purchaser of the Assets (the "<u>Closing</u>") shall be held on December 28, 2009 assuming the satisfaction or waiver of the conditions set forth in <u>Sections 9</u> and <u>10</u> of this Agreement (excluding those conditions which by their nature are to be satisfied as part of the Closing), or at such other time as the parties hereto may agree (the "<u>Closing Date</u>").  The Closing shall be held at the offices of Dilworth Paxson LLP, 1500 Market Street, 3500E, Philadelphia, Pennsylvania  19102 or at such other location as the parties hereto may agree.  At the Closing, all of the transactions provided for in <u>Section 2</u> hereof shall be deemed to be consummated on a concurrent and simultaneous basis.

(a)    <u>Sellers' Deliveries at Closing</u>.  At the Closing, Sellers shall deliver (or cause to be delivered) to Purchaser the following:

(i)    the duly executed Assignment and Assumption Agreement;

(ii)    the duly executed Bill of Sale;

(iii)    the duly executed special warranty deeds in form to be agreed upon by Purchaser and Sellers (collectively, the "<u>Deeds</u>") conveying to Purchaser good and marketable fee title to the Transferred Real Property free and clear of all Encumbrances other than the Permitted Encumbrances;

(iv)    the duly executed Trademark Assignment;

- 38 -

(v)     the duly executed Lease;

(vi)    a certified copy of the Confirmation Order and case docket reflecting that the Confirmation Order is in effect;

(vii)   copies of each Assumed Contract;

(viii)  certified resolutions of the governing body of each Seller approving and authorizing the Transactions;

(ix)    officer's certificates, executed by a duly authorized officer of each Seller to the effect that all conditions to Closing set forth in <u>Section 10.1</u> and <u>Section 10.2</u> have been satisfied;

(x)     affidavits executed by each Seller stating that such Seller is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code; and

(xi)    such other documents as Purchaser or its counsel shall reasonably require in order to effect the Transactions.

(b)     <u>Purchaser's Payment of Purchase Price</u>.  At the Closing, Purchaser shall deliver (or cause to be delivered) the Purchase Price (less the Purchaser Deposit Amount, together with all accrued interest and investment income thereon (which shall be released by the Deposit Escrow Agent to Sellers in accordance with <u>Section 2.5</u> and <u>Section 2.6</u>)) in accordance with <u>Section 2.5</u>.

(c)     <u>Purchaser's Deliveries to Sellers at Closing</u>.  At the Closing, Purchaser shall deliver (or cause to be delivered) to Sellers the following:

(i)     the duly executed Assignment and Assumption Agreement;

(ii)    the duly executed Lease;

(iii)   certified resolutions of the governing body of Purchaser approving and authorizing the Transactions;

(iv)    a certificate, executed by a duly authorized officer of Purchaser, to the effect that all conditions to Closing set forth in <u>Section 9.1</u> and <u>Section 9.2</u> have been satisfied; and

(v)     such other documents as Sellers or their counsel shall reasonably require in order to effect the Transactions.

- 39 -

(d)     Other Bids.  Purchaser acknowledges that Sellers will solicit bids ("Bids") from other prospective purchasers (collectively, "Bidders") for the sale of the Assets in accordance with Auction procedures to be set forth in the Bid Procedures Order.  Each Bidder will submit two copies of this form of asset purchase agreement marked to show changes from this Agreement.  Sellers shall have the right to select the Bid or Bids which will create the highest net return to the bankruptcy estate (the "Superior Bid").  Sellers acknowledge that Sellers will strongly favor Bids for all of the Assets or for all of Sellers' assets or for such assets which Sellers determine, in their sole discretion, cannot otherwise be easily sold.

(e)     Overbid Protection.  The Bid Procedures Order shall contain the following overbid protections: (i) a higher Bid will not be considered by Sellers unless such Bid is more than the sum of (w) the Purchase Price set forth in this Agreement and the assumption of the Assumed Liabilities, (x) the Breakup Fee, (y) the Expense Reimbursement and (z) $250,000 and (ii) any bids thereafter must be higher than the then existing highest or better bid (as determined in the reasonable discretion of Sellers) by at least $100,000 ((i) and (ii) constituting, as applicable, a "Qualifying Bid"); provided, however, that there shall be no overbid protection if Purchaser has not confirmed in writing that its condition set forth in Section 10.10 has been satisfied on or prior to the date of the Auction.

(f)     Breakup Fee.  If Sellers, after consultation with its creditor constituencies, (i) determines that a Qualifying Bid (or Bids) (which is not Purchaser's Bid) is the Superior Bid, and (ii) executes a definitive agreement embodying such Superior Bid, then upon consummation of the sale pursuant to the Superior Bid, Sellers will pay to Purchaser the Breakup Fee and the Expense Reimbursement.

11.2.   Termination.  Anything in this Agreement to the contrary notwithstanding, this Agreement and the Transactions may be terminated in any of the following ways at any time before the Closing and in no other manner, subject to the provisions hereof:

(a)     at any time by mutual written consent of Purchaser and Sellers;

(b)     by Purchaser or Sellers, if the Closing shall not have occurred on or before December 31, 2009 or such later date as Sellers and Purchaser agree or is necessary due solely to the scheduling and availability of the Bankruptcy Court (the "Termination Date"); provided, however, that Purchaser or Sellers may not terminate this Agreement pursuant to this Section 11.2(b) if the Closing shall not have occurred on or before the Termination Date due to a breach by Purchaser or Sellers, as the case may be, of any representations, warranties, covenants or agreements of Purchaser or Sellers, as the case may be, contained in this Agreement;

(c)     by Sellers, if any condition to the obligations of Sellers set forth in Section 9

- 40 -

shall have become incapable of fulfillment (including failure of Purchaser to be the successful bidder at the Auction) other than as a result of a breach by Sellers of any covenant or agreement contained in this Agreement, and such condition is not waived by Sellers or if Purchaser gives notice pursuant to Section 10.10 that it is not satisfied with its potential liability for Workers' Compensation Claims in Section 2.3(f) or the Cure Amounts in Section 2.3(d);

(d)     by Purchaser, if any condition to the obligations of Purchaser set forth in Section 10 shall have become incapable of fulfillment (including failure of Purchaser to be the successful bidder at the Auction) other than as a result of a breach by Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser;

(e)     by Sellers, if Purchaser is in breach in any respect of any of its representations made in this Agreement that are qualified by materiality or Material Adverse Effect or in material breach in any respect of any of its representations not so qualified, or is in violation or default in any material respect of any of its covenants or agreements in this Agreement, if such breach, violation or default has not been cured or waived within ten (10) days following receipt of written notice from Sellers specifying, in reasonable detail, such claimed breach, violation or default and demanding its cure or satisfaction;

(f)     by Sellers, if in compliance with the terms of the Bid Procedures Order;

(g)     by Purchaser or Sellers, if the Bid Procedures Order is not issued within 30 days of filing of the Bid Procedures Motion or if the Bankruptcy Court denies the Bid Procedures Motion;

(h)     by Purchaser, if the Sellers are in breach in any respect of any of their representations made in this Agreement that are qualified by materiality or Material Adverse Effect or in material breach in any respect of any of their representations not so qualified, or are in violation or default in any material respect of any of their covenants or agreements in this Agreement, if such breach, violation or default has not been cured or waived within ten (10) days following receipt of written notice from Purchaser specifying, in reasonable detail, such claimed breach, violation or default and demanding its cure or satisfaction;

(i)     by Sellers or Purchaser if there shall be in effect a final non-appealable order of a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions, it being agreed that the parties hereto shall promptly appeal any adverse determination which is not non-appealable (and pursue such appeal with reasonable diligence);

(j)     by Purchaser, if, as a result of an order of the Bankruptcy Court, the Cases are

- 41 -

dismissed, converted to chapter 7 and a chapter 7 trustee is appointed with respect to Sellers;

(k)     automatically, if any Seller closes or consummates the sale of the Assets pursuant to a Superior Bid; or

(l)     by Purchaser or Sellers, if the Bankruptcy Court shall not have entered the Confirmation Order by December 7, 2009.

11.3.     Effects of Termination.

(a)     If this Agreement is terminated pursuant to Section 11.2, this Agreement (other than Section 11.3 (Effects of Termination), Section 13 (Expenses, Employees, Attorneys' Fees and Brokers' Fees) and Section 14.6 (Governing Law; Jurisdiction), each of which shall remain in full force and effect) shall forthwith become null and void and no party hereto shall have any liability or further obligation to any other party hereto, except as provided in this Section 11.3.

(b)     Notwithstanding anything in Section 11.3(a) to the contrary, (x) if this Agreement is terminated by Sellers pursuant to Section 11.2(e), Section 2.6(b) shall remain in full force and effect, and (y) if this Agreement is terminated for any reason other than by Sellers pursuant to Section 11.2(e), Section 2.6(c) shall remain in full force and effect.

(c)     Sellers' liability under or arising from this Agreement is and shall be limited to Sellers' return of the Purchaser Deposit Amount and payment of the Breakup Fee and the Expense Reimbursement if payable pursuant to the terms hereof.

(d)     Purchaser's liability under or arising from this Agreement shall be limited to its forfeiture of the Purchaser Deposit Amount.

## SECTION 12
## TAXES

12.1.     Taxes Related to Purchase of Assets.     The parties recognize and acknowledge that they may be exempt under section 1146(c) of the Bankruptcy Code and the Confirmation Order from state and local transfer, recording, stamp or other similar transfer Taxes (collectively "Transaction Taxes") that may be imposed by reason of the sale, transfer, assignment and delivery of the Assets; provided, however, that if Transaction Taxes are assessed for any reason, Purchaser shall be solely responsible for the payment of such Transaction Taxes along with any recording and filing fees. Purchaser and Sellers agree to cooperate to determine the amount of Transaction Taxes payable in connection with the Transactions.     At the Closing, Purchaser shall remit to Sellers such properly completed resale exemption certificates and other similar certificates or instruments as are applicable to claim available exemptions from the payment of sales, transfer, use or other similar Taxes under applicable law.     Purchaser and Sellers shall cooperate in preparing such forms and shall execute and

- 42 -

deliver such affidavits and forms as are reasonably requested by the other party.

12.2.  Cooperation.  Purchaser and Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Assets as is reasonably necessary for the preparation and filing of any Tax Return, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Taxes and for the answer of any governmental or regulatory inquiry relating to Taxes.  Purchaser agrees to retain possession of all Tax files, books and records delivered to Purchaser by Sellers for a period of at least five years from the Closing Date.  If Purchaser determines to destroy or discard any of such files, books or records after the end of such five-year period, Purchaser shall give Sellers reasonable notice thereof and shall allow Sellers to take possession of such files, books and records at Sellers' expense.  From and after the Closing Date, Purchaser agrees that it shall provide reasonable access to Sellers and their attorneys, accountants and other representatives (after reasonable notice and during normal business hours and without charge) to such files, books and records as Sellers may reasonably deem necessary to prepare for, file, prove, answer, prosecute or defend any claim, suit, inquiry or other proceeding, related to Taxes in connection with the Assets.

## SECTION 13
## EXPENSES, EMPLOYEES, ATTORNEYS' FEES AND BROKERS' FEES

13.1.  Expenses.  Except as otherwise provided under this Agreement, Sellers shall be responsible for all expenses, liabilities and obligations arising out of or relating to the Assets and the Assumed Liabilities or the use, possession, ownership or operation thereof accruing on or prior to the Closing, as applicable.  Purchaser shall be responsible for all expenses, liabilities and obligations arising out of or relating to the Assets and the Assumed Liabilities or the use, possession, ownership or operation thereof accruing after the Closing.

13.2.  Attorneys' Fees; Brokers' Fees; Expenses.  Each party shall be responsible for the payment of its own attorneys', brokers' and other fees and expenses in connection with the Transactions.

## SECTION 14
## MISCELLANEOUS

14.1.  Sale of Assets Subject to Bankruptcy Court Approval.  This Agreement, the sale of the Assets and Sellers' ability to perform under this Agreement is conditioned and contingent upon Bankruptcy Court approval of the Plan and entry of the Confirmation Order.

14.2.  Survival of Representations and Warranties.  Until the Closing, all representations and warranties herein shall be operative and in full force and effect, and the parties hereto shall be entitled to rely thereon, regardless of any investigation made by or for them.  All representations and

- 43 -

warranties and covenants contained herein shall terminate and shall not survive the Closing, except the covenants contained in <u>Sections 2</u>, <u>5.3</u>, <u>6</u>, <u>7</u>, <u>11.3</u>, <u>12</u>, and <u>13</u>.

14.3.   <u>Entirety of Agreement; Amendments and Waivers</u>.  This Agreement (including all schedules and exhibits hereto), together with the Ancillary Agreements and certificates delivered hereunder, state the entire agreement of the parties with respect to the subject matter hereof, merge all prior negotiations, agreements and understandings, if any, and state in full all representations, warranties, covenants and agreements which have induced this Agreement.  Each of Sellers and Purchaser otherwise makes no other representations or warranties including any implied representations or warranties.  Each party agrees that in dealing with third parties no contrary representations shall be made.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other or subsequent breach.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

14.4.   <u>Assignment</u>.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties without the prior written consent of the other party except, in the case of Purchaser, to an Affiliate (but only if such Affiliate becomes a party to this Agreement and agrees to be bound by the representations, warranties, covenants and obligations herein and Purchaser guarantees such Affiliate's obligations herein and; <u>provided</u>, <u>however</u>, that no such assignment shall relieve Purchaser of its obligations hereunder).  No party shall be relieved of any liability hereunder in respect of any assignment pursuant to this <u>Section 14.4</u>, unless such assignor has received a written release expressly excepting such assignor from any liability that may arise hereunder.

14.5.   <u>Successors and Assigns; No Third Party Beneficiaries</u>.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.  This Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective heirs, personal representatives, legatees, successors and permitted assigns.

14.6.   <u>Governing Law; Jurisdiction</u>.  This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware applicable to contracts made and to be entirely performed therein.  In the event of any controversy or claim arising out of or relating to this Agreement or the breach or alleged breach hereof, each of the parties hereto irrevocably (i) submits to the exclusive jurisdiction of the Bankruptcy Court, (ii) waives any objection which it may have at any time to the laying of venue of any action or proceeding brought in the Bankruptcy

- 44 -

Court, (iii) waives any claim that such action or proceeding has been brought in an inconvenient forum, and (iv) agrees that service of process or of any other papers upon such party by registered mail at the address to which notices are required to be sent to such party under <u>Section 14.12</u> shall be deemed good, proper and effective service upon such party.

14.7.  <u>Gender and Number</u>.  In this Agreement, words importing the singular include the plural and vice versa and words importing a specific gender include all genders.

14.8.  <u>Headings</u>.  The division of this Agreement into Sections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

14.9.  <u>Construction</u>.  In this Agreement (i) words denoting the singular include the plural and vice versa, (ii) "it" or "its" or words denoting any gender include all genders, (iii) the word "including" shall mean "including without limitation," whether or not expressed, (iv) any reference to a statute shall mean the statute and any regulations thereunder in force as of the date of this Agreement or the Closing Date, as applicable, unless otherwise expressly provided, (v) any reference herein to a Section, Exhibit or Schedule refers to a Section of, or Exhibit or Schedule to, this Agreement, unless otherwise stated, (vi) any reference to "knowledge" shall mean, with respect to Sellers the actual knowledge of Brian Tierney, Scott Baker or Richard Thayer and with respect to Purchaser the actual knowledge of the investors of Purchaser and (vii) when calculating the period of time within or following which any act is to be done or steps taken, the date which is the reference day in calculating such period shall be excluded and if the last day of such period is not a Business Day, then the period shall end on the next day which is a Business Day.

14.10.  <u>Severability</u>.  If any provision of this Agreement is held to be illegal, invalid or unenforceable by a court of competent jurisdiction, the legality, validity and enforceability of the remaining provisions shall not be affected thereby, and in lieu of each such illegal, invalid or unenforceable provision, the parties shall negotiate in good faith to add a provision similar in terms to such illegal, invalid or unenforceable provision as may be possible while giving effect to the benefits and burdens for which the parties have bargained hereunder.

14.11.  <u>Negotiated Agreement</u>.  Each of Sellers and Purchaser acknowledges that it has been advised and represented by counsel in the negotiation, execution and delivery of this Agreement and accordingly agrees that, if an ambiguity exists with respect to any provision of this Agreement, such provision shall not be construed against any party because such party or its representatives drafted such provision.

14.12.  <u>Notices</u>.  All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given or made as follows: (a) if sent by registered or certified mail in the United States return receipt requested, upon receipt; (b) if sent designated for overnight delivery by nationally recognized overnight air courier (such as

- 45 -

Federal Express), one Business Day after delivery to such courier; (c) if sent by facsimile transmission before 5:00 p.m. in Philadelphia, when transmitted and receipt is confirmed; (d) if sent by facsimile transmission after 5:00 p.m. in Philadelphia and receipt is confirmed, on the following Business Day; and (e) if otherwise actually personally delivered, when delivered, provided that such notices, requests, demands and other communications are delivered to the address set forth below, or to such other address as any party shall provide by like notice to the other parties to this Agreement:

Purchaser:       Philly Papers, LLC
250 Gibraltar Road
Horsham, PA  19044
Attn:  Bruce E. Toll

with a copy to:      Klehr, Harrison, Harvey, Branzburg & Ellers LLP
260 S. Broad Street
Philadelphia, PA  19102
Facsimile:  (215) 568-6603
Attn:  Jeffrey D. Kurtzman, Esq.

Also with a copy to:  Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
Facsimile:  (215) 994 2222
Attn:  David S. Denious, Esq.

Sellers:        Philadelphia Newspapers, LLC
400 N. Broad Street
Philadelphia, PA 19130
Facsimile:  (215) 854-5105
Attn:  Scott Baker

with a copy to:      Proskauer Rose LLP
70 W. Madison Street
Chicago, IL 60602
Facsimile:  (312) 962-3551
Attn:  Paul V. Possinger

- 46 -

Any party hereto may change its address for service from time to time by notice given to other parties hereto in accordance with the foregoing.

14.13.  <u>Counterparts; Facsimile Copies</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Signed facsimile copies of this Agreement shall legally bind the parties to the same extent as original documents.

**[Remainder of Page Intentionally Left Blank]**

Current/15517013v5                                                08/20/2009 12:35 PM

821303_1

**IN WITNESS WHEREOF,** the parties hereto have duly executed and delivered this Agreement as of the date first above written.

**SELLERS:**

**PHILADELPHIA MEDIA HOLDINGS, LLC**

By: _____
Name: Brian P. Tierney
Title: Chief Executive Officer


**PMH ACQUISITION, LLC**

By: _____
Name: Brian P. Tierney
Title: Chief Executive Officer


**BROAD STREET VIDEO, LLC**

By: _____
Name: Brian P. Tierney
Title: Chief Executive Officer


**PHILADELPHIA NEWSPAPERS, LLC**

By: _____
Name: Brian P. Tierney
Title: Chief Executive Officer


[Signature Page to ASSET PURCHASE AGREEMENT]

**PHILADELPHIA DIRECT, LLC**

By: _____
Name:  Brian P. Tierney
Title:  Chief Executive Officer


**PHILLY ONLINE, LLC**

By: _____
Name:  Brian P. Tierney
Title:  Chief Executive Officer


**PMH HOLDINGS, LLC**

By: _____
Name:  Brian P. Tierney
Title:  Chief Executive Officer


**BROAD STREET PUBLISHING, LLC**

By: _____
Name:  Brian P. Tierney
Title:  Chief Executive Officer


**PHILADELPHIA MEDIA, LLC**

By: _____
Name:  Brian P. Tierney
Title:  Chief Executive Officer


[Signature Page to ASSET PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**PURCHASER:**

**PHILLY PAPERS, LLC**

By: _____
Name: Bruce E. Toll
Title: Chairman