Fred S. Hodara
Abid Qureshi
Alexis Freeman
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY   10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

Attorneys for the Steering Group of Prepetition
Secured Lenders

- and -

Andrew C. Kassner
David F. Abernethy
Andrew J. Flame
DRINKER BIDDLE & REATH LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996
Telephone: (215) 988-2700
Fax: (215) 988-2757

Attorneys for Citizens Bank of Pennsylvania, as Agent,
on behalf of the Prepetition Secured Lenders

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Philadelphia Newspapers, LLC *et al.*, | ) | Case No. 09-11204 (SR) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | |
| | ) | |

**OBJECTION OF THE STEERING GROUP OF PREPETITION SECURED
LENDERS AND CITIZENS BANK OF PENNSYLVANIA, AS AGENT FOR
THE PREPETITION SECURED LENDERS, TO DEBTORS' MOTION
FOR AN ORDER:  (A) APPROVING PROCEDURES FOR THE SALE OF
CERTAIN OF THE DEBTORS' ASSETS; (B) SCHEDULING AN AUCTION;
(C) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES; (D)
<u>APPROVING FORM OF NOTICE; AND (E) GRANTING RELATED RELIEF</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND .................................................................................................................... 3

OBJECTION ........................................................................................................................... 4

I.     The Sale Transaction is Subject to Heightened Scrutiny Because the Stalking
       Horse Bidder is Controlled by Insiders ...................................................................... 5

II.    The Bankruptcy Code Preserves the Basic Right of Secured Creditors to Bid the
       Amount of Their Debt at Any Sale of Their Collateral .............................................. 6
       A.     Bankruptcy Code Section 363(k) Preserves A Secured Lender's Right to
              Credit Bid ........................................................................................................... 7
       B.     Bankruptcy Code Section 1129 Does Not Eviscerate the Prepetition
              Lenders' Right to Credit Bid ............................................................................ 9
       C.     Bankruptcy Code Section 1111 Confirms the Prepetition Lenders' Right to
              Credit Bid ......................................................................................................... 10
       D.     Judicial Authority Overwhelmingly Confirms that a Secured Creditor
              Cannot Be Deprived of Its Right to Credit Bid Under the Undisputed Facts
              Presented Here. ................................................................................................ 13
       E.     Debtors' Reading of the Bankruptcy Code Violates the Fifth Amendment
              to Which the Bankruptcy Power Is Subject .................................................. 18
       F.     The Debtors' Improperly Conflate Approval of the Bid Procedures and
              Confirmation of the Proposed Plan ............................................................... 20

III.   Denying Secured Creditors the Right to Credit Bid Will Have Far Reaching
       Ramifications in the Lending Market ........................................................................ 22

IV.    The Insider Purchaser is not Entitled to a Break-up Fee or Expense
       Reimbursement ........................................................................................................... 24

V.     Union Contracts Acceptable to the Purchaser In Its Sole Discretion Cannot Be a
       Condition Precedent to Closing ................................................................................ 27

CONCLUSION ..................................................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**

*222 Liberty Assocs.*, 108 B.R. 971 (Bankr. E.D. Pa. 1990) ............................ 10 n.10, 13-5

*Bank of N.Y. v. Treco (In re Treco)*, 240 F.3d 148, 160 (2d Cir. 2001) ..............................19

*Butner v. U.S.*, 440 U.S. 48 (1979) ................................................................22

*Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999) ................................................................25, 27

*Chrysler Credit Corp. v. Ruggiere (In re George Ruggiere Chrysler-Plymouth, Inc.)*, 727 F.2d 1017 (11th Cir. 1984) ........................................................18

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims (In re Papercraft Corp.)*, 211 B.R. 813 (W.D. Pa. 1997) ...............................5

*City of New York v. Quanta Res. Corp. (In re Quanta Res. Corp.)*, 739 F.2d 912 (3d Cir. 1984) ................................................................19

*Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448 (3d. Cir. 2006) ............................................................... 7-8

*Commonwealth of Pa. State Employees' Ret. Fund v. Roane*, 14 B.R 542 (E.D. Pa. 1981) ................................................................23

*Enewally v. Wash. Mut. Bank (In re Enewally)*, 368 F.3d 1165 (9th Cir. 2004) ................19

*Greenblatt v. Steinberg*, 339 B.R. 458 (N.D. Ill. 2006) ................................................8 n.7

*H&M Parmely Farms v. Farmers Home Admin.*, 127 B.R. 644 (D.S.D. 1990) ...............17

*In re Aloha Airlines, Inc.*, No. 08-00337, 2009 WL. 1371950 (Bankr. D. Haw. May 14, 2009) ................................................................8 n.5

*In re Antaeus Technical Servs., Inc.*, 345 B.R. 556 (W.D. Va. 2005) ...........................8 n.6

*In re Beth Israel [Hosp. Assoc.] of Passaic*, No. 06-16186, 2007 WL. 2049881 (Bankr. D.N.J. July, 12 2007) ................................................................25

*In re Briggs Transportation Co.*, 35 B.R. 210 (Bankr. D. Minn. 1983) ...........................23

*In re Criimi Mae, Inc.*, 251 B.R. 796 (Bankr. D. Md. 2000) ........................................ 17-8

*In re Diebart Bancroft*, Nos. 92-3744 & 92-3745, 1993 WL. 21423 (E.D. La. Jan. 26, 1993) ................................................................8 n.3

*In re Edwards*, 228 B.R. 552 (Bankr. E.D. Pa. 1998) ............................................................4

*In re Finova Capital Corp.*, 356 B.R. 609 (Bankr. D. Del. 2006) .......................................7

*In re Kent Terminal Corp.*, 166 B.R. 555 (Bankr. S.D.N.Y. 1994) ...................................17

*In re Matrix Dev. Corp*, No. 08-32798, 2009 WL. 2169717 (Bankr. D. Or. 2009) ..........17

*In re Morgan House General P'ship*, Nos. 96-MC-184 & 96-MC-185, 1997 WL
    50419 (E.D. Pa. Feb. 7, 1997)...................................................................................8

*In re Orfa Corp. of Philadelphia*, Nos. 90-11253S, 90-11254S & 90-11255S,
    1991 WL. 225985 (Bankr. E.D. Pa. Oct. 30, 1991) .................................10 n.10, 15, 20

*In re Realty Investments, Ltd.*, 72 B.R. 143 (Bankr. C.D. Cal. 1987)..............................16

*In re Reliant Energy Channelview, LP*, 403 B.R. 308 (D. Del. 2009) .............................25

*In re River Village*, 181 B.R. 795 (E.D. Pa. 1995)............................................................16

*In re Seminole Oil & Gas Corp.*, 963 F.2d 368 (4th Cir. 1992)......................................5-6

*In re Suncruz Casinos, LLC*, 298 B.R. 833 (Bankr. S.D. Fla. 2003) ...........................16-7

*In re Theroux*, 169 B.R. 498 (Bankr. D. R.I. 1994) ......................................................8 n.4

*In re Valley Bldg. Supply*, 39 B.R. 131 (Bankr. D. Vt. 1984) .......................................8 n.8

*Louisville Joint Stock  Land Bank v. Radford*, 295 U.S. 555 (1935).................................19

*Matter of Kennedy*, 158 B.R. 589 (Bankr. D.N.J. 1993)...................................................22

*Texas & P. Ry. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426 (1907)..............................21-2

*The Southerton Corp. v. United Penn Bank (In re The Southerton Corp.)*, 46 B.R.
    391 (M.D. Pa. 1982) .................................................................................................23

*Unisys Fin. Corp. v. Resolution Trust Corp.*, 979 F.2d 609 (7th Cir. 1992) ....................19

*United Savings Ass'n of Tex. v. Timbers of Inwood Forest Assocs. (In re Timbers of
    Inwood Forest Assocs.)*, 793 F.2d 1380 (5th Cir. 1981) .........................................18-9

*United States v. Sec. Indus. Bank*, 459 U.S. 70 (1982) .....................................................18

**Statutes**

11 U.S.C. § 363(k) .................................................................................................7

11 U.S.C. § 506(a)(1)........................................................................................11 n.11

11 U.S.C. § 1111(b)(1)(A) ................................................................................ 10-1

11 U.S.C. § 1111(b)(1)(B)(ii)................................................................................12

11 U.S.C. § 1129(b)(2)........................................................................................11

11 U.S.C. § 1129(b)(2)(A) ...............................................................................9 n.9

124 Cong. Rec. 32,407 (1978)............................................................................6, 12

**Other Authorities**

7 Collier on Bankruptcy, ¶1111.03[3][c] (15th ed. 2008) ..................................................13

7 Collier on Bankruptcy, ¶1111.03[4] (15th ed. 2008) ................................................. 11-2

**Miscellaneous**

Ronald J. Mann, *Explaining the Pattern of Secured Credit*, 110 Harv. L. Rev. 625,
    (1997)....................................................................................................24

The steering group of prepetition secured lenders (the "Steering Group")[1] and Citizens Bank of Pennsylvania, in its capacity as administrative agent and collateral agent (in such capacities, "Citizens" or the "Prepetition Agent") under that certain Credit and Guaranty Agreement, dated June 29, 2006, with Citizens, and certain other lender parties (collectively, the "Prepetition Lenders") in the original principal amount of $295,000,000 (as amended from time to time, the "Prepetition Credit Agreement") submit this objection (the "Objection") to the Motion of the above-captioned debtors (collectively, the "Debtors") for an Order:  (A) Approving Procedures for the Sale of Certain of the Debtors' Assets; (B) Scheduling an Auction; (C) Approving Assumption and Assignment Procedures; (D) Approving Form of Notice; and (E) Granting Related Relief (Docket No. 1007) (the "Bid Procedures Motion").  In support of their Objection, the Steering Group and the Prepetition Agent respectfully submit as follows:

## PRELIMINARY STATEMENT

1.      By the Motion, the Debtors seek approval of Bid Procedures that purport to deny a secured creditor the right to credit bid, in contravention of the United States Constitution, the Bankruptcy Code, and nearly every decision to have considered the issue.  A secured creditor's right to credit bid is a fundamental, constitutionally protected property right – a right that enables a secured creditor to preserve its bargained-for interests in its collateral.  Such a right cannot and should not be eviscerated by a strained reading of the Bankruptcy Code and applicable case law. The Debtors have failed to meet their burden of showing that any justification exists to deny the Prepetition Lenders their right to credit bid.

2.      The Debtors have asked this Court to approve Bid Procedures that prevent the Prepetition Lenders from credit bidding in order to enhance the prospects that the insider

---

[1] The Steering Group members are Angelo Gordon & Co., L.P.; CIT Syndicated Loan Group; Credit Suisse Candlewood Special Situations Master Fund Ltd., Eaton Vance Management; GECC; and Wells Fargo Foothill.

Stalking Horse bidder championed by the Debtors will be successful in acquiring the Debtors'

assets.  The proposed Bid Procedures would in effect allow the Debtors to liquidate the

Prepetition Lenders collateral for the benefit of their insiders, without affording the Prepetition

Lenders their fundamental rights in the sale process.  The Debtors dress up their proposed

process, through their publicity campaign, as the only available option to protect journalistic

standards and local Philadelphia interests.  The Debtors' rhetoric is unsupportable, self-serving

and woefully insufficient to deprive the Prepetition Lenders of their right to credit bid.  The

Debtors clearly hope to create an atmosphere of irrational, almost xenophobic, hostility toward

the Prepetition Lenders and somehow use that to urge this Court to ignore the clear weight of

judicial authority and legislative history and reach an unprecedented decision.  Settled law

confirms that secured creditors always have the right to bid the amount of their claim when a

debtor attempts to sell their collateral, whether that collateral be media assets, a building, or a

widget factory.

       3.     The Debtors' attempts to obfuscate the issue before this Court – whether these

Bid Procedures should authorize the Prepetition Lenders to credit bid – further evidences the

frailty of the Debtors' position.  The Debtors rely upon the plan confirmation provisions of

the Bankruptcy Code in support of the proposition that secured creditors should be denied the

right to credit bid at a sale of their collateral that occurs before plan confirmation.  The right to

credit bid, however, is a fundamental procedural right of a secured creditor that exists

independently of the standards for plan confirmation, and applies anytime a debtor attempts to

sell the secured creditor's collateral.  The Debtors cannot, by conflating the plan confirmation

process with the bankruptcy auction process, eliminate from the Bankruptcy Code the clear right

of a secured creditor to credit bid at any auction at which its collateral is being sold.   For this

Court to rule otherwise would create a dangerous precedent that would undermine lending

markets and deprive secured creditors of the benefit of their bargain.

## BACKGROUND

4.      On February 22, 2009 (the "Petition Date"), each of the Debtors filed a voluntary

petition for relief with the Court under chapter 11 of title 11 of the United States Code, 11 U.S.C.

§101, *et seq.* (as amended, the "Bankruptcy Code"), commencing these jointly administered

chapter 11 cases.  The Debtors are operating their business and managing their property as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  An

Official Committee of Unsecured Creditors (the "Committee") was appointed on March 2, 2009;

no trustee or examiner has been appointed or sought in these chapter 11 cases.

5.      On August 20, 2009, the Debtors filed their Joint Chapter 11 Plan (the "Plan")

and accompanying disclosure statement.  The Plan provides for the sale of substantially all of the

Debtors' assets to a stalking horse bidder.  Also on August 20, 2009, the Debtors filed the Bid

Procedures Motion.

6.      The Stalking Horse bidder identified in the Bid Procedures Motion is comprised

of, among others, the Carpenters Pension and Annuity Fund of Philadelphia and Vicinity

("Carpenters Pension Fund").  Carpenters Pension Fund owns approximately 30% of the equity

in PMH.  The Chairman of the Stalking Horse bidder is Bruce Toll, who also serves as Chairman

of the Board of Advisors of Debtor PMH, the entity that appointed Brian Tierney as the Debtors'

CEO and sole manager.  Until recently, Mr. Toll owned 20% of the equity in PMH.  Penn Matrix

Investors, whose controlling partner is David Haas, is the third entity comprising the Stalking

Horse bidder.  The Stalking Horse bid also contemplates "other" participating investors, which

the Prepetition Lenders are advised may include Brian Tierney, either as a direct investor or as a

recipient of equity in the reorganized debtors in his capacity as Chief Executive Officer.

3

7.      On August 28, 2009, the Debtors, Prepetition Agent, Steering Group and Committee entered into a stipulation and order that provided, among other things, that the Bid Procedures Motion would be heard on September 15, 2009.  That hearing date was extended by consent of the parties to October 1, 2009.

8.      On September 2, 2009, the Committee filed their Motion for an Order (A) Directing Debtors to Cease Their Publicity Campaign Advocating a Sale of Substantially all Their Assets to "Local Owners" and (B) Granting Other Remedial Relief (the "Publicity Campaign Motion").  The Committee alleges in the Publicity Campaign Motion, among other things, that the Debtors breached their fiduciary duty to run a fair and impartial sale process by running ads in support of the Horse bid.  The Publicity Campaign Motion has not yet been resolved.  (Publicity Campaign Motion, Doc. No. 1033, ¶¶ 26-37.)

9.      On September 9, 2009 and again on September 14, 2009, the Prepetition Lenders, the Debtors, and the Committee engaged in mediation with Judge Fehling, which resolved numerous objections that the Prepetition Lenders had to the proposed bid procedures.

## **OBJECTION**[2]

10.      As established by courts in this and other jurisdictions, the purpose of bid procedures is to encourage the fair, open and competitive sale of a debtor's assets while maximizing the value of the estate for the debtor's creditors.  *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.").  The Bid Procedures proposed by the Debtors guarantee precisely the opposite result by seeking to manipulate bankruptcy law to deprive the Prepetition Lenders of their fundamental right to credit bid their debt.

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Bid Procedures Motion or the Bid Procedures.

Additionally, the Bid Procedures propose the payment of a Break-up Fee and Expense

Reimbursement totaling $1.5 million that, in the circumstances present here, is not appropriate

and should not be approved.  These fundamental flaws in the Bid Procedures would be

inappropriate even if the Stalking Horse bidder were an unaffiliated third party, but when

viewed, as these Bid Procedures must be, as a component of an insider transaction, these

shortcomings are particularly egregious.

I.      **The Sale Transaction is Subject to Heightened Scrutiny Because the Stalking Horse Bidder is Controlled by Insiders**

11.      The Stalking Horse bidder is controlled by Bruce Toll.  As the Court is aware, Mr.

Toll is also Chairman of the Board of Advisors of Debtor PMH and, until recently, held 20% of

PMH's equity.  In addition, one of the Stalking Horse bidder's key investors, Carpenters Pension

Fund, currently owns approximately 30% of PMH's equity.  Brian Tierney, the Debtors' current

CEO, is also closely affiliated with the Stalking Horse bidder and is expected to retain control of

the Debtors' operations if the Stalking Horse bid is ultimately successful.

12.      In light of the foregoing, the sale proposed and championed by the Debtors is an

insider transaction.  As stated by courts in this and other circuits, transactions involving insiders

are subject to a heightened level of scrutiny.  *See Citicorp Venture Capital, Ltd. v. Comm. of

Creditors Holding Unsecured Claims (In re Papercraft Corp.)*, 211 B.R. 813, 823 (W.D. Pa.

1997) ("[I]nsider transactions are subjected to rigorous scrutiny and when challenged, the burden

is on the insider not only to prove the good faith of a transaction but also to show the inherent

fairness from the viewpoints of the corporation and those with interests therein."); *see also, In re

Seminole Oil & Gas Corp.*, No. 91-1636, 1992 WL 110720, at *6 (4th Cir. May 22, 1992)

(holding that transactions involving insiders should be closely scrutinized).  Accordingly, the

Debtors bear a heightened burden of proving the good faith and inherent fairness of a set of Bid

Procedures that (i) contemplate the sale of the Prepetition Lenders' collateral free and clear, while concurrently depriving the Prepetition Lenders of the basic right to credit bid their debt, and (ii) provide for the payment of a substantial Break-up Fee and Expense Reimbursement to the Debtors' insiders. For the reasons set forth below, the Prepetition Lenders respectfully submit that under any standard, let alone the heightened scrutiny applicable here, the Debtors cannot meet their burden.

**II.      The Bankruptcy Code Preserves the Basic Right of Secured Creditors to Bid the Amount of Their Debt at Any Sale of Their Collateral**

13.      The Bankruptcy Code provides two specific means by which a secured creditor can protect the value of its collateral – the right to credit bid pursuant to section 363(k), and the right to make an election pursuant to section 1111(b). If made, a section 1111(b) election allows an undersecured creditor to have its claim treated as fully secured to the extent allowed, rather than as a claim bifurcated into a secured claim to the extent of the value of the collateral, and an unsecured deficiency claim. As discussed in detail below, the section 1111(b) election is not available to the Prepetition Lenders here because, as stated in the Congressional Record, a "sale of property under section 363 or under a plan is excluded from treatment under section 1111(b) because of the secured party's right to bid in the full amount of its allowed claim at any sale of collateral under section 363(k) of the House Amendment." 124 Cong. Rec. 32,407 (1978).

14.      The Debtors have concocted a highly manipulated structure in an attempt to sell the Prepetition Lenders' collateral free and clear while purporting to avoid the requirements of Bankruptcy Code section 363(k), which codifies a secured creditor's right to credit bid. The Debtors claim to be able to circumvent section 363(k) and the Prepetition Lenders' right to credit bid by asserting that the cramdown requirements of Bankruptcy Code section 1129 do not require that a sale conducted pursuant to a plan be conducted in accordance with section 363.

6

While it is undisputed that the Bankruptcy Code authorizes the Debtors to sell assets pursuant to a plan of reorganization, the Debtors cannot thereby deprive the Prepetition Lenders of their right to credit bid. That fundamental, constitutionally protected right is the only mechanism available to the Prepetition Lenders to preserve their property interest in the collateral, and thus the benefit of the bargain struck with the Debtors when the $295 million loan was initially extended under the Prepetition Credit Agreement. The Prepetition Lenders' right to credit bid is therefore equally applicable to a sale under a plan of reorganization as it is to a sale pursuant to section 363(k).

### A.    Bankruptcy Code Section 363(k) Preserves A Secured Lender's Right to Credit Bid

15.    Bankruptcy Code section 363(k) empowers a secured lender to credit bid the full face amount of its claim when the collateral securing its claim is sold outside the ordinary course of business. Section 363(k) provides:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property. 11 U.S.C. § 363(k).

By granting a secured creditor the right to credit bid its claim, the Bankruptcy Code preserves the secured creditor's status by ensuring that its debt is either paid in full or the collateral remains in place to secure the debt. *See Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 461 (3d. Cir. 2006) ("Because the Lenders had a valid security interest in essentially all the assets sold…[t]heir credit bid did nothing more than preserve their right to the proceeds, as credit bids do under § 363(k)"); *see also, In re Finova Capital Corp.*, 356 B.R. 609, 626 (Bankr. D. Del. 2006) (same).

16.     As noted above, section 363(k) authorizes a secured creditor to bid the *full amount* of its claim regardless of the underlying value of its collateral.  *SubMicron Systems,* 432 F.3d. at 459 (finding that section 363(k) does not limit a secured creditor's bid to the economic value of its secured claim); *see also In re Morgan House General P'ship*, Nos. 96-MC-184 & 96-MC-185, 1997 WL 50419, at *1 (E.D. Pa. Feb. 7, 1997) (holding that secured creditor under section 363(k) was authorized to bid on its collateral to the extent of its claim).

17.     While Bankruptcy Code section 363(k) also authorizes a court to order, for cause, that a secured creditor is not permitted to credit bid its claim in connection with a sale of its collateral, courts have narrowly construed this "for cause" provision to circumstances entirely inapplicable here.  The only instances in which courts have deprived a secured creditor of its constitutionally-based right to credit bid are:  (i) where there is a bona fide dispute as to the validity of a secured creditor's lien;[3] (ii) where the trustee is colluding with the secured creditor to purchase an asset at a fraction of the fair market value;[4] (iii) where the secured creditor is intending to transfer a purchased asset to the debtor's competitor;[5] (iv) where the secured creditor is demonstrating bad faith by failing to comply with an agreement giving it the right to credit bid;[6] (v) where the secured creditor did not act in compliance with bidding procedures approved by the court;[7] and (vi) where a junior lienholder is seeking authority to credit bid for an asset that does not have value in excess of claims held by a senior lienholder.[8]  None of the "for cause" case law, in this jurisdiction or elsewhere, involves circumstances at all analogous to

---

[3] *In re Diebart Bancroft*, Nos. 92-3744 & 92-3745, 1993 WL 21423, *5 (E.D. La. Jan. 26, 1993).
[4] *In re Theroux*, 169 B.R. 498, 499 (Bankr. D. R.I. 1994).
[5] *In re Aloha Airlines, Inc.*, No. 08-00337, 2009 WL 1371950, *8-9 (Bankr. D. Haw. May 14, 2009).
[6] *In re Antaeus Technical Servs., Inc.*, 345 B.R. 556, 565 (W.D. Va. 2005).
[7] *Greenblatt v. Steinberg*, 339 B.R. 458, 463 (N.D. Ill. 2006).
[8] *In re Valley Bldg. Supply*, 39 B.R. 131, 133 (Bankr. D. Vt. 1984).

those presented here.  Accordingly, cause does not exist to take the extraordinary step of
preventing the Prepetition Lenders from credit bidding.

> ### B.    Bankruptcy Code Section 1129 Does Not Eviscerate the Prepetition Lenders' Right to Credit Bid.

18.    Contrary to settled law, the Debtors attempt to rely upon the cram-down
provisions of Bankruptcy Code Section 1129 for the extraordinary proposition that they may sell
the Prepetition Lenders' collateral pursuant to a plan of reorganization and thereby avoid the
Prepetition Lenders' right to credit bid.  Specifically, the Debtors contend that Bankruptcy Code
section 1129 authorizes a debtor to sell assets pursuant to a plan outside the auspices of section
363(k) if the debtor can meet one of the other fair and equitable requirements set forth in section
1129(b)(2)(A).  Bankruptcy Code section 1129(b)(2)(A) allows a debtor to cram down a plan on
a non-consenting secured creditor if the debtor can satisfy one of three disjunctive cram down
methods: (i) allowing the secured creditor to retain its lien on its collateral and receive deferred
cash payments equaling the present value of the creditor's allowed secured claim; (ii) allowing
the secured creditor to obtain a lien on the proceeds from the sale (subject to 363(k)) of its
collateral and receive deferred cash payments equaling the present value of the creditor's
allowed secured claim; or (iii) providing the secured creditor with the "indubitable equivalent" of
its allowed secured claim.[9]

---

[9] Section 1129(b)(2)(A) provides: (i)(I) that the holders of such claims retain the liens securing such claims,
whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of
the allowed amount of such claims; and (II) that each holder of a claim of such class receive on account of such
claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date
of the plan, of at least the value of such holder's interest in the estate's interest in the property; (ii) for the sale,
subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear
of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds
under clause (i) or (iii) of this subparagraph; or (iii) for the realization by such holders of the indubitable equivalent
of such claims.  11 U.S.C. § 1129(b)(2)(A).

19.    Although the cram down test in section 1129 is disjunctive, the Debtors

incorrectly assume that they can thereby avoid a secured creditor's right to credit bid under

section 1129(b)(2)(A)(ii) by asserting that the underlying plan of reorganization complies with

1129(b)(2)(A)(iii).  However, as further discussed below, the Debtors do not even attempt to

distinguish, let alone discuss, case law within this jurisdiction that specifically supports a secured

creditor's right to credit bid under these very circumstances.[10]

### C.    **Bankruptcy Code Section 1111 Confirms the Prepetition Lenders' Right to Credit Bid.**

20.    Although section 363(k) does not, by its express terms, apply to the sale of

collateral in the context of a plan, Congressional intent and applicable case law make clear that a

secured creditor must always have the right to credit bid when its collateral is being sold.  This is

particularly true where, as is the case here, a secured lender has been stripped of the second form

of protection available to it under the Bankruptcy Code:  Bankruptcy Code section 1111(b).

21.    In general terms, a section 1111(b) election enables a secured creditor to waive

any deficiency claim otherwise assertable against the debtor, and instead require that the debtor

pay out the allowed amount of such creditor's claim over time pursuant to a plan of

reorganization.  A secured creditor who has recourse to the debtor and its estate is, however,

statutorily prohibited from making an 1111(b) election when such creditor's collateral is sold

either under section 363 or pursuant to a plan.

22.    Bankruptcy Code section 1111(b) was enacted to, among other things, provide

non-recourse creditors with a mechanism to enforce any deficiency claims held by such creditors

against the debtor or its estate.  Specifically, section 1111(b)(1)(A) provides that "[a] claim

---

[10] *See, e.g., In re Orfa Corp. of Philadelphia*, Nos. 90-11253S, 90-11254S & 90-11255S, 1991 WL 225985
(Bankr. E.D. Pa. Oct. 30, 1991); *222 Liberty Assocs.*, 108 B.R. 971, 977 (Bankr. E.D. Pa. 1990).  Both *Orfa* and *222
Liberty* are discussed at length below.

secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse…."  11 U.S.C. § 1111(b)(1)(A).  There is no dispute as to the fact that the Prepetition Lenders have recourse against the Debtors pursuant to the Prepetition Credit Agreement, and are therefore considered "recourse" creditors for purposes of section 1111(b).  Accordingly, the benefits afforded non-recourse creditors with respect to the ability to assert a deficiency claim against the Debtors are inapplicable here. However, section 1111 also provides secured creditors (both recourse and non-recourse) with the option to make an 1111(b) election.  Section 1111(b)(2) provides that, if an election under that subsection is made, "then notwithstanding section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed."  11 U.S.C. § 1111(b)(2).

23.    The practical import of a section 1111(b) election is as follows.  An undersecured creditor has, pursuant to section 1111(b)(1), both a secured claim (fixed at the value of the collateral underlying the claim) and an unsecured deficiency claim assertable against the debtor's estate for that portion of the creditor's claim not covered by the value of the collateral.[11]  An 1111(b)(2) election allows an undersecured creditor to capture any future upside in the value of the collateral by converting such creditor's right to a deficiency claim into a claim fully secured by the subject collateral.  If a secured creditor makes an 1111(b) election, the debtor's plan must provide that the secured creditor will receive payments equal to the total amount of the creditor's claims with such payment obligation having a present value equal to the current value of the creditor's collateral (or, stated differently, the value of the creditor's secured claim).  *See, e.g.,* 7

---

[11] Pursuant to Bankruptcy Code section 506(a)(1), a secured creditor's claim "is a secured claim to the extent of the value of such creditor's interest in the estate's interest in [the property securing such claim]…and is an unsecured claim to the extent that the value of such creditor's interest…is less than the amount of such claim."  11 U.S.C. § 506(a)(1).

Collier on Bankruptcy, ¶1111.03[4] (15th ed. 2008).  Accordingly, a secured creditor is likely to make an 1111(b) election where he or she believes that the value of the collateral securing the claim will increase post-emergence, or where the value of any distributions on account of the creditor's otherwise assertable deficiency claim is such that the creditor is willing to risk the deficiency claim in favor of the possibility that the collateral will increase in value over time.

24.    There are a number of exclusions contained in section 1111 which, if triggered, prevent a secured creditor from making an 1111(b) election.  Specifically, pursuant to section 1111(b)(1)(B)(ii), a secured creditor cannot make an 1111(b) election if "the holder of a [secured] claim has recourse against the debtor on account of such claim and such property is sold under section 363 of this title or is to be sold under the plan."  11 U.S.C. § 1111(b)(1)(B)(ii).  Based on the plain language of section 1111, a secured creditor that has recourse against a debtor or its estate cannot make an 1111(b) election when the collateral securing its claim is sold either under Bankruptcy Code section 363 or pursuant to a plan of reorganization.  The reason for this exclusion, as articulated by the legislative history and applicable case law, is simple:  if a debtor *elects to sell* collateral that secures the debt of a creditor, the secured creditor *is entitled to credit bid* in connection with such sale to protect the value of its investment.

25.    As stated in the Congressional Record, a "sale of property under section 363 or under a plan is excluded from treatment under section 1111(b) because of the secured party's right to bid in the full amount of its allowed claim at any sale of collateral under section 363(k) of the House Amendment."  124 Cong. Rec. 32,407 (1978).  Colliers similarly recognizes that a secured creditor is entitled to credit bid when its collateral is sold:  "As previously noted in connection with section 1111(b)(1)(A)(i), the reason for the inclusion of the exception contained in section 1111(b)(1)(B)(ii) is that a secured creditor has the opportunity to protect its position.

It may bid its debt at the sale of the collateral and recover the collateral.  This ability gives it the benefit of its bargain and requires no special protection."  7 Collier on Bankruptcy ¶ 1111.03[3][c].  Put simply, a secured creditor is deprived of its ability to make an 1111(b) election when its collateral is sold either under 363 or pursuant to a plan only because the secured creditor's right to credit bid is sufficient to protect its interests in the property.

26.     The rationale of Congress's intent is clear, logical, and dispositive:  a debtor cannot transfer the inherent value of a secured creditor's collateral to another party (least of all an insider) without affording the secured creditor the right to either take the property through a credit bid, be repaid its entire claim by being outbid on its credit bid, or preserve its entire claim secured by the collateral through an 1111(b) election.  Here, the Debtors seek to have the Court authorize unprecedented Bid Procedures that would eliminate all three of these possibilities.  Such authorization would violate the Bankruptcy Code, the Constitution, and would obviously unsettle the secured lending market.

27.     If this Court were to authorize the Bid Procedures, such authorization would also be in direct conflict with the vast majority of cases to have considered the issue.  Courts within this district have repeatedly recognized that a secured creditor cannot be deprived of its constitutionally protected right to credit bid where, as is the case here, such creditor is undersecured by a substantial margin.

**D.     Judicial Authority Overwhelmingly Confirms that a Secured Creditor Cannot Be Deprived of Its Right to Credit Bid Under the Undisputed Facts Presented Here.**

28.     This Court considered the question of whether an undersecured creditor should be entitled to credit bid at the sale of its collateral in *222 Liberty Associates*.  Debtor 222 Liberty Associates was a limited partnership holding a single asset, an office building located in Philadelphia (the "Property").  The Property was subject to a mortgage held by creditor Goldome

Realty Credit Corporation ("Goldome"), who had granted the debtor a $6.5 million construction

loan prior to the petition date.  Over the course of the bankruptcy proceedings, one of the

debtor's two general partners had proposed no less than seven various plans of reorganization for

the debtor and its estate.  In its decision, the Court considered whether the fifth amended and

sixth amended proposed plans were confirmable as a matter of law.  The fifth amended plan

contemplated that the general partner and plan proponent, David Wolk, would commit to fund

plan distributions.  In exchange for Wolk's commitment to fund the plan, the debtor was required

to sell to Wolk or his designee, among other things, all of the debtor's rights, title, and interest in

the Property.  The fifth amended plan also required that the final order be entered decreeing that

the sale of the Property was not subject to section 363(k), and that Goldome was therefore not

entitled to credit bid at the proposed sale.

29.    Goldome objected to the fifth amended plan on the basis that, among other things,

the plan stripped Goldome of its right to credit bid for the Property.  The *222 Liberty* Court

sustained Goldome's objection and held that the fifth amended plan could not be confirmed as a

matter of law "because it fails to afford Goldome its right to credit bid, as required by 11 U.S.C.

§§ 363(k), 1111(b) and 1129(b)."  *222 Liberty Assocs.*, 108 B.R. at 973-74.  In its analysis, the

*222 Liberty* Court focused on the fact that the fifth amended plan deprived Goldome of its ability

to convert nonrecourse debt into recourse debt under section 1111(b) or make an 1111(b)

election, while at the same time preventing Goldome from credit bidding for the Property.[12]

---

[12] Courts are inconsistent in their analysis as to whether *nonrecourse* secured creditors are also prohibited from making an 1111(b) election if the collateral securing their claim is sold.  This distinction is largely irrelevant to the case at hand because: (i) the Prepetition Lenders are recourse lenders and are therefore clearly prohibited from making an 1111(b) election in connection with the proposed plan; and (ii) while the Prepetition Lenders arguably derive a benefit by virtue of their recourse status, the distribution estimated to be received by the Prepetition Lenders on account of their deficiency claim is valued at less than 1%.  (Debtors' Disclosure Statement With Respect to the Joint Chapter 11 Plan, Doc. No. 946 at pg. 8-9.)  Accordingly, the Prepetition Lenders are in virtually the same position they would be in if they were nonrecourse creditors and, as a result, may very well have made an 1111(b)

Moreover, the *222 Liberty* Court found the Congressional Record cited above to be compelling

evidence that Congress intended a secured creditor to be able to bid the full amount of its claim

at any sale of collateral. *Id*. at 979.

30.      *222 Liberty*'s holding was reaffirmed in a subsequent decision issued by this

Court. *In re Orfa Corp. of Philadelphia,* Nos. 90-11253S, 90-11254S & 90-11255S, 1991 WL

225985, *5 (Bankr. E.D. Pa. Oct. 30, 1991).  In its analysis of whether the secured creditor

before it should be entitled to credit bid, the *Orfa* Court cited *222 Liberty* and stated that, while

Bankruptcy Code section 363(k) does not by its express terms apply to a sale conducted pursuant

to a plan, "there are certain circumstances in which the requirements of §§ 363(b),(k) cannot be

avoided, even though a sale takes place within the plan process, because the particular sale

provided for in the plan would frustrate other Code provisions." *Orfa*, 1991 WL 225985 at *6.[13]

The "circumstances" referred to by the *Orfa* Court (which were also present in *222 Liberty*) exist

where a debtor seeks to "cash out the creditor's secured claim, already significantly 'stripped

down' by 11 U.S.C. § 506(a) to the value of the secured asset, without providing it with an §

1111(b) election or a right to credit bid, the very 'evils' which §§ 1111(b) and 1129(b) were

enacted to prevent." *Id*.

31.      The *Orfa* Court ultimately determined that the fully secured creditor asserting its

right to credit bid was not entitled to do so given the facts of that case.  Specifically, the *Orfa*

Court expressly noted two facts that are inapposite here:  (i) the proposed purchaser in the

---

election had the option been available to them.  The Prepetition Lenders' right to credit bid for the assets should
therefore be enforced by this Court.

[13] The Debtors cite *Orfa* in support of their argument that the Prepetition Lenders should not be authorized
to credit bid on the basis that the *Orfa* Court found no Bankruptcy Code provision that expressly rendered a sale
conducted pursuant to a plan subject to section 363(k).  However, when read in its entirety, the *Orfa* decision
recognizes and affirms a secured creditor's right to credit bid when such creditor is otherwise deprived of the benefit
of its bargain and cannot look to its collateral to recover the full amount of its claim.

transaction before it was not an insider or a plan proponent, and (ii) the secured creditor

contesting confirmation of the plan was either oversecured or, at worst, slightly undersecured.  In

other words, in *Orfa*, the secured creditor was to receive virtually full payment of its entire claim

under the debtor's plan.  Under those limited circumstances, the *Orfa* Court found that the

secured creditor's interests were already protected by virtue of the value of its collateral.

32.     Although *Orfa* is not strictly consistent with the Congressional Record or Colliers,

the reasoning applied by the *Orfa* Court is consistent with the intent of both - preserve a secured

creditor's interest in its collateral (not merely the temporary current deemed value of such

collateral) to the greatest extent possible.  Such intent is demonstrated by the Bankruptcy Code's

inclusion of two means by which a secured creditor can protect itself:  an 1111(b) election; or the

right to credit bid.  Where it is generally agreed that a secured creditor is fully secured, the *Orfa*

Court determined that such protections are not necessary.  However, even the *Orfa* Court

recognized that an undersecured creditor's right to credit bid for its assets, even when such assets

are sold pursuant to a plan, simply cannot be avoided.

33.     The overwhelming weight of authority from other courts in this jurisdiction and

elsewhere have similarly held that a secured creditor should not be deprived of its right to credit

bid in connection with the sale of assets pursuant to a plan.  *See e.g.*, *In re River Village,* 181

B.R. 795, 805-6 (E.D. Pa. 1995) (court permitted the secured lender to credit bid over the

debtor's objections and noted that courts and commentators have concluded that Congress did

not intend to deprive creditors of the right to bid their full claim under a plan of reorganization);

*In re Realty Investments, Ltd.* 72 B.R. 143, 146 (Bankr. C.D. Cal. 1987) ("legislative history

makes it clear that the rights of section 363(k) attach to sale of property under the plan"); *In re*

*Suncruz Casinos, LLC*, 298 B.R. 833, 839 (Bankr. S.D. Fla. 2003) (holding that debtor's attempt

to limit secured creditor's right to credit bid "contravenes the plain language of section 363(k) and its legislative history, and therefore is improper"); *In re Kent Terminal Corp.*, 166 B.R. 555, 566-7 (Bankr. S.D.N.Y. 1994) (holding that "if a plan proposes the sale of a creditor's collateral free and clear of liens, the lienholder has the unconditional right to bid in its lien"); *H&M Parmely Farms v. Farmers Home Admin.*, 127 B.R. 644, 648 (D.S.D. 1990) (holding that "where a Chapter 11 plan contemplates liquidation of certain assets, the intent of § 363(k) is to notify the creditor of the upcoming sale of the secured property and allow it to reap the 'benefit of the bargain' by 'bidding in debt' to the full amount of its allowed claim"); *In re Matrix Dev. Corp,* No. 08-32798, 2009 WL 2169717, *8 (Bankr. D. Or. 2009) (holding that "Section 1111(b) was enacted to protect the rights of secured creditors by ensuring that they either received full payment of their allowed claims or retained the right to retake their collateral via a credit bid at a sale, either under § 363 or under [a plan]").

34.    With the exception of *Orfa*, the only case cited by the Debtors in support of their contention that the Prepetition Lenders are not entitled to credit bid is *Criimi Mae*.[14]  *In re Criimi Mae, Inc.*, 251 B.R. 796 (Bankr. D. Md. 2000).  Even if it were controlling authority, *Criimi Mae* is inapplicable here for a number of reasons.  First, the *Criimi Mae* Court was not asked to, and did not consider, the interplay between Bankruptcy Code sections 363, 1111 and 1129.  Second, the *Criimi Mae* Court also did not examine the Congressional record underlying the enactment of any of these Bankruptcy Code sections or analyze the applicable legislative history.  Third, the *Criimi Mae* Court did not discuss whether the secured creditor was oversecured, and thus arguably not in need of the protections afforded by sections 363(k) and 1111(b), or undersecured.  Instead, the *Criimi Mae* Court summarily concluded that the debtors' failure to provide the

---

[14] The Debtors also cite *Orfa* in support of their argument that the Prepetition Lenders should not be entitled to credit bid.  As discussed above, however, the Debtors' reliance on *Orfa* is misplaced.

secured creditor with the right to credit bid did not render the plan unconfirmable as a matter of

law.  The *Criimi Mae* decision is therefore unpersuasive and inapplicable to the facts at issue

here, and this Court should rely on the well-reasoned and comprehensive decisions upholding the

right to credit bid issued within this district and echoed by courts across the country.

35.     Settled law from courts within the Third Circuit have recognized and upheld a

secured creditor's right to credit bid where, as here, such creditor (i) is unable to make an

1111(b) election, and (ii) was not fully secured by the value of its collateral.  Applying the law to

the undisputed facts at issue here, the Debtors' proposed bid procedures cannot be approved.

First, by the plain language of Bankruptcy Code section 1111, a recourse secured creditor cannot

make an 1111(b) election when its collateral is sold pursuant to a plan.  Second, there is no

dispute that the Prepetition Lenders are dramatically undersecured based on the value of their

collateral.[15]  Accordingly, no valid basis exists to deny the Prepetition Lenders the right to credit

bid at the Auction.

### E.     Debtors' Reading of the Bankruptcy Code Violates the Fifth Amendment to Which the Bankruptcy Power Is Subject

36.     It is well-established that Congress's "bankruptcy power is subject to the Fifth

Amendment's prohibition against taking private property without compensation."  *United States*

*v. Sec. Indus. Bank*, 459 U.S. 70, 75 (1982); *see also Chrysler Credit Corp. v. Ruggiere* (*In re*

*George Ruggiere Chrysler-Plymouth, Inc.*), 727 F.2d 1017, 1019 (11th Cir. 1984) ("security

interests are 'property rights' protected by the Fifth Amendment from public taking without just

compensation").  In keeping with the Fifth Amendment, the Bankruptcy Code protects the "right

of a secured creditor to have the value of its secured position maintained throughout the

---

[15] *See* Declaration of Richard R. Thayer, Executive Vice President, Finance of the Debtors In Support of First Day Motions, in which he states, "[T]he value of the Debtor's business and assets are almost certainly far less than the amount of the outstanding debt under the Prepetition Credit Agreement . . . ."  (Doc. No. 23, ¶ 29 at p. 13.)

proceeding." *United Savings Ass'n of Tex. v. Timbers of Inwood Forest Assocs.* (*In re Timbers of Inwood Forest Assocs.*), 793 F.2d 1380, 1390 n.14 (5th Cir. 1981) (internal quotations omitted); *see also City of New York v. Quanta Res. Corp. (In re Quanta Res. Corp.),* 739 F.2d 912, 922 (3d Cir. 1984) ("The rights of a secured creditor in the debtor's assets are 'property' subject to a 'taking.'"); *Enewally v. Wash. Mut. Bank* (*In re Enewally*), 368 F.3d 1165, 1169 n.2 (9th Cir. 2004) (the takings clause "underl[ies] the treatment of secured claims in bankruptcy); *accord*, *Bank of N.Y. v. Treco* (*In re Treco*), 240 F.3d 148, 160 (2d Cir. 2001).

37.    As set forth above, one of the ways the Bankruptcy Code protects a secured creditor is by preserving its right to credit bid at a sale of the debtor's assets.  This critical right cannot be impaired without running afoul of the Fifth Amendment.  *See Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589 (1935) (recognizing the right to credit bid among those rights subject to Fifth Amendment protection); *Unisys Fin. Corp. v. Resolution Trust Corp.*, 979 F.2d 609, 611 (7th Cir. 1992) ("for purposes of the takings clause of the Fifth Amendment a lien (which is just another name for a security interest) is property and cannot be confiscated without just compensation") (internal citation omitted).  Debtors' reading of the Code would eliminate this critical right by creating a loophole that puts the bankruptcy system impermissibly at odds with the takings clause of the Fifth Amendment.  It must be rejected.

38.    In sum, a secured creditor can affirmatively protect its property rights and the benefit of its bargain by:  (i) credit bidding at the sale of the subject collateral, or (ii) making an 1111(b) election.  As discussed, the Bankruptcy Code expressly prohibits a recourse creditor from making a Bankruptcy Code section 1111(b) election when the creditor's collateral is sold pursuant to a plan.  Without the opportunity to credit bid for and thus regain control of their collateral, the Prepetition Lenders will lose the benefit of their bargain and will have been

19

deprived of the protections afforded them by the Bankruptcy Code and by contract.  Moreover,

the Prepetition Lenders' property interests, i.e, the Prepetition Lenders' security interests in the

collateral, will have been taken without just compensation in violation of the Prepetition

Lenders' Fifth Amendment property rights.  Accordingly, the Bid Procedures cannot be

approved by this Court.

### F.    The Debtors' Improperly Conflate Approval of the Bid Procedures and Confirmation of the Proposed Plan

39.    The Prepetition Lenders' right to credit bid is substantiated by the Constitution,

the Bankruptcy Code, applicable legislative history, and the vast weight of judicial authority.

The Debtors summarily dismiss the Prepetition Lenders' right to credit bid, a right which cannot,

in the words of this Court, be avoided by asserting that section 1129(b)(2)(A) is disjunctive and

does not require that assets sold pursuant to a plan be subject to a secured lender's credit bid.

*Orfa,* 1991 WL 225985 at *6.  In so doing, the Debtors have improperly applied what is a

confirmation requirement (i.e. that a proposed plan be fair and equitable) to the Bid Procedures.

It is irrelevant for purposes of the Debtors' Bid Procedures Motion that section 1129(b)(2)(A)

sets forth a disjunctive test for confirmation, because that section only applies to plan

confirmation, and is in fact titled "Confirmation of Plan."  The Debtors have elected to sell the

Prepetition Lenders' collateral at an auction.  That auction will occur prior to plan confirmation,

and must be conducted in accordance with the requirements of the Bankruptcy Code, the

Constitution, and applicable case law.  The plan confirmation provisions of section 1129 cannot

be read to impliedly limit any of the rights that a secured creditor has at an auction, which rights

expressly include the right to credit bid.  It is therefore not surprising that the Debtors have failed

to present this Court with a single case in support of their proposition that *bid procedures* are

exempt from the requirements of sections 363 and 1111.  Nor do the Debtors present any support

for the proposition that the plan confirmation requirements of section 1129 somehow apply to a

pre-confirmation auction process, and must be read to imply a prohibition on a secured creditor's

right to credit bid.

40.       At the plan confirmation hearing that will follow the auction, section 1129 will

apply and must be satisfied.  Section 1129 cannot, however, be read to take away the

fundamental right to credit bid at an auction any more than it could be interpreted to modify a

secured creditor's right to adequate protection, or the requirements for the use of its cash

collateral, or any other right that a secured creditor has during the course of a bankruptcy case.

The "indubitable equivalence" concept in section 1129(b)(2)(A)(iii) is only applicable to the

treatment of a secured creditor's claim under a plan of reorganization.  That this standard can be

satisfied at plan confirmation does not provide a debtor with license to abridge a secured

creditor's fundamental rights at an auction.

41.       This Court should not, therefore, infer that Congress meant to eviscerate a secured

creditor's right to credit bid by enacting section 1129.  As noted, section 1129 should not be

relevant to this Court's determination of whether the Bid Procedures are appropriate.  Even if

section 1129 were applicable, however, section 1129 does not expressly eliminate a secured

creditor's right to credit bid.  The Debtors read section 1129 as implying, by virtue of the fact

that section 363(k) is not expressly made applicable to sales of property under a plan, that a

secured creditor's right to credit bid does not exist in such circumstances.  However, a

constitutionally protected right cannot be abrogated by mere implication in much the same way

that a common law right cannot be taken away "unless the pre-existing right is so repugnant to

the statute that the survival of such right would in effect deprive the subsequent statute of its

efficacy; in other words, render its provisions nugatory."  *Texas & P. Ry. Co. v. Abilene Cotton*

*Oil Co.*, 204 U.S. 426, 436-7 (1907).  The Debtors have not demonstrated that credit bidding is

so "repugnant" to section 1129 that the inclusion of such right would render the provision

"nugatory."

42.    Moreover, a secured creditor's contractual right to credit bid exists separate and

apart from the Bankruptcy Code and should not be lightly dismissed.  When construing the

Bankruptcy Code, every effort should be made to preserve a creditor's state law rights vis-à-vis

the debtor.  *Matter of Kennedy*, 158 B.R. 589, 601 (Bankr. D.N.J. 1993) ("[R]ights of the secured

creditor . . . at the time of the filing of the bankruptcy petition are created and defined by state

law, except to the extent that the Bankruptcy Code specifically authorizes a departure from state

law.").  Therefore, unless the express provisions of the Bankruptcy Code evidence an intent to

depart from state law, the provisions should not be so construed.  *See Butner v. U.S.*, 440 U.S.

48, 55 (1979) ("Property interests are created and defined by state law. Unless some federal

interest requires a different result, there is no reason why such interests should be analyzed

differently simply because an interested party is involved in a bankruptcy proceeding.").  This is

particularly true where, as is the case here, congressional intent clearly indicates that a given

right was meant to be preserved and protected.  Accordingly, this Court should not allow the

Prepetition Lenders' constitutional and state law rights to be trampled simply because the

Debtors have put before this Court an inference that section 363(k) and thus a secured creditor's

right to credit bid are not required to be included in the Bid Procedures.

**III.    Denying Secured Creditors the Right to Credit Bid Will Have Far Reaching
        Ramifications in the Lending Market**

43.    Separate and apart from the Constitutional ramifications of the Debtors' attempt

to evade a secured creditor's right to credit bid, an unprecedented decision by this Court

authorizing the extreme relief sought by the Debtors would have far reaching implications for an

already troubled lending market.  Both the Bankruptcy Code and applicable case law recognize the importance of preserving the benefit of the bargain struck by a secured creditor even in the greater context of a debtor's rehabilitation efforts.  *See e.g., The Southerton Corp. v. United Penn Bank (In re The Southerton Corp.)*, 46 B.R. 391, 397-398 (M.D. Pa. 1982) (observing that Bankruptcy Code section 361 was enacted to ensure that secured creditors should not be deprived of the benefit of their bargain); *Commonwealth of Pa. State Employees' Ret. Fund v. Roane*, 14 B.R 542, 545 (E.D. Pa. 1981) (same).  A crucial benefit of the bargain struck by a secured creditor is the ability to resort to the collateral securing such creditor's claim.  *In re Briggs Transportation Co.*, 35 B.R. 210, 214 (Bankr. D. Minn. 1983).  Indeed, the ability to access collateral (and thus lend on a secured basis) is a crucial component of a creditor's decision to lend to a given borrower.

44.     As Congress recognized in creating section 1111(b) and in its statements regarding credit bidding, a secured creditor is not a forced seller of its collateral.  Rather the rights of a secured creditor to determine whether to hold or sell its collateral are preserved under the Bankruptcy Code.  This is critical in situations just like the instant case where a secured creditor believes that the value of its collateral has been temporarily depressed by extreme market conditions.  In enacting section 1111(b) and recognizing the essential right to credit bid, Congress both recognized a secured creditor's right to sell or hold and legislated against the ability of an insider to arrogate to itself the perceived upside of the impaired secured creditor's collateral.

45.     A secured creditor who has recourse to a debtor's collateral is also exposed to a lesser degree of risk than a creditor who lends on an unsecured basis.  As a result, secured creditors typically have lesser risk of repayment and lower overall costs with respect to enforcing

payment of a delinquent debt than unsecured creditors may have and, therefore, generally charge less for a secured loan than an unsecured loan.  See Ronald J. Mann, *Explaining the Pattern of Secured Credit*, 110 Harv. L. Rev. 625, 638-9 (1997) (general discussion of the cost savings obtained by secured creditors, and how those savings translate into reduced costs for borrowers).  The markets associate a panoply of rights with a typical secured loan including, among others, the right to seek to foreclose upon collateral after a default outside of bankruptcy and the right to participate in an auction conducted after a bankruptcy by credit bidding.  It follows, therefore, that creditors that are no longer recognized as having the full traditional range of rights upon default or bankruptcy will price such further risk and associated costs that may be required to enforce payment of the debt into their loans.  A ruling for the Debtors here could therefore result in more expensive financing for borrowers going forward, particularly given the current state of the lending market.

46.    A ruling for the Debtors here will also pave the way for a series of copy-cat plans (and litigation) in which debtors across the country seek to evade their obligations to secured creditors and deprive such creditors of their constitutionally protected property rights.  In addition to the potentially devastating effect such a result could have on the lending markets, denying secured creditors the right to credit bid would frustrate the clear intent of the Bankruptcy Code provisions discussed herein.

**IV.    The Insider Purchaser is not Entitled to a Break-up Fee or Expense Reimbursement**

47.    The Bid Procedures currently contemplate that the Stalking Horse is entitled to receive a break-up fee of $1,000,000 (the "Break-up Fee") in the event that an alternative transaction closes and the Stalking Horse is not the Successful Bidder (as defined in the Bid Procedures).  In addition, the Bid Procedures provide that all out-of-pocket expenses incurred by the Stalking Horse in connection with the transactions contemplated by the Stalking Horse

Agreement up to a maximum of $500,000 will be reimbursed (the "Expense Reimbursement").

In the context of an insider transaction under the present circumstances, neither the Break-up Fee

nor the Expense Reimbursement should be approved by this Court.

48.      In determining the permissibility of a break-up fee, the Third Circuit has held that

the party requesting the break-up fee must "show that the fees were actually necessary to

preserve the value of the estate." *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien*

*Envtl. Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999). The Third Circuit held in O'Brien that

such value to the estate could be found to exist if: (i) the guarantee of a break-up fee led to more

competitive bidding; (ii) the bid of the bidder receiving the break-up fee served as a "catalyst" to

higher bids; and (iii) the promise of a break-up fee and other expenses enticed a bidder to

conduct diligence on the debtor's value and then proceeded to convert that value to a dollar

amount on which other bidders could rely. *Id.* at 537. Subsequent decisions in the Third Circuit

have adopted and relied upon the test articulated in *O'Brien* when considering the propriety of

requested break-up fees and expense reimbursements. *See In re Beth Israel [Hosp. Assoc.] of*

*Passaic*, No. 06-16186, 2007 WL 2049881, *12 (Bankr. D.N.J. July, 12 2007) ("Using the

guidance provided by *O'Brien*, it is manifest that BIRAC's request for payment of a break-up fee

cannot be granted."); *In re Reliant Energy Channelview, LP*, 403 B.R. 308, 311 (D. Del. 2009)

("Applying *O'Brien* to the circumstances of this case, the Court cannot conclude that the

Bankruptcy Court abused its discretion in declining to award Kelson the Break-Up Fee.").

Applying the *O'Brien* test to the facts at hand, the Break-up Fee and Reimbursement Fee

requested by the Stalking Horse bidder do not and will not provide the Debtors' estate with value

as that term is construed by the Third Circuit.

49.     As an initial matter, the Prepetition Lenders again note that the Stalking Horse

Agreement and Bid Procedures amount to an insider transaction that should be subjected to a

heightened level of scrutiny.  *See supra*, section I.

50.     Turning now to the standard that must be met to justify payment of a break-up fee

and expense reimbursement, neither the Debtors nor the Stalking Horse bidder can demonstrate

that such fees have added or will add value to the estates in any of the ways specified by the

Third Circuit.  First, the "guarantee of a break up fee" did not induce the Stalking Horse bidder

to bid on the assets of these Debtors and thus did not lead to more competitive bidding.  There is

a well-established record in this case of the Debtors' existing equity insiders attempting, through

a variety of means, to retain control of these Debtors.  These same insiders, now constituted as

the controlling force behind the Stalking Horse bidder, needed no financial inducement to submit

the Stalking Horse bid.  Indeed, the Debtors have publicly characterized the Stalking Horse

bidders as "philanthropic" investors who are bidding for the assets in order to "do the right

thing" for their community.

51.     Second, the Debtors will not be able to demonstrate that the Stalking Horse bid

served as a catalyst for additional bids.  Again, the mere fact that the Stalking Horse bidder is an

insider of the Debtor companies with intimate and preexisting knowledge of the assets to be sold

is likely to dissuade true third party purchasers from subjecting themselves to the skewed process

proposed by the Debtors.  If the Stalking Horse's insider status is not enough to chill bidding,

current management's loud and self-publicized support of the Stalking Horse surely will.  Even

if, notwithstanding the foregoing, third party bidders ultimately elect to bid on the asset, the

Debtors will not be able to demonstrate that the Stalking Horse bid was a "catalyst" for other

bids solely because (to the extent proven to be true) the Stalking Horse bid was lower than

subsequent bids. *O'Brien*, 181 F.3d at 537 (holding that the "mere showing" that subsequent

bids were higher than the stalking horse bid is not sufficient to prove that the stalking horse bid

was a "catalyst" for higher bids). For the Debtors to suggest, in the face of a massive publicity

campaign that the Debtors have launched in support of the Stalking Horse bid, that the Stalking

Horse bid is a "catalyst" for additional bids, is disingenuous at best. Nor will the Stalking Horse

have been demonstrated to have been a catalyst or to have provided value in the likely event that

the Prepetition Lenders prevail at the auction.

52.    Finally, the Debtors cannot argue in good faith that the Break-up Fee and Expense

Reimbursement should be paid to the Stalking Horse bidder on the basis that such bidder

conducted diligence on the assets to be auctioned to determine a value upon which other bidders

could rely. To the contrary, the Stalking Horse bidder is composed of insider entities who have

had unfettered access to information regarding the valuation of these assets for the duration of

these chapter 11 cases. There is simply no basis to compensate the Stalking Horse bidder for

performing diligence on the Debtors' assets when the Stalking Horse bidder is itself an insider of

the Debtors with preexisting knowledge as to the value attributable to such assets and all of the

particulars of the assets. Accordingly, the proposed Break-up Fee and Expense Reimbursement

should not be approved by this Court because the Debtors' estates will not receive any value or

benefit as a result of the expenditure of the fees.

**V.    Union Contracts Acceptable to the Purchaser In Its Sole Discretion Cannot Be a
Condition Precedent to Closing**

53.    The Stalking Horse bidder's proposed asset purchase agreement (the "Stalking

Horse APA") includes as a condition precedent to closing a requirement that collective

bargaining agreements acceptable to the purchaser shall have been executed. In other words, the

purchaser is permitted to walk away from this transaction and not close if it fails to conclude

collective bargaining agreements with the unions that are acceptable to the Stalking Horse bidder in its reasonable discretion.  *See* Stalking Horse APA, section 10.7.  This provides the Stalking Horse bidder with such a massive "out" that the Stalking Horse bid cannot even be considered to be a firm bid.  Nor is it possible to value the Stalking Horse bid with the inclusion of this provision, or to have any certainty as to the timetable for closing.

54.     The Debtors' unionized workforce is vital to the future success of these Debtors, and should be treated as a partner in the process of a successful reorganization, not as a burden to be pushed aside if their contracts are not acceptable to the Purchaser in its sole discretion.  The Bid Procedures should therefore expressly exclude section 10.7 of the Stalking Horse APA as a condition to closing.

## <u>CONCLUSION</u>

WHEREFORE, the Steering Group and the Prepetition Agent request that the Court enter an Order denying the relief requested in the Bid Procedures Motion and granting such other relief as the Court deems just, proper and equitable.

Dated: September 18, 2009

Respectfully Submitted,

_/s/ Andrew C. Kassner_____
Andrew C. Kassner
David F. Abernethy
Andrew J. Flame
DRINKER BIDDLE & REATH LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996
Telephone: (215) 988-2700
Fax: (215) 988-2757
Email: andrew.kassner @dbr.com
Email: andrew.flame@dbr.com

Attorneys for Citizens Bank of Pennsylvania, as Agent, on behalf of the Prepetition Lenders

- and -

Fred S. Hodara
Abid Qureshi
Alexis Freeman
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY   10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

Attorneys for the Steering Group of Prepetition Lenders