## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:                                        : CHAPTER 11
                                              :
PHILADELPHIA NEWSPAPERS, LLC ET AL.           : BANKRUPTCY NO. 09-11204SR
                                              :
                                              : JOINTLY ADMINISTERED
                    DEBTOR(S)                 :
                                              :

# OPINION

BY: STEPHEN RASLAVICH, CHIEF UNITED STATES BANKRUPTCY JUDGE.

## Introduction

Before the Court is the above Debtors' Motion for an Order: (A) Approving

Procedures for the Sale of Certain of the Debtors' Assets; (B) Scheduling an Auction; (C)

Approving Assumption and Assignment Procedures; (D) Approving Form of Notice; and

(E) Granting Related Relief, (hereinafter referred to as the "Bid Procedures Motion" or

"the Motion"). The Bid Procedures Motion is opposed to one degree or another by the

Office of the United States Trustee (UST) and every represented creditor constituency

in these jointly administered cases. In addition to the UST, opponents include 1) the

Official Committee of Unsecured Creditors (the "Committee"), 2) the Steering Group of

Prepetition Secured Lenders and Citizens Bank of Pennsylvania as Agent for the

Prepetition Secured Lenders (collectively "the Lenders"), and 3) certain Plaintiffs in

prepetition tort suits against the Debtors ("the Plaintiffs"). Those opposed to the relief

sought by the Debtors are sometimes hereinafter collectively referred to as "the

Objectors."

A hearing on the Bid Procedures Motion was held October 1, 2009.  For the reasons set forth herein the Motion will be denied as presented, but may be approved provided it is amended in conformity with the within ruling.

## Background

The factual background incident to the commencement of these Chapter 11 cases can be found in numerous Court filings, including a "First Day Declaration" of the Debtors' Executive Vice President of Finance.  (Docket Entry #23)  Those facts are generally not in dispute and thus will not be repeated here at length.  The Debtors have incorporated them by reference in the Bid Procedures Motion and the Court does so likewise herein.

Via the Bid Procedures Motion the Debtors seek Court approval of procedures to govern a public auction sale of substantially all of the Debtors' businesses and assets. To this end the Debtors have entered into an Asset Purchase Agreement dated August 20, 2009, with an entity known as Philly Papers, LLC, a Delaware Limited Liability Company ("The Stalking Horse Bidder").

The Debtors also filed a Disclosure Statement and Plan of Reorganization on August 20, 2009. (collectively "the Plan") The Plan contemplates that the purchase offer of the Stalking Horse Bidder will be marketed and made subject to higher and better offers in accordance with the bid procedures for which approval is presently sought.  Subsequent to an auction the Plan contemplates consummation of the

2

transaction with the party determined to have submitted the highest and best bid.

To this extent the circumstances presented are unremarkable. Indeed, it has become increasingly common for Chapter 11 debtors to proceed in precisely the fashion the instant Debtors do. Often such proceedings are consensual. The present cases are distinguishable, however, in the degree of animosity that exists between the Debtors and their creditors. It is, regrettably, quite high. As a consequence, the Court recognizes that getting to the point at which the cases now rest has not been easy. The bid procedures have been extensively negotiated, along with many other issues in these cases. As to the bid procedures, consensus has essentially been reached on all issues but two: 1) the right of the Lenders to submit a "credit bid" at the auction, and 2) the entitlement of the Stalking Horse Bidder to be reimbursed its expenses (up to $500,000) and to receive a $1 million "break-up" fee if it is not determined to be the winning bidder after the auction.[1]

It is these two issues which the parties have extensively briefed and which were the focus of oral argument at the hearing of October 1, 2009. Having considered the parties' remarks and written submissions, the Court finds the Debtors' position on both issues to be unsustainable. Accordingly, neither of these provisions will be approved as part of the bid procedures.

---

[1]The Court applauds all concerned for their willingness and ability to achieve the compromises which they have. The Court likewise acknowledges and thanks Judge Richard E. Fehling for his assistance as a mediator over the past several weeks.

3

## Discussion

### I.    Credit Bid

The Lenders in this case are owed in excess of $300 million.  The Debtors' Plan contemplates a distribution to them of approximately $66 million in full satisfaction of their secured claim.  This distribution is to take the form of a cash distribution of approximately $36 million and the surrender of the Debtors' headquarters building at 400 North Broad Street, Philadelphia, PA.  The bulk of the cash distribution will represent funds generated from the public auction contemplated in the Bid Procedures Motion.

As noted, the Debtors intend to "market" the offer in hand in an effort to solicit a higher and better bid.  According to the Debtors, they mean to encourage a transparent and competitive process designed to ensure that the best possible sale price is obtained.

Of significance for present purposes, however, is the Debtors' insistence that any qualified bidder fund its purchase offer with cash.  The Lenders, which have long made known their intention to submit a competing bid, insist that they are not required to meet such a condition; rather, they argue that applicable law provides them with the right to set off against the sums owed to them the amount of their bid.  Put differently, the Lenders maintain the right to submit a "credit bid."

The Debtors disagree with the Lenders' proposition.  The Debtors' rationale on this score is set forth at subparagraph 11(h) of the Bid Procedures Motion, as follows:

4

> **Credit Bid**: The Plan Sale is being conducted under sections
> 1123 (a) and (b) and 1129 of the Bankruptcy Code, and not
> section 363 of the Bankruptcy Code. As such, no holder of a
> lien on any assets of the Debtors shall be permitted to credit
> bid pursuant to section 363(k) of the Bankruptcy Code.

The Debtors' argument is multi-faceted and implicates, as noted above, three

separate sections of the Bankruptcy Code. The first is § 1123, which allows for a

reorganization plan to be a "liquidating" plan, and as such provide for sale of the

Debtors' assets under a plan:

> (a) Notwithstanding any otherwise applicable nonbankruptcy
> law, a plan shall-
> ...
> (5) provide adequate means for the plan's implementation,
> such as–
> ...
> (D) sale of all or any part of the property of the estate,
> either subject to or free of any lien, or the distribution of all
> or any part of the property of the estate among those having
> an interest in such property of the estate;

11 U.S.C. § 1123(a)(5)(D)

The second implicated section of the Bankruptcy Code is § 1129, which describes

the ("cramdown") conditions upon which a reorganization plan will be deemed to be fair

and equitable, despite its rejection by an impaired class of secured creditors, and hence

when such a plan will be entitled to confirmation over such creditor's objection. In

particular, it recites:

> (b)(1) Notwithstanding section 510(a) of this title, if all of
> the applicable requirements of subsection (a) of this section
> other than paragraph (8) are met with respect to a plan, the
> court, on request of the proponent of the plan, shall confirm
> the plan notwithstanding the requirements of such

5

paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides--

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. 1129(b)

A third Code section implicated under the circumstances is § 363, which sets

forth provisions to govern, *inter alia,* a debtor's sale of its assets outside the ordinary

course of business. Of particular significance for present purposes is subsection (k) of §

363 which provides as follows:

(k) At a sale under subsection (b) of this section of property

6

> that is subject to a lien that secures an allowed claim, unless
> the court for cause orders otherwise the holder of such claim
> may bid at such sale, and, if the holder of such claim
> purchases such property, such holder may offset such claim
> against the purchase price of such property.

11 U.S.C. § 363(k).

The Debtors maintain that the language of the Bankruptcy Code sections they point to is clear, and that the same unambiguously confirms 1) that where an asset sale is contemplated to be conducted pursuant to a reorganization plan, the credit bid right codified in § 363(k) does not apply at all, and 2) that even if § 363 applies in the instance where cramdown confirmation of a reorganization plan is sought under 11 U.S.C. § 1129(b)(2)(A)(ii), it is still inapplicable to the instant facts, because the Debtors do not intend to request confirmation of their Plan under § 1129(b)(2)(A)(ii), but instead intend to demonstrate that their plan provides the Lenders with the "indubitable equivalent" of their claims, thus independently entitling their Plan to confirmation under § 1129(b)(2)(A)(iii).

Apart from the above, which the parties agree involves a purely legal analysis of the Bankruptcy Code sections in question, the Debtors argue that as a matter of policy the Lenders should otherwise be precluded the right to credit bid. The Debtors argue that investing the Lenders with the right to credit bid will chill competitive bidding. In this regard the Debtors argue that other bidders will be disincentivized from spending the time and money to engage in the sale process if the Lenders can submit a credit bid, because the Lenders' claim vastly exceeds the fair market value of the assets in

7

question, such that the Lenders have the absolute ability to control the outcome of any auction by simply bidding to the limit of their claim.  Consonant with this the Debtors argue that their "business judgment" in exercising the "rights" they seek to invoke via the Bid Procedures Motion should not be disturbed by the Court.

The Lenders, of course, see matters differently.  As a threshold matter the Lenders agree that the Bid Procedures should be designed to encourage a fair, open and competitive sale of the Debtors' assets.  From here the parties part ways.

The Lenders agree that the Bankruptcy Code sections to which the Debtors make reference (§§ 1123, 1129, 363(k)) are relevant.  But to these the Lenders would add § 1111, and in particular subsection 1111(b), as being germane to the inquiry.

Ironically, the Lenders argue, as do the Debtors, that the language of the Bankruptcy Code is clear and unambiguous on the points at issue.  Specifically, the Lenders argue that the correct interpretation of the Bankruptcy Code cramdown provisions is that a sale of a secured parties' collateral, whether under § 363 or under a plan can only be accomplished where the secured party in question is accorded the right to credit bid at the sale.

To arrive at this conclusion the Lenders argue that Code §§ 363 and 1129(b) must be read in conjunction with § 1111(b), which provides, as follows:

> (b)(1)(A) A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse, unless--

8

(i) the class of which such claim is a part elects, by at least two-thirds in amount and more than half in number of allowed claims of such class, application of paragraph (2) of this subsection; or

(ii) such holder does not have such recourse and such property is sold under section 363 of this title or is to be sold under the plan.

(B) A class of claims may not elect application of paragraph (2) of this subsection if–

(i) the interest on account of such claims of the holders of such claims in such property is of inconsequential value; or

(ii) the holder of a claim of such class has recourse against the debtor on account of such claim and such property is sold under section 363 of this title or is to be sold under the plan.

(2) If such an election is made, then notwithstanding section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed.

11 U.S.C. § 1111(b)

Bankruptcy Code § 1111(b) allows a non-recourse undersecured creditor to waive any deficiency claim otherwise assertable against a debtor and elect to have its allowed claim treated as fully secured. This "election", in turn, would normally require the Debtor to pay the creditor's entire claim in full under a plan of reorganization. An undersecured recourse creditor, on the other hand, is statutorily precluded from making the so-called 1111(b) election when its collateral is proposed to be sold, either under § 363(b) or a reorganization plan. The Lenders in this case fall into the latter category, i.e., they are undersecured recourse creditors and thus cannot make the § 1111(b)

9

election.  Other things being equal, therefore, they would, as a consequence, have an

enormous deficiency claim that would be entitled, in this instance, to participate on a

pro-rata basis in a de minimis fund reserved for "prepetition unsecured debt claims"

under the Debtors' Plan.  (estimated recovery < 1%)

The Lenders argue, however, that the intent of the integrated provisions of the

Bankruptcy Code (§§ 363, 1111, 1123, and 1129) is to ensure that where an

undersecured creditor's collateral is proposed to be sold, whether under § 363 or under

a plan, the secured creditor is entitled in all events to protect its rights in its collateral,

either by making an election under § 1111(b) or by credit bidding its debt.

Having carefully considered this question, the Court agrees.

No party to this dispute would disagree that where the language of the statute at

issue is plain, the sole function of the Court is to enforce it according to its terms.

*United States v. Ron Pair Enterprises,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1031 (1989).

Both the Lenders and the Debtors maintain that their different respective interpretations

of the statutory provisions in question yields the one true meaning thereof.  This

dichotomy alone should perhaps give the Court pause.  And indeed it does.

The Court does not find the cited sections to be entirely clear and free of

ambiguity in two respects.

First, the Court disagrees with the proposition that, although § 1129(b)(2)(A)

specifies three alternative means by way of which a reorganization plan may be

confirmed, the last of these three (indubitable equivalence) may be employed when the

10

exact means by which the plan intends the indubitable equivalent cramdown of a

dissenting secured creditor is a cash out of the creditor via an auction sale such as is

provided for in detail under the second of the three described alternatives.  That is

illogical and at odds with a settled canon of statutory construction which dictates that a

generic provision of a statute should not be used to achieve a result not contemplated

by a more specific provision.  *See, e.g., In re Combustion Engineering, Inc.*, 391 F.3d

190, 237 n.50 (3d Cir. 2004) (section 105(a) of the Bankruptcy Code cannot be used to

achieve a result not contemplated by more specific provisions of the Code); *TRW v.*

*Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 449 (2001) ("a statute ought, upon the

whole, to be so construed that, if it can be prevented, no clause, sentence, or word

shall be superfluous, void, or insignificant.") (citations and quotations omitted).  In

reaching this conclusion the Court recognizes that the alternatives available under §

1129(b)(2)(A) are framed in the disjunctive by virtue of the use of the word "or."  In

the opinion of the Court, however, to avail oneself of an "alternative" to one section of

a statute, one cannot simply employ the provisions of that very section itself and render

it an "alternative" merely by calling it such.  The Debtors' arguments on this score,

unfortunately, appear to the Court to be a not so thinly veiled attempt to manipulate

the sale process in order to frustrate a credit bid which the Debtors anticipate will

exceed the bid of the Stalking Horse.

     The Court similarly rejects the notion that the credit bid right referred to in §

1129(b)(2)(A)(ii) is limited to sales under § 363(b).  Under the second of the described

11

alternatives, reference is made to a sale, "subject to section 363(k)," which section, of course, provides for the preservation of a Lenders' credit bid right. The Debtors argue that even if one reaches this point in the analysis, the Lenders nevertheless still lose, because § 363(k) makes reference to a sale under § 363(b). The Court disagrees. Another fair interpretation of the language of § 1129(b)(2)(A)(ii) is that it is simply importing the essence of § 363(k) into this Code cramdown section; that is, the secured parties' right to make a credit bid. Otherwise, the reference arguably should be to § 363(b), since that would incorporate the provisions of § 363(k) and limit their application in a far clearer way than the Debtors are forced to urge here.

In short, the Court finds the Bankruptcy Code sections in question to be susceptible to more than one reasonable interpretation. If they are not patently ambiguous, they are at a minimum latently so. Hence resort to extrinsic evidence may be considered. *In re Mehta*, 310 F.3d 308, 311 (3d Cir.2002) In this context, doing so buttresses the Lenders' position. Indeed, doing so makes clear that even if one were to accept the Debtors' arguments, in this instance the alleged "plain meaning" of the statute should not be conclusive, as the literal application of the language in question would produce a result demonstrably at odds with the intention of the drafters. In such event it is well established that the intent of the drafters, rather than the strict language of the statute controls. *Ron Pair, supra*, 489 U.S. at 242, 109 S.Ct. at 1031 .

In keeping with this, and passing beyond the language of the statute, the Court notes that, at least before last week, the clear weight of authority supported the

12

Lenders' position on the issue. With but one apparent exception, courts to have

considered the question had concluded that Congress did not intend to deprive secured

creditors of the right to credit bid when sale of their collateral is proposed under a

reorganization plan. *See In re 222 Liberty Associates*, 108 B.R. 971, 978

(Bankr.E.D.Pa.1990); *In re Orfa Corp. Of Philadelphia*, 1991 WL 225985 *6 (October 31,

1991 Bankr.E.D.Pa.); *In re River Village*, 181 B.R. 795, 805 (E.D.Pa.1995); *In re Realty

Investments, Ltd.*, 72 B.R. 143, 146 (Bankr.C.D.Cal.1987); *In re SunCruz Casinos, LLC*

298 B.R. 833, 839 (Bankr.S.D.Fla.2003); *In re Kent Terminal Corp.*, 166 B.R. 555, 566-

567 (Bankr.S.D.N.Y.1994); *H&M Parmely Farms v. Farmers Home Admin.*, 127 B.R. 644,

648 (D.S.D. 1990); *In re Matrix Dev. Corp.*, 2009 WL 2169717 *8 (July 16, 2009

Bankr.D.Or.)

The lone decision which supported the Debtors was *In re Criimi Mae, Inc.*, 251

B.R. 796 (Bankr.D.Md.2000). In *Criimi Mae*, the Bankruptcy Court held that the mere

fact that a proposed Chapter 11 plan provided for the sale of a secured creditor's

collateral free and clear of liens, without affording the creditor a credit bid opportunity,

did not preclude confirmation of a reorganization plan where the plan otherwise

provided the creditor with the indubitable equivalent of its claim. 251 B.R. at 807-808

This, of course, is precisely what the Debtors maintain that they intend to do

herein. There is an important distinction, however, between *Criimi Mae* and the instant

case. In reaching its decision, the Bankruptcy Court in *Criimi Mae*, unlike this Court,

accepted the statutory language of § 1129 as being clear and unambiguous. *Id.* at 806

13

As a consequence, the *Criimi Mae* Court did not consider the interplay between Code
section 363(k), 1111(b) and 1129, nor did it consider relevant legislative history
(discussed *infra*). *Id.* at 806-807 Further, in distinguishing contrary authority, the
*Criimi Mae* Court noted that unlike opposing decisions, such as *Kent Terminal*, wherein
the Court had no occasion to test clause (iii) of 1129(b)(2)(A), the *Criimi Mae* Court
would be able to do so because the *Criimi Mae* debtor was proposing to provide the
affected creditor with substitute collateral. *Id.* at 807

The latter observation is important. The concept of indubitable equivalence
typically arises, whether in connection with confirmation under § 1129(b)(2)(A)(iii), or
the provision of adequate protection to a secured creditor under § 361(b), in the
context of a debtor's proposal to surrender collateral, or to provide a secured creditor
with substitute collateral such as a replacement lien or additional assets. With the
exception of the recent Circuit Court decision discussed *infra*, the Court, as previously
noted, is aware of no other decision wherein § 1129(b)(2)(A)(iii) and the indubitable
equivalence alternative were permitted to enable a debtor to cash out a secured
creditor via the type of sale contemplated under § 1129(b)(2)(A)(ii). To reiterate, this
seems to allow one to accomplish indirectly a result unavailable by direct application of
the statutory scheme.

Relevant legislative history on the question exists and it is supportive of this
conclusion. The legislative history speaks to the precise facts presented herein; that is,
where a reorganization plan proposes sale of a secured parties' collateral and the

14

dissenting class of creditors is precluded from making a § 1111(b) election due to the

recourse nature of their debt.  Legislative history makes clear that where the preferred

treatment which follows from the § 1111(b) election is unavailable to a secured creditor

the creditors credit bid right is preserved:

> Sale of property under section 363 or under a plan is
> excluded from treatment under section 1111(b) because of
> the secured party's right to credit bid in the full amount of its
> allowed claim at any sale of collateral under section 363(k)
> of the House Amendment.

124 Cong. Rec. H11, 104 (daily ed. Sept 28, 1978) (statement of Rep. Edwards)

*reprinted in Collier on Bankruptcy*, App. Pt. 4(f)(i)(2); 124 Cong. Rec. S17420 (daily ed.

Oct. 6, 1978) (remarks of Sen. DeConcini) *reprinted in Collier on Bankruptcy*, App. Pt.

4(f)(iii)(Matthew Bender, 15th ed. rev.)

      *Colliers*, a leading bankruptcy treatise, discusses this point and, without much

elaboration, arrives at the same conclusion:

> Section 1111(b)(1)(B) contains an additional restriction upon
> the exercise of the section 1111(b)(2) election. Section
> 1111(b)(1)(B)(ii) states that a class may not exercise the
> election if the holder of a claim of the class has recourse
> against the debtor on account of the claim and the property
> is sold under section 363 of this title or is to be sold under
> the plan.
>
> As previously noted in connection with section
> 1111(b)(1)(A)(i), the reason for the inclusion of the
> exception contained in section 1111(b)(1)(B)(ii) is that a
> secured creditor has the opportunity to protect its position. It
> may bid its debt at the sale of the collateral and recover the
> collateral. This ability gives it the benefit of its bargain and
> requires no special protection.

15

7 *Collier on Bankruptcy*, ¶ 1111.03[3][b]

The body of applicable law on the issues at hand changed abruptly in the last

week when a highly relevant decision was issued by the Fifth Circuit Court of Appeals:

*In the Matter of Pacific Lumber Co.*, - - F.3d - -, 2009 WL 3082066 (5th Cir. Sept. 29,

2009)  The decision is not binding on this Court but it is, of course, entitled to serious

consideration.[2]

The Chapter 11 case involved six affiliated entities which were involved in the

growing, harvesting and processing of redwood timber in Humboldt County, California.

The appeal before the Circuit Court related to the reorganization of the principal

Debtors, Pacific Lumber Company ("PALCO") and Scotia Pacific LLC, (SCOPAC").  The

facts of the case are complex and do not warrant elaborate recitation here.  Of

relevance is that a group of secured creditors (the Noteholders) challenged the

confirmation of a plan to reorganize PALCO and SCOPAC.  Under the plan the

Noteholders, who were owed approximately $740 million, were to receive approximately

$513 million which (after hearing) the Bankruptcy Court had determined to be the fair

market value of the Noteholders' collateral, along with an unsecured deficiency claim

and a lien on certain potential litigation proceeds.  The Noteholders were dissatisfied

and appealed.

---

[2]*See Onyeanusi v. Pan American World Airways, Inc.*, 767 F.Supp. 654, 655 n.1.
(E.D.Pa. 1990) ("Absent a decision by its Court of Appeals and a conflict between circuits, a
district court should regard the authority of another circuit as "highly persuasive.") *citing* 1B
*Moore's Federal Practice* ¶ 0.402[1] (2d ed. 1988); *King v. United States*, 10 F.Supp.206, 209
(D.Md.), *aff'd* 79 F.2d 453 (4th Cir. 1935)

Certain of the legal issues on appeal in *Pacific Lumber* are strikingly similar to ones herein. In particular, the Fifth Circuit's decision extensively discusses the requirement that a reorganization plan be fair and equitable as to a dissenting class of secured creditors before it may be confirmed over their objection. In this respect the Court held § 1129(b)(2)(A)(ii) did not always provide the exclusive means by which to confirm a reorganization plan where sale of a secured party's collateral was contemplated. Rather, the Court indicated that where a sale returned to a secured creditor in proceeds the indubitable equivalent of its collateral, confirmation of a plan under § 1129(b)(2)(A)(iii) was possible. In keeping with its conclusion that the sale transaction which underpinned the reorganization plan at issue accomplished that result, the *Pacific Lumber* Court, in turn, rejected the Noteholders' complaint that confirmation of the subject plan was improper because they had not been afforded the opportunity to make a credit bid for the assets that were sold.

At first blush, the *Pacific Lumber* decision is supportive of the Debtors' position herein, but careful analysis of the decision counsels against unfettered reliance upon it.

To begin, the Appellate Court emphasized that the three alternatives prescribed in § 1129(b)(2)(A) were minimum standards. The Court went on to observe that in some cases provision of a credit bid option to a dissenting secured creditor might be "imperative." The Court in *Pacific Lumber* did not find that imperative to exist, but clearly that was a reflection of the relevant facts before it.

The sale in *Pacific Lumber* was a private sale. Of utmost significance, the value

17

of the collateral being sold (for purposes of ascertaining whether the Noteholders would
receive the "indubitable equivalent" of their claims) had been judicially determined after
an extensive evidentiary hearing.  The Noteholders participated and interposed no
objection to the process until it was over and they were dissatisfied with the Bankruptcy
Court's valuation.  It seems clear that the Circuit Court in *Pacific Lumber* viewed
objections predicated on the credit bid issue as belated.  It appears, moreover, that the
Circuit Court placed weight on the fact that the Noteholders had not acted to protect
themselves either by seeking to propose their own reorganization plan (something the
present Lenders have done) or by making an election to be treated as fully secured
under § 1111(b).  The Bankruptcy Court below had similarly arrived at the latter
conclusion; however, the Bankruptcy Court had characterized the subject transaction as
one involving a "transfer" and not a "sale," which rendered § 1111(b) inapplicable.  The
Circuit Court reversed that conclusion and re-characterized the transaction as a sale, but
seemingly failed to then observe that in such case the Noteholders, as recourse
creditors, did not have the protection of the § 1111(b) election available to them.

   In *Pacific Lumber* the Circuit Court characterized the nature of the cramdown
plan before it, and the Bankruptcy Court's refusal to authorize a credit bid, as
unprecedented.  It is this Court's view that on the facts presented herein a different
outcome would have obtained in the Fifth Circuit.

   The Debtors propose an auction not a private sale.  There has been no pre-
confirmation judicial determination of value.  The auction is intended to set value.  That

18

being the case, the bidding should not be artificially constrained by contending that
doing so will in fact enhance competitive bidding, certainly not where such a result is
clearly at odds with legislative intent.  To put it differently, it appears to this Court that
the facts before it represent the case where the right to tender a credit bid should be an
imperative.

In sum, therefore, the Court rejects the Debtors' contention that it may deny the
Lenders a credit bid as a matter of right under relevant provisions of the Bankruptcy
Code.

Even were it otherwise, however, it is far from clear that it would be appropriate
for the Court to approve such tactic as a legitimate exercise of the Debtors' business
judgment.  Bankruptcy Courts typically accord a degree of deference to decisions made
by a Debtor-in-Possession.  This is not, however, without limit.  In reviewing business
decisions courts have employed what has been described as a "sliding scale" of
scrutiny, with the most searching standard of review being accorded to transactions not
in the ordinary course of business, transactions in which there is a potential for
managerial self-dealing, and transactions that by virtue of their sheer size or substance
could dictate the outcome of a case or the terms of a reorganization plan.  7 *Collier on
Bankruptcy,* ¶ 1108.07[2]

All three of the foregoing factors are implicated in this instance.  The Bid
Procedures could easily dictate the outcome of the case.  It is clear, moreover, that
there is an "insider" relationship between the Debtors and the Stalking Horse Bidder.

19

The Stalking Horse Agreement of Sale was signed on August 20, 2009 by Brian Tierney,

the Debtors' CEO, on behalf of the Debtors, and by Bruce Toll, as Chairman of the

Stalking Horse Bidder. Mr. Toll is also Chairman of Philadelphia Media Holding, LLC

("PMH"). PMH is the holding company which owns or controls the various Debtor

entities. Until just recently, Mr. Toll held 20% of the equity in PMH. The Carpenters

Pension Fund, which is another entity having a significant ownership interest in PMH,

also holds an ownership interest in the Stalking Horse Bidder. The foregoing facts

unquestionably render the proposed sale to the Stalking Horse Bidder an insider

transaction. As such, it warrants close scrutiny.

On this score, each side, i.e, the Debtors and the Objectors, accuse the other of

advocating a sale process which will chill competitive bidding.

As noted, the Debtors argue that, if the Lenders are permitted to credit bid,

other potential bidders will be dissuaded from undertaking expensive "due diligence"

that an informed bid would entail. Commentators have written in support of this

general thesis. *See Resolved: Loan-to-Own DIP Lenders Should not be Allowed to

Credit Bid*, 0412078 American Bankruptcy Institute 85 (25th Annual Spring Meeting,

Educational Materials, April 12-15, 2007); *see also* Daniel P. Winekka and Debra K.

Simpson, *Will Bankruptcy Courts Limit the Right to Credit Bid?*, 17 J. Bankr.L. & Prac. 6,

Art. 6 (September 2008). Such commentators, as do the Debtors, emphasize that even

under § 363(k) a lender's right to credit bid is not absolute, and that § 363(k) permits

the Court "for cause" to deny such right to a secured creditor.

20

As conversely noted, the Lenders maintain that the sole motivation behind the Debtors' proposal to deny them the right to credit bid is to frustrate their ability to make a competing offer. Such result, they suggest, might possibly obtain given that the Lenders are a consortium of upwards of 30 distinct entities. The Lenders argue further that the Debtors' tactics are in furtherance of a strategy which is designed not to produce the highest and best offer for the Debtors' assets, but which is instead designed to promote the success of the Stalking Horse Bidder and the continuation of current ownership and management.

The Court is constrained to observe that the Debtors have offered little that points to a different conclusion.

In particular, the Court notes that commentary critical of the preservation of the right to credit bid is generally premised on the notion that allowing credit bidding permits a secured creditor to appropriate the going concern value of the business to itself, while sharing no infusion of value through the bid process with other creditors.

This "evil," to the extent it is one, is not present in the instant case. Under the Plan the amounts payable to the Debtors' various creditor constituencies are fixed. They will not vary depending upon the existence of additional funds from a cash overbid. Any and all funds which might derive from a cash overbid are to go exclusively to the Lenders. The Debtors concede this point.

Having done so, the Court is left to look elsewhere for some justification for the Debtors' proposal to deny the Lenders the right to credit bid. In response to its inquiry

21

on that score, the Court was told that the condition is intended to test the ability of a

bidder to "write a check." (N.T. 10/1/09 @ 73)  In this way, say the Debtors, some

assurance can be had that the successful bidder will have the economic substance to

operate the business post confirmation, presumably including, if necessary, the ability

to make capital contributions.

This explanation is unpersuasive as a basis for denial of the credit bid right at the

bid procedures stage.  It is a "confirmation issue" involving feasibility and the question

of whether confirmation of the plan is likely to be followed by the need for further

reorganization.  It is a question, moreover, which applies equally as much to a cash

bidder versus a credit bidder.

Giving the Debtors the benefit of the doubt as to their motives, the Court

nevertheless can discern no plausible business justification for the restriction which the

Debtors seek to include in the Bid Procedures.  On the facts before it the Court can

similarly see no "cause" to deny the Lenders a credit bid right under § 363(k).

Accordingly, this provision of the Bid Procedures will not be approved.[3]

## II.   Break-Up Fee

As noted, the Bid Procedures Motion seeks authority 1) to reimburse the Stalking

Horse Bidder its out-of-pocket expenses up to a limit of $500,000, and 2) pay a $1

---

[3]The above conclusions render it unnecessary for the Court to discuss the Lenders'
arguments about the potential effect which a decision adverse to them might have on the
lending industry, or to address their contention that denial of a right to credit bid will result in
an unconstitutional taking of their property.

million fee to the Stalking Horse Bidder, in the event it is not the successful bidder at
the auction (collectively, the "Break-Up Fee").

The Debtors' rationale is that:

> [t]he Stalking Horse Bid for the Debtors' assets provides
> considerable value to these estates because it guarantees a
> floor price for the Debtors' assets that will enable the
> Debtors to provide some recovery to unsecured creditors
> and affords the Debtors sufficient time to test its floor bid in
> a competitive bid process.

Debtors' Omnibus Reply Brief, 19

The Objectors oppose this request on various grounds, these include the insider
nature of the relationship between the Debtors and the Stalking Horse Bidder, and the
allegedly false premises 1) that guarantee of the Break-Up Fee was necessary to induce
the Stalking Horse Bidder to tender an "opening bid," and 2) that the Stalking Horse Bid
is necessary to induce competitive bidding.

The Debtors dismiss all objections to the proposed Break-Up Fee as baseless, but
clearly they are not, and under applicable controlling authority the Break-Up Fee cannot
be approved.

All parties agree that controlling authority on the allowance of break-up fees is
found in the Court of Appeals decision in *Calpine Corp. v. O'Brien Environmental
Energy, Inc. (In re O'Brien Environmental Energy, Inc.)*, 181 F.3d 527 (3d Cir.1999)

In determining the permissibility of a break-up fee, the Third Circuit has held that
the party requesting the break-up fee must show that the fees were actually necessary
to preserve the value of the estate. *O'Brien, supra*, 181 F.3d at 535. In this respect

23

the Circuit Court elaborated that such value might be found to exist if 1) the guarantee

of a break-up fee led to more competitive bidding, 2) the bid of the bidder served as a

"catalyst" to higher bids and 3) the promise of a break-up fee enticed a bidder to

conduct diligence on the Debtor's value and then proceeded to convert that value to a

dollar amount on which other bidders could rely. *Id.* at 537.

Of significance, the *O'Brien* Court held that a request for a break-up fee should

not be treated any differently than any other request for the allowance of administrative

expense claims under 11 U.S.C. § 503(b). *Id.* at 536. As such, the Court held that the

"business judgment rule" discussed, *supra*, should not be applied in this context.

On a similar note, and of equal significance, the Objectors all emphasize case law

which takes the matter further by stressing that transactions involving insiders should

be subjected to a heightened level of scrutiny. *In re Bidermann Industries U.S.A., Inc.*,

203 B.R. 547, 550 (Bankr.S.D.N.Y. 1997); *Citicorp Venture Capital, Ltd, v. Comm. of*

*Creditors Holding Unsecured Claims (In re Papercraft Corp.)*, 211 B.R. 813, 823

(W.D.Pa.1997) ("[I]nsider transactions are subjected to rigorous scrutiny and when

challenged, the burden is on the insider not only to prove the good faith of a

transaction but also to show the inherent fairness from the viewpoints of the

corporation and those with interests therein."); *In re Seminole Oil & Gas Corp.*, 1992

WL 110720 *6 (4th Cir. May 22, 1992)

Measured against the foregoing standards, it is clear that the requested break-up

fee cannot be justified.

24

In the first place, it bears reiterating that this is manifestly an insider transaction. Even the Debtors concede that fact. As a consequence, the proposed break-up fee must be carefully scrutinized.

As the Lenders point out, there is a well-established record in this case of the existing equity holders attempting to retain control of the Debtors. Indeed, despite maintaining that they are extensively marketing their assets to potential bidders throughout the country, the Debtors have made no secret whatsoever of their preference for the success of the Stalking Horse Bidder and the perpetuation of "local ownership" of the Debtors. It simply is not credible against this backdrop to contend that the Stalking Horse Bidder required a financial inducement to submit its opening bid.

Further, it is likewise not credible to maintain that the Stalking Horse Bid was necessary to serve as a catalyst for other bids. The Lenders have been contesting the Debtors' retention of exclusivity for months specifically so that they could submit their own liquidating plan of reorganization. At present they have made abundantly clear their desire to submit a competing (albeit credit) bid for the Debtors' assets. Moreover, even where subsequent bids higher than the Stalking Horse Bid are received, the *O'Brien* Court has specifically held that the mere showing that subsequent bids were higher than the Stalking Horse Bid is not sufficient to prove that the Stalking Horse Bid was a catalyst for higher bids.

Finally, it once again cannot credibly be argued that the Break-Up Fee is warranted to compensate the Stalking Horse Bidder for the time and expense it has

25

invested in formulating and submitting its bid.  As all of the Objectors emphasize, the

Stalking Horse Bidder is comprised of insider individuals and entities which have had

"free" and unfettered access to all information concerning the Debtors, financial and

otherwise, since the inception of these Chapter 11 cases and long before that.  Such

pre-existing knowledge wholly undercuts any claimed entitlement predicated on

expensive due diligence and arms length negotiation.

In sum, it makes no difference that break-up fees are still sometimes allowed, or

that if this particular break-up fee were to be allowed it would fall within a range not

otherwise out of line with fees allowed for transactions of a similar size.  Nor is it

controlling that the Stalking Horse Bidder has asserted that it was unwilling to go

forward without a guarantee of the instant Break-Up Fee.  The bar for allowance of a

break-up fee has been raised considerably in the wake of the *O'Brien* decision.  The

Debtors have not met criteria which it is their burden to do.  The Bid Procedures Motion

in this respect will therefore be denied.

An appropriate Order follows.

By the Court:

Stephen Raslavich
Chief U.S. Bankruptcy Judge

Dated: October 8, 2009