IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: : CHAPTER 11
:
PHILADELPHIA NEWSPAPERS, LLC, ET AL :
         DEBTOR(S) : BANKRUPTCY NO. 09-11204 SR
: JOINTLY ADMINISTERED

# OPINION

BY: STEPHEN RASLAVICH, CHIEF UNITED STATES BANKRUPTCY JUDGE.

## Introduction

Before the Court is an Amended Motion of the above Debtors through which they seek an Order Approving the Rejection of certain Executory Contracts related to their newspaper publications delivery system. The Motion is opposed by a group of the respondent Dealers whose dealership agreements will be terminated if the Motion is granted. (Collectively the "Objecting Dealers"). For the reasons hereinafter set forth, the Motion will be granted.

## Background

The Debtors are the publishers of the Philadelphia Inquirer and the Philadelphia Daily News. The papers are sold to the public at various retail outlets such as convenience stores and newsstands (hereinafter the "Retailers"). Sales of this type are known in the industry as single copy sales. In some instances the Debtors distribute the papers for single copy sales directly to the Retailers, using their own personnel and equipment. In other instances the Debtors sell the papers to the Dealers, who then

resell the papers to the Retailers.

The Debtors assert that the results of a study they commenced in or about May 2009, indicate to them that they can generate some $372,000 in additional revenue per year if they take over the entire distribution of single copy sales themselves and cease utilizing most of the Dealers.

To this end the Debtors offered the testimony of Jim DiPasquale, their single copy sales regional manager. Mr. DiPasquale testified that the increased revenue the Debtors anticipate reflects the fact that the Debtors are paid more, per copy, for direct sales to retailers, than is paid to them by the Dealers. Debtors' Exhibit "A" reflects the price differential and Debtors' Exhibit "B" extrapolates the per copy differential by the aggregate number of daily and Sunday editions which the Debtors distribute through the Dealers.

Of significance, the Debtors maintain that the increased revenue which they project to result if the instant Motion is granted will all flow to their bottom line, because they believe that they can service the retail outlets "in-house" at no additional cost. Specifically, the Debtors contend that they will not need to purchase any additional delivery trucks nor hire any additional drivers to service the retail outlets. According to Mr. DiPasquale this belief is predicated on two factors: first, the fact that more than one half of the retail outlets at issue are already being serviced by the Debtors (with the Debtors' employees delivering one of their two newspapers and the Dealers delivering the other); and second, because there are inefficiencies in the Debtors current distribution system which can be eliminated by realigning their routes.

Debtors' Exhibit "C" is a chart which reflects that if the instant Motion is granted, the Debtors will add 31 new routes but eliminate 44 existing routes, for a net reduction in the number of routes the Company presently handles itself.

The Debtors envision other benefits to be gained by assuming the routes now serviced by the Dealers.  One example, according to Mr. DePasquale, is that the Debtors will increase the "footprint" of their in-house delivery capability, making the Debtors more attractive to out-of-town publishers who might want to pay the Debtors to deliver their publications in the Philadelphia region.

The Objecting Dealers do not address the latter point, but they do take strenuous exception to the Debtors' revenue and expense projections.  Most particularly, the Objections Dealers dispute the proposition that the Debtors can take over the Dealers routes at no additional cost.  In keeping with this, the Objecting Dealers make a number of arguments.

First, they emphasize that the Debtors' present arrangement with the Dealers carries with it absolutely no cost to the Debtors.  The Debtors sell the papers to the Dealers for a set price.  The Dealers, in turn, negotiate a price at which they sell the papers to the Retailers.  All expenses associated with the Dealers' businesses are borne solely by the Dealers.  The Objecting Dealers note that their costs include, inter alia, fuel and maintenance of vehicle fleets and the wages of employees.  On this score, the Objecting Dealers point out, for example, that the Debtors deliver between 16,000 to 18,000 Sunday papers to the Dealers each week, and that the Sunday papers come unassembled and must be "stuffed and put together" by the Dealers before being

dropped off to the Retailers. The Objecting Dealers stress that there are significant overhead and employment costs associated with their businesses.

More specifically, the Objecting Dealers assert that in the aggregate they have a minimum of 20 trucks in service and employ at least 30 individuals in addition to the Dealers themselves. The Objecting Dealers argue that it will simply be impossible for the Debtors to perform the same work they now do with absolutely no incremental cost.

The Objecting Dealers also stress the fact that many of the Retailers have "special needs," which is to say that they require that the papers supplied to them be delivered at a certain time. The Debtors, they note, are at present unaware of such requirements, leaving open to question whether assuming the undertaking they propose is something within the Debtors' capacity.

The Objecting Dealers further point out that whereas they remit payment to the Debtors monthly for the papers they buy, there can be a lengthier delay in the receipt of payment from the Retailers.

Finally, the Objecting Dealers assert that if the Debtors' Motion is granted each of them will have a claim against the Debtors' estate, inasmuch as their routes and customers, they say, are assets of substantial value which cannot simply be taken away from them without compensation.

**Discussion**

The parties are in agreement as to the legal standard applicable to the contested

4

matter.

Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may . . . reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a); *see also Univ. Med. Ctr. V Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1075 (3rd Cir 1992)." This provisions allows a debtor to "relieve the bankruptcy estate of burdensome agreements which have not been completely performed." *Stewart Title Guar. Co. v. Old Republic Nat'l Title Co.,* 83 F.3d 735, 741 (5th Cir. 1996) (*citing in re Muerexco Petroleum, Inc.*, 15 F.3d 60, 62 (5th Cir. 1994)).

The standard applied to determine whether the rejection of an executory contract or unexpired lease should be authorized is the "business judgment" standard. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.,* 872 F.2d 36, 39 (3d Cir. 1989); *NLRB v. Bildisco & Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir. 1982), *aff'd,* 465 U.S. 513 (1984); *see also NLRB v. Bildisco & Bildisco* 465 U.S. 513, 524 (1984); *In re Federated Dep't Stores, Inc.,* 131 B.R. 808, 811 (S.D. Ohio 1991) ("Courts traditionally have applied the business judgement standard in determining whether to authorize the rejection of executory contracts and unexpired leases.") Rejection of an executory contract is appropriate where such rejection would benefit the estate. *See Sharon Steel Corp.*, 872 F.2d at 39 (*citing Wheeling-Pittsburgh Steel Corp v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.),* 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987)). The business judgment standard requires that the Court approve the debtor's business

decision unless it is the product of bad faith, whim or caprice. *See In re Trans World Airlines, Inc.* 261 B.R. 103, 121 (Bankr. D.Del 2001); *see also Lubrizol Enter., Inc. v Richmond Metal Finishers,* 756 F.2d 1043, 1047 (4th Cir. 1985) *cert denied* 475 U.S. 1057 (1986).

The parties part ways over whether the Debtor has carried its burden of proof. In particular, the Objecting Dealers insist that Debtors' business judgment is entitled to no weight, because the evidence, in fact, fails to demonstrate that rejection of the Dealer Agreements will actually produce a benefit to the estate. The Court disagrees and will grant the Motion.

The Court notes initially that in a supplemental filing the Debtors have represented that the present Motion was only filed out of an abundance of caution, "as there is no evidence that the business relationships at issue constitute executory contracts as opposed to day-to-day business arrangements terminable at will." The Objecting Dealers no doubt see that question differently, although it is apparently true that there are no writings which memorialize the Dealer arrangements, all of which are seemingly based on oral understandings. The Court need not belabor that question at this point, as even assuming *arguendo* that the Dealer Agreements are executory contracts, the Debtors have made out a sufficient case for the relief they seek.

In reaching this conclusion the Court acknowledges that there is arguably some merit to certain arguments which the Objecting Dealers have interposed. Specifically, the Court has doubt that the Debtors can in fact wholly supplant the Dealers at no additional cost. That the Debtors expectations may seem overly optimistic; however,

does not warrant the Court substituting its business judgment for theirs.  There is no evidence from which one might conclude, as do the Objecting Dealers, that there will be no additional revenue derived from the new business plan.  Rather, the evidence suggests, at most, that increased revenues may be less than hoped for.

There is on the other hand, no evidence of record to support the contention that granting the Motion will occasion millions of dollars in rejection damages.

Finally, there is also no evidence that the business decision in question is the product of bad faith, whim or caprice.

The Court recognizes the poignant human dimension to this controversy: if the Motion is granted, a number of the Dealers may go out of business and the people they employ could then lose their jobs.  While the Court is mindful of this, and of course regrets such looming possibility, it does not alter the governing law, or the facts before the Court.[1]  Applying one to the other it is clear that the Motion must be granted.

---

[1]  Unfortunately, this is an increasingly common by-product of business bankruptcy. *See e.g. In re Old Carco LLC (f/k/a Chrysler LLC, et al*, Debtors 406 B.R. 180 (Bankr. S.D. N.Y. 2009) (Under business judgment standard employed in determining whether to permit debtor to assume or reject executory contract, effect of rejection on other entities is not a material fact to be weighed. . . (406 B.R. @ 188)

An appropriate Order follows.

By the Court:

Dated: December 10, 2009

Stephen Raslavich
Chief U.S. Bankruptcy Judge