## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: | : CHAPTER 11 |
| | : |
| PHILADELPHIA NEWSPAPERS, LLC, ET AL | : |
| DEBTOR(S) | : BANKRUPTCY NO.  09-11204 SR |
| | : JOINTLY ADMINISTERED |

# OPINION

BY: STEPHEN RASLAVICH, CHIEF UNITED STATES BANKRUPTCY JUDGE.

## Introduction

Before the Court is a Motion of the Debtors which seeks the entry of an Order compelling a self-styled "Steering Group of Pre-petition Lenders" to comply with Federal Rule of Bankruptcy Procedure 2019 by providing the complete data which Subsection (a) of that rule requires to be filed in a verified statement with the Court.

The Motion is opposed by the Respondent Steering Group which contends that it does not fall within the ambit of those subject to the rule, and hence that it need not disclose any information beyond that which has already been disclosed.

Modern day case law on this issue consists of five Bankruptcy Court decisions in which the Courts are divided three to two in favor of applying Rule 2019 to *ad hoc* committees.[1]  Notwithstanding the implications of this rather sharp split of authority,

---

[1] Over the years Rule 2019 has generated relatively little litigation.  What controversy there has been has generally arisen in the context of law firms representing (class action) plaintiffs having claims against bankruptcy estates.  The rule has come into prominence of late with the increased activity of hedge funds which prefer to keep their trading strategies in reorganization cases confidential.  *See* Menachem O. Zelmanovitz & Matthew W. Olsen, *Rule*

(continued...)

each side herein insists that the plain language of Rule 2019 supports its interpretation

of the Rule's scope.  Adding to this conundrum, there is a considerable body of

commentary extant, in the form of law review articles, etc., much of which supports the

proposition that the current construct of Rule 2019 does not cover *ad hoc* committees,[2]

but much of which calls for amendment of the Rule in one way or another to either

expand its scope and/or the disclosures it mandates.[3]  On the latter score, the Court

notes further that in August 2009, the Committee on Rules of Practice and Procedure of

the Judicial Conference of the United States circulated for public comment the

---

[1](...continued)
*2019: A Long Neglected Rule of Disclosure Gains Increasing Prominence in Bankruptcy,*
available at http://www.morganlewis.com/pubs/Restructuring_Newsletter_Summer20071.pdf.
There have of course, been other bankruptcy cases in which this issue has arisen; however the
disputes in those cases settled without court decisions.  *See, e.g., In re Le Nature's, Inc.,* No.
06-25454 (Bankr. W.D. Pa 2007); *In re Musicland Holding Corp.* No. 06-10064 (Bankr. S.D.N.Y.
2007) and *In re Dura Automotive Systems, Inc.* No. 06-11202 (Bankr. D. Del 2007).

[2]  *See, e.g.,* Evan D. Flaschen and Kurt A. Mayr, *Ad Hoc Committees and the Misuse of
Bankruptcy Rule 2019,* 16 J. Bankr. L. & Prac. 6 Art 3, p. 4 (December 2007) ("[A] careful
analysis of the plain meaning of Rule 2019 confirms that the rule does not extend to informal
creditor groups."); James M. Shea, Jr., *Who is at the Table? Interpreting Disclosure
Requirements for Ad Hoc Groups of Institutional Investors Under Federal Rule of Bankruptcy
Procedure 2019,* 76 Fordham L.Rev. 2561, 2615 (April 2008)("Classification of *ad hoc* groups of
institutional investors as committees is inconsistent with the plain, legal and historical definitions
of a committee.") *But see* Sparkle L. Alexander, Note, *The Rule 2019 Battle: When Hedge Funds
Collide With the Bankruptcy Code,* 73 Brook L.Rev. 1411, 1460 ("[]Rule 2019 on its face applies
to *ad hoc* committees.")

[3]*See, e.g.,* Kevin J. Coco, *Empty Manipulation: Bankruptcy Procedure Rule 2019 and
Ownership Disclosure in Chapter 11 Cases,* 2008 Colum. Bus. L. Rev. 610 (arguing for uniform
disclosure rules for official and unofficial committees patterned on U.S. securities laws.).  *But
see* Michael DeMarino, *Rule 2019: The Debtor's New Weapon,* 42 J. Marshall L. Rev. 165, 185
(Fall 2008) (arguing for rebuttable presumption that Rule 2019 doesn't apply to *ad hoc*
committees absent finding that committee acts as a fiduciary or has a conflict of interest.)

Preliminary Draft of Proposed Amendments to *inter alia*, the Federal Rules of

Bankruptcy Procedure.  The Committee has proposed changes to Rule 2019.[4]  Of

import, the Committee Note explains that if these changes were adopted, then Rule

2019 would be substantially amended to expand the scope of its coverage and the

content of its disclosure requirements.  In particular, the Committee Note explains that

"[i]n addition to an entity that represents more than one creditor or equity security

holder, the Amendment extends the Rule's coverage to committees that consist of more

than one creditor or equity security holder.  It also applies to a group of creditors or

equity security holders that act in concert to advance common interests, even if the

group does not call itself a committee."[5]

Against this rather problematic backdrop, the Court has carefully considered the

issue.  The Court concludes that while cogent arguments can be made for why the rule

should be expanded to include *ad hoc* committees and, equally, for why it should not

---

[4]  *See generally* Eugene R. Wedoff, *Proposed New Bankruptcy Rules on Creditor
Disclosure and Court Enforcement of the Disclosures - Open For Comment*, 83 Am. Bankr.L.J.
579 (2009)

[5]  As noted, the proposed amendments are currently in the "public comment" stage of
the rule making process and under the Rules Enabling Act would become effective on December
1, 2011, if ultimately approved, with or without revision, by the relevant advisory committee,
and in turn, the Standing Committee, the Judicial Conference and the Supreme Court, and not
otherwise disapproved or delayed by Congress.  On this score the Court notes that the two
leading trade organizations of financial securities firms, i.e., the Loan Syndications and Trading
Association and the Securities Industry and Financial Markets Association oppose the
amendments and have in fact urged that Rule 2019 be repealed.  The "Industry" position is
opposed by, among others, the National Bankruptcy Conference.  *See* Letter of Richard Levin,
Vice-Chair, National Bankruptcy Conference to Advisory Committee on Bankruptcy Rules (Sept.
22, 2008) avail. at http://www.nationalbankruptcyconference.org/other_communications.cfm

be, the language of the Rule in its current iteration does not compel the disclosures

sought.  The Motion will therefore be denied.

## Jurisdiction

This Court has subject matter jurisdiction over this contested matter under 28

U.S.C. §§ 157, 1334(b).  This is a core proceeding under 28 U.S.C. § 157(b)(2).  Venue

is proper in this District under 28 U.S.C. §§ 1408, 1409.

## Background

Most of the relevant facts are undisputed but certain of them will be recited

herein for completeness.

All but one of the present Chapter 11 cases were filed on February 22, 2009.

(Debtor, Philadelphia Media Holdings, LLC. commenced its case on June 10, 2009).

The debtors are best known as the publishers of Philadelphia's two major newspapers,

i.e., the Philadelphia Inquirer and the Philadelphia Daily News.  The multiple cases are

being jointly administered, but each individual debtor continues in possession of its

property and each continues to operate its respective business as a debtor-in-

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On March

2, 2009, the United States Trustee appointed an Official Committee of Unsecured

Creditors pursuant to 11 U.S.C. § 1102, and the Committee, although it has taken no

position herein, has been an active participant in most aspects of the cases.  No other

"official" committee has been appointed in the cases.

The Debtors are parties to a Credit and Guaranty Agreement, originally dated

4

June 29, 2006, (as amended the "Prepetition Credit Agreement") with Citizens Bank and

a number of other lender parties (collectively the "Prepetition Lenders.")   There is

approximately $300 million owed under the Prepetition Credit Agreement, which

consisted of a term loan in the original principal amount of $295 million and a senior

revolving credit facility in the original stated amount of $50 million.  Citizens is the

administrative agent and collateral agent for the collectivity of all of the lender parties.

(as such, the "Prepetition Agent")

It would appear that pursuant to the terms of the Prepetition Credit Agreement

those holding in excess of 50% of the Debtors' outstanding secured debt are authorized

to direct the Prepetition Agent to take certain actions on behalf of all of the Prepetition

Lenders.  It further appears agreed that the Steering Group consists of lenders which in

the aggregate hold the requisite majority of the Debtors' outstanding secured debt.

The respondent Steering Group first appeared in these cases on February 24,

2009.  At that time counsel for the "Group," the law firm Akin Gump Strauss Haver &

Feld LLP, hereinafter "Akin Gump" identified the Group as being the Steering

"Committee" of secured lenders.  (emphasis added)  On March 9, 2009, Akin Gump

moved for *pro hac vice* admission of three of its lawyers and in its application once

again referred to its client as being the Steering Committee of secured lenders.

On April 15, 2009 Akin Gump filed the first of three verified statements regarding

multiple representations under Rule 2019(a).  In its initial filing Akin Gump recited that

the lenders which comprised its client were: certain funds and/or accounts managed or

advised by the following entities: (i) Angelo Gordon & Co., L.P., (ii) CIT Syndicated

Loan Group, (iii) Eaton Vance Management, (iv) McDonnell Investment Management

LLC, (v) General Electric Capital Corporation and (vi) Wells Fargo Foothill.

Of significance to the Debtors, in the April 15th filing Akin Gump for the first time

denominated its client as the Steering "Group" of Prepetition Lenders. (emphasis

added)  Since that time it would appear that Akin Gump has never again referred to its

client as being anything other than "the Steering Group of Prepetition Lenders."  It is

unclear to the court whether the Debtors have ever employed any other term but

"Committee" to describe the Respondent; however, and perhaps needless to say, the

Debtors steadfastly refer herein to Akin Gump's client as being "the Steering

Committee."   Indeed, in this regard the Debtors chide Akin Gump for a name change

which they obviously view as a tactical ploy.  The Court, for its part, views this entire

aspect of the controversy to be a distraction and of no moment.[6]  For present purposes

the Court will make reference to Akin Gump's "clients" as the Steering "Group."

Amendments to the Rule 2019(a) statement were filed on May 27, 2009 and

again on December 3, 2009.  The May filing added Credit Suisse Candlewood Special

Situations Master Fund LTD as a member of the Steering Group and deleted McDonnell

Investment Management LLC.  The December filing added Credit Suisse Loan Funding

LLC as a group member, re-added McDonnell Investment Management LLC, and

---

[6] It has been observed that the fact that *ad hoc* groups often colloquially describe
themselves using the term "Committee" cannot be considered dispositive, any more that a
creditor calling itself "secured" means that it must be treated as a secured creditor within the
meaning of the Bankruptcy Code.  *See* Flaschen and Mayr*, Ad Hoc Committees and the Misuse
of Bankruptcy Rule 2019, supra* at n. 2, p. 5

deleted Wells Fargo.

The foregoing Rule 2019 filings have included certain information beyond the identity of lender members of the Steering Group.  In particular, the filings have disclosed the aggregate balance then outstanding under the prepetition term loan, as well as the aggregate amount of that debt held by the members of the Steering Group on a date relatively near in time to the filing.  Each filing states, however, that because amounts owing under the prepetition term loan are sold from time to time, the actual term loan "holdings" of the Steering Group as of the filing date might vary from the reported amount.

The Debtors, by way of the present motion, protest that this information is deficient and fails to comply with the requirements of Rule 2019.  Specifically, the Debtors argue that to fully comply with Rule 2019 each present and former member of the Steering Group must additionally disclose (i) the amount of each of its claims, (ii) the date(s) such claims were acquired, (iii) the amount paid therefor and (iv) any subsequent disposition thereof.  Barring that, the Debtors ask that the Court bar any further participation of the Steering Group and its counsel in these Chapter 11 cases.

At the outset, it should be noted that the information which the Debtors seek to have disclosed is unquestionably required of those to whom the rule applies. [7]  In

---

[7]  Rule 2019.  REPRESENTATION OF CREDITORS AND EQUITY SECURITY HOLDERS IN CHAPTER 9 MUNICIPALITY ANC CHAPTER 11 REORGANIZATION CASES

(a) Data required.  In a chapter 9 municipality or chapter 11 reorganization case, except with respect to a committee appointed pursuant to § 1102 or 1114 of the Code, every

(continued...)

support of their position that the Rule extends to the present Steering Group, the

Debtors rely principally upon the Rule's text and secondarily upon legislative history and

public policy.

Initially, say the Debtors, the plain meaning of Rule 2019 applies to each present

and former member of the Steering Group.  In reaching this conclusion the Debtors rely

upon the decisions of two Courts, the facts in which cases the Debtors analogize to the

present case, and the Court's reasoning in which they adopt.

The decisions in question are *In re Northwest Airlines Corp.*, 363 B.R. 701

(Bankr. S.D.N.Y. 2007) and *In re Washington Mutual, Inc.*, 419 B.R. 271 (Bankr.D.Del.

2009).  The Debtors' reliance on these decisions is hardly misplaced, as the holdings of

each expressly support the legal position the Debtors have staked out.

I.  *Northwest*

In *Northwest* the Bankruptcy Court was asked to compel an *ad hoc* committee of

equity security holders to provide the same information which the Debtors seek herein.

---

[7](...continued)
entity or committee representing more than one creditor or equity security holder and,
unless otherwise directed by the court, every indenture trustee, shall file a verified
statement setting forth (1) the name and address of the creditor or equity security
holder; (2) the nature and amount of the claim or interest and the time of acquisition
thereof unless it is alleged to have been acquired more than one year prior to the filing
of the petition; (3) a recital of the pertinent facts and circumstances in connection with
the employment of the entity or indenture trustee, and, in the case of a committee, the
name or names of the entity or entities at whose instance, directly or indirectly, the
employment was arranged or the committee was organized or agreed to act; and (4)
with reference to the time of the employment of the entity, the organization or formation
of the committee, or the appearance in the case of any indenture trustee, the amounts
of claims or interests owned by the entity, the members of the committee or the
indenture trustee, the times when acquired, the amounts paid therefor, and any sales or
other disposition thereof.

In resisting the Motion the *ad hoc* committee argued that by virtue of its lead-in clause, which limits the rule's application to "every entity or committee representing more than one creditor or equity security holder," the scope of the rule did not extend to the *ad hoc* committee's members, because no member of the committee represented any party other than itself.  363 B.R. at 703.  Rather, the Committee argued, the only party subject to the Rule was the *ad hoc* committee's legal counsel, which had fully complied with it.  *Id.*

The Court summarily dismissed this argument calling it a blithe attempt by the *ad hoc* committee to avoid complying with the Rule.  *Id.*  In reaching its conclusion the Court noted that the members of the *ad hoc* committee had appeared in the case as a "Committee," had been an active participant in the case, and had thereby implicitly asked the Court and other parties to give their positions a degree of credibility appropriate to a unified Group with larger holdings.  *Id.*  On these facts the Court concluded that the individual members of the *ad hoc* committee were required to provide the information detailed in Rule 2019(a).  In closing, the Court described its result as being in keeping with the rationale which had prompted the passage of the precursor to Rule 2019: that being Rule 10-211 of the Bankruptcy Act of 1898, as follows:

> Unofficial committees have long been active in reorganization cases, and the influential study in the 1930's by Professor (later Justice) William O. Douglas for the Securities and Exchange Commission centered on perceived abuses by unofficial committees in equity receiverships and other corporate reorganizations. *See* Report on the Study and Investigation of the Work, Activities, Personnel and

Functions of Protective and Reorganization Committees (1937). The four-volume SEC report led directly to the adoption of Chapter X and Rule 10-211 thereunder, which provided for disclosure of the "personnel and activities of those acting in a representative capacity" in order to help foster fair and equitable plans free from deception and overreaching. 13A King *et al., Collier on Bankruptcy,* ¶ 10-211.04 (14th ed.1976). Although they made many other changes to the law and rules relating to reorganizations, the drafters of the 1978 Bankruptcy Code and the rules thereunder retained the substance of former Rule 10-211 in Bankruptcy Rule 2019 as a comprehensive regulation of representation in chapter 9 and chapter 11 reorganization cases." Advisory Committee Note to Bankruptcy Rule 2019; *see also* Report of the Commission on Bankruptcy Laws of the United States, H.R.Doc. No. 137, 93d Cong., 1st Sess. 242-43 (1973). The Rule is long-standing, and there is no basis for failure to apply it as written. Although the Committee argues that the Rule has been frequently ignored or watered down, there is no shortage of cases applying it. *See In re Okla. P.A.C. First Ltd. P'ship,* 122 B.R. 387, 391 (Bankr.D.Ariz.1990), quoting *Collier on Bankruptcy:* "The Code contemplates that there will be unofficial committees. Any such unofficial committee must comply with Rule 2019 by its terms ...."; *see also Baron & Budd P.C. v. Unsecured Asbestos Claimants Comm.,* 321 B.R. 147, 166 (D.N.J.2005); *In re Ionosphere Clubs, Inc.,* 101 B.R. 844, 852 (Bankr.S.D.N.Y.1989); *In re Keene,* 205 B.R. 690 (Bankr.S.D.N.Y.1997); In re Kaiser Aluminum Corp., 327 B.R. 554, 558 (D.Del.2005).

*Id.* at 704.

## II. *Washington Mutual*

The recently decided *Washington Mutual* decision involved very similar facts.

Prior to filing its Chapter 11 case, the Debtor Washington Mutual, Inc., was a savings

and loan holding company which owned Washington Mutual Bank.  Before failing,

Washington Mutual Bank was the nation's largest savings and loan association, with

over 2200 branches and $188.3 billion in deposits.  The affected creditors in the

*Washington Mutual* case consisted of a group of some 23 entities which had constituted

themselves as the Washington Mutual, Inc. Noteholders Group.  Faced with the same

Motion implicated in *Northwest* , and the same arguments as in *Northwest*, the

Noteholders Group argued that Rule 2019 was inapplicable to them because the Group

was not an "entity or committee representing more than one creditor."  *See*

*Washington Mutual, supra*, 419 B.R. at 274  Rather, the Group asserted, it was simply a

loose affiliation of creditors who, in the interests of efficiency was sharing the cost of

advisory services in connection with the instant case.  *Id.*  More explicitly, the

Noteholder Group argued

> that the Group is neither an entity nor an *ad hoc* committee
> within the meaning of the Rule because the Group is:
>
> simply a loose affiliation of WMI creditors who, in the
> interest of efficiency, are sharing the cost of advisory
> services in connection with the case. The Noteholders do not
> speak for, have no ability to bind and owe no duties to
> anyone who is not a Noteholder. Perhaps as importantly, the
> Noteholders don't even have the right to  speak for or bind
> individual Noteholders absent their individual consent. Each
> Noteholder acts in its own right and on its own behalf;
> issues are discussed and negotiated among the individual
> Noteholders, who often hold competing views about certain
> issues, and ultimately agreed to before a position is formally
> taken by the Noteholders.

*Id.*

The *Washington Mutual* Court noted this argument, but found it to be, in fact,

counterproductive.  Said the *Washington Mutual* Court:

> Counsel's argument proves too much; the above statement

applies with equal force to *ad hoc* committees as well as to the WMI Noteholder Group.

*Ad hoc* committees, due to their unofficial status, are typically a "loose affiliation" of creditors. The at-will nature of committee membership is one of the defining characteristics of *ad hoc* committees. *See* Robert J. Rosenberg, et al., *Ad Hoc Committees and Other (Unofficial) Creditor Groups: Management, Disclosure and Ethical Issues*, ABI Business Reorganization Committee Newsletter (June 2008), *available at* http://www.abiworld.org/committees/newsletters/ busreorg/ vol7num2/AdHoc.pdf(noting that "[b]ecause membership in an *ad hoc* committee is at will, the roster of members can change frequently and radically over the course of a bankruptcy"). Because membership is at-will, an *ad hoc* committee cannot bind members absent their consent, and generally all members must agree on any position the committee takes. Otherwise, dissenting members will simply leave the committee.

Here, the WMI Noteholders Group possesses virtually all the characteristics typically found in an *ad hoc* committee, save the name. The WMI Noteholders Group consists of multiple creditors holding similar claims. The members of the WMI Noteholders Group filed pleadings and appeared in these chapter 11 cases collectively, not individually. The WMI Noteholders Group retained counsel, which takes its instructions from the Group as a whole. While counsel contends that it speaks only for the members of the WMI Noteholders Group that agree with the filing of each pleading or position taken in each appearance, counsel for the Group has never advised this Court that it is representing less than all the Group. Rather the pleadings and appearances by counsel demonstrate that the Group and counsel represent not each individual member in its individual capacity, but rather the Group as a whole. In fact, it is the collective $1.1 billion in holdings of the members of the Group that counsel uses to argue in favor of the Group's position, not each individual's separate holding.

Under the plain language of Rule 2019, therefore, the Court finds that although the WMI Noteholders Group call

themselves a Group, they are in fact acting as an *ad hoc*
committee or entity representing more than one creditor.
The WMI Noteholders Group, therefore, must comply with
Rule 2019.

419 B.R. at 274-275

In reaching its decision the *Washington Mutual* Court noted and concurred with

what it called the well reasoned decision of the Court in the *Northwest* case. *Id.* at

276-277. The *Washington Mutual* Court also noted, but found unpersuasive, the only

other decision to that date on point. *Id.* at 276

### III.  Scotia Pacific

The latter decision is unreported.  It arose in *In re Scotia Development LLC*, Case

No. 07-20027 (Bankr.S.D.Tex., Corpus Christi Div.) The Debtor therein, Scotia Pacific

Company LLC, ("SCOPAC") was a special purpose entity created to own and operate

vast acres of timberland it had acquired with borrowed funds.  When the Company

encountered financial difficulties it requested the holders of this debt to organize an *ad*

*hoc* committee to negotiate with it.  That then occurred.  In the ensuing bankruptcy the

Noteholder Group provided disclosure similar to that in *Northwest* and *Washington*

*Mutual* (i.e., identity of members and aggregate holdings).  In reliance on *Northwest*,

however, *SCOPAC* pressed to have the Noteholder Group members disclose their

individual trading histories, including prices paid and received.  The *SCOPAC* Court

denied the request, agreeing with the Noteholder Group that Rule 2019 was

inapplicable to it because it was not a Committee within the meaning of the Rule, but

was at that point just a "bunch of creditors" represented by a single law firm.  *See*

13

Transcript of Hearing, April, 17, 2007, p.5.  The *SCOPAC* Court's decision is embodied in

a brief Order of April 18, 2007, which followed an abbreviated bench ruling.  The

*Washington Mutual* Court found the *SCOPAC* decision unpersuasive, *inter alia*, because

of the lack of a more detailed articulation of the Court's rationale.  419 B.R. at 276

       This Court certainly agrees that the *SCOPAC* decision is less helpful than it might

otherwise be given the absence of an opinion of the Court.  However, *SCOPAC* did

serve the salutary function of bringing further to the forefront (through the briefs of the

respondent and *amici curiae*) an exposition of the legislative history of Rule 2019 and

its import for present purposes.  The *Washington Mutual* Court discussed this legislative

history in extensive detail and reached the conclusion that its own plain meaning

interpretation of Rule 2019 was consonant with the intent of its drafters.  419 B.R. at

278.  In this respect the *Washington Mutual* Noteholders Group had argued that the

precursor to Rule 2019 (Rule 10-211 under former Chapter X of the Bankruptcy Act)

was adopted in the 1930s specifically and solely to address abuses by "protective

committees" that solicited deposit agreements from investors in the context of the

equity receiverships that were typically formed in railroad bankruptcy cases.  *Id.* at 277.

In such instances, the creditors "depositing" their securities with the protective

committee effectively gave up their rights in the reorganization to the Committee.[8]  The

---

[8] So called "Protective Committees" were non-statutory committees organized by insider groups dominated by the Debtor and/or its investment bank and institutional investors.  The Committee would solicit smaller investors to enter into a "deposit agreement" (or other similar instruments which were rarely arms length) pursuant to which the smaller investors would deposit their securities, and then the "Committee" would negotiate with the Debtor with little, if

(continued...)

14

*Washington Mutual* Noteholders Group contended that the Rule was intended to apply only to "a body that purports to speak on behalf of an entire class or broader group of stakeholders in a fiduciary capacity with the power to bind the stakeholders that are members of such a committee." *Id.* at 278

The *Washington Mutual* Court rejected this contention saying that it was premised on the erroneous assumption by the Noteholders Group that its own group owed no fiduciary duties to other similarly situated creditors, either inside or outside the Group.  The *Washington Mutual* Court opined that members of a class of creditors may, in fact, owe fiduciary duties to other members of the class, because collective action by creditors in a class implies some obligation to other members of that class.  *Id.*  In particular, the *Washington Mutual* Court had this to say:

> Although much has changed in the financial universe since 1937, concerns regarding the actual economic interests of creditors participating in bankruptcy cases still exist. The proliferation of short-selling and the advent of myriad derivative products now allow creditors to take multiple stakes in the capital structure of debtors. Such varied holdings have the potential to create complex, conflicting incentives for large  creditors. In addition, collective action by creditors through the use of *ad hoc* committees or groups allows creditors to utilize other group members' holdings to obtain a greater degree of influence in a bankruptcy case than single creditors acting alone.  As such, the policies behind the disclosure requirements of Rule 2019 are as relevant today as they were 70 years ago.

---

[8](...continued)

any, participation by the smaller holders that the Committee represented.  *See* Flaschen and Mayr*, supra,* at n. 2, p. 2.

*Id.* at. 279

As previously noted, the present Chapter 11 cases, save one, were filed in February 2009 and the Steering Group has participated in them from their inception. Notwithstanding, the Debtors did not file the instant Motion until December 8, 2009, roughly one week after the Court's decision in *Washington Mutual*. Perhaps not unsurprisingly, this has led the Steering Group to complain that the filing of the Motion (on an emergency basis) was purely a litigation tactic by the Debtors designed to intimidate, divide, and conquer its members. In this respect the Steering Group also emphasizes that the filing has come proximate in time to the Third Circuit Court of Appeals consideration of an important issue in this case having to do with the right of the Prepetition Lenders to "credit bid" at a forthcoming auction of the Debtors' assets.

While the timing of the present motion may be cause to raise an eyebrow, the Court will not belabor the fact, save to observe that this contested matter has presented yet another opportunity for these acrimonious litigants to attack their respective motivations with unhelpful invective.

IV. *Premier International*

That aside, one plus to the timing of the present motion is that it gave yet a fourth Bankruptcy Court an opportunity to weigh in on this contentious and cutting edge issue. On January 11, 2010, the Bankruptcy Court in *In re Premier International Holdings, Inc., et al*, Case No. 09-12019 (Bankr.D.Del.) (Sontchi, J), entered an Order denying a Motion of the Official Committee of Unsecured Creditors to Compel a Noteholders Committee to comply with Rule 2019. On January 20, 2010, the Court

16

followed its order with an Opinion setting forth its findings of fact and conclusions of

law. *See In re Premier International Holdings, Inc.*, 2010 WL 198676 (Bankr.D.Del.)

The Debtor in *Premier* owns and operates 20 amusement parks throughout

North America, 18 of which do business under the well known "Six Flags" name.  The

Debtors are a corporate group, one subsidiary of which, Six Flags Operations, Inc.

("SFO"), issued approximately $400 million in notes.  An informal committee of SFO

Noteholders formed in September 2009.  Its members hold approximately 95% of the

outstanding SFO Notes.  *See* 2010 WL 198676 at ** 1-2

In late December 2009, the "Official" Committee of Unsecured Creditors filed a

motion to compel the "Unofficial" Committee to comply with Rule 2019.  In its Motion,

the Committee sought disclosure of information identical to that which was sought in

*Northwest*, *SCOPAC*, and *Washington Mutual*.  The Court's holding is summarized on

the first page of its Opinion:

> The issue before the Court is whether an "informal
> committee" of bondholders in this case is a "committee
> representing more than one creditor" under Rule 2019 of the
> Federal Rules of Bankruptcy Procedure. If so, the members
> of the informal committee would be subject to the disclosure
> requirements set forth in that rule.
>
> Under the plain meaning of the rule's language, such a
> group is not a "committee representing more than one
> creditor" and, thus, its members need not make the
> disclosures required by Rule 2019. In addition, the legislative
> history behind Rule 2019 and its predecessor, Rule 10-211
> under Chapter X of the Bankruptcy Act, supports the Court's
> interpretation based upon plain meaning. In so ruling, the
> Court respectfully declines to follow the holding in two
> recent cases addressing the virtually identical question: *In re
> Washington Mutual, Inc., et al.*, 419 B.R. 271 (Bankr. D. Del.

17

2009); and *In re Northwest Airlines Corp., et al.*, 363 B.R.
701 (Bankr. S.D.N.Y. 2007).

*Id.* at *1

In support of its plain meaning determination, the *Premier* Court had the

following to say:

> The question here is whether the SFO Noteholders Informal
> Committee is "a committee representing more than one
> creditor." If so, its members are subject to Rule 2019. The
> starting point of the analysis or "default entrance" is plain
> meaning.
>
> A "committee" is a "body of two or more people *appointed*
> for some special function by, and usu. out of a (usu. larger)
> body." The use of the word "appointed" clearly
> contemplates some action be taken by the larger body.
> Thus, a *self-appointed* subset of a larger group - whether it
> calls itself an informal committee, an *ad hoc* committee, or
> by some other name – simply does not constitute a
> committee under the plain meaning of the word. In order for
> a group to constitute a committee under Rule 2019 it would
> need to be formed by a larger group either by consent,
> contract or applicable law -- not by "self-help." This
> construct is supported by the rule's applicability to indenture
> trustees, which are delegated with certain rights and
> obligations on behalf of all holders of the debt *by operation
> of contract, i.e., the indenture*. Similarly, official committees
> under section 1102 of the Bankruptcy Code (although
> exempted from Rule 2019) receive their authority *from
> federal law, i.e., the Bankruptcy Code*.
>
> The meaning of "represent" is: "take the place of (another);
> be a substitute in some capacity for; act or speak for
> another by a deputed right." A deputed right is one that is
> assigned to another person. Thus, the plain meaning of
> "represent" contemplates an active appointment of an agent
> to assert deputed rights. It is black letter law that a person
> cannot establish itself as another's agent such that it may
> bind the purported principal without that principal's consent
> unless the principal ratifies the agent's actions. Thus, under

> the plain meaning of the phrase "a committee representing
> more than one creditor," a committee must consist of a
> group representing the interests of a larger group with that
> larger group's consent or by operation of law. As the SFO
> Noteholders Informal Committee does not represent any
> persons other than its members either by consent or
> operation of law, it is not a "committee" under Rule 2019
> and, thus, its members need not make the disclosures
> required under the rule.  (Footnotes omitted.)

*Id.* at *5

The *Premier Court* added that, although its determination of the plain meaning

of the text of Rule 2019 was determinative, it would undertake a review of the

legislative history of the rule as a "reality check" on its own interpretation.  Thus, just

as the *Washington Mutual* Court before it, the Court in *Premier* set forth an extensive

and thoughtful retrospective of the events which prompted passage of Rule 2019,

tracing those events from the days of the Great Depression and evaluating the vitality

of the Rule's historic underpinnings in the modern era.  *See id.* at **5-11.  On this

score, the *Premier* Court wrote, as follows:

> The nub of the question is how the legislative history of
> Rules 10-211 and 2019 applies to the informal and *ad hoc*
> committees of today and, more specifically, the Informal
> Committee of SFO Noteholders. Certainly there are parallels
> between the "protective committees" under equity
> receivership and the informal committees of today. For
> example, both are usually composed of Wall Street banks
> and institutional investors. Both are formed for the purpose
> of obtaining leverage in the reorganization that would not be
> available to disparate creditors. Both are involved in the
> negotiation and formulation of a plan of reorganization.
>
> The differences, however, far outweigh the similarities. The
> "protective committees" that were the target of the reforms
> under the Chandler Act were able to control completely the

19

entire reorganization – from inception to formulation to solicitation to implementation. They were granted the authority to negotiate on behalf of and to bind creditors through the use of deposit agreements. They were so intimately involved with management so as to be virtually in control of the business. They could force disparate treatment of similarly situated creditors. Finally, they were able "to steal" the company for an inadequate "upset price" at a foreclosure sale by credit bidding their debt.

The informal and *ad hoc* committees of today have none of these expansive powers. Indeed, the Chandler Act so effectively curbed the power of protective committees that they virtually ceased to exist within a few years of the Act's passage. Rule 10-211 was, for all intents and purposes, superfluous almost immediately after its passage. There was nothing left to regulate.

The Bankruptcy Code continues to limit the powers of committees, albeit in other ways. For example, the debtor is given exclusive authority to propose and to solicit a plan of reorganization; claims and interests may only be classified with substantially similar creditors; creditors in the same class must be treated equally; a trustee or examiner can be appointed for cause. Even if an informal committee were to try to exercise the powers formerly available to protective committees, it would be prevented by the Bankruptcy Code. Thus, Rule 2019 is also, for all intents and purpose, superfluous – the problem it was designed to address by requiring certain disclosures simply no longer exists.

*Id.* at *12

## Discussion

The Court has quoted liberally and at length from the foregoing opinions for the simple reason that the case at bar is essentially on "all fours" with them.[9]  What

---

[9] The fifth Bankruptcy Court decision on point was issued on January 22, 2010 in the matter of *In re Accuride Corp.*, Case No. 09-13449 (Bankr.D.Del.)(Shannon, J.).  The *Accuride*

(continued...)

distinctions which exist are legally irrelevant.  Moreover, the decisions underscore the

sharp divergence of Opinion which has come to characterize the issue.  To reiterate,

five bankruptcy courts have now addressed the issue and they are sharply divided.  In

four decisions courts have expressly based their ruling on the "plain meaning" of the

text of Rule 2019 but have evenly split on that "plain meaning."  Further, the two

Courts to have most recently and extensively reviewed legislative history (as a fallback)

have reached diametrically opposite conclusions as to the import of such extrinsic

evidence.

As previously noted, this Court, for its part, has concluded that before one ever

reaches a consideration of legislative history or other canons of construction, the plain

meaning of the rule's text renders it inapplicable to the Steering Group.

All parties, of course, agree on the primacy of plain meaning.  As is well known,

where the terms of a rule or statute are plain the sole function of the Courts is to

enforce it according to its terms.  *United States vs Ron Pair Enters, Inc.*, 489 U.S. 235,

241, 109 S.Ct. 1026, 1030 (1989)

The operative language in this case comes in the preamble to the rule; to wit:

---

[9](…continued)
Order followed a hearing held January 20, 2010, and itself contains no discussion.  It simply
grants a Motion to compel compliance with Rule 2019 "for the reasons stated in Open Court."
The transcript in *Accuride* just recently became available.  In a brief bench rule Judge Shannon
stated that, with one caveat, he was approving the Motion before him because he concurred with
the conclusions reached in the *Northwest* and *Washington Mutual* cases.  The caveat he
expressed was that he did not necessarily concur with the *Washington Mutual* Court that there
are fiduciary obligations that arise by definition in the context of multiple representation.  *See*
Transcript of Hearing at 116, *In re Accuride Corp.*, Case No. 09-13449 (Bankr. D.Del. January
20, 2010)

> In a Chapter 9 municipality or Chapter 11 reorganization
> case, except with respect to a committee appointed
> pursuant to § 1102 or 1114 of the Code, every entity or
> committee representing more than one creditor or equity
> security holder and unless otherwise directed by the Court,
> every indenture trustee, shall file a verified statement ...

B.R. 2019(a)

Regrettably, key terms and terminology in Rule 2019 are undefined in the Code. The term "entity," being the exception, is defined at Section 101(15).  The term "committee" is undefined, however, as is the phrase "representing more than one creditor."

With respect to the term "entity," the Bankruptcy Code defines it to include any "person, estate, trust, governmental unit and United States Trustee."  11 U.S.C. § 101(15)  The term "person" is defined at § 101(41) to include an "individual, partnership and corporation."  By resort to the word "includes," the definition of the term "entity" is non-exclusive and not intended to be limiting.  Though the phrase "Steering Group" is not expressly included in the Code's definition of an entity, the Court relies on the persuasive authority of *Black's Law Dictionary* to conclude that the Group is not an entity within the meaning of Rule 2019.

When a statutory term is undefined, courts give it its "ordinary meaning" or "common usage."  *United States vs Santos*, --- U.S. --- , 128 S. Ct. 2020, 2024, 170 L.Ed.2d 912 (2008).  To ascertain ordinary meaning Courts often turn to dictionary

definitions for guidance.  *See, e.g., Santos,* 128 S.Ct. at 2024.[10]

In its latest edition, *Black's* defines an entity as being an organization (such as a business or governmental unit) that has a legal identity apart from its members or owners.[11]  The Steering Group fits neither of the examples which *Black's* cites.  It is clear, conversely, that the Steering Group has no legal identity apart from its members.  It does not represent any creditors other than its members and it has no instrument authorizing it to act on behalf of non-member creditors.  Members are apparently free to join and withdraw as they see fit, and no member is bound by any decisions of the majority of the Group.  In short, this Court finds that the "Group" before it is not an "entity" because it is not an organization that has a legal identity apart from its individual members.[12]

The Court turns next to the definition of the term "committee."  The Court agrees with the *Premier* Court that the Steering Group is not a "committee" within the

---

[10] The United States Supreme Court first explicitly authorized reliance on a dictionary in order to understand the meaning of particular terms in 1920.  *See Werk vs Parker*, 249 U.S. 130, 132-33, 39 S.Ct. 197, 198 (1919).

[11] See *Black's Law Dictionary,* 612 (Ninth ed. 2009)

[12] Indeed, it has been persuasively argued that Rule 2019 may not even apply to Akin Gump.  Legislative history, it is argued, makes clear that the rule is aimed at persons having the delegated authority to act on behalf of a larger group.  Akin Gump is the Steering Group's attorney-at-law, not its attorney-in-fact.  Akin Gump advocates the Steering Group's position, but it does not make its clients decisions, nor could it, absent holding an express power of attorney to do so.  *See* Flaschen and Mayr, *supra* n. 2, p. 7.  Nevertheless, Courts have traditionally interpreted "entity" to include lawyers and law firms.  *See, e.g., In re Muralo Co*, 295 B.R. 512, 524 (Bankr. D. N.J. 2003) (Rule 2019 applies to counsel); *In re Oklahoma P.A.C. First Ltd. P'shp*, 122 B.R. 387, 390-391 (Bankr. D. Ariz. 1990) (Fiduciary relationship between attorney and clients brings attorneys within ambit of Rule 2019)

ordinary meaning or common usage of the term.  Clearly, a committee, *ad hoc* or

otherwise, is a body <u>appointed</u> by a larger body for some specific purpose.  *Black's*

once again confirms this as follows:

> *committee.*  A subordinate group to which a deliberative
> assembly or other organization refers business for
> consideration, investigation, oversight, or action (the bill was
> sent to the legislative committee).

*Black's, supra* 309

An *ad hoc* committee, similarly is defined as follows:

> *ad hoc committee.*  See *special committee*
>
> *special committee.* A committee established for a particular
> purpose or a limited time.  A legislature will ordinarily
> establish a special committee for a nonlegislative purpose,
> such as writing memorials, procuring chaplains, determining
> the qualifications of members, and settling election disputes.
> –Also termed *ad hoc committee, select committee;
> temporary committee.*

*Id.* 310

The present Steering Group formed itself.  It has not been appointed by any

larger deliberative body, either by consent, contract or applicable non-bankruptcy law.

It accordingly is not a "committee" within the meaning of Rule 2019.

The Court turns next to the phrase "representing more than one creditor."  On

this score, the *Washington Mutual* Court had this to say

> Although not defined in the Bankruptcy Code, "representing"
> requires that one simply act on behalf of another. *See
> Black's Law Dictionary* 1328 (8th ed. 2004) (defining
> "representative" as "[o]ne who stands for or acts on behalf
> of another [the owner was the football team's representative
> at the labor negotiations]. See agent."); *Merriam-Webster's*

24

*Collegiate Dictionary* 993 (10th ed. 1997) (defining
"represent" as "to take the place of in some respect [or] to
act in the place of or for usually by legal right"). That is
exactly the situation here. The WMI Noteholders Group
counsel has repeatedly filed papers and made appearances
at various hearings representing the constituent members as
part of the WMI Noteholders Group.

419 B.R. at 275 n. 8

The *Premier Court* conversely had this to say:

The meaning of "represent" is "take the place of (another);
be a substitute in some capacity for; act or speak for
another by a deputed right."  A deputed right is one that is
assigned to another person.  Thus, the plain meaning of
"represent" contemplates an active appointment of an agent
to assert deputed rights.  It is black letter law that a person
cannot establish itself as another's agent such that it may
bind the purported principal without that principal's consent
unless the principal ratifies the agent's actions.

Thus, under the plain meaning of the phrase "a committee
representing more than one creditor," a committee must
consist of a group representing the interests of a larger
group with that larger group's consent or by operation of
law.  As the SFO Noteholders Informal Committee does not
represent any persons other that its members either by
consent or operation of law, it is not a "committee" under
Rule 2019 and, thus its members need not make the
disclosures required under the rule.

2010 WL 198676 at *5

The Court agrees with the reasoning of the *Premier* Court on this point and

cannot articulate the basis for its conclusions better than the *Premier* Court  itself has.

The Court accordingly adopts the *Premier* Court's rationale herein.[13]

---

[13] The Court observes, however, that relying on the example of a "representative" which
(continued...)

In reaching its decision herein, this Court, as others before it, underscores that its holding is predicated on the Court's view of the plain meaning of the text of the Rule.

In reaching its decision that the "plain meaning" of Rule 2019 renders it inapplicable to the Steering Group, however, the Court, apart from a review of legislative history, finds a "reality check" of a different sort to exist by reason of the amendments to Rule 2019 proposed by the Judicial Conference's Committee on Rules of Practice and Procedure.  As previously noted, the proposed amendment is *expressly* intended to *extend* coverage of the rule to a body such as the Steering Group.  The *Washington Mutual* Court saw in this a refutation of the hedge fund industry position that Rule 2019 had become unimportant and obsolete.  That may be so, and if the proposed rule is enacted in its present form disputes of the type presented herein may indeed become a thing of the past.  Of equal significance to this Court, however, is the fact that in the collective wisdom of the National Rules Committee, the language of the present rule does not extend to a "a group of creditors that act in concert to advance common interests, even if the group does not call itself a committee."  Proposed Amendments to Federal Rules of Bankruptcy Procedure, Committee Note to Proposed

---

[13](...continued)
*Black's* cites (i.e., the owner of a football team at a labor negotiation) is unhelpful to the Movants.  *Black's* analogizes such a person to an agent.  *Black's*, 1416 (directing reader to "*see* agent").  In order to "represent" other investors, an *ad hoc* group would need to have the authority to "stand for" or "act or behalf" of the other investors as their agent.  *Ad hoc* committees in general, and the Steering Group herein in particular, have no such authority.

Amendment to Rule 2019, Subdivision (b).  Inductive reasoning supports the conclusion

reached herein.  In other words, it is logical to infer that if the rule already covered the

Steering Group, there would be no need to expand the Rule to do so.

Insofar as legislative history is concerned, the Court hesitates to wade very far

into the debate.  The Court agrees with the *Premier* Court that the original impetus for

the rule has passed into history.  The *Washington Mutual* Court, however, seems

similarly correct in opining that the policies behind the disclosure requirements of Rule

2019 remain relevant today.   The latter observation, however, must be tempered with

caution, for it is not the role of the courts to act upon and decide policy disputes;

ultimately that is the province of the legislature.[14]

The debate between Chapter 11 debtors and the hedge fund industry over the

scope and application of Rule 2019 is vigorous.  Advocates of applying the rule to *ad hoc*

committees argue that to do so is consistent with long standing common law principles

of openness and transparency in court proceedings in general and the reorganization

process in particular.  Hedge funds, however, have historically guarded their trading

secrets fiercely.  They argue, in fact, that compelling disclosure of such data may effect

the deprivation of substantive rights.  Those that argue that trading information should

be protected from disclosure also maintain that compulsory disclosure of such data may

deter non-traditional lender participation in reorganization cases and thereby diminish or

---

[14]  Congress has authorized the federal judiciary to prescribe the rules of practice, procedure, and evidence for the federal courts, subject to the ultimate legislative right of the Congress to reject, modify, or defer any of the rules.  The authority and procedures for promulgating rules are set forth in the Rules Enabling Act.  28 U.S.C. §§ 2071-2077.

eliminate essential sources of capital and liquidity.

The Court will refrain from casting a vote on this issue, but merely notes that it lies at the root of the controversy.  If Congress ultimately accedes to the proposed amendment to Rule 2019, it should settle the matter.  For present purposes, it will suffice to reiterate that the Court does not find the plain meaning of existing Rule 2019 to cover the Steering Group and the Debtors' Motion will therefore be denied.

An appropriate Order follows.

By the Court:

Dated: <u>February 4, 2010</u>

_____
Stephen Raslavich
Chief U.S. Bankruptcy Judge