Proskauer Draft:  9/15/10

# ASSET PURCHASE AGREEMENT

### DATED AS OF SEPTEMBER ___, 2010

### BY AND AMONG

**PHILADELPHIA MEDIA HOLDINGS, LLC,**

**PMH ACQUISITION, LLC,**

**PHILADELPHIA NEWSPAPERS, LLC,**

**PHILADELPHIA DIRECT, LLC,**

**BROAD STREET VIDEO, LLC,**

**PHILLY ONLINE, LLC,**

**PHILADELPHIA MEDIA, LLC,**

**BROAD STREET PUBLISHING, LLC, AND**

**PMH HOLDINGS, LLC,**

AS SELLERS,

AND

_____,

**AS PURCHASER**

# TABLE OF CONTENTS

**Page**

**SECTION 1** INTERPRETATION.................................................................................1

   1.1.   Definitions...............................................................................................1

**SECTION 2** PURCHASE, SALE AND ASSIGNMENT OF PURCHASED ASSETS...............8

   2.1.   Sale of Assets..........................................................................................8

   2.2.   Excluded Assets.......................................................................................9

   2.3.   Assumed Liabilities...............................................................................10

   2.4.   Excluded Liabilities..............................................................................10

   2.5.   Purchase Price.......................................................................................11

   2.6.   Purchaser Deposit.................................................................................12

   2.7.   Allocation of Purchase Price.................................................................12

   2.8.   Sale at Closing Date..............................................................................13

   2.9.   Excluded Assets and Liabilities.............................................................13

**SECTION 3** REPRESENTATIONS AND WARRANTIES OF SELLERS.............................13

   3.1.   Organization and Good Standing...........................................................13

   3.2.   Authorization........................................................................................13

   3.3.   No Conflicts..........................................................................................13

   3.4.   Consents and Approvals...................................................................~~14~~13

   3.5.   Compliance with Law............................................................................14

   3.6.   Title to Assets.......................................................................................14

   3.7.   Cure Amounts.......................................................................................14

   3.8.   Litigation..............................................................................................14

   3.9.   Intellectual Property..............................................................................14

   3.10.  Material Contracts...........................................................................~~15~~14

   3.11.  Real Property........................................................................................15

   3.12.  No Broker or Finder..............................................................................15

3.13.   Insurance ...................................................................................................15

3.14.   Disclaimer of Other Representations and Warranties ..................................15

**SECTION 4** REPRESENTATIONS AND WARRANTIES OF PURCHASER ........................15

4.1.    Organization and Good Standing .................................................................15

4.2.    Authorization .......................................................................................~~16~~15

4.3.    No Conflicts ................................................................................................16

4.4.    Consents and Approvals .............................................................................16

4.5.    Litigation ....................................................................................................16

4.6.    No Broker or Finder ...................................................................................16

4.7.    Capital Resources .......................................................................................16

4.8.    Purchaser not a Plan ...................................................................................17

4.9.    "AS IS" TRANSACTION ..........................................................................17

**SECTION 5** CERTAIN COVENANTS OF SELLERS ...............................................17

5.1.    Amended Plan and Confirmation Order .......................................................17

5.2.    Provision of Records ..................................................................................18

5.3.    Receipt of Property Relating to Assets .......................................................18

5.4.    Conduct of Business Pending the Closing ...................................................18

5.5.    Access to Information .................................................................................20

5.6.    Transfer of Permits ....................................................................................20

5.7.    Release of Encumbrances ...........................................................................20

5.8.    Further Assurances .....................................................................................20

5.9.    Transferred Avoidance Actions. .................................................................20

**SECTION 6** CERTAIN COVENANTS OF PURCHASER. ..........................................20

6.1.    Performance with Respect to the Assets and the Assumed Contracts .........20

6.2.    Cure Amounts ............................................................................................21

6.3.    Workers' Compensation .............................................................................21

6.4.    Further Assurances.....................................................................................21

**SECTION 7** CERTAIN MUTUAL COVENANTS ....................................................21

    7.1.   Mutual Cooperation ..........................................................................21

    7.2.   Actions, Approvals and Filings..........................................................22

    7.3.   Public Statements .............................................................................22

**SECTION 8** EMPLOYEE MATTERS....................................................................23

    8.1.   Employment ......................................................................................23

    8.2.   Employee Benefits Matters................................................................23

    8.3.   Seller Assumed Plans .......................................................................23

    8.4.   Compliance with WARN Act .............................................................24

**SECTION 9** CONDITIONS TO SELLERS' OBLIGATIONS....................................24

    9.1.   Representations and Warranties.........................................................24

    9.2.   Compliance with Agreements ............................................................25

    9.3.   Approvals; No Injunctions.................................................................25

    9.4.   Purchaser's Closing Deliveries and Obligations..................................25

    9.5.   Entry of the Confirmation Order ........................................................25

**SECTION 10** CONDITIONS TO PURCHASER'S OBLIGATIONS...........................25

    10.1.  Representations and Warranties.........................................................25

    10.2.  Compliance with Agreements ............................................................25

    10.3.  Approvals; No Injunctions.................................................................25

    10.4.  Sellers' Closing Deliveries and Obligations .......................................26

    10.5.  DIP Financing Facility......................................................................26

    10.6.  Entry of the Confirmation Order ........................................................26

**SECTION 11** CLOSING; TERMINATION .............................................................26

    11.1.  The Closing ......................................................................................26

    11.2.  Termination......................................................................................27

    11.3.  Effects of Termination ......................................................................28

**SECTION 12** TAXES ..................................................................................................28

    12.1.  Taxes Related to Purchase of Assets ...........................................................28

    12.2.  Cooperation ..................................................................................................29

**SECTION 13** EXPENSES, ATTORNEYS' FEES AND BROKERS' FEES ...........................29

    13.1.  Expenses ......................................................................................................29

    13.2.  Attorneys' Fees; Brokers' Fees; Expenses .................................................29

**SECTION 14** MISCELLANEOUS .................................................................................29

    14.1.  Sale of Assets Subject to Bankruptcy Court Approval ...............................29

    14.2.  Survival of Representations and Warranties and Covenants ......................29

    14.3.  Entirety of Agreement; Amendments and Waivers ....................................30

    14.4.  Assignment ..................................................................................................30

    14.5.  Successors and Assigns; No Third Party Beneficiaries ..............................30

    14.6.  Governing Law; Jurisdiction.......................................................................30

    14.7.  Gender and Number ................................................................~~30~~31

    14.8.  Headings ...................................................................................~~30~~31

    14.9.  Construction ................................................................................................31

    14.10. Relation to the Amended Plan ....................................................................31

    14.11. Severability .................................................................................................31

    14.12. Negotiated Agreement ................................................................................31

    14.13. Notices ........................................................................................................31

    14.14. Counterparts; Facsimile Copies .................................................................32

Proskauer Draft:  9/15/10

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is made as of September__, 2010, by and among [_____], a [_____] ("Purchaser"), Philadelphia Media Holdings, LLC ("PMH"), PMH Acquisition, LLC, a Delaware limited liability company ("Parent"), and each of Parent's direct and indirect Subsidiaries (as defined below) listed on the signature pages hereto (individually, "Seller" or "Debtor" or "Debtor-in-Possession" and collectively with PMH and Parent, "Sellers" or "Debtors" or "Debtors-in-Possession").

## W I T N E S S E T H:

WHEREAS, on February 23, 2009, each Seller, other than PMH, filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the Bankruptcy Court (as defined below), and on February 24, 2009, the Bankruptcy Court entered an order approving Sellers' application seeking administration and consolidation of Sellers' chapter 11 cases for procedural purposes only;

WHEREAS, on June 10, 2009, PMH filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court and, on June 16, 2009, the Bankruptcy Court entered an order approving PMH's application seeking administration and consolidation of its chapter 11 case with the other Sellers' chapter 11 cases for procedural purposes only;

WHEREAS, Sellers are continuing in the possession of their respective assets and in the management of their respective businesses pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, Sellers are presently engaged in the Business (as defined below); and

WHEREAS, Purchaser desires to purchase from Sellers, and Sellers desire to sell, transfer and assign to Purchaser, the Assets (as defined below) in accordance with this Agreement and in accordance with and subject to the Amended Plan and the Confirmation Order (each as defined below), pursuant to sections 105(a), 1123 and 1129 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants, promises and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## SECTION 1
## INTERPRETATION

1.1.    Definitions.  Whenever used in this Agreement, the following words and phrases shall have the respective meanings ascribed to them as follows.

"Affiliate" means, with respect to any Person, any other Person which directly or indirectly controls, is controlled by or is under common control with such Person.  For purposes

of this definition "control" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Amended Plan" means the Plan, as amended, substantially in the form attached hereto as Exhibit A, with such changes as are reasonably acceptable to Purchaser and Sellers and are otherwise made in accordance with the terms thereof.

"Ancillary Agreements" means, together, the Assignment and Assumption Agreement, the Bill of Sale, the Deeds, the Intellectual Property Assignment Agreement, the Deposit Escrow Agreement and the Estate for Years Transfer Deed, substantially in the forms attached hereto as Exhibits B, C, D, E, F and G.

"Assets" means, other than the Excluded Assets, all of Sellers' tangible and intangible assets, properties, rights, claims and contracts owned, leased and/or licensed by any Seller of every kind, character and description, whether accrued, contingent or otherwise, existing as of the Closing (which Assets comprise substantially all of Sellers' assets, properties, rights, claims and contracts), including, without limitation, those Assets set forth in Section 2.1.

"Assignment and Assumption Agreement" means that certain assignment and assumption agreement to be executed at Closing with respect to the Assumed Contracts in the form attached hereto as Exhibit B.

"Assumed Contracts" has the meaning set forth in Section 2.3.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Auction" means the auction in connection with the sale of the Assets, as described in the Bid Procedures Order.

"Avoidance Actions" has the meaning set forth in the Amended Plan.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Pennsylvania.

"Base Purchase Price" has the meaning set forth in Section 2.5(a).

"Benefits Plans" means all (i) employee pension or welfare benefit plans (as defined in Section 3(2) and 3(1) of ERISA), respectively (A) which were maintained or administered by any Seller, or any entity that along with any Seller is or has been treated as a "single employer" under Section 414 of the Code ("ERISA Affiliates") since August 20, 2007; (B) to which any Seller or any ERISA Affiliate contributed, or was legally obligated to contribute, since August 20, 2007; or (C) under which any Seller or any ERISA Affiliate had any liability since August 20, 2007, with respect to its current or former employees, and (ii) all other material plans or arrangements maintained by Sellers for the benefit of current or former employees, their beneficiaries or dependents.

"Bid Procedures Order" means the Order of the Bankruptcy Court entered on September __, 2010 (A) Approving Amended Procedures for the Sale of Certain of the Debtors' Assets, (B) Scheduling an Auction, (C) Approving Assumption and Assignment Procedures, (D) Approving Form of Notice; and (E) Granting Related Relief.

"Bill of Sale" means that certain bill of sale to be executed at Closing with respect to the Assets other than the Assumed Contracts in the form attached hereto as Exhibit C.

"Business" means Sellers' business of operating the newspapers and publications, listed on Schedule 1.1(a) hereto and certain related websites located at the domain names listed on Schedule 1.1(b) hereto (the "Websites").

"Business Day" means a day other than a Saturday, Sunday or any other day on which the principal national banks located in the City of Philadelphia are not open for business during normal banking hours.

"Cases" means the chapter 11 cases of Sellers filed in the Bankruptcy Court.

"Cash" means all cash and cash equivalents of Sellers, including the Restricted Cash.

"Causes of Action" has the meaning set forth in the Amended Plan.

"CBAs" mean, collectively, Sellers' collective bargaining agreements with any union.

"Closing" has the meaning set forth in Section 11.1.

"Closing Date" has the meaning set forth in Section 11.1.

"COBRA" has the meaning set forth in Section 8.2(b).

"Code" means the Internal Revenue Code of 1986, as amended.

"Committee" has the meaning set forth in the Amended Plan.

"Confirmation Hearing" means a hearing seeking the confirmation of the Amended Plan pursuant to the Confirmation Order and section 1129 of the Bankruptcy Code.

"Confirmation Order" means an order of the Bankruptcy Court confirming the Amended Plan, in form and substance reasonably acceptable to Purchaser and Sellers, which order, as of the Closing Date, shall not have been stayed, vacated or otherwise rendered ineffective, and shall authorize, among other things (i) the sale of the Assets to Purchaser free and clear of all Encumbrances, (ii) the assignment of the Assumed Contracts to and the assumption of the Assumed Contracts by Purchaser and (iii) the consummation of the transactions contemplated by the Ancillary Agreements and all other transactions and agreements contemplated hereby.

"Contracts" means all commitments, contracts, leases, licenses, agreements and understandings, written or oral, relating to the Assets or the operation of the Business to which any Seller is a party or by which any Seller or any of the Assets is bound.

"Credit Agreement" means that certain Credit and Guaranty Agreement dated as of June 29, 2006, as amended, among the Senior Agent, the Debtor Philadelphia Newspapers, LLC, as borrower, the other Debtors (other than PMH), as guarantors, and the Senior Lenders and lenders thereunder.

"Cure Amounts" means all amounts payable in connection with the cure of defaults of any of the Assumed Contracts.

"Debtors" has the meaning set forth in the preamble.

"Debtors-in-Possession" has the meaning set forth in the preamble.

"Deeds" has the meaning set forth in the Section 11.1(a)(iii).

"Deposit Escrow Agent" has the meaning set forth in Section 2.6.

"Deposit Escrow Agreement" has the meaning set forth in Section 2.6.

"DIP Financing Facility" has the meaning set forth in the Amended Plan.

"Distribution Agent" has the meaning set forth in the Amended Plan.

"DOJ" has the meaning set forth in Section 7.2(b).

"Employee" means any employee of Sellers as of the Closing Date.

"Encumbrances" means, with respect to any Asset, any mortgage, deed of trust, deed to service debt, pledge, security interest, lien, charge, lease, claim, encumbrance, option, right of first refusal, imperfection of title, covenant, encroachment, easement, servitude, proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement, state of facts or any other restrictions or third party rights.

"Environmental Law" means any federal, state, local or foreign statute, law, ordinance, rule, regulation, code, order, writ, judgment, injunction, decree or legally binding judicial or agency interpretation, policy or guidance relating to pollution or protection of the environment, natural resources, or public health and safety, including those relating to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Materials.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" has the meaning set forth in the definition of "Benefit Plans" in this Section.

"Estate for Years" shall mean the right of the legal holder thereof to possess and use the Excluded Real Property for a period of two (2) years following the Closing, under the terms and conditions set forth in the Estate for Years Transfer Deed and/or other appropriate documents, as necessary.

"Estate for Years Transfer Deed" has the meaning set forth in Section 11.1(a)(iv).

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Liabilities" means all of the obligations and liabilities of Sellers other than the Assumed Liabilities.

"Excluded Real Property" means the real property described on Schedule 2.2(b), together with all buildings, fixtures, structures, improvements and other appurtenances thereto and thereon, which property shall be transferred to the Senior Lenders (or their designee) pursuant to the Amended Plan, subject to the Estate for Years which shall be an Asset hereunder and transferred to Purchaser pursuant to the Estate for Years Transfer Deed.

"FTC" has the meaning set forth in Section 7.2(b).

"Governmental Authority" means any United States federal, state or local government or any foreign government, or political subdivision thereof, or any multinational organization or authority or any authority, agency or commission entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, any court or tribunal (or any department, bureau or division thereof), or any arbitrator or arbitral body.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"Intellectual Property" has the meaning set forth in Section 3.9.

"Intellectual Property Assignment Agreement" means that certain intellectual property assignment agreement to be executed at Closing with respect to the Intellectual Property of Sellers in the form attached hereto as Exhibit E.

"IRS" means the United States Internal Revenue Service.

"Law" means any federal, state, local or foreign statute, law, code, ordinance, order, rule or regulation or any common law requirement.

"Liability" means any debt, liability, duty, responsibility, obligation, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, premium or obligation of any kind, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed, including all costs and expenses relating thereto.

"Liquidating Trust" means the liquidating trust to be established pursuant to the Amended Plan.

"Material Adverse Effect" means (x) with respect to the Sellers or the Business, any material adverse effect on the business, operations, assets, condition (financial or otherwise), liabilities or results of operations of the Sellers or the Business taken as a whole, or on the ability of the Sellers to perform their obligations under this Agreement and the Ancillary Agreements and consummate the Transactions, and (y) with respect to the Assets, any material adverse effect on the condition of the Assets taken as a whole; provided, however, that in determining whether there has been a Material Adverse Effect, any effect to the extent attributable to any of the

following shall be disregarded: (i) with respect to the Sellers, the Business or the Assets, the occurrence of any event materially adversely affecting the industry in which the Business operates or in which the Assets are held and not uniquely relating to the Sellers, the Business or the Assets (as applicable); (ii) with respect to the Sellers, the Business or the Assets, any change in the general condition of the regional, national or global economy; (iii) the taking of any action required to be taken by a party under the terms of this Agreement; (iv) the announcement or existence of this Agreement or the Transactions; or (v) any labor action constituting a lockout, a strike, a slowdown, a work stoppage or threats thereof by or with respect to any Employees.

"Material Contract" means any Contract that requires payment by or to Sellers of more than $500,000 in any consecutive twelve (12) month period or is otherwise material to the Business.

"Newco Employees" has the meaning set forth in Section 8.1(a).

"Orders" has the meaning set forth in Section 5.1.

"Organizational Documents" means, with respect to any Person (other than an individual), (a) the certificate or articles of incorporation or organization and any joint venture, limited liability company, operating or partnership agreement and other similar documents adopted or filed in connection with the creation, formation or organization of such Person and (b) all by-laws, voting agreements and similar documents, instruments or agreements relating to the organization or governance of such Person, in each case, as amended or supplemented.

"Owned Real Property" has the meaning set forth in Section 3.11.

"Parent" has the meaning set forth in the preamble.

"Permits" has the meaning set forth in Section 3.5(b).

"Permitted Encumbrances" means those Encumbrances set forth on Schedule 1.1(c), any other Encumbrances such as utility easements, zoning restrictions, tax liens (for taxes not yet due and payable), other exceptions noted on a current survey, or other customary covenants and restrictions of record, in each case, that do not adversely affect the ownership, or leasing of the Real Property or the conduct of the Business, and Encumbrances related to Assumed Liabilities.

"Person" means any individual or corporation, association, partnership, limited liability company, joint venture, joint stock or other company, business trust, trust, organization, Governmental Authority or other entity of any kind.

"Plan" means the Debtors' First Amended Joint Chapter 11 Plan filed by the Debtors in the Cases on October 28, 2009 as may be further amended by the Debtors, through the date hereof.

"PMH" has the meaning set forth in the preamble.

"Pre-Closing Period" has the meaning set forth in Section 5.4(a).

"Providing Party" has the meaning set forth in Section 7.1(b).

"Purchase Price" has the meaning set forth in Section 2.5.

"Purchaser" has the meaning set forth in the preamble.

"Purchaser Deposit Amount" has the meaning set forth in Section 2.6.

"Real Property" means all real property owned, leased or subleased by Sellers and all easements granted to Sellers, each of which is described on Schedule 1.1(d), together with all buildings, improvements and fixtures thereon and all appurtenances and rights thereto.

"Requesting Party" has the meaning set forth in Section 7.1(b).

"Restricted Cash" means all cash held by insurance or credit card companies to secure Sellers' obligations under such policies or plans, including all unearned premiums and payments on account of loss.

"Secured Parties" means the Senior Lenders and each other Person with secured obligations under or pursuant to the Credit Agreement or related security agreement.

"Seller Assumed Plans" has the meaning set forth in Section 8.3.

"Sellers" has the meaning set forth in the preamble.

"Senior Agent" means Citizens Bank of Pennsylvania, as agent for the Secured Parties.

"Senior Lenders" means the lenders party to the Credit Agreement.

"Subsidiary" means, with respect to any Person, any corporation or other business entity, whether or not incorporated, of which more than fifty percent (50%) of the securities or interests having, by their terms, ordinary voting power to elect members of the board of directors or managers, or other persons performing similar functions with respect to such entity, are held, directly or indirectly, by such Person.

"Tax" or "Taxes" means  (i) all federal, state, local and foreign taxes, charges, fees, imposts, levies or other assessments, including income, gross receipts, excise, employment, sales, use, transfer, license, payroll, franchise, severance, stamp, withholding, Social Security, unemployment, disability, real property, personal property, registration, alternative or add-on minimum, estimated or other taxes, charges, fees, imposts, levies or other assessments, including any interest, penalties or additions thereto, whether disputed or not, and (ii) any liability for any items described in clause (i) payable by reason of contract, transferee liability, operation of law (including Treasury Regulation Section 1.1502-6) or otherwise.

"Tax Return" means any report, return, information return, filing, claim for refund or other information, including any schedules or attachments thereto, and any amendments to any of the foregoing required to be supplied to a taxing authority in connection with Taxes.

"Termination Date" has the meaning set forth in Section 11.2(b).

"Transactions" mean the transactions contemplated by this Agreement, the Ancillary Agreements and all other transactions and agreements contemplated hereby and thereby.

"Transaction Taxes" has the meaning set forth in Section 12.1.

"Transferred Avoidance Actions" has the meaning set forth in the Amended Plan.

"Transferred Real Property" means the Owned Real Property other than the Excluded Real Property.

"WARN Act" means, collectively, the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any other similar statutes or regulations of any jurisdiction relating to any plant closing or mass layoff.

"Website" has the meaning set forth in the definition of "Business" in this Section.

"Workers' Compensation Claims" means claims asserted by any Persons for compensation for injuries or illnesses incurred while working for any Seller, whenever such claims are asserted.

## SECTION 2
## PURCHASE, SALE AND ASSIGNMENT OF PURCHASED ASSETS

2.1.    Sale of Assets.  Subject to the terms and conditions of this Agreement, at Closing, Sellers shall sell, assign, convey, transfer and deliver to Purchaser, and Purchaser shall purchase from Sellers, all of Sellers' right, title and interest in the Assets, free and clear of all Encumbrances other than the Permitted Encumbrances, including all of Sellers' right, title and interest in the following:

(a)    all tangible personal property owned or used by any Seller including, without limitation, all equipment, furniture, fixtures, newsprint, inventory, supplies, machinery, vehicles, tools and furnishings;

(b)    the Estate for Years and all Owned Real Property, together with all buildings, fixtures, structures, improvements and other appurtenances thereto and thereon, other than the Excluded Real Property;

(c)    all interests of Sellers in the Assumed Contracts;

(d)    all interests of Sellers in, and all assets relating to, the Seller Assumed Plans;

(e)    any and all Causes of Action, including, without limitation, all Causes of Action of Sellers relating to this Agreement and Avoidance Actions against any Secured Party or the Senior Agent or any professional of the foregoing (but excluding any Transferred Avoidance Actions, which shall be treated as provided in Section 2.2(f));

(f)    all interests of Sellers in and to all Intellectual Property, including, without limitation, all computer software, programs and similar systems (including data and related documentation) owned or licensed by Sellers;

(g)    all accounts receivable and other receivables of Sellers including, without limitation, all accounts receivable and other receivables from advertisers payable to any

Seller with respect to services performed by or on behalf of any Seller on or prior to the Closing Date;

(h)     all Permits that relate to the Business;

(i)     all rights of any Seller relating to deposits and prepaid charges and expenses, and claims for refunds relating to the Assets (including, without limitation, utility deposits of Sellers);

(j)     Sellers' rights in all insurance policies to the extent transferable and to the extent the coverage relates to the Assets or the Assumed Liabilities (other than the insurance policies covering Workers' Compensation Claims);

(k)     all books and records, files, data, reports, computer codes and sourcing data, advertiser and supplier lists, cost and pricing information, business plans, and manuals, blueprints, research and development files, accounting and tax files, personnel records and other records of any Seller or related to the operations of any Seller and/or the Business;

(l)     all marketing, advertising and promotional materials; and

(m)     all goodwill associated with the Business and/or the Assets.

2.2.    Excluded Assets.  Notwithstanding the generality of Section 2.1, the following assets are not a part of the sale and purchase contemplated by this Agreement and are excluded from the Assets (collectively, the "Excluded Assets"):

(a)     all Cash;

(b)     the Excluded Real Property, subject to the Estate for Years;

(c)     all Contracts (including, without limitation, all CBAs and insurance policies covering Workers' Compensation Claims) other than the Assumed Contracts;

(d)     those assets of Sellers set forth on Schedule 2.2(d);

(e)     the Purchase Price;

(f)     all Transferred Avoidance Actions, which shall be irrevocably assigned and transferred by the Debtors to the Liquidating Trust on or prior to the Closing, in accordance with the Amended Plan;

(g)     all Benefits Plans and all assets relating to the Benefits Plans, other than Seller Assumed Plans;

(h)     all corporate minute books, stock transfer books, the corporate seal of Sellers and all other corporate books and records relating to Sellers' organization and existence; and

(i)     any shares of stock or other equity interests in Parent or any Subsidiary of Parent.

883552_1

2.3.    <u>Assumed Liabilities</u>.  <u>Schedule 2.3</u> lists those Contracts that Purchaser may elect to assume and request Sellers to assign to Purchaser at the Closing, along with the Cure Amount related to each such Contract.  At any time prior to the Closing Purchaser may identify Contracts to be added to and/or deleted from <u>Schedule 2.3</u> (such Contracts that remain on <u>Schedule 2.3</u> as of the Closing, the "<u>Assumed Contracts</u>"), which final and complete schedule of Assumed Contracts and any Cure Amounts relating thereto, shall be filed by Sellers with the Bankruptcy Court prior to the Confirmation Hearing.  At Closing, Purchaser shall be required to provide adequate assurance of future performance with respect to the Assumed Contracts.  Effective as of the Closing Date, Purchaser shall assume and thereafter in due course pay, fully satisfy, discharge and perform the Liabilities of Sellers arising after the Closing under the Assumed Contracts and the other Liabilities of Sellers referred to in this <u>Section 2.3</u> (collectively, the "<u>Assumed Liabilities</u>"), as follows:

(a)    all trade payables arising after February 23, 2009, all accrued Liabilities (including all accrued vacation Liabilities and accrued personal time-off Liabilities with respect to Newco Employees, and all unpaid accrued Liabilities relating to salaries and payroll taxes, incentives and commissions, non-union employee health insurance, union health and welfare and pension contributions, in each case in respect of Newco Employees and arising after February 23, 2009, but excluding all other accrued Liabilities in respect of Employees), and all deferred revenues as of the Closing Date that, in each case, arose in the ordinary course of Sellers' business;

(b)    all Liabilities relating to the Seller Assumed Plans;

(c)    all Liabilities relating to ownership or use of the Assets or otherwise relating to the Business, in each case arising after the Closing;

(d)    all Cure Amounts with respect to the Assumed Contracts;

(e)    all Liabilities to pay for, purchase or acquire assets, supplies or services ordered but not received and consumed by Sellers on or prior to the Closing Date (whether pursuant to purchase orders or otherwise) in the ordinary course of Sellers' business; and

(f)    all obligations to the Debtors' managers, officers, and employees arising out of the May 12, 2010 global settlement agreement reached between the Debtors, the Senior Lenders and the Committee, which global settlement agreement was recited in open court.

2.4.    <u>Excluded Liabilities</u>.    Under no circumstance shall Purchaser assume or be obligated to pay, and none of the Assets shall be or become liable for or subject to, any of the Excluded Liabilities, including, but not limited to, the following Liabilities, which shall be and remain Liabilities of Sellers:

(a)    Liabilities which are not Assumed Liabilities, including all Liabilities relating to noncompliance with Permits or Environmental Laws that occurred on or before the Closing and any and all Liabilities relating to any environmental, health or safety matter (including any Liability or obligation under any Environmental Law) arising out of or relating to Sellers' leasing, ownership or operation of any real property on or prior to the Closing Date, no matter when raised;

(b)      Liabilities associated with any Excluded Assets;

(c)      Liabilities associated with any and all indebtedness of any Seller for borrowed money not included in the Assumed Liabilities and Liabilities associated with any guarantees given by any Seller with respect to the obligations of any Person;

(d)      Liabilities arising out of or in connection with claims, litigation and proceedings (whether instituted prior to or after Closing) for acts or omissions that occurred, or arise from events that occurred, prior to the Closing Date including, without limitation, all Workers' Compensation Claims;

(e)      Liabilities arising out of any CBAs or any other Contracts that are not Assumed Contracts;

(f)      Liabilities arising out of any Benefits Plans, other than the Seller Assumed Plans, and all accrued Liabilities in respect of Employees except for those accrued Liabilities that are Assumed Liabilities pursuant to Section 2.3(a) above;

(g)      penalties, fines, settlements, interest, costs and expenses arising out of or incurred as a result of any actual or alleged violation by any Seller of any Law prior to the Closing Date;

(h)      Tax Liabilities;

(i)      Liabilities arising out of or resulting from layoffs or termination of Employees by any Seller prior to Closing, but not Liabilities arising out of the termination of Employees upon the consummation of the Transactions, including any WARN Act Liabilities resulting therefrom, all of which Purchaser has agreed to be responsible for pursuant to Section 8.4 hereof;

(j)      all Liabilities for expenses (i) relating to the negotiation and preparation of this Agreement and (ii) relating to the Transactions, in each case, to the extent incurred by Sellers and including those related to legal counsel, accounting, brokerage and investment advisors fees and disbursements;

(k)      except as provided in Section 2.3(a), all claims having statutory priority pursuant to section 503 or 507 of the Bankruptcy Code; and

(l)      any Liability of Sellers for indemnification to any officer, director, manager, employee or agent pursuant to any litigation claims existing as of the date hereof, including without limitation such claims as are set forth on Schedule 2.4(l), or any other litigation commenced on or after the date hereof and prior to the Closing

2.5.      Purchase Price.  Upon the terms and subject to the conditions set forth in this Agreement, the aggregate purchase price for the Assets (the "Purchase Price") shall equal:

(a)      $[_____] (the "Base Purchase Price"), plus;

(b)      the assumption of the Assumed Liabilities.

The Base Purchase Price shall be payable in immediately available funds on behalf of Sellers to the Distribution Agent for distribution under and in accordance with the Amended Plan.

2.6.    <u>Purchaser Deposit</u>.  In accordance with the Bid Procedures Order, Purchaser has, pursuant to the terms of an escrow agreement attached hereto as Exhibit F (the "<u>Deposit Escrow Agreement</u>"), deposited with the escrow agent under the Deposit Escrow Agreement (the "<u>Deposit Escrow Agent</u>") the sum of $[_____][1] by certified check or wire transfer of immediately available funds (the "<u>Purchaser Deposit Amount</u>"), to be released by the Escrow Agent and delivered to either Purchaser or Sellers in accordance with the provisions of the Deposit Escrow Agreement and the terms of this Agreement as follows:

(a)    If the Closing shall occur, the Purchaser Deposit Amount, together with all accrued interest and investment income thereon, shall be applied in accordance with <u>Section 11.1(b)</u> below towards the Purchase Price payable by Purchaser under <u>Section 2.5 (a)</u> hereof;

(b)    If this Agreement is terminated by Sellers pursuant to <u>Section 11.2(c)</u> due to a breach by Purchaser that results in the failure of a condition to Sellers' obligations set forth in <u>Section 9.1</u> or <u>Section 9.2</u>, the Purchaser Deposit Amount, together with all accrued interest and investment income thereon, shall be delivered to Sellers.[2] Sellers' right to the Purchaser Deposit Amount shall be in addition to any other rights and remedies to which Sellers may be entitled as a result of Purchaser's breach; and

(c)    If this Agreement is terminated for any reason other than by Sellers pursuant to <u>Section 11.2(c)</u>, the Purchaser Deposit Amount, together with all accrued interest and investment income thereon, shall be returned to Purchaser in lieu of any and all other remedies that Purchaser may otherwise have against Sellers on account of, and in full satisfaction of, any breach, violation or default by Sellers under this Agreement.

2.7.    <u>Allocation of Purchase Price</u>.    Purchaser shall prepare an allocation of the Purchase Price (and all other capitalized costs) among the Acquired Assets in accordance with Code Section 1060 and the Treasury regulations thereunder (and any similar provision of state, local or foreign law, as appropriate), which allocation shall be binding upon Sellers unless Sellers reasonably determine that such allocation is not reasonable in which case Purchaser and Sellers shall seek to agree upon a reasonable allocation and if they fail to so agree, the allocation shall be determined by an accounting firm selected by Purchaser.  Purchaser shall deliver such allocation to Sellers within 60 days after the Closing Date. Purchaser and Sellers and their Affiliates shall report, act and file Tax Returns (including, but not limited to Internal Revenue Service Form 8594) in all respects and for all purposes consistent with such allocation. Sellers shall timely and properly prepare, execute, file and deliver all such documents, forms and other information as Purchaser may reasonably request to prepare such allocation.  Neither Purchaser nor Sellers shall take any position (whether in audits, tax returns or otherwise) that is inconsistent with such allocation unless required to do so by applicable law.

2.8.    <u>Sale at Closing Date</u>.  The sale, transfer, assignment, conveyance and delivery by Sellers of the Assets to Purchaser and the assumption by Purchaser of the Assumed Liabilities, as provided herein and in the Ancillary Agreements, shall be effected on the Closing Date by (i) the

---

[1]  The Purchaser Deposit Amount shall be equal to 15% of the Base Purchase Price. The terms relating to the disposition of the Purchaser Deposit Amount shall be as set forth in the Bid Procedures Order.

execution and delivery by Sellers and Purchaser of the Assignment and Assumption Agreement with respect to the Assumed Contracts and the Assumed Liabilities, (ii) the execution and delivery by Sellers to Purchaser of Deeds with respect to the Transferred Real Property, (iii) the execution and delivery by Sellers to Purchaser of the Estate for Years Deed with respect to the Estate for Years, (iv) the execution and delivery by Sellers of the Intellectual Property Assignment Agreement with respect to Sellers' Intellectual Property, (v) the execution and delivery by Sellers to Purchaser of the Bill of Sale with respect to all of the Assets other than the Assumed Contracts and the Transferred Real Property, and (vi) the execution and delivery by Sellers to Purchaser of any other instruments as may be reasonably requested by Purchaser to effect the transfer of the Assets hereunder and the Transactions as contemplated hereby.

2.9.    Excluded Assets and Liabilities.    Notwithstanding anything to the contrary contained herein, Purchaser shall not purchase any of the Excluded Assets nor assume any liability for any of the Excluded Liabilities.

## SECTION 3
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers hereby jointly and severally represent and warrant to Purchaser as follows:

3.1.    Organization and Good Standing.    Schedule 3.1 sets forth for each Seller its name and jurisdiction of organization.    Each Seller is (a) validly existing and in good standing under the laws of the jurisdiction of its organization and (b) duly qualified to do business and in good standing in each jurisdiction in which the ownership, use or leasing of its assets and properties, or the conduct or nature of its business, makes such qualification, licensing or admission necessary, except for such failures to be so qualified, licensed or admitted and in good standing which, individually or in the aggregate, could not be reasonably expected to have a Material Adverse Effect.

3.2.    Authorization.    Subject to entry of the Confirmation Order, each Seller has all requisite power and authority to execute and deliver, and carry out its obligations under, this Agreement and the Ancillary Agreements and consummate the Transactions, and is not under any prohibition or restriction, contractual, statutory or otherwise, against doing so.    Each of this Agreement and the Ancillary Agreements has been or will be duly executed and delivered by each Seller and, assuming due authorization, execution and delivery by Purchaser, constitutes or will constitute the legal, valid and binding obligation of such Seller, enforceable against it in accordance with its terms, subject to entry of the Confirmation Order.

3.3.    No Conflicts.    Subject to entry of the Confirmation Order and approval, if required, under the HSR Act and other than as set forth on Schedule 3.3 hereto, the execution, delivery and performance by each Seller of this Agreement and each of the Ancillary Agreements and the consummation by each Seller of the Transactions shall not, with or without the giving of notice or lapse of time, (i) violate any provision of the Organizational Documents of such Seller, or (ii) violate any Law to which such Seller is subject.

3.4.    Consents and Approvals.    Subject to entry of the Confirmation Order and approval, if required, under the HSR Act and other than as set forth on Schedule 3.4 hereto, the execution, delivery and performance by each Seller of this Agreement and the Ancillary Agreements and the consummation of the Transactions do not require the consent or approval of, or filing with, any Governmental Authority.

3.5.    <u>Compliance with Law</u>.

(a)    Sellers are in compliance with Sellers' Organizational Documents and with all Laws relating to the Assets, including all Environmental Laws, except as could not have a Material Adverse Effect on the Sellers or the Assets.

(b)    <u>Schedule 3.5(b)</u> sets forth a true and complete list of all material approvals, permits, certificates, qualifications, authorizations, licenses, franchises, consents, orders and registrations, together with all modifications, amendments, supplements and extensions thereof, of all United States federal, state and local Governmental Authorities and any other Person that are necessary for Sellers to own the Assets (collectively, the "<u>Permits</u>").  To Sellers' knowledge, the Permits are valid and in full force and effect and are fully and freely transferable by Sellers to Purchaser except as could not have a Material Adverse Effect.  Except as set forth on <u>Schedule 3.5(b)</u>, none of the Permits shall be terminated or become terminable as a result of the Transactions.

3.6.    <u>Title to Assets</u>.  Except as set forth in <u>Schedule 3.6</u> hereto, Sellers are the owners of the Assets as of the date hereof.  Subject to entry of the Confirmation Order, Sellers have, and at the Closing Purchaser shall receive, good, valid and marketable title to the Assets, free and clear of any and all Encumbrances except for the Permitted Encumbrances.

3.7.    <u>Cure Amounts</u>.  <u>Schedule 3.7</u> sets forth the monetary Cure Amounts currently set forth on Sellers' books and records with respect to all of the Contracts set forth on <u>Schedule 2.3</u>.

3.8.    <u>Litigation</u>.    As of the date of this Agreement, no lawsuit, governmental investigation or legal, administrative or arbitration action or proceeding is pending or, to the best of Sellers' knowledge, has been threatened against any Seller, or any director or officer of any Seller in his or her capacity as such, which questions the validity of this Agreement or seeks to prohibit, enjoin or otherwise challenge the consummation of the Transactions, or which relates to, or could have a Material Adverse Effect on, the Assets.

3.9.    <u>Intellectual Property</u>.  Except as could not have a Material Adverse Effect, one or more Sellers own, or is licensed or otherwise possess legally enforceable rights to use, all material trademarks, trade names, service marks, service names, mark registrations, logos, assumed names, registered and unregistered copyrights, patents or applications and registrations used in the Business as currently conducted (collectively, the "<u>Intellectual Property</u>").  Except as could not have a Material Adverse Effect, (a) as of the date hereof, there are no pending or, to the best of Sellers' knowledge, threatened claims by any Person alleging infringement of any material Intellectual Property rights of any Person by Sellers as a result of their use of the Intellectual Property used in the Business, (b) to the best of Sellers' knowledge, the conduct of the Business does not infringe any material intellectual property rights of any Person, (c) no Seller has made any claim of a violation or infringement by others of its rights to or in connection with the Intellectual Property included in the Assets, and (d) to the best of Sellers' knowledge, no person is infringing any Intellectual Property included in the Assets.

3.10.    <u>Material Contracts</u>.    True and complete copies (including all modifications, amendments and supplements) of each of the Material Contracts have been made available by Sellers to Purchaser.  Except as has not had or could not have a Material Adverse Effect, or as would be cured pursuant to this Agreement and the Amended Plan, no Seller and, to the best of Sellers' knowledge, no other party to any Material Contract is in default, violation or failure to perform under any Material Contract.  To the best of Sellers' knowledge, no Seller has assigned,

delegated or otherwise transferred to any third party any of its rights or obligations with respect to any Material Contract.  To the best of Sellers' knowledge, no party to any of the Material Contracts has threatened or is intending to cancel, terminate, materially alter, or not renew any of the Material Contracts.

3.11.  <u>Real Property</u>.  <u>Schedule 3.11</u> sets forth a list of real property currently owned ("<u>Owned Real Property</u>") or leased by Sellers and used in the operation of the Business.  Except as could not have a Material Adverse Effect, one or more Sellers own and has valid title to all of the Owned Real Property and has valid leasehold interests in all of the leased properties used in the operation of the Business, free and clear of any and all Encumbrances (except for Permitted Encumbrances).  Except as could not have a Material Adverse Effect, to Sellers' knowledge, each material lease agreement to which any Seller is a party is valid and enforceable and no Seller is in default under any such agreement other than as would be cured pursuant to this Agreement and the Amended Plan, and no circumstances exist which, with notice, the passage of time or both, would reasonably be expected to constitute a default by any Seller under any such lease agreement.

3.12.  <u>No Broker or Finder</u>.  Except for Sonenshine Partners, no broker, finder or financial advisor has been engaged by any Seller in connection with the Transactions.

3.13.  <u>Insurance</u>.  All insurance policies maintained by Sellers are with reputable insurance carriers, and provide coverage appropriate in character and amount for the Assets. Each such insurance policy is in full force and effect, and all premiums due and payable in respect thereof have been paid.

3.14.  <u>Disclaimer of Other Representations and Warranties</u>.  Except as expressly set forth in this <u>Section 3</u>, Sellers make no representation or warranty, statutory, express or implied, at law or in equity, in respect of Sellers or any of their assets, liabilities or operations, and any such other representations or warranties are hereby expressly disclaimed, and there are no other warranties, statutory, express or implied that extend beyond the warranties contained in this Agreement.  Purchaser hereby acknowledges and agrees that, except to the extent specifically set forth in this <u>Section 3</u>, Purchaser is purchasing the Assets on an "as-is, where-is" basis and "with all faults."

**SECTION 4**
**<u>REPRESENTATIONS AND WARRANTIES OF PURCHASER</u>**

Purchaser hereby represents and warrants to Sellers as follows:

4.1.  <u>Organization and Good Standing</u>.  Purchaser is a [_____] duly organized, validly existing and in good standing under the laws of the State of [_____] and has full corporate power and authority to enter into and carry out its obligations under this Agreement.

4.2.  <u>Authorization</u>.  Purchaser has all requisite power and authority to execute and deliver and carry out its obligations under this Agreement and the Ancillary Agreements, and consummate the Transactions, and is not under any prohibition or restriction, contractual, statutory or otherwise, against doing so.  Each of this Agreement and the Ancillary Agreements has been or will be duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery by each Seller, constitutes or will constitute the legal, valid and binding obligation of Purchaser, enforceable against it in accordance with its terms, except as such

15<sub>883552_1</sub>

enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other Laws affecting the rights of creditors generally and by general principles of equity (regardless of whether enforcement is considered in a proceeding at law or in equity).

4.3.     No Conflicts.  Subject to approval, if required, under the HSR Act, the execution, delivery and performance by Purchaser of this Agreement and the consummation by Purchaser of the Transactions shall not, with or without the giving of notice or lapse of time, (i) violate any provision of the Organizational Documents of Purchaser, (ii) violate any law to which Purchaser is subject, or (iii) conflict with, or result in a breach or default under, any term or condition of any other agreement or other instrument to which Purchaser is a party or by which Purchaser is bound.

4.4.     Consents and Approvals.  Subject to entry of the Confirmation Order and approval, if required, under the HSR Act, the execution, delivery and performance by Purchaser of this Agreement and the Ancillary Agreements and the consummation of the Transaction do not require the consent or approval of, or filing with, any Governmental Authority.

4.5.     Litigation.  No lawsuit, governmental investigation or legal, administrative or arbitration action or proceeding is pending or, to the best of Purchaser's knowledge, has been threatened against Purchaser, or any director or officer of Purchaser in his or her capacity as such, which questions the validity of this Agreement or seeks to prohibit, enjoin or otherwise challenge the consummation of the Transactions or could otherwise have a material adverse effect on Purchaser's ability to finance or otherwise consummate the Transactions.

4.6.     No Broker or Finder.  Except for [_____] no broker, finder or financial advisor has been engaged by Purchaser in connection with the Transactions.

4.7.     Capital Resources.  True, accurate and complete copies of the following documents have been delivered to Sellers prior to the date hereof: (i) an executed equity commitment letter in the form of Exhibit H hereto to provide equity financing to Purchaser to provide funding for the Purchase Price, and (ii) an executed debt commitment letter in the form of Exhibit I hereto pursuant to which, and subject to the terms and conditions thereof, certain lenders have committed to provide Purchaser with loans in the amounts described therein, the proceeds of which may be used to provide additional funding for the Purchase Price, as needed, or which may be used to provide working capital to support Purchaser's operations after Closing, and (iii) all other agreements, including backstop and similar agreements, relating to the Purchaser's financing and capitalization.  As of the date hereof, each of the foregoing debt commitment letters, in the form so delivered, is a legal, valid and binding obligation of Purchaser and the lender parties thereto.  As of the date hereof, each of the foregoing debt commitment letters is in full force and effect and has not been withdrawn or terminated (and no party thereto has indicated an intent to so withdraw or terminate) or otherwise amended or modified in any respect and Purchaser is not in breach of any of the terms or conditions set forth therein and no event has occurred which, with or without notice, lapse of time or both, could reasonably be expected to constitute a material breach or failure to satisfy a condition precedent set forth therein or a default thereunder.  As of the date hereof, Purchaser does not have any reason to believe that it will be unable to satisfy on a timely basis any term or condition contemplated to be satisfied by it contained in these debt commitment letters.  The proceeds from the equity and debt financing set forth in this Section 4.7 constitute all of the financing required for the consummation of the Transactions contemplated hereby, are sufficient for the satisfaction of all

of Purchaser's obligations under this Agreement, including the payment of the Purchase Price, and for the funding of the operations of the Business in the ordinary course following the Closing. The debt and equity commitments set forth herein contain all of the conditions precedent to the obligations of the parties thereunder to make the related financing available to Purchaser on the terms therein.

4.8.    Purchaser not a Plan. Purchaser is not an "employee benefit plan" as defined in ERISA, whether or not subject to ERISA, or a "plan" as defined in Section 4975 of the Code and none of Purchaser's assets constitutes (or is deemed to constitute for purposes of ERISA or Section 4975 of the Code, or any substantially similar federal, state or municipal law) "plan assets" for purposes of 29 CFR Section 2510.3-101, as modified by Section 3(42) of ERISA or otherwise for purposes of ERISA or Section 4975 of the Code.

4.9.    "AS IS" TRANSACTION. PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED IN SECTION 3 OF THIS AGREEMENT, SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE ASSETS. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE ASSETS. PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ASSETS AS PERMITTED IN THE SHORTENED TIME FRAME OF THIS ASSET PURCHASE PROCESS AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN SECTION 3 OF THIS AGREEMENT, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, PURCHASER WILL ACCEPT THE ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

## SECTION 5
## CERTAIN COVENANTS OF SELLERS

5.1.    Amended Plan and Confirmation Order. The Sellers shall cooperate in a timely fashion and in all respects with the Purchaser in connection with the prosecution of the confirmation of the Amended Plan as soon as practicable after the date hereof and the consummation of the Amended Plan and the Transactions as soon as practicable thereafter. Without limiting the generality of the foregoing, Sellers shall (i) comply with all requirements under the Bankruptcy Code and Federal Bankruptcy Rules in connection with obtaining approval of the Confirmation Order, (ii) proceed with the Cases pursuant to and in accordance with the terms and provisions contemplated by each of the Amended Plan, the Confirmation Order and the Bid Procedures Order (collectively, the "Orders"), in each case after the applicable Order has been entered by the Bankruptcy Court and (iii) comply or cause compliance with the notice requirements of the Orders, in each case after the applicable Order has been entered by the Bankruptcy Court, and any other applicable order of the Bankruptcy Court as they relate to the Cases, the Federal Bankruptcy Rules (including, without limitation, Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure) and any applicable rules of the Bankruptcy Court with respect to the Transactions contemplated by this Agreement. In the event that the

Orders or any other orders of the Bankruptcy Court relating to this Agreement shall be appealed by any Person other than the Sellers, the Purchaser or any Affiliate of the Purchaser (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any such order), unless such appeal has been rendered moot, Sellers and Purchaser will cooperate in taking such steps to diligently defend against such appeal, petition or motion and Sellers and Purchaser shall use their reasonable best efforts to obtain an expedited resolution of any such appeal, petition or motion. Neither Purchaser nor Sellers shall make any filing in the Bankruptcy Court with respect to the Orders (or otherwise take any position in the Bankruptcy Court proceedings with respect thereto) without the express written consent of the other party, which may not be unreasonably withheld, conditioned or delayed, or otherwise that would be reasonably likely to delay the confirmation or consummation of the Amended Plan or result in the failure of the transactions contemplated hereby.

5.2.    <u>Provision of Records</u>.    Sellers shall arrange at Purchaser's cost as soon as practicable following the Closing Date for transportation to Purchaser of the documents in the possession of any Seller relating to the Assets, to the extent not previously delivered in connection with the Transactions, including all agreements and filings with Governmental Authorities, but excluding documents relating to the Excluded Assets or the Excluded Liabilities.

5.3.    <u>Receipt of Property Relating to Assets</u>.    If any of the Sellers or any of their respective Affiliates, or any other Person acting for or in concert with any of the foregoing Persons, shall receive any money, check, note, draft, instrument, payment or other property as proceeds of the Assets or the Assumed Liabilities or any part thereof, each such Person shall receive all such items in trust for, and as the sole and exclusive property of, Purchaser and, immediately upon receipt thereof, shall notify Purchaser in writing of such receipt and shall remit the same (or cause the same to be remitted) to Purchaser in the manner specified by Purchaser.

5.4.    <u>Conduct of Business Pending the Closing</u>.

(a)    From the date hereof through the Closing Date or the earlier termination of this Agreement (the "<u>Pre-Closing Period</u>"), except as may be expressly permitted or contemplated by this Agreement or as otherwise agreed to in writing by Purchaser, each Seller shall continue to operate its business in the ordinary course (it being understood that such ordinary course may take into account the fact that the Business is being operated while in bankruptcy) and as a Debtor and Debtor-in-Possession in the Cases. Without limiting the generality of the foregoing, during the Pre-Closing Period, except as may be expressly permitted or contemplated by this Agreement or as otherwise agreed to in writing by Purchaser, no Seller shall, except as could not have a Material Adverse Effect on the Assets:

(i)    sell (including by sale-leaseback), lease, transfer, license (whether on an exclusive or non-exclusive basis), mortgage or otherwise dispose of, encumber or subject to any Encumbrance, any Assets or interests therein;

(ii)    fail to maintain in full force and effect any policy of insurance covering the Assets;

(iii)    incur or permit the incurrence of any Liability that would constitute an Assumed Liability, except in the ordinary course of business;

(iv)    enter into any contract, license, sublicense or other agreement that contains any provision that, as a result of the consummation of the Transactions, would (assuming that the other party's consent or approval is not obtained, to the extent required) result in any penalty, additional payments or forfeiture that would be payable or sufferable by Purchaser on or after the Closing Date;

(v)    except as previously disclosed to or known by Purchaser, modify, amend, supplement or terminate any Assumed Contract;

(vi)    acquire any entity or all or substantially all of the assets of any entity or make any other investment outside the ordinary course of business;

(vii)    except as would not adversely affect Purchaser, adopt or change any method of Tax accounting, make, change or revoke any material Tax election, file any Tax Return other than in a manner consistent with past practice, consent to the extension or waiver of the limitations period applicable to any Tax claim or assessment, or settle any material Tax claim or assessment;

(viii)    (A) perform any act which would cause (1) any representation, warranty, covenant, condition or agreement of Sellers in this Agreement that is qualified by materiality or Material Adverse Effect to be or become untrue in any respect or (2) any representation, warranty, covenant, condition or agreement of Sellers in this Agreement that is not qualified by materiality or Material Adverse Effect to be or become untrue in any material respect, or (B) intentionally omit to take any action necessary to prevent (1) any such representation, warranty, covenant, condition or agreement that is qualified by materiality or Material Adverse Effect from being or becoming untrue in any respect or (2) any such representation, warranty, covenant, condition or agreement that is not qualified by materiality or Material Adverse Effect from being or becoming untrue in any respect;

(ix)    waive or compromise any claim or right with respect to any of the Assets or fail to renew any Permit;

(x)    declare, issue, make or pay any dividend or other distribution of assets, whether consisting of money, other personal property, real property or other thing of value, to holders of any equity interests of any of the Sellers or use or permit the use of any Cash in any manner other than is permitted by the Cash Collateral Order (as defined in the Amended Plan);

(xi)    other than in the ordinary course of business consistent with past practice, enter into any transaction with any Affiliate, director, officer, manager or employee of any Seller; or

(xii)    authorize any of, or commit or agree to take any of, the foregoing actions.

(b)      Sellers shall promptly notify Purchaser in writing of (i) any event known to any Seller which would render any representation or warranty of any Seller contained in this Agreement, if made on or prior to the Closing Date, untrue or inaccurate in any material respect, (ii) any change, condition or event known to any Seller that has or could reasonably be expected to have a Material Adverse Effect on the Assets or (iii) any failure of a Seller to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied hereunder.

5.5.    <u>Access to Information</u>.  Upon reasonable notice by Purchaser, Purchaser and its representatives shall have reasonable access during normal business hours throughout the period from the date hereof through the Closing Date, or the earlier termination of this Agreement in accordance with its terms, to the Assets and documents relating thereto.  Any inspections, examinations and audits shall be conducted during normal business hours by Purchaser's employees or agents upon reasonable advance notice.

5.6.    <u>Transfer of Permits</u>.  Except for those Permits that are not transferable by Law, Sellers shall use commercially reasonable efforts to cause the issuance or transfer at Purchaser's expense of all Permits included in the Assets to Purchaser on or before the Closing Date.  Sellers shall give and make all notices and reports Sellers are required to make to the appropriate Governmental Authorities and other Persons, each at Purchaser's expense, with respect to the Permits that may be necessary for the sale of the Assets to Purchaser at the Closing.

5.7.    <u>Release of Encumbrances</u>.  Sellers' obligation to deliver the Assets free and clear of any Encumbrances (other than Permitted Encumbrances) shall be limited to Sellers' efforts to obtain the Confirmation Order that provides for the delivery of the Assets free and clear of any Encumbrances (other than Permitted Encumbrances).  If Purchaser desires to have any Encumbrances released and discharged other than by means of the Confirmation Order, Purchaser, at its sole cost and expense, shall obtain such releases or discharges.

5.8.    <u>Further Assurances</u>.  Upon the request of Purchaser, each Seller shall forthwith execute and deliver such documents and take such actions as Purchaser or its counsel may reasonably request to effectuate the purposes of this Agreement.

5.9.    <u>Transferred Avoidance Actions</u>.  Effective upon the Closing, as set forth in the Amended Plan, each and every Transferred Avoidance Action shall be transferred and assigned to the Liquidating Trust and, to the extent reasonably requested by Purchaser, Sellers agree to execute one or more written instruments to effect such transfer and assignment and shall thereafter do all such other things as are reasonably requested to effect such transfer and assignment and shall take no action to interfere with such transfer and assignment.

## SECTION 6
## CERTAIN COVENANTS OF PURCHASER.

6.1.    <u>Performance with Respect to the Assets and the Assumed Contracts</u>.  Purchaser agrees that from and after the Closing Date, that it shall (i) assume all Assumed Liabilities, and (ii) take all actions necessary to satisfy its obligations and liabilities with respect to the Assumed Liabilities (including, without limitation, under the terms and conditions of each Assumed Contract).

6.2.   <u>Cure Amounts</u>.   Purchaser shall pay the Cure Amounts with respect to each Assumed Contract as of the Closing Date or on such later date as may be agreed to by the counterparty to such Assumed Contract.

6.3.   <u>Workers' Compensation</u>.   On or before the Closing Date, Purchaser shall arrange for workers' compensation insurance coverage for all Newco Employees, which coverage shall be on terms similar to Sellers' current workers' compensation insurance policies for the period from and after the Closing Date.

6.4.   <u>Further Assurances</u>.   Upon the request of Sellers, Purchaser shall forthwith execute and deliver such documents as Sellers or their counsel may reasonably request to effectuate the purposes of this Agreement.

## SECTION 7
## CERTAIN MUTUAL COVENANTS

7.1.   <u>Mutual Cooperation</u>.

(a)   Sellers, on one hand, and Purchaser, on the other hand, shall promptly give notice to the other upon becoming aware that any action is pending or threatened by or before any Governmental Authority with respect to the Transactions.  Sellers, on the one hand, and Purchaser, on the other hand, (i) shall cooperate with each other in connection with the prosecution, investigation or defense of any such action, (ii) shall supply promptly all information requested by the other, by any such Governmental Authority or by any party to any such action that is legally required to be produced, and (iii) shall each use commercially reasonable efforts to cause any such action to be determined as promptly as practicable and in a manner which does not impact adversely on, and is consistent with, the Transactions.

(b)   After the Closing Date, each of Sellers and Purchaser shall use commercially reasonable efforts to provide to any other party to this Agreement (the "<u>Requesting Party</u>") such records and information and to make available to the Requesting Party such employees or other personnel, in each case as may be reasonably requested in writing by the Requesting Party, for the purpose of assisting the Requesting Party in responding to governmental inquiries, making required governmental filings or defending or prosecuting any action or other proceeding involving any Person other than the party providing such information or records or making available such employees or other personnel (the "<u>Providing Party</u>") and in resolving all claims, preparing all tax returns, and handling all matters necessary to administer and close the Cases; <u>provided</u>, <u>however</u>, that no Providing Party shall be required to (i) incur any out-of-pocket expenses, (ii) provide information, records or employees or other personnel under circumstances which the Providing Party believes in its sole reasonable determination may expose it to liability to any Person or may prejudice any commercial, legal or other interest of the Providing Party, or (iii) take any action that in the Providing Party's reasonable determination unreasonably interferes with its business.

7.2.   <u>Actions, Approvals and Filings</u>.

(a)   Subject to the terms and conditions of this Agreement, each of the parties hereto shall use all commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable under

applicable Laws and regulations to consummate the sale of the Assets pursuant to this Agreement on or prior to the Termination Date and to make effective the Transactions, including using commercially reasonable efforts to obtain all necessary or appropriate waivers, consents and approvals, and effecting all necessary registrations and filings. Purchaser shall make or cause to be made all filings and submissions under Laws applicable to Purchaser, if any, as may be required for the consummation of the Transactions.   Sellers shall make or cause to be made all such other filings and submissions under Laws applicable to any Seller, if any, as may be required for the consummation of the Transactions. Purchaser, on the one hand, and Sellers, on the other hand, shall coordinate and cooperate in exchanging such information and reasonable assistance as may be requested by either of them in connection with the filings and submissions contemplated by this Section 7.2.  Purchaser, on the one hand, and Sellers, on the other hand, shall each promptly provide the other or their respective counsel with copies of all filings made by such party with any Governmental Authority in connection with this Agreement and the Ancillary Agreements and the Transactions.

(b)     HSR.  Each of Purchaser and Sellers shall, as promptly as practicable after the date of this Agreement, file with the United States Federal Trade Commission (the "FTC") and the United States Department of Justice (the "DOJ") the notification and report form, if any, required for the consummation of the Transactions and any supplemental information requested in connection therewith pursuant to the HSR Act. Any such notification and report form and supplemental information shall be in substantial compliance with the requirements of the HSR Act.  Each of Purchaser and Sellers shall furnish to the other such necessary information and reasonable assistance as the other may reasonably request in connection with its preparation of any filing or submission which is necessary under the HSR Act.  Sellers and Purchaser shall keep each other apprised of the status of any communications with, and any inquiries or requests for additional information from, the FTC and the DOJ.  If such a filing is made, each of Purchaser and Sellers shall seek early termination of the waiting period under the HSR Act and use its best efforts to obtain as promptly as possible any clearance required under the HSR Act for the consummation of the Transactions.

7.3.    Public Statements.  The parties shall consult with each other prior to issuing any press release or making any public announcement with respect to this Agreement, the Ancillary Agreements, or the Transactions (including the financial terms hereunder and thereunder), and shall not issue any such press release or public announcement prior to such consultation or to which the other party shall reasonably object, except as may be required by Law or judicial process.  No party to this Agreement shall make any statement to, or otherwise communicate (whether orally or in writing) with, any employee or advertiser of, or supplier to, any Seller regarding this Agreement, the Ancillary Agreements or the Transactions except for any statement or communication with respect to which the other parties hereto shall have previously consented in writing.

## SECTION 8
## EMPLOYEE MATTERS

8.1.    Employment.

(a)     Purchaser shall offer to employ, commencing upon Closing, on such terms and conditions as determined by Purchaser (or, at Purchaser's choice, agreed upon by

Purchaser in any CBA with any labor organization representing any Employees), each Employee of Sellers who is, as of immediately prior to the Closing, (i) actively at work in connection with the Business, (ii) on short-term disability or workers' compensation in connection with the Business, or (iii) on a leave of absence approved by Sellers in connection with the Business, but not including any person on long-term disability, layoff with or without recall rights or on a leave of absence with no prior agreement or understanding to return to employment with Sellers at the end of such disability, layoff or leave.    Employees who accept such offer of employment will be referred to in this Agreement as "Newco Employees."  Schedule 8.1(a) sets forth all Employees who are on long-term disability or on a leave of absence with a prior agreement or understanding to return to employment with Sellers at the end of such disability, layoff or leave.

(b)    Except as described in the remaining sentences of this Section 8.1(b), the employment of each such Newco Employee with Purchaser will commence immediately upon the Closing.  In the case of any individual who is absent from active employment and receiving short-term disability or workers' compensation benefits, the employment of such individual with Purchaser will commence upon his or her return to active work, and such individual will become an Newco Employee as of such date.

8.2.    Employee Benefits Matters.

(a)    As of the Closing, all of the Newco Employees will cease participation in any of the Benefits Plans that such Newco Employees participated in immediately prior to the Closing that are not Seller Assumed Plans.

(b)    In accordance with Treasury Regulation Section 54.4980B-9 Q&A-7, as of the Closing Date, Purchaser will assume all liability for providing and administering all required notices and benefits under Section 4980B of the Code and Part 6 of Subtitle B of Title I of ERISA (usually referred to as "COBRA") to all current and former employees of Sellers (including, without limitation, Newco Employees).  Sellers will have no COBRA liability or obligations to such current and former employees after the Closing Date, except with respect to any violations of law that occurred prior to the Closing Date.

(c)    Purchaser and Sellers acknowledge and agree that Purchaser constitutes a "successor employer" within the meaning of Code Section 3121(a)(1) and Code Section 3306(b)(1) and the regulations thereunder for federal and state income tax and employment tax purposes.  Accordingly, the Purchaser agrees to treat all wages paid to the current and former employees as paid by a successor employer for all federal and state income tax and employment tax purposes.

8.3.    Seller Assumed Plans.  Purchaser shall notify Sellers in writing no later than two Business Days prior to the Closing as to which Benefits Plans Purchaser shall adopt and assume, if any (the "Seller Assumed Plans").  With respect to each Seller Assumed Plan, Purchaser or, any entity designated by Purchaser, will be substituted for the applicable Seller as the plan sponsor under each such Seller Assumed Plan and Purchaser shall have all rights of such Seller thereunder, including, without limitation, full authority to maintain, amend or terminate any such Seller Assumed Plan at any time, in Purchaser's sole discretion.  Sellers agree to cooperate with Purchaser in adopting and effectuating any plan amendments to the Seller Assumed Plans reasonably desired by Purchaser, so long as such amendments are effective as of, or after, the

Closing Date and are consistent with applicable law and other agreements under which Sellers are obligated.  The parties agree to cooperate in all respects and take any actions necessary to implement the assumption by Purchaser of the Seller Assumed Plans.  Before, or as soon as administratively practicable after, the Closing, Sellers will supply Purchaser with (i) all records concerning participation, vesting, accrual of benefits, payment of benefits, and election forms of benefits under each Seller Assumed Plan, and (ii) any other information reasonably requested by Purchaser as necessary or appropriate for the administration of each Seller Assumed Plan. Purchaser will make all required filings or reports with or to the IRS, or any other governmental agency, and the participants and their beneficiaries with respect to each Seller Assumed Plan on a timely basis for all plan years ending before, on or after the Closing Date or as may be required with respect to such Seller Assumed Plan, provided the initial deadline for such filing or report is after the Closing Date.  All parties recognize that a reasonable transition period may be necessary after the Closing Date and prior to Purchaser's implementation of its assumption of the Seller Assumed Plans before full compliance with this Section 8.3 is achieved, during which some or all of the Newco Employees and other participants and beneficiaries of the Seller Assumed Plans may not be able to (i) make (and Purchaser may not be able to process) elective deferral contributions, loan repayments, investment changes, distribution requests, benefit payment requests or reimbursement requests or (ii) exercise or enjoy other rights or features of the Seller Assumed Plans, and that during such transition period Purchaser shall not be considered to be in violation of this Section 8.3.  Notwithstanding the foregoing, Purchaser shall not assume or succeed to any of Sellers' past, current or future liabilities or obligations (including, without limitation, any withdrawal liability, termination liability or mass withdrawal liability) with respect to any multiemployer plan to which any Seller or any ERISA Affiliate contributes or has ever contributed.

8.4.    Compliance with WARN Act.  Purchaser will have full responsibility for all Liabilities of any kind under the WARN Act that are, in whole or in part, caused by or result from this Agreement or any action on or after the Closing Date that, in whole or in part, causes or results in Liabilities under the WARN Act of any kind.  Purchaser shall indemnify Seller for any such WARN Act Liabilities and for the cost of any legal action related to such Liabilities.

## SECTION 9
## CONDITIONS TO SELLERS' OBLIGATIONS

The obligations of Sellers to consummate the Transactions are subject to the satisfaction (unless waived in writing by Sellers) of each of the following conditions on or prior to the Closing Date:

9.1.    Representations and Warranties.  The representations and warranties of Purchaser contained in this Agreement, disregarding all materiality and material adverse effect qualifications contained therein, shall be true and correct on and as of the Closing Date, except to the extent expressly made as of an earlier date, in which case they shall be true and correct as of such earlier date, except, for any failure to be true and correct that, together with all other such failures, has not had, and could not reasonably be expected to have, a material adverse effect on Purchaser's ability to consummate the Transactions and otherwise perform its obligations under this Agreement.

9.2.    Compliance with Agreements.  Purchaser shall have performed and complied with all covenants and conditions under this Agreement and the Ancillary Agreements, disregarding all materiality and material adverse effect qualifications contained therein, to be

performed or complied with by it on or prior to the Closing Date, except for any failure to perform and comply that, together with all other such failures, has not had, and could not reasonably be expected to have, a material adverse effect on Purchaser's ability to consummate the Transactions and otherwise perform its obligations under this Agreement.

9.3.    Approvals; No Injunctions.  Any material approval required by a Governmental Authority to close the Transactions shall have been obtained or provided by an order of the Bankruptcy Court, including the expiration or termination of any waiting period (and each extension thereof, if any) applicable to the sale of the Assets under the HSR Act.  Such approvals shall be in full force and effect on the Closing Date.  No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation or non-appealable judgment, decree, injunction or other order that is in effect on the Closing Date and prohibits the consummation of the Closing.

9.4.    Purchaser's Closing Deliveries and Obligations.  Purchaser shall have delivered all items and satisfied all obligations pursuant to Sections 11.1(b) and 11.1(c).

9.5.    Entry of the Confirmation Order.  The Bankruptcy Court shall have entered the Confirmation Order.

## SECTION 10
## CONDITIONS TO PURCHASER'S OBLIGATIONS

The obligation of Purchaser to consummate the Transactions is subject to the satisfaction (unless waived in writing by Purchaser) of each of the following conditions on or prior to the Closing Date:

10.1.    Representations and Warranties.  The representations and warranties of the Sellers contained in this Agreement, disregarding all materiality and Material Adverse Effect qualifications contained therein,  shall be true and correct on and as of the Closing Date, except to the extent expressly made as of an earlier date, in which case as of such earlier date, except for any failure to be true and correct that, together with all other such failures, has not had, and could not reasonably be expected to have, a Material Adverse Effect.

10.2.    Compliance with Agreements.  Each Seller shall have performed and complied with all covenants and conditions under this Agreement and the Ancillary Agreements, disregarding all materiality and Material Adverse Effect qualifications contained therein, to be performed or complied with by it on or prior to the Closing Date, except for any failure to perform and comply that, together with all other such failures, has not had, and could not reasonably be expected to have, a Material Adverse Effect.

10.3.    Approvals; No Injunctions.  Any material approval required by a Governmental Authority to close the Transactions shall have been obtained or provided by an order of the Bankruptcy Court, including the expiration or termination of any waiting period (and each extension thereof, if any) applicable to the sale of the Assets under the HSR Act.  Such approvals shall be in full force and effect on the Closing Date.  No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation or non-appealable judgment, decree, injunction or other order that is in effect on the Closing Date and prohibits the consummation of the Closing.

10.4.    <u>Sellers' Closing Deliveries and Obligations</u>.  Each Seller shall have delivered all items and satisfied all obligations pursuant to <u>Section 11.1(a)</u>.

10.5.    <u>DIP Financing Facility</u>.  The DIP Financing Facility shall have been repaid in full.

10.6.    <u>Entry of the Confirmation Order</u>.  The Bankruptcy Court shall have entered the Confirmation Order.

<u>For the avoidance of any doubt, any labor action constituting a lockout, a strike, a slowdown, a work stoppage or any threat thereof with respect to any Employees, or the impact thereof on the Business, financial condition or results of operation of Sellers, shall not constitute or be the basis of a failure of any representation or warranty to be true, or of any failure by Sellers to perform or comply with any covenant or condition under this Agreement or any Ancillary Agreement, or otherwise provide any basis for Purchaser not to consummate the Transactions contemplated by this Agreement.</u>

## SECTION 11
## CLOSING; TERMINATION

11.1.    <u>The Closing</u>.  The Closing of the purchase by Purchaser from Sellers and sale by Sellers to Purchaser of the Assets (the "<u>Closing</u>") shall be held within three (3) Business Days following the satisfaction (or waiver) of the conditions set forth in <u>Section 9</u> and <u>Section 10</u> of this Agreement (excluding those conditions which by their nature are to be satisfied as part of the Closing) or at such other time as the parties hereto may agree.  The Closing shall be held at the offices of Proskauer Rose LLP at 1585 Broadway, New York, NY 10036 at 10:00 a.m., local time, or at such other location or time as the parties hereto may agree. The date on which the Closing shall occur is hereinafter referred to as the "<u>Closing Date</u>," and the Closing shall be deemed effective as of 12:01 a.m. on the Closing Date. On the Business Day immediately preceding the Closing Date, Purchaser and Sellers shall conduct a pre-Closing at the same location as the Closing, commencing at 10:00 a.m., local time, at which each party shall present for review by the other party copies in execution form of all documents required to be delivered by such party at the Closing. At the Closing, all of the Transactions shall be deemed to be consummated on a concurrent and simultaneous basis.

(a)    <u>Sellers' Deliveries at Closing</u>.  At the Closing, Sellers shall deliver (or cause to be delivered) to Purchaser the following:

(i)    the duly executed Assignment and Assumption Agreement;

(ii)    the duly executed Bill of Sale;

(iii)    the duly executed special warranty deeds in the form attached hereto as Exhibit D (collectively, the "<u>Deeds</u>") conveying to Purchaser good and marketable fee title to the Transferred Real Property free and clear of all Encumbrances other than the Permitted Encumbrances;

(iv)    the duly executed special warranty deed in the form attached hereto as Exhibit G conveying to Purchaser good and marketable title to the Estate for Years (collectively, the "<u>Estate for Years Transfer Deed</u>");

(v)    the duly executed Intellectual Property Assignment Agreement;

(vi)    a certified copy of the Confirmation Order and case docket reflecting that the Confirmation Order is in effect;

(vii)    certified resolutions of the governing body of each Seller that is not a Debtor approving and authorizing the Transactions;

(viii)    officer's certificates, executed by a duly authorized officer of each Seller, to the effect that all conditions to Closing set forth in Sections 10.1 and 10.2 have been satisfied; and

(ix)    customary forms of affidavits executed by each Seller stating that such Seller is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code.

(b)    Purchaser's Payment of Purchase Price.  At the Closing, Purchaser shall deliver (or cause to be delivered) the Purchase Price (less the Purchaser Deposit Amount, together with all accrued interest and investment income thereon, which shall be released by the Deposit Escrow Agent to Sellers in accordance with Section 2.5 and Section 2.6)) in accordance with Section 2.5.

(c)    Purchaser's Deliveries to Sellers at Closing.  At the Closing, Purchaser shall deliver (or cause to be delivered) to Sellers the following:

(i)    the duly executed Assignment and Assumption Agreement;

(ii)    certified resolutions of the governing body of Purchaser approving and authorizing the Transactions; and

(iii)    a certificate, executed by a duly authorized officer of Purchaser, to the effect that all conditions to Closing set forth in Sections 9.1 and 9.2 have been satisfied.

11.2.    Termination.  Anything in this Agreement to the contrary notwithstanding, this Agreement and the Transactions may be terminated in any of the following ways at any time before the Closing and in no other manner, subject to the provisions hereof:

(a)    at any time by mutual written consent of Purchaser and Sellers;

(b)    by Purchaser or Sellers, if the Closing shall not have occurred on or before October 14, 2010, or such later date (not later than October 31, 2010) as Sellers and Purchaser agree or is necessary due solely to the scheduling and availability of the Bankruptcy Court (the "Termination Date"); provided, however, that Purchaser or Sellers may not terminate this Agreement pursuant to this Section 11.2(b) if the Closing shall not have occurred on or before the Termination Date due to a breach by Purchaser or Sellers, as the case may be, of any representations, warranties, covenants or agreements of Purchaser or Sellers, as the case may be, contained in this Agreement;

(c)    by Sellers, if any condition to the obligations of Sellers set forth in Section 9 shall have become incapable of fulfillment other than as a result of a breach by Sellers of any covenant or agreement contained in this Agreement, and such condition is not waived by Sellers;

(d)     by Purchaser, if any condition to the obligations of Purchaser set forth in Section 10 shall have become incapable of fulfillment other than as a result of a breach by Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser;

(e)     by Sellers or Purchaser if there shall be in effect a final non-appealable order of a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions, it being agreed that the parties hereto shall promptly appeal any adverse determination which is not non-appealable (and pursue such appeal with reasonable diligence); or

(f)     by Purchaser, if, as a result of an order of the Bankruptcy Court, the Cases are converted to chapter 7 and a chapter 7 trustee is appointed with respect to Sellers.

11.3.   Effects of Termination.

(a)     Except as is otherwise expressly set forth in this Section 11.3, if this Agreement is terminated pursuant to Section 11.2, then this Agreement (other than Section 2.6 (Purchaser Deposit), this Section 11.3 (Effects of Termination), Section 13 (Expenses, Attorneys' Fees and Brokers' Fees) and Section 14.6 (Governing Law; Jurisdiction), each of which shall remain in full force and effect) shall forthwith become null and void and no party hereto shall have any liability or further obligation to any other party hereto.

(b)     If this Agreement is terminated by Sellers pursuant to Section 11.2(c) due to a breach by Purchaser that results in the failure of a condition to Seller's obligations set forth in Section 9.1 or Section 9.2, then the Purchaser Deposit Amount, together with all accrued interest and investment income thereon, shall be delivered to Sellers.

(c)     If this Agreement is terminated for any reason other than by Sellers as set forth in Section 11.3(b), the Purchaser Deposit Amount, together with all accrued interest and investment income thereon, shall be returned to Purchaser.

(d)     Sellers' liability under or arising from this Agreement is and shall be limited to Sellers' return of the Purchaser Deposit Amount.

(e)     Purchaser's liability under or arising from this Agreement shall not be limited to the Purchaser Deposit Amount.

## SECTION 12
## TAXES

12.1.   Taxes Related to Purchase of Assets.  The parties recognize and acknowledge that they may be exempt under section 1146(c) of the Bankruptcy Code and the Confirmation Order from state and local transfer, recording, sales and use, duty, stamp or other similar transfer Taxes (collectively "Transaction Taxes") that may be imposed by reason of the sale, transfer, assignment and delivery of the Assets; provided, however, that if Transaction Taxes are assessed for any reason, Purchaser shall be solely responsible for the payment of such Transaction Taxes along with any recording and filing fees.  Purchaser and Sellers agree to cooperate to determine the amount of Transaction Taxes payable in connection with the Transactions.  At the Closing, Purchaser shall remit to Sellers such properly completed resale exemption certificates and other

similar certificates or instruments as are applicable to claim available exemptions from the payment of sales, transfer, use or other similar Taxes under applicable law. Purchaser and Sellers shall cooperate in preparing such forms and shall execute and deliver such affidavits and forms as are reasonably requested by the other party.

12.2.    <u>Cooperation</u>.    Purchaser and Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Assets as is reasonably necessary for the preparation and filing of any Tax Return, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Taxes and for the answer of any governmental or regulatory inquiry relating to Taxes. Purchaser agrees to retain possession of all Tax files, books and records delivered to Purchaser by Sellers for a period of at least five years from the Closing Date. From and after the Closing Date, Purchaser agrees that it shall provide reasonable access to Sellers and their attorneys, accountants and other representatives (after reasonable notice and during normal business hours and without charge) to such files, books and records as Sellers may reasonably deem necessary to prepare for, file, prove, answer, prosecute or defend any claim, suit, inquiry or other proceeding, related to Taxes in connection with the Assets.

## SECTION 13
## EXPENSES, ATTORNEYS' FEES AND BROKERS' FEES

13.1.    <u>Expenses</u>.    Except as otherwise provided under this Agreement, Sellers shall be responsible for all expenses, liabilities and obligations arising out of or relating to the Assets and the Assumed Liabilities or the use, possession, ownership or operation thereof accruing on or prior to the Closing, other than expenses relating to HSR approval of the Transactions, as applicable. Purchaser shall be responsible for all expenses, liabilities and obligations (a) relating to HSR approval of the Transactions, and (b) arising out of or relating to the Assets and the Assumed Liabilities or the use, possession, ownership or operation thereof accruing after the Closing.

13.2.    <u>Attorneys' Fees; Brokers' Fees; Expenses</u>.    Each party shall be responsible for the payment of its own attorneys', brokers' and other fees and expenses in connection with the Transactions.

## SECTION 14
## MISCELLANEOUS

14.1.    <u>Sale of Assets Subject to Bankruptcy Court Approval</u>.    This Agreement, the sale of the Assets and Sellers' ability to perform under this Agreement are conditioned and contingent upon Bankruptcy Court approval of the Amended Plan and entry of the Confirmation Order.

14.2.    <u>Survival of Representations and Warranties and Covenants</u>.    Until the Closing, all representations and warranties herein shall be operative and in full force and effect, and the parties hereto shall be entitled to rely thereon, regardless of any investigation made by or for them. All representations and warranties and covenants contained herein shall terminate and shall not survive the Closing, except the covenants contained in <u>Section 2</u>, <u>Sections 5.2</u>, <u>5.3</u> and <u>5.8</u>, <u>Sections 6.1</u>, <u>6.2</u> and <u>6.4</u>, <u>Sections 7.1</u>, <u>7.3</u>, <u>Section 8</u>, <u>Section 12</u>, <u>Section 13</u> and <u>Section 14</u>.

883552_1

14.3.   Entirety of Agreement; Amendments and Waivers.  This Agreement (including all schedules and exhibits hereto), together with the Ancillary Agreements, certificates delivered hereunder and the Amended Plan, state the entire agreement of the parties with respect to the subject matter hereof, merge all prior negotiations, agreements and understandings, if any, and state in full all representations, warranties, covenants and agreements which have induced this Agreement.   Each of Sellers and Purchaser otherwise makes no other representations or warranties including any implied representations or warranties.  Each party agrees that in dealing with third parties no contrary representations shall be made.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other or subsequent breach.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

14.4.   Assignment.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties without the prior written consent of the other party except, in the case of Purchaser, to an Affiliate (but only if such Affiliate becomes a party to this Agreement and agrees to be bound by the representations, warranties, covenants and obligations herein and Purchaser guarantees such Affiliate's obligations herein); provided, however that no such assignment shall relieve Purchaser of its obligations hereunder.  No party shall be relieved of any liability hereunder in respect of any assignment pursuant to this Section 14.4, unless such assignor has received a written release expressly excepting such assignor from any liability that may arise hereunder.

14.5.   Successors and Assigns; No Third Party Beneficiaries.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.  This Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective heirs, personal representatives, legatees, successors and permitted assigns.

14.6.   Governing Law; Jurisdiction.   This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware applicable to contracts made and to be entirely performed therein.  In the event of any controversy or claim arising out of or relating to this Agreement or the breach or alleged breach hereof, each of the parties hereto irrevocably (i) submits to the exclusive jurisdiction of the Bankruptcy Court, (ii) waives any objection which it may have at any time to the laying of venue of any action or proceeding brought in the Bankruptcy Court, (iii) waives any claim that such action or proceeding has been brought in an inconvenient forum, and (iv) agrees that service of process or of any other papers upon such party by registered mail at the address to which notices are required to be sent to such party under Section 14.13 shall be deemed good, proper and effective service upon such party.

14.7.   Gender and Number.  In this Agreement, words importing the singular include the plural and vice versa and words importing a specific gender include all genders.

14.8.   Headings.   The division of this Agreement into Sections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

14.9.   Construction.   In this Agreement (i) words denoting the singular include the plural and vice versa, (ii) "it" or "its" or words denoting any gender include all genders, (iii) the word "including" shall mean "including without limitation," whether or not expressed, (iv) any reference to a statute shall mean the statute and any regulations thereunder in force as of the date of this Agreement or the Closing Date, as applicable, unless otherwise expressly provided, (v) any reference herein to a Section, Exhibit or Schedule refers to a Section of, or Exhibit or Schedule to, this Agreement, unless otherwise stated, (vi) any reference to "knowledge" shall mean, with respect to Sellers, the actual knowledge of Joseph Bondi and Scott Baker and, with respect to Purchaser, the actual knowledge of [_____] and [_____] and (vii) when calculating the period of time within or following which any act is to be done or steps taken, the date which is the reference day in calculating such period shall be excluded and if the last day of such period is not a Business Day, then the period shall end on the next day which is a Business Day.

14.10.   Relation to the Amended Plan.   In the event of any inconsistency or discrepancy between this Agreement and the Amended Plan, the Amended Plan will govern and prevail with respect to any inconsistency or discrepancy.

14.11.   Severability.   If any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by Law, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other such instrument.

14.12.   Negotiated Agreement.   Each of Sellers and Purchaser acknowledges that it has been advised and represented by counsel in the negotiation, execution and delivery of this Agreement and accordingly agrees that, if an ambiguity exists with respect to any provision of this Agreement, such provision shall not be construed against any party because such party or its representatives drafted such provision.

14.13.   Notices.   All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given or made as follows: (a) if sent by registered or certified mail in the United States return receipt requested, upon receipt; (b) if sent designated for overnight delivery by nationally recognized overnight air courier (such as Federal Express), one Business Day after delivery to such courier; (c) if sent by facsimile transmission before 5:00 p.m. in Philadelphia, when transmitted and receipt is confirmed; (d) if sent by facsimile transmission after 5:00 p.m. in Philadelphia and receipt is confirmed, on the following Business Day; and (e) if otherwise actually personally delivered, when delivered, provided that such notices, requests, demands and other communications are delivered to the address set forth below, or to such other address as any party shall provide by like notice to the other parties to this Agreement:

Purchaser:              [_____]
                        [_____]
                        [_____]
                        Facsimile:  [_____]
                        Attn:  [_____]


with a copy to:         [_____]
                        [_____]
                        [_____]
                        Facsimile:  [_____]
                        Attn:  [_____]


Sellers:                Philadelphia Newspapers, LLC
                        400 N. Broad Street
                        Philadelphia, PA 19130
                        Facsimile:  (215) 854-5105
                        Attn:  Scott Baker


with a copy to:         Proskauer Rose LLP
                        70 W. Madison Street
                        Chicago, IL 60602
                        Facsimile:  (312) 962-3551
                        Attn:  Paul V. Possinger

Any party hereto may change its address for service from time to time by notice given to other parties hereto in accordance with the foregoing.

14.14.  Counterparts; Facsimile Copies.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Signed facsimile copies of this Agreement shall legally bind the parties to the same extent as original documents.


**[Remainder of Page Intentionally Left Blank]**

**IN WITNESS WHEREOF,** the parties hereto have duly executed and delivered this Agreement as of the date first above written.

<u>**SELLERS:**</u>

**PHILADELPHIA MEDIA HOLDINGS, LLC**
**PMH ACQUISITION, LLC**
**BROAD STREET VIDEO, LLC**
**PHILADELPHIA NEWSPAPERS, LLC**
**PHILADELPHIA DIRECT, LLC**
**PHILLY ONLINE, LLC**
**PMH HOLDINGS, LLC**
**BROAD STREET PUBLISHING, LLC**
**PHILADELPHIA MEDIA, LLC**

By:_____
     Name:  Joseph A. Bondi
     Title:   Chief Executive Officer

Signature Page to Asset Purchase Agreement

883552_1

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**PURCHASER:**

[_____]

By: _____
Name:
Title:

Signature Page to Asset Purchase Agreement

883552_1