## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:                                                 : CHAPTER 11
                                                       :
PHILADELPHIA NEWSPAPERS, LLC, et al.,                  :
                                                       :
                         DEBTORS                       : BANKRUPTCY NO. 09-11204 SR
                                                         JOINTLY ADMINISTERED

# OPINION

BY: STEPHEN RASLAVICH, CHIEF UNITED STATES BANKRUPTCY JUDGE.

### Introduction

Before the Court is the Administrative Claim Request of Bruce Toll Pursuant to 11

U.S.C. § 503(a) and (b) (the "Claim").  Toll seeks the allowance of an administrative

claim in the amount of $65,947.34 for attorneys' fees and costs. The Acting United

States Trustee (the "Trustee") and the Official Committee of Unsecured Creditors (the

"Committtee") filed objections ("Objections") to the Claim.  The steering group of

prepetition secured lenders (the "Steering Group") and Citizens Bank of Pennsylvania, in

its capacity as the administrative and collateral agent for the Steering Group, filed a

Joinder in the Objections.  A hearing on the Claim was held on July 29, 2010.  At the

close of the hearing, the Court took the matter under advisement.  Upon consideration,

the Court shall grant the Claim in the reduced amount of $24,000.

## BACKGROUND

### Filing for Bankruptcy

On February 22, 2009, Philadelphia Newspapers, LLC and its related debtor-entities (the "Debtors")[1] filed for relief under Chapter 11 of the Bankruptcy Code.[2]  The Debtors own and operate numerous print and online publications in the Philadelphia area, including Philadelphia's two major newspapers (i.e., the Philadelphia Inquirer and the Philadelphia Daily News) and Philly.com.   In re Philadelphia Newpapers, LLC, 418 B.R. 548, 553 (E.D. Pa. Nov. 10, 2009), aff'd, 599 F.2d 298 (3d Cir. 2010).

### The DIP Loan and Toll

Prior to filing their cases, the Debtors knew that they would need a debtor-in-possession loan ("DIP loan").[3]  Transcript, dated July 29, 2010 ("Tr. 7/29/10") at 17. The Debtors' pre-petition lenders were a consortium of lenders (collectively referred to hereinafter as the "Lenders"), with Citizens Bank of Pennsylvania acting as the administrative and collateral agent.  In re Philadelphia Newspapers, LLC., 599 F.3d 298, 301 (3d Cir.  2010).  The Lenders hold first priority liens on substantially all of the

---

[1]  The Debtors consist of PHM Acquisition, LLC; Broad Street Video, LLC; Philadelphia Newspapers, LLC, Philadelphia Direct, LLC; Philly Online, LLC.; Broad Street Publishing, LLC; Philadelphia Media, LLC; and Philadelphia Media Holdings, LLC ("PMH"). The Debtors' cases are being jointly administered.  See Docket Entry No. 42 (Order Directing Joint Administration of the Debtors' Related Chapter 11 Cases).

[2]  The exception to this statement is that PMH, which is the parent company of all of the rest of the Debtors, commenced its bankruptcy case on June 10, 2009.

[3]  The Debtors were able to operate after filing their bankruptcy cases without a DIP loan; however, they knew from the commencement of their cases that they would need such a loan and they eventually did. Tr. at 18.

Debtors' assets.  Id.  The Lenders offered to provide Debtors with a DIP loan but the

terms of the loan had a provision which the Debtors refused to accept.  Tr. 7/29/10 at

18.  That provision was that any Chapter 11 plan which the Debtors filed had to be

approved in advance by the Lenders.  Id.  When the Debtors filed their bankruptcy

cases, their intent was to propose a Chapter 11 plan that would enable them to conduct

an auction at which potential buyers would be required to bid cash and be precluded

from credit bidding.[4]  Id. at 17-18.  The goal was for the Debtors to raise as much cash

as possible in hopes that the Lenders would elect to take cash instead of an equity

interest in the Debtors.  Id. at 17.  However, the Lenders opposed such a plan.  See In

re Philadelphia Newspapers, LLC, 2009 WL 3242292, at *2 (Bankr. E.D. Pa. Oct. 8),

rev'd in part on other grounds, 418 B.R. 548 (E.D. Pa. Nov. 10, 2009), aff'd, 599 F.2d

298 (3d Cir. 2010); see also Tr. 7/29/19 at 20.[5]  Consequently, the Debtors needed a

---

[4]  As the Third Circuit explained in In re Philadelphia Newspapers, LLC., 599 F.3d
298 (3d Cir.  2010), "[a] credit bid allows a secured lender to bid its debt in lieu of
cash."  Id. at 302 n.4.

[5]  According to Lawrence McMichael, Esquire ("McMichael"), who is the Debtors'
counsel and was the sole witness at the hearing on the Claim, if the lenders had been
able to control the Debtors' Chapter 11 plan, the Debtors would have been unable to
prevent the Lenders from credit bidding.  On this point, McMichael testified as follows:

> The fact that only 3 of our original 40 lenders are still in as
> equity owners of the debtors' business going forward, to me,
> is extremely telling.  And illustrates the benefit of that
> process.  That process wouldn't have happened without a
> non-coercive DIP.  **If we had been forced to borrow**
> **money from the senior lenders on the terms that they**
> **originally wanted, we never would have gotten there,**
> **because they would have controlled the plan; there**

(continued...)

DIP loan that did not require them to obtain the Lenders' approval before filing a plan. Tr. 7/29/10 at 18.  To obtain such a loan, the Debtors approached Bruce Toll because they believed "he was the most liquid party that [they] had available to [them] that could actually do what [they] wanted him to do, on the time frame that [they] needed[.]"  Id.

From sometime prior to the Debtors' bankruptcy filings until mid-August of 2009, Toll owned approximately 20 percent equity in PMH.  In re Philadelphia Newspapers, LLC, 599 F.3d 298, 301 (3d Cir. 2010).  In addition, from June of 2007 through mid-August of 2009, he was the Chairman of PMH.  In re Philadelphia Newspapers, LLC, 2009 WL 3242292, at *10 (Bankr. E.D. Pa. Oct. 8), rev'd in part on other grounds, 418 B.R. 548 (E.D. Pa. Nov. 10, 2009), aff'd, 599 F.2d 298 (3d Cir. 2010); see also Transcript, dated October 1, 2009 ("Tr. 10/1/09"),[6] at 84.

In response to the Debtors' request, Toll agreed to provide a DIP loan to the Debtors and he retained the law firm of Klehr, Harrison, Harvey, Branzburg & Ellers LLP (the "Klehr, Harrison Firm") to negotiate and document it.  Tr. 7/29/10 at 18.  A commitment letter, dated February 10, 2009, contains an attachment which summarizes

---

[5](...continued)
**would have been a credit bid**, and all 40 lenders would now own the debtor, the cash would not have been on the table to pay them.

Tr. 7/29/10 at 20 (underlining added).

[6]  This transcript is from the "final hearing on the DIP loan agreement between Citizens Bank as agent and the [D]ebtors."  Tr. 10/1/09 at 4.

the terms and conditions at which the DIP loan, through Toll, was being offered.[7]  See

Toll Exhibit 1.  On February 22, 2009, the Debtors filed a motion requesting Court

approval of the DIP loan which was arranged by Toll.[8]  See Motion of the Debtors for

Entry of Interim and Final Orders: (A) Authorizing the Debtors to Obtain Postpetition

Financing, (B) Granting Liens and Superpriority Claims, (C) Authorizing Use of Cash

Collateral, (D) Granting Adequate Protection to Prepetition Senior Lenders and (E)

Scheduling a Final Hearing, Docket Entry No. 22.

### Benefit of DIP loan Involving Toll

At the hearing on the Claim, McMichael was asked on direct examination to

testify regarding the benefit which the DIP loan from Toll provided to the Debtors'

estates and their creditors.  He stated: "From our perspective, the presence of an

alternative DIP loan was the key leverage that the debtors had to get into ultimately a

mediation, and make a deal with our incumbent pre-petition lenders."   Tr. 7/29/10 at

18.  Expounding further on this point, McMichael testified:

---

[7]  The commitment letter is from Newspring Capital, LLC, which McMichael explained, was the entity which Toll arranged to act as the agent for the DIP loan.  Tr. 7/29/10 at 32-33.

[8]  A Debtor-in-Possession Credit, Guaranty and Security Agreement, dated February 22, 2009, was attached as Exhibit A to the above-mentioned motion.  This agreement was introduced as Toll Exhibit 2 at the hearing on the Claim.  See Toll Exhibit 2.  This Agreement is between: (i) Philadelphia Newspapers, LLC as the borrower; (ii) PHM Acquisition, LLC; Broad Street Video, LLC; Philadelphia Direct, LLC; Philly Online, LLC.; Broad Street Publishing, LLC; Philadelphia Media, LLC; and Philadelphia Media Holdings, LLC ("PMH") as the guarantors; (iii) Callowhill Partners, LLC, as the administrative agent; and (iv) "The Lenders Named Herein," as the lenders. Id.  The last page of the exhibit list the "Lenders" as BET Associates, LP.  id.  The signature line for the Lenders bears the name of "Bruce E. Toll."  Id.

> We did make that deal. And as the Court knows, that deal
> resulted in a DIP loan without the critical provision in it that
> the lenders, the DIP lenders would control the plan that the
> debtors could propose.  The debtors were free to propose
> whatever plan they wanted.
>
> And our ability to get that done was, in my view, 100
> percent dependent on the fact that we had an alternative to
> the senior lenders as a DIP lender, that being Mr. Toll.  We
> did try to replace Toll with a bank ... but for the early part of
> the case, Mr. Toll was the lender.

Id. at 19.

### Stalking Horse

While the Debtors were negotiating with Toll for a DIP loan, they were also

trying to put "together a transaction by which Mr. Toll and others would put up cash to

act as a stalking horse."   Tr. 7/29/10 at 22.  As a result of the negotiations, the

Debtors entered into an asset purchase agreement, dated August 20, 2009 (the "Asset

Purchase Agreement"), with Philly Papers, LLC (the "Stalking Horse Bidder").  In re

Philadelphia Newspapers, LLC, 2009 WL 3242292, at *1 (Bankr. E.D. Pa. Oct. 8), rev'd

in part on other grounds, 418 B.R. 548 (E.D. Pa. Nov. 10, 2009), aff'd, 599 F.2d 298

(3d Cir. 2010); see also Tr. 10/1/09 at 84.  Toll, along with the Carpenters Pension and

Annuity Fund of Philadelphia and Vicinity, held a majority interest in the Stalking Horse

Bidder.  In re Philadelphia Newspapers, LLC, 599 F.3d 298, 301 (3d Cir. 2010).   In

connection with the negotiations between the parties on the terms of the Asset

Purchase Agreement, Toll was represented by the Klehr, Harrison Firm which is the

same firm that represented him in connection with his negotiations with the Debtor

6

regarding the DIP loan.   Tr. 10/1/09 at 85-86.

### The Debtors' Decision to Pursue a
### DIP Loan with a Bank Rather than with Toll

The Debtors subsequently decided to pursue a DIP loan with a bank instead of

Toll.  Tr. 7/29/10 at 23.  McMichael explained the reasoning behind this decision,

stating as follows:

> [E]very time we walked into Court, the DIP loan was
> characterized by as an insider, or, you know DIP loan, and
> we thought that, particularly with the finalization of the
> stalking horse agreement, with Mr. Toll and others, that it
> was best to try to separate that from the DIP loan.  And we
> tried to find a bank to do it[.]

Id. at 25.  See also Transcript, dated 8/17/10 , at 17 [9] (McMichael's testimony that the

Debtors decided to pursue a DIP loan with a bank instead of Toll because "of the

volume" of criticism which they were receiving for "proposing a DIP loan provided by an

insider.").

The bank with which the Debtors ended up negotiating for a DIP loan was

Republic First Bank.  One of the requirements included in the draft commitment or term

sheet for the DIP loan from Republic First Bank was that "there be a major participant

for a significant portion" of the DIP loan to the Debtors.  Tr. 7/29/10 at 24.  The fund

that agreed to partner with Republic First Bank to fund the DIP loan was Tennenbaum

Capital Partners, LLC ("Tennenbaum").  Tr. 7/29 at 7, 24-25.   Both Republic First Bank

---

[9]  This transcript is from the hearing on, inter alia, the Amended Request of
Republic First Bank for Allowance and Payment of Administrative Expense Claim
Pursuant to 11 U.S.C. 503(b).  See Docket Entry Nos. 2437.

and Tennenbaum incurred out-of-pocket fees and expenses in connection with the due

diligence which they had performed in connection with the DIP loan.

### Debtors Obtained their DIP Loan
### From the Lenders

Ultimately, the Debtors resolved matters with the Lenders and obtained a

commitment from them for a DIP loan.  The Lenders agreed to extend a DIP loan to the

Debtors without the condition upon which the Lenders originally had been insisting,

namely that they have the right to pre-approve any reorganization plan before the

Debtors filed it.  See Docket Entry No. 1006.  At that point, the Debtors no longer

needed a financing commitment from Republic First Bank and Tennenbaum.  Tr.

7/29/10 at 24; see also Docket Entry No. 1223 at ¶4  (explaining that, on or about

August 26, 2009, the Debtors reached an agreement in principle with the Lenders

concerning the terms of a DIP loan).  On August 28, 2009, a stipulation (the "DIP Loan

Stipulation") was filed by and between the Debtors, Citizens Bank, the Steering Group

and the Official Committee for Unsecured Creditors stating, inter alia, that Citizens had

agreed to provide a DIP loan to the Debtors.  See Docket Entry No. 1006.

### Requests for Fees and Expenses
### Related to the DIP Loan

### (i) Republic First Bank

In anticipation of Republic First Bank incurring fees and expenses in connection

with the process of entering into a DIP Loan, the Debtors filed a motion, on July 30,

2009, seeking reimbursement of such fees and expenses for the bank.  Docket Entry

No. 822 (Motion for the Entry of an Order Pursuant to 11 U.S.C. § 105 and 363(b)

Authorizing Payment of Fees and Expenses for Prospective Debtor-in-Possession

Financing).  The Debtors based the motion on §§ 105 and 363 of the Code, asserting

that their request for the reimbursement of fees and expenses sought in the motion

"represent[ed] a sound exercise of business judgment."  Id. ¶ 14.  In the motion, the

Debtors sought Court approval to reimburse "their prospective lender for reasonable,

documented, out-of-pocket third party fees and expenses ... up to a total of $300,000

in connection with the Debtors' efforts to obtain a $15 million debtor-in-possession

financing ... commitment."  Id.  In the motion, the Debtors stated in relevant part:

> 2.     The Debtors and their professionals have been
> negotiating the potential for a DIP Facility commitment from
> several prospective investors and lenders.  The Debtors
> anticipate obtaining a commitment for a DIP Facility,
> following a period of due diligence . . . .
>
> 3.     From the original prospective investors and lenders
> with whom the Debtors discussed potential debtor-in-
> possession financing, including their current Senior Secured
> Lenders, the Debtors selected the lender who they believed
> provided the most attractive financing options.  This lender,
> who has met with the Debtors' management and has been
> provided with access to an electronic data room, has been
> negotiating with the Debtors as to the terms on which a DIP
> Facility commitment will be made.  **This prospective
> lender, Republic First Bank** (the "Anticipated Lender")
> will be invited to conduct more comprehensive due diligence
> and the Debtors will negotiate with the Anticipated Lender
> toward a definitive DIP Facility commitment.

> **4.     By this Motion, the Debtors seek Court
> approval to reimburse the Anticipated Lender's
> reasonable due diligence fees and expenses — a
> condition required by the Anticipated Lender before it
> will conduct such due diligence.**

Id. ¶¶ 2-4 (bolding added).  Following a hearing, the Court issued an Order, dated

August 11, 2009, granting the motion but <u>limiting</u> the reimbursement of fees and

expenses to a total amount of $100,000.  Docket Entry No. 903.

On August 21, 2009, the Debtors filed a motion for reconsideration of the

aforementioned $100,000 cap.   Docket Entry No. 954.   The Debtors asked the Court

to increase the cap to $200,000.  See id.   However, before the hearing was held on the

motion for reconsideration, the Debtors and the Lenders reached the agreement

mentioned above regarding the DIP loan and other issues.  See Docket Entry No. 1006.

In the DIP Loan Stipulation, the parties specifically addressed the Debtors' motion for

reconsideration of the $100,000 cap.  See id. at pg. 15.  The stipulation provided that

the Debtors' motion for reconsideration of the $100,000 cap "shall be deemed

withdrawn," but that Republic First Bank "may file a motion and seek allowance of an

administrative expenses" in addition to the $100,000 already granted by the Court.[10]

---

[10]  With regard to the Debtor's motion for reconsideration of the $100,000 cap,
the DIP Loan Stipulation provided as follows:

> 5. <u>The RFB Fee Reconsideration Motion</u>.
>
> a) Upon approval of this Stipulation by the Bankruptcy Court,
> the RFB Fee Reconsideration Motion shall be deemed
> withdrawn. RFB and Tennenbaum Capital Partners, LLC may
> file a motion and seek allowance of an administrative

(continued...)

10

Id.  Pursuant to this provision, Republic First Bank filed a request on August 13, 2010,

seeking the allowance of an administrative claim in the total amount of $159,960.79 (in

addition to the $100,000 which the Court originally approved) pursuant to 11 U.S.C.

§503(b), for its "Due Diligence Fee" and the legal expenses which it incurred in

responding to and defending against discovery that was propounded against it in

connection with the DIP Loan.  See Docket Entry No. 2437 (Amended Request of

Republic First Bank for Allowance and Payment of Administrative Expense Claim

Pursuant to 11 U.S.C. 503(b)).  A hearing on this request was held on August 17, 2010.

At the hearing, the evidence showed that Republic First Bank's out-of-pocket expenses

to third parties in connection with the DIP loan did not exceed $110,000.  Tr. 8/17/10

at 45, 47.  As the Court noted on the record at the hearing, the only un-reimbursed

third party out-of-pocket expenses which Republic First Bank had were $9,960.79.  Id.

at 71. The Court granted the bank half of this amount in light of the following

observations: (i) Republic First Bank exceeded the $100,000 cap which it knew the

---

[10](...continued)
> expense claim (in addition to the $100,000 payment to RFB
> already approved by the Bankruptcy Court). All Parties and
> other parties-in-interest in the Bankruptcy Case reserve their
> rights to object to anysuch request for allowance of
> administrative expense claim filed by RFB.

> b) The Debtors shall immediately inform RFB to cease all
> underwriting, due diligence, drafting of documents and other
> actions related to possible debtor-in-possession financing for
> the Debtors.

Docket Entry No. 1006, at pg. 15.

Court had imposed; but (ii) it had incurred significant legal fees in connection with defending against the discovery that was propounded against it in connection with the DIP loan.  Id. at 71-72; see also Docket Entry No. 2447 (Order, dated August 18, 2010, allowing Republic First Bank an Administrative Expense Claim "in the reduced amount of $4,980.40").

### (ii) Tennenbaum

Tennenbaum also incurred out-of-pocket expenses in performing its due diligence in connection with the DIP loan.  On October 7, 2009, Tennenbaum filed an application, based on Code § 503(b), requesting the allowance of an administrative claim in the amount of $14,012.50 for the out-of-pocket expenses which it incurred in the form of attorneys' fees in connection with the DIP loan.  Docket Entry No. 1223.  By Order, dated October 30, 2009, the Court granted the application.

### (iii) Toll

Toll filed his Claim on October 15, 2009.  After the Trustee filed his objection to the claim, a hearing on the claim and objection was scheduled for December 21, 2009.  Docket Entry No. 1539.  That hearing was continued to February 1, 2010 but, prior to that date, the Debtors filed a notice stating that the hearing on Toll's Claim and the objections thereto was "continued generally" and that notice of the rescheduled hearing would be "filed when a new hearing date has been scheduled."  Docket Entry No. 1660 ("Notice of Adjournment of Hearings Scheduled for February 1, 2010 at 2:00 P.M.").[11]

---

[11]  Prior to February 1, 2010, the Debtors had already submitted their motion for
(continued...)

See also Docket Entry No. 1667 (docket entry noting that the hearing on Toll's claim

was "continued generally.").   By Notice dated July 15, 2010, the Debtors rescheduled

the hearing on Toll's claim and the Trustee's Objection thereto for July 29, 2010.  See

Docket Entry No. 2342.   As noted above, the hearing was held and the matter was

taken under advisement.  See Docket Entry No. 2402.

## DISCUSSION

Toll asserts that he is entitled to the allowance of an administrative claim in the

amount of $65,947.34 because: (1) he incurred reasonable costs and attorneys' fees in

the aforementioned amount in connection with the DIP loan; and (ii) the availability of

the DIP loan from him "conferred a material benefit upon the Debtors and their estates

and constituted a substantial contribution to [the Debtors'] cases within the meaning of

§503(b)(3)(D)."  Claim ¶¶ 2-6.   The Trustee contends that Toll's claim should be

disallowed for the following reasons: (1) Toll is an "insider" as that term is defined in 11

U.S.C. § 101(31); (2) Toll made no substantial contribution to the Debtors' cases but

---

[11](...continued)
court approval of the bidding procedures which they sought in connection with the
anticipated public auction of their assets. See Docket Entry No. 1007 ("Debtors' Motion
for an Order: (A) Approving Procedures for the Sale of Certain of the Debtors' Assets;
(B) Scheduling an Auction; (C) Approving Assumption and Assignment Procedures; (D)
Approving Form of Notice; and (E) Granting Related Relief").  The Court's decision on
that motion had been appealed and the District Court had issued its decision on the
matter.  See Docket Entry Nos. 1234, 1235, 1249 & 1414.  The Lenders' appeal to the
Third Circuit was pending.

The Third Circuit subsequently issued its decision.  On June 28, 2010, a
confirmation hearing was held on the Debtors' Fourth Amended Joint Plan of
Reorganization and the plan was confirmed.  See Docket Entry No. 2253 ("Order
Confirming Fourth Amended Joint Chapter 11 Plan as of June 28, 2010").

"merely engaged in negotiations to arrange for DIP financing for his own benefit" and

to "protect his own interests and/or the interests of insiders."  Trustee Objection at ¶¶5-

7.  The Committee argues, inter alia, that Toll's claim should be disallowed because: (1)

the "proposed, non-consensual" DIP loan for which he seeks an administrative claim for

his fees and expenses "was never presented to the Court and never had a realistic

chance of approval."  Committee Objection ¶1.  The Committee further argues that the

Court authorized a payment of $100,000 for fees and expenses related to the Debtors'

proposed DIP financing with First Republic Bank and that it is "highly inappropriate" for

Toll to seek fees in addition to this amount particularly since the unsecured creditors

will receive only a minimal distribution on their claims.  Committee's Objection ¶2.

### The Statutory Basis for Toll's Claim

Toll seeks allowance of his claim pursuant to §503(b)(3)(D).  Claim ¶6.

However, the fees and expenses for which he seeks compensation are fees and

expenses for professional services rendered by his attorneys.  Therefore, his Claim

technically falls within the scope of §503(b)(4) which works in tandem with

§503(b)(3)(D).  These subsections provide, in pertinent part:

> (b) After notice and a hearing, there shall be allowed
> administrative expenses, other than claims allowed under
> section 502(f) of this title, including–
>
> (3) the actual, necessary expenses, other than
> compensation and reimbursement specified in paragraph (4)
> of this subsection, incurred by--
>
> * * *
> (D) a creditor, an indenture trustee, an equity

14

security holder, or a committee representing
creditors or equity security holders other than
a committee appointed under section 1102 of
this title, in making a substantial contribution in
a case under chapter 9 or 11 of this title;

* * *

(4) reasonable compensation for professional services
rendered by an attorney or an accountant of an entity whose
expense is allowable under subparagraph . . .(D) ... of
paragraph (3) of this subsection, based on the time, the
nature, the extent, and the value of such services, and the
cost of comparable services other than in a case under this
title, and reimbursement for actual, necessary expenses
incurred by such attorney or accountant[.]

11 U.S.C. § 503(b)(3)(D) & (b)(4).  As these statutory provisions reveal, a prerequisite

to the allowance of an administrative claim under §503(b)(4) is a finding of "substantial

contribution" by an entity coming within the scope of §503(b)(3)(D). See Lebron v.

Mechem Financial, Inc., 27 F.3d 937, 943  (3d Cir. 1994) (observing that §503(b)(4)

"authorizes awards of legal and accounting fees only in situations coming within the

scope of §503(b)(3)[.]"); see also In re ASARCO, LLC, 2010 WL 3812642, at *10

(Bankr. S.D. Tex. September 28, 2010)  (ruling that movants were not entitled to

recover legal fees or expenses under §503(b)(4) absent a finding that they made a

substantial contribution pursuant to §503(b)(3)(D)); In re Oxford Homes, Inc., 204 B.R.

264, 267 (Bankr. D. Me. 1997) ("A finding under §503(b)(3)(D) that Connell, as a

creditor, made a substantial contribution to [the debtor's] reorganization is a

prerequisite to administrative allowance of his counsel's fees under §503(b)(4).").

Consequently, the Court must find that Toll made a substantial contribution to the

Debtors' cases for him to be entitled to recover any amount on his Claim.

## Substantial Contribution Standard

According to the Third Circuit, the test for "'determining whether there has been

a 'substantial contribution' pursuant to §503(b)(3)(D)'" is "whether the efforts of the

applicant resulted in an actual and demonstrable benefit to the debtor's estate and the

creditors.'" Lebron, 27 F.3d at 944 (quoting In re Lister, 846 F.2d 55, 57 (10th Cir.

1988)).  In Aerosmith, Inc. v. Carco Electronics (In re Carco Electronics), 346 B.R. 377

(Bankr. W.D. Pa. 2006), the Court stated:

> For a contribution to qualify as "substantial", it must be more
> than an incidental contribution that arose from actions the
> applicant has taken in furtherance of its own interest. An
> applicant is presumed to have acted in furtherance of its
> own interest until it satisfies the court that its actions
> transcended self-interest. The term "substantial contribution"
> should be applied in a manner that excludes reimbursement
> for actions taken primarily to serve the applicant's interest
> and which it would have taken absent an expectation of
> reimbursement from the bankruptcy estate.

Id. at 387 (citations omitted).   See also Lebron, 27 F.3d at 934-44  (explaining that

"[t]he services engaged by creditors, creditor committees and other parties interested in

a reorganization are presumed to be incurred for the benefit of the engaging party and

are reimbursable if, but only if, the services 'directly and materially contributed' to the

reorganization." ).

Importantly, a bankruptcy court "has wide discretion to determine the amount of

16

expenses to be awarded under §503."[12]  In re Glickman, Berkowitz, Levinson & Weiner,

P.C., 196 B.R. 291, 294 (Bankr. E.D. Pa. 1996) (citing In re Lister, 846 F.2d 55, 56

(10th Cir.1988), citing In re Consolidated Bancshares, Inc., 785 F.2d 1249, 1252 (5th

Cir.1986)).   See also Smith v. Mirant Corporation (In re Mirant Corporation), 308 Fed.

Appx. 824, 828 (5th Cir. 2009) (observing that a bankruptcy court has "broad

discretion" in determining fee awards under §503(b)(4) and concluding that the

bankruptcy court did not abuse its discretion in reducing a fee award to a law firm

under §503(b)(4) from $645,146.64 to $15,000).   Moreover, the "inquiry concerning

the existence of a substantial contribution is one of fact, and it is the bankruptcy court

that is in the best position to perform the necessary fact finding task."  Lebron, 27 F.3d

at 946.

## Application of "Substantial Contribution" Standard

As noted above, Toll owned approximately 20 percent equity in and was

Chairman of PMH when he incurred the fees and expenses for which he is seeking

payment in his Claim.  Consequently, at the relevant time, Toll was an insider of PMH as

that term is defined in Code § 101(31)(b).  Because of his positions as an equity holder

and Chairman of PMH, Toll had a significant self-interest in promoting a reorganization

of the Debtors that was not encumbered by the condition which the Lenders sought to

impose on them in connection with a DIP loan (i.e., that any Chapter 11 plan which the

---

[12]  The "determination of whether or not to allow any administrative expenses
under § 503(b)(3)(D) is left to the bankruptcy court's discretion."  In re Glickman,
Berkowitz, Levinson & Weiner, P.C., 196 B.R. 291, 294 (Bankr. E.D. Pa. 1996) (citing In
re Lister, 846 F.2d 55, 56 (10th Cir.1988)).

17

Debtors proposed had to be approved in advance by the Lenders). Therefore, in seeking to provide the Debtors with a DIP loan other than that initially being offered by the Lenders, Toll was acting, to a large extent, to further his own self-interest and that of the other insiders. This conclusion is buttressed by the undisputed fact that, at the same time that he was negotiating the DIP loan, he was also negotiating with the Debtors to act as the Stalking Horse Bidder and negotiating the terms of the Asset Purchase Agreement.

As an insider, Toll also had much of the information at his fingertips or his disposal that he needed to negotiate and reach an agreement regarding the DIP loan. Because of this, he had no need to engage in the same type or degree of due diligence as Republic First Bank or Tannenbaum. Therefore, his fee and expenses with regard to the DIP loan should be significantly less than the fees and expenses incurred by Republic First Bank or Tannenbaum.

It is also evident that, to a large extent, Toll was acting in his own self-interest when he incurred the $65,947.34 in attorneys' fees and expenses in connection with the DIP loan. Indeed, the extent of his legal fees undercuts any argument to the contrary. He expended significant legal fees to have the terms of the DIP loan negotiated and documented in a manner that was favorable to him. He did so without imposing any requirement on the Debtors ahead of time, or requiring them to make any request to the Court, for the reimbursement of his professional fees. In this regard, his actions are in stark contrast to those of Republic First Bank, a non-insider, which

18

required the Debtors to seek Court approval of its fees as a condition precedent to

performing due diligence for a DIP loan.[13]  See Debtors' Motion for the Entry of an

Order Pursuant to 11 U.S.C. § 105 and 363(b) Authorizing Payment of Fees and

Expenses for Prospective Debtor-in-Possession Financing ¶4 ("By this Motion, the

Debtors seek Court approval to reimburse the Anticipated Lender's reasonable due

diligence fees and expenses – a condition required by the Anticipated Lender before it

will conduct such due diligence.").

Further, and of critical importance, is the fact that the likelihood that any DIP

loan involving Toll would be approved by this Court was nearly non-existent.  Firstly,

the standard for obtaining authorization for a postpetition loan with a superpriority

priming lien under the Third Circuit's decision in Resolution Trust Corporation v.

Swedeland Development Group, Inc. (In re Swedeland Development Group, Inc.), 16

F.3d 552 (3d Cir. 1994), is very difficult to satisfy. Nothing in the record before the

Court suggests that the Debtors or Toll were in any way capable of meeting the

Swedeland standard.  Secondly, the fact that Toll was an insider made it even less likely

---

[13]  This Court is fully cognizant that prior court approval is not required under nor
relevant to the "substantial contribution" standard applicable to §503(b).  See Bernstein
v. Bernstien, P.C. v. Bohm (In re DeCarbo), 152 B.R. 44 (W.D. Pa. 1993)(holding that
bankruptcy court erred by applying improper legal standard in ruling on fee application
submitted by attorneys for a creditor under 11 U.S.C. §503(b)(4) because it relied upon
Third Circuit case law requiring prior court approval for reimbursement of professionals'
fees).  However, the fact that Republic First Bank required the Debtors to seek court
approval for reimbursement of its fees as a condition precedent to conducting
comprehensive due diligence and negotiating a definitive DIP facility commitment
whereas Toll did not, is relevant to the issues of: (i) whether Toll was acting primarily to
serve his own interest; and (ii) whether he would have taken such actions absent an
expectation of reimbursement from the bankruptcy estate.

that a DIP loan funded by him could be approved.  Therefore, while Toll may have

provided some benefit to the Debtors' estates and their creditors by "getting the ball

rolling" to enable the Debtors to ultimately obtain a DIP loan that would be approved by

the Court, there was never a realistic chance that Toll's DIP loan would be the loan that

would carry the Debtors through their reorganization.  Even the Debtors recognized this

fact as shown by their decision to seek a DIP loan with a non-insider bank rather than

Toll.

    For these reasons, the Court concludes, in the exercise of its discretion, that Toll

conferred a substantial benefit on the Debtors' estates and their creditors in providing

an alternative, at the beginning of the Debtors' cases, to a DIP loan with the Debtors'

Lenders.  However, the value of that benefit does not equate to the $65,947.34 he

seeks.

### CONSIDERATION OF THE TIME, NATURE, EXTENT AND VALUE OF PROFESSIONAL SERVICES RENDERED BY THE KLEHR, HARRISON FIRM

    Exhibit "A" to Toll's Claim is an invoice from the Klehr, Harrison Firm to Bruce Toll

for legal services for "Debtor-in-Possession Financing."  See Exhibit "A" to Claim.  The

entries on the invoice date from February 5, 2009 through August 6, 2009.  There are

no entries between April 1, 2009 and July 12, 2009.  Since the Debtors had

undoubtedly commenced their discussions with Republic First Bank for a DIP Loan by

July 13, 2009, any services which the Klehr Harrison Firm may have provided to Toll

after that date are unlikely to have had any value to the estate.

20

Significantly, many of the entries on the invoice contained lumped tasks.  For example, a time entry for 02/09/09 for 1.75 hours states: "review Carpenters Union commitment/blacklined term sheet/emails from and to S. Baker, J. Schwartz, B. Tierny and B. Toll/telephone calls with J. Schwartz and B. Toll/conference call with PNI."[14] Moreover, many of the entries lack detail.  For example, an entry on 02/05/09 for 1.25 hours states: "telephone calls with D. Topkins, B. Tierney and B. Toll."  Another entry on the same date for 1.5 hours states: "meeting with B. Tierney, S. Baker and S. Baker." [15] These deficiencies render it difficult for the Court to evaluate "the time, the

─────────────────────

[14]   Other examples of entries containing lumped tasks include but are not limited to the following:

| Date | Description | Hours |
|------|-------------|-------|
| 02/05/09 | review debtor's restated term loans term sheet and management incentive proposals/confer with J. Kurtzman/confer with M. Rittinger/prepare mandate letter and summary of terms and conditions for proposed DIP financing | 1.25 |
| 02/06/09 | telephone calls and letter to S. Baker and B. Tierney/telephone calls with B. Toll re: DIP loan issues | 1.75 |
| 02/06/09 | telephone calls with Borrower and investor group/comment on term sheet | 2.90 |
| 02/09/09 | office conference with R. Roisman and J. Kurtzman/telephone calls with working group/revise and distribute proposed term sheet | 1.50 |

Exhibit "A" to Claim.  When multiple tasks are lumped into one entry, the Court cannot determine the time and, therefore, the value of the individual tasks contained in the entry.

[15]   Other examples of vague entries include the following:

| Date | Description | Hours |
|------|-------------|-------|
| 02/12/09 | confer with J. Kurtzman and M. Rittinger | 0.50 |
| | | (continued...) |

nature, the extent and the value" of the services of the Klehr, Harrison Firm.[16]  See In

re Burgoyne, Inc., 2002 WL 31685730, at *3 (Bankr. E.D. Pa. Nov. 4, 2002) (observing

that lumping of activities in time entries has "long been disapproved" and that such

lumping makes it problematic for the court in ruling on request for an allowed

administrative expense for professional fees under § 503(b)(3) and §503(b)(4)) to

determine "whether a finding of substantial benefit is warranted.").

---

[15](...continued)

| | | |
|---|---|---|
| 02/13/09 | meeting with L. McMichael and K. Pappas | 1.25 |
| 02/16/09 | conference with J. Kurtzman, L. McMichael, et al. | 0.30 |
| 02/16/09 | telephone call with Al Ciardi | 0.25 |
| 02/16/09 | confer with J. Kurtzman and M. Rittinger | 0.75 |
| 02/19/09 | conference call with Inquirer/telephone call with B. Toll | 0.75 |
| 02/25/09 | follow up with open issues/review bankruptcy pleadings | 0.30 |
| 02/26/09 | telephone calls with J. Schwarts and B. Toll | 0.50 |
| 02/26/09 | review bankruptcy pleadings | 0.50 |
| 02/27/09 | confer with J. Kurtzman/telephone call to L. McMichael | 0.50 |
| 03/03/09 | conference call with Judge FitzSimon and counsel | 1.50 |
| 03/04/09 | emails from and to D. Abernathy/telephone call with C. Cummerford | 0.25 |
| 03/09/09 | attend meetings with bank group/telephone calls with B. Toll, B. Gross and J. Schwartz | 8.25 |

Exhibit "A" to the Claim.  The lack of detail in these entries makes it impossible for the Court to determine whether the tasks performed therein related to Toll's proposed DIP loan, whether the time billed for the task was reasonable or excessive, and whether the task conferred any benefit on the Debtors' estates and their creditors.

[16]  There is a time entry on the invoice for 02/16/09 for 13.30 hours for "office conference with J. Kurtzman and Dilworth Paxson re: terms of proposed DIP Facility/draft credit agreement."  The billable hourly rate for the attorney who performed these services is $375.00 per hour.  The Court considers the time recorded in this entry to be excessive.

In light of the deficiencies in the invoice which Toll has submitted with his Claim and bearing in mind the Court's determination as set forth above that the benefit which Toll conferred on the Debtors' estates and their creditors occurred but in an amount substantially less than the $65,947.34 for which Toll is seeking compensation, the Court concludes that Toll's Claim shall be allowed (albeit imprecisely) in the reduced amount of $24,000.  The Court concludes that this amount is "reasonable compensation" for the services which the Klehr, Harrison Firm rendered to Toll in connection with the DIP loan.

**SUMMARY**

Based on the Court's conclusion that Toll conferred a substantial benefit on the Debtors' estates and their creditors, but that Toll's request for an allowed administrative expense in the amount of $65,947.34 is excessive and unreasonable, the Court shall grant Toll's Claim in the reduced amount of $24,000.00.

By the Court:

_____
Stephen Raslavich
Chief U.S. Bankruptcy Judge

Dated: <u>October 21, 2010</u>