IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:                                              : CHAPTER 11
                                                    :
PHILADELPHIA NEWSPAPERS, LLC, *ET AL*               : CASE NO. 09-11204 SR
                                                    :
                              DEBTOR(S)             : JOINTLY ADMINISTERED

# OPINION

BY: STEPHEN RASLAVICH, CHIEF UNITED STATES BANKRUPTCY JUDGE.

*Introduction*

Before the Court is the Motion of Philadelphia Media Network, Inc., (PMN), Alfred Lubrano, Julie Shaw, William Bender, and Rita Giordano (collectively, the Reporters) to Enforce the Confirmed Plan and to Bar Certain Plaintiffs from Prosecuting State Court Actions. The Plaintiffs who are the subject of this Motion have commenced defamation lawsuits against either PMN or the newspapers it owns. Two of the Plaintiffs (Richard Glunk, M.D., and Michelle Brodie) oppose the Motion.[1] A hearing on the Motion was held on May 12, 2011. The Court took the matter under advisement. For the reasons which follow the Motion will be granted.

*Factual Background*

The Debtors owned and operated the print newspapers the *Philadelphia Inquirer* and *Philadelphia Daily News* as well as the online publication *philly.com*. The Debtors filed for Chapter 11 bankruptcy relief in February 2009. In October 2009 the papers printed an article which Dr. Glunk maintains defamed him. *See* Glunk's Opposition to

---

[1] The third claimant, Peter Quinn, did not appear or otherwise oppose the Motion. Counsel for Debtor informed the Court that Mr. Quinn withdrew his claim. *See* Transcript of Hearing, 5/12/11 (T-) 3.

Motion. He filed a writ of summons against the papers on October 1, 2010. Motion, Exhibit 1. On June 22, 2010, the papers printed an article which Ms. Brodie maintains defamed her. *Id.*, Exhibit 6. Ms. Brodie filed her complaint on December 13, 2010. *Id.*

The Debtors proposed a plan of reorganization which would sell substantially all of their assets at an auction.[2] On September 30, 2010, that plan was confirmed. PMN won the auction and purchased the Debtors' assets under an Asset Purchase Agreement. The effective date of the Debtors' plan was October 8, 2010; the closing of the Asset Purchase Agreement occurred on that same date. Important for present purposes are the release and injunction provisions in the plan and the exclusion of liabilities in the Asset Purchase Agreement. The plan and order of confirmation provide releases to the Debtors, to their employees, and to PMN. The plan and order likewise enjoin any actions against the purchaser or its reporters. Consistent with those plan provisions, the Asset Purchase Agreement specifically excludes the assumption of any liability of the Debtors for acts or omissions which occurred prior to the closing of the Asset Purchase Agreement.

*Jurisdiction*

Because a bankruptcy court is one of limited jurisdiction, the Court first determines its competence to hear the matter in question. As this Motion involves administration of the estate, adjudication of claims against the estate, as well as plan confirmation, it is within this Court's core jurisdiction. *See* 28 U.S.C. § 157(b)(2)(A), (B) and (L). It also arises post-confirmation and so the Court must likewise determine to what extent it retained jurisdiction under the plan to hear subsequently-arising issues.

---

[2] Its final iteration would be the Fifth Amended Joint Plan as of September 24, 2010.

In that regard, the confirmation order provides that:

> <u>Retention of Jurisdiction</u>.  Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of this Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction as provided in Article XI of the Plan over all matters arising out of, arising in or related to, the chapter 11 Cases and the Plan.

Order of Confirmation, ¶ 40, p. 40.  The plan provides:

> <u>Section 11.01.  Exclusive Jurisdiction of Bankruptcy Court</u>. Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain after the Effective Date exclusive jurisdiction of all matters arising out of, arising in or related to the Chapter 11 Cases to the fullest extent permitted by applicable law, including, without limitation, jurisdiction to:
> …
> (e) construe, take any action, issue such order, prior to and following the Confirmation Date..., as may be necessary for the enforcement, implementation, execution and consummation of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan
> …
> (m) hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or Asset Purchase Agreement.

Plan, Article XI, § 11.01(e), (m).  Based on the plan and order of confirmation, jurisdiction was vested in this Court in order to ensure that the plan would be consummated.

*Parties' Positions*

PMN maintains that both the Glunk and Brodie lawsuits were released and discharged pursuant to the express terms of the plan. The only claims not released were those which were pending as of June 25, 2010 and which were covered by the

Debtors' insurance policy for defamation claims. Motion, ¶ 28. A list of such claims was attached as Exhibit A to the plan. *Id.* Neither Ms. Brodie's nor Dr. Glunk's claims were on that list. *Id*. Thus, PMN concludes, the claims of these plaintiff were released by the Plan. Moreover, while it purchased substantially all of the Debtors' assets, PMN did not assume therewith liabilities such as the defamation claims which these two Plaintiffs raise. *Id*., ¶¶ 36-37. The sum and substance of PMN's position is that these plaintiffs are without recourse as to the Debtor, the Reporters, or PMN.

Glunk and Brodie make two arguments in response: first, that such claims were not discharged by the plan because the release excepts claims involving willful and malicious conduct; and second, that PMN is liable for such claims because they arose after the effective date of the plan.

*Notice of the Bankruptcy*

Although neither Glunk nor Brodie raised the issue, PMN addresses a threshold question: it maintains that both plaintiffs received sufficient notice of the bankruptcy case and deadlines relevant to their claims in order to act to protect their interests. T-4-7. Because both claims arose post-petition, PMN explains, neither plaintiff would have received actual notice. This is because neither would have been listed on the Debtors' schedules. Yet while neither may have received actual notice of the bankruptcy, relevant deadlines were published in the Philadelphia newspapers as well as the *Wall Street Journal*. T-6. For such "unknown" creditors, notice by publication has been deemed consistent with due process:

> For notice purposes, bankruptcy law divides claimants into
> two types, 'known' and 'unknown. *Chemetron,* 72 F.3d at

> 346 (citing *Charter Crude Oil Co. v. Petroleos Mexicanos* ( *In re Charter Co.*), 125 B.R. 650, 654 (Bankr.M.D.Fla.1991)). Known creditors are entitled to actual written notice, while due process for unknown claimants is generally satisfied through notification by publication. *Id.* A known creditor is "one whose identity is either known or 'reasonably ascertainable by the debtor.' " *Id.* (quoting *Tulsa Prof'l Collection Serv., Inc. v. Pope,* 485 U.S. 478, 490, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988)). An unknown creditor is an individual "whose interests are either conjectural or future, or although they could be discovered upon investigation, do not in due course of business come to knowledge [of the debtor]." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 317, 70 S.Ct. 652, 94 L.Ed. 865 (1950).
>
> "A creditor's identity is 'reasonably ascertainable' if that creditor can be identified through 'reasonably diligent efforts.' " *Id.* (quoting *Mennonite Bd. of Missions v. Adams,* 462 U.S. 791, 798 n. 4, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983)). Reasonable diligence does not require a debtor to conduct " 'impracticable and extended searches ... in the name of due process.' " *Id.* (quoting *Mullane,* 339 U.S. at 317). To that end, "[a] debtor does not have a 'duty to search out each conceivable or possible creditor and urge that person or entity to make a claim against it.' " *Id.* (quoting *Charter,* 125 B.R. at 654). Efforts beyond a careful examination of a debtor's own books and records are generally not required. *Id.* at 347.
>
> For unknown claimants or creditors, it is well established that "constructive notice of the bar claims [*sic*] date by publication satisfies the requirements of due process." *Id.* at 348 (holding that notice published in the *New York Times* and the *Wall Street Journal* was sufficient to satisfy due process owed to unknown creditors); *see Brown v. Seaman Furniture Co.,* 171 B.R. 26, 27 (Bankr.E.D.Pa.1994) (notice by publication satisfies due process with respect to potential creditors when the notice appears in national publications and in newspapers of general circulation in areas where the debtor did business)

*Wright v. Owens Corning*, 2011 WL 1085673, at *12 (W.D.Pa., March 21, 2011)

Because of when both the Glunk and Brodie lawsuits were filed (October 1, 2010

and December 13, 2010), neither could have received actual notice of the bankruptcy. However, as PMN pointed out at the hearing, the docket reflects that the Debtors provided notice by publication of various dates related to administrative claims and confirmation of this plan. *See* docket #2357 (notice of administrative claims bar date), #2590 (notice of confirmation hearing), and #2700 (effective date). Such notice was given in both local and national newspapers. Both Glunk and Brodie, then, had at least constructive notice of the bankruptcy case. They could and should have acted sooner to protect their interests. Their failure to have done so cannot be attributed to a lack of due process.

*Releases of Claims*
*Under the Plan*

The Plan provides that certain persons would be granted releases. The Plan defines "releasees" as

> each of ...(e) the Purchaser... (h) the Debtors, and (i) with respect to each of the foregoing entities... such entities' ... employees, agents, ... representative... solely in their respective capacities as representatives of any of the foregoing."

Plan, Article I, § 101, p.14. The term "releasee" is broadly defined to include the Debtors, the Purchaser as well as their employees. This would include, then, the Reporters who are the subject of these two claims.

Those qualifying as "releasees" would be absolved of liability as follows:

> <u>Releases by Holders of Claims and Interests</u>. Effective as of the Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, in consideration for the obligations of the Debtors under the Plan and the Asset Purchase Agreement and the payments, contracts, instruments, releases, agreements or documents to be

> entered into or delivered in connection with the Plan and the Asset Purchase Agreement, each Person (excluding any of the Debtors) that has held, currently holds or may hold a Claim or Interest, and any Affiliate of any such Person (as well as any trustee or agent on behalf of each such Person), shall be deemed to have forever waived, released and discharged the Releasees from any and all Claims, obligations, suits, judgments, damages, rights, Causes of Action and liabilities whatsoever, * * * whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the Plan, the Disclosure Statement or the Asset Purchase Agreement *other than Claims or liabilities arising out of or relating to any act or omission that constitutes a failure to perform the duty to act in good faith and where such failure to perform constitutes willful misconduct, gross negligence or fraud*; * * * provided further, however, that this section 10.02(b) shall not release any natural person Releasee under subsection (i) of the defined term Releasees from any Claim or Cause of Action asserted against such natural person only if such Claim or Cause of Action was pending as of June 25, 2010 and is covered by insurance, to the extent of such insurance coverage. The Plaintiffs listed on Exhibit A to the Plan are not bound by the releases provided for in Section 10.02(b) of the Plan.

Plan, Article X, § 10.02(b) (emphasis added). Concomitant with the release is an injunction as to the pursuit of claims against the Debtor as well as its successors and assigns, i.e., PMN:

> <u>Injunction</u>. No holder of a Claim against any Debtor may, on account of such Claim, seek or receive any payment or other distribution from, or seek recourse against, any of the Debtors or the Debtors' respective successors or their respective property, except that from and after the Confirmation date, all Person who have held, hold, or may hold Claims against or Interests in the Debtors are permanently enjoined from taking any of the following actions against the Purchaser … , or any of their property on account of such Claims or Interest: (A) commencing or continuing, in any manner or in any place, any action or

> other proceeding; (B) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (C) creating, perfecting, or enforcing any Lien or encumbrance; and (D) commencing or continuing in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; *provided, however, that nothing contained herein shall preclude such Persons from exercising their rights pursuant to and consistent with the terms of the Plan.*

Order of Confirmation, ¶ 31, p.34; *see also id*. ¶ 32, p.35-36 (providing for release of such claim pursuant to § 10.02 of the plan)

The release, while broad, is not absolute. Excluded are claims resulting from failures to act in good faith and where such failure constitutes willful misconduct, gross negligence or fraud. Neither does the release extend to claims covered by the Debtors' insurance, which were pending as of June 25, 2010 and which were on the list of claims attached as Exhibit A to the plan.[3]

Both Ms. Brodie and Dr. Glunk assert that their claims are not released because each are the result of willful misconduct on the part of the Debtors' reporters. T-11; *see* Brodie's Brief, 2; Glunk's Reply, 3. PMN points out, however, that under the plan invoking the exclusion implicates a two-part conjunctive test; willful misconduct alone is not enough to exclude a claim from the plan's release provision. To qualify for exclusion, the claim must both arise from a failure to perform a duty to act in good faith *and* constitute willful misconduct, gross negligence or fraud. See PMN's Reply, 3-4. Context, as well as conduct, then, matters here.

Pennsylvania courts recognize an independent cause of action of action for

---

[3] Neither Glunk nor Brodie argue that their claim should have been included among those on Exhibit A to the plan. Indeed, neither claim was pending on June 25, 2010.

breach of a good-faith duty, but only when it arises under the law of contracts, and not under the law of torts. *See Hughes v. George P. Brown Investment Advisors, Inc*. 2010 WL 5071413 at *7 (E.D.Pa. Nov. 24, 2010) *quoting Chrysler Credit Corp. v. B.J.M. Jr., Inc.*, 834 F.Supp.813, 841-842 (E.D.Pa. 1993); *see also Williams v. Katawicz*, 53 Pa. D. & C. 4th 558, 564 (Pa.Com.Pl. Oct. 2, 2001) ("The duty of good faith arises under the law of contracts). The duty exists as between insurers and their insureds. *See Ash v. Continental Ins. Co.*, 593 Pa. 523, 532, 932 A.2d 877, 883 (Pa. 2007) ("where an insurer acts in bad faith, by unreasonably refusing to settle a claim, it breaches its *contractual* duty to act in good faith and its fiduciary duty to its insured") *quoting Birth Center v. St. Paul Companies*, 567 Pa. 386, 389, 787 A.2d 376 (2001). The duty arises inherently between partners. *See, e.g., Alpart v. General Land Partners, Inc.*, 574 F.Supp.2d 491, 500 (E.D.Pa. 2008)(noting how the "fundamental characteristics of trust, fairness, honesty and good faith define the essence of the partners' relationship") The duty also arises in the context of a fiduciary relationship. *See, e.g., Winer Family Trust v. Queen*, 503 F.3d 319, 338 (3d Cir. 2007) (recognizing that corporate directors owe duty of good faith to the business). It has also been held to exist among joint venturers. *See, e.g., Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc*., 247 F.3d 79, 101 (3d Cir. 2001)   But where, as here, there is an absence of privity as between the papers and their reporters on the one hand and the subject of the reporting on the other, the Court does not discern a fiduciary relationship and the heightened duty which attends it.

  On this basis alone, then, (i.e., a non-fiduciary tort claim) the Glunk and Brodie

claims would *not* be excluded from the plan's release provision.

But even aside from the question of context, neither claim arguably demonstrates *willful misconduct*. Defined as "conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow," *E.N. v. Susquehanna Tp. School Dist.*, 2010 WL 4853700, at *19 M.D.Pa. Nov. 23, 2010), willful misconduct is a demanding level of fault. *Id.* In the case of Ms. Brodie, the articles nowhere allege, contrary to her Reply,[4] that she "starves her children." The reporting is based on interviews of her child. The articles quote her child who stated therein that he is often hungry.[5] The statements are reported to have been made while the child was receiving meals from the Philadelphia Housing Authority. Ms. Brodie maintains that such statements are false and misleading as to her fitness as a parent. *Id.*, Complaint, ¶¶ 32, 34, 36, 38, 43, and 45. Had the reporter contacted her first, she explains, it would have been discovered that the child's statements were without basis in fact. *Id.*, ¶ 25.

The Court, however, does not adopt without reserve the same conclusions from that supposition. A phone call might have revealed that the child's statements were untrue, perhaps not, but inaccuracies are not necessarily falsehoods nor intentional misrepresentations, for present purposes. Arguably, the most that the reporters might be guilty of here is negligence for failing to contact Ms. Brodie before publishing the story. There is nothing to suggest that the reporter intended to portray Ms. Brodie as a

---

[4] Brodie Reply in Opposition to Motion, 1.

[5] Alleged in the Complaint which is attached as Exhibit 6 to PMN's Motion. The articles are attached as Exhibits A, B and C to that Complaint.

10

neglectful parent or knew that she would be considered as such because of that article .

Not even that much can be said as to Dr. Glunk's claim.  The allegations of bribery in the offending articles are based on a complaint filed by the Commonwealth's Bureau of Professional and Occupational Affairs.  *See* PMN's Reply, Exhibits 2 and 3.  The complaint, the article explains, was based on the result of a state investigation.[6]  It is hard to see where the article, then, could be based on a falsehood.  Even the person identified in the article as Dr. Glunk's attorney characterizes the charges as no more than "not well-founded" and "inaccurate." *Id*.  Nowhere can intent to smear Dr. Glunk be easily inferred on the part of the reporters.

In any event, because neither claim implicated both the breach of a contractual duty of good faith *and* willful misconduct, as the latter phrase has been construed by Pennsylvania state courts, both are subject to the release and injunction provisions of the plan and order of confirmation.

*PMN's Liability After*
*the Effective Date*

Notwithstanding, Ms. Bender and Dr. Glunk argue that because their defamation claims arose after the effective date, PMN is liable to them for defamation.  See Brodie's Reply Brief; T-10 through T-13.  They explain that although the original defamatory article first appeared *prior* to the effective date, *subsequent publications* after the effective date constitute separate causes of action against PMN.  *Id.*  In response, PMN asserts that the plaintiffs' argument is contrary to established

---

[6]It should be noted that the article is based on a complaint, and not an official government report.  Thus, the Court would not agree with PMN that the privilege afforded government reports would apply here.  *See* PMN's Brief, n.4. citing *Sciandra v. Lynett*, 187 A.2d 586, 599-600 (Pa.1963)(adopting "fair report" privilege)

11

Pennsylvania law.  PMN's Reply Brief, 6.

Before reaching that question, however, the Court reviews the purchase agreement to establish the temporal limits of PMN's liability.  The APA specifically excluded certain liabilities from those which PMN agreed to assume:

> <u>Excluded Liabilities</u>: Under no circumstances shall Purchaser assume or be obligated to pay, and none of the Assets shall be or become liable for or subject to, any of the Excluded Liabilities, including, but not limited to, the following Liabilities, which shall be and remain Liabilities of the Sellers:
> …
> (d) Liabilities arising out of or in connection with claims, litigation and proceedings (whether instituted prior to or after Closing) for acts or omissions that occurred, or arise from events that occurred, *prior to the Closing date*…

APA § 2.4(d), 12 (emphasis added).  The APA goes on to provide:

> <u>Excluded Assets and Liabilities</u>.  Notwithstanding anything to the contrary contained herein, Purchaser shall not purchase any of the Excluded Assets nor assume any liability for any of the Excluded Liabilities.

APA § 2.9, 15. The Effective Date of the Plan was October 8, 2010.  The sale closed that month.  Both the Glunk and Brodie claims arose well prior to that date.  The articles which Glunk claims defamed him were published in October 2009.  In the case of Brodie, the allegedly defamatory material appeared on June 22, 2010.  As both arose prior to the Closing date, PMN did not assume liability for them.

Brodie's and Glunk's rejoinder is that the defamation claims arose *again* after the effective date when PMN assumed ownership of the papers, because the offending articles remained on the website *philly.com* which was now in control of PMN.  Brodie's Reply Brief; T-10 through T-13.  Brodie and Glunk consider that to constitute a

*re*publication of defamatory material.  *Id.*  That, they say, constitutes a new cause of action arising on PMN's watch.  *Id.*  PMN raises the single publication rule to argue that no subsequent cause of action arises from republication of allegedly defamatory content.  PMN's Brief, 6.

*Single Publication, Online*
*Material, Limitations*

With regard to defamation claims, Pennsylvania[7] has adopted the Uniform Single Publication Act by statute:

> (b) General rule.--No person shall have more than one cause of action for damages for libel or slander, or invasion of privacy, or any other tort founded upon any single publication, or exhibition, or utterance, such as any one edition of a newspaper, or book, or magazine, or any one presentation to an audience, or any one broadcast over radio or television, or any one exhibition of a motion picture. Recovery in any action shall include all damages for any such tort suffered by the plaintiff in all jurisdictions.

42 P.S. § 8341(b).  The purpose of Pennsylvania's single publication rule is to protect publishers from multitude of lawsuits based on one tortious act.  *Bailey v. Dell Pub. Co., Inc.*, 790 F.Supp. 101, 104 (W.D.Pa.1992), *aff'd* 983 F.2d 1049.  As the District Court has explained:

> Under the single publication rule, "any one edition of a book or newspaper, or any one radio, television broadcast, exhibition of a motion picture or similar aggregate communication is a single publication." *Graham v. Today's Spirit,* 503 Pa. 52, 468 A.2d 454, 457 (Pa.1983) (quoting *Restatement (Second) of Torts* § 577A(3)).  As the Supreme Court of Pennsylvania has explained, this rule was designed to "alleviate [the] problem of multiplicity of causes of actions" engendered by the common law rule (also known as the

---

[7]Along with Arizona, California, Idaho, Illinois, New Mexico and North Dakota.

>   multiple publication rule) that a single publication of material such as a newspaper or magazine results in a separate cause of action each time a reader views the defamatory article. *Id.* The common law rule rendered the statute of limitations "meaningless in that an action could be filed any time a defamatory article was read, no matter the time lag between the actual printing of the article and the reading of the article by a third party." *Id.* In contrast, under the single publication rule, "it is the original printing of the defamatory material and not the circulation of it which results in a cause of action." *Id.*

*Pendergrass v. ChoicePoint, Inc.*, 2008 WL 5188782, at *3 (E.D.Pa.,Dec. 10, 2008)

This rationale has been extended to online sources.  See *Firth v. State*, 775 N.E.2d 463, 466, 98 N.Y. 2d 365, 370 (N.Y.2002) (holding that republication of defamatory material does not occur by maintaining that information on website or from later viewing of same material online); *Nationwide Bi-Weekly Admin., Inc. v. Belo Corp.*, 512 F.3d 137, 144-145 (5th Cir. 2007) (holding that continued availability of article on website does not constitute republication despite website's ability to remove it); *Oja v. U.S. Army Corp of Eng'rs*, 440 F.3d 1122, 1133 (9th Cir. 2006) (noting that single publication rule has been extended to internet publications); *McCandless v. Cox Enterprises, Inc.*, 593 S.E.2d 856, 858, 265 Ga.App. 377, 378 (Ga.App.2004) (rejecting argument equating website hit to a separate publication).

   The articles which Dr. Glunk maintains are defamatory were published on October 3 and 4, 2009.  The article which Ms. Brodie maintains cast her in a negative light appeared on June 22, 2010.  While the articles may remain extant and available online, neither was republished *after* PMN become the owner of the papers.  Neither did PMN assume liability for defamation claims such as these.  For that reason, the plaintiffs may not look to PMN for any recovery.

*Summary*

The claims of Michelle Brodie and Richard Glunk, M.D. were released pursuant to the terms of the Debtors' Plan of Reorganization. Likewise, those same claims were not assumed by PMN when it purchased the Debtors' assets. Accordingly, PMN's Motion will be granted.

An appropriate Order follows.

By the Court:

Stephen Raslavich
Chief U.S. Bankruptcy Judge

Dated: June 15, 2011